## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

|  |  |
|---|---|
| **JOHN DOE,** | |
| **Plaintiff,** | **Civil Action No. 1:20-CV-2006** |
| **v.** | |
| **THE TRUSTEES OF INDIANA UNIVERSITY, INDIANA UNIVERSITY SCHOOL OF MEDICINE, INDIANA UNIVERSITY PURDUE UNIVERSITY – INDIANAPOLIS, INDIANA UNIVERSITY KELLEY SCHOOL OF BUSINESS, GREGORY KUESTER, in his official and individual capacity, BRADLEY ALLEN, in his official and individual capacity, and JAY HESS, in his official and individual capacity,** | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe" or "Doe"), by his attorneys Nesenoff & Miltenberg, LLP and Delk NcNally LLP, as and for his Complaint against Defendants the Trustees of Indiana University, Indiana University, Indiana University School of Medicine, Indiana University Purdue University – Indianapolis, Indiana University Kelley School of Business, Gregory Kuester, Bradley Allen, and Jay Hess (collectively, "Defendants"), respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.      This case arises from an egregious miscarriage of justice committed against Plaintiff Doe by Defendants the Trustees of Indiana University (the "Trustees") at Indiana

---

[1] Plaintiff herewith files a Motion to Proceed Pseudonymously and is prepared to confidentially disclose his identity to the Court.

University ("IU"), Indiana University Purdue University – Indianapolis ("IUPUI"), Indiana University School of Medicine ("IUSM"), and the Indiana University Kelley School of Business ("IUKSB") (collectively hereinafter referred to as the "University") which ultimately resulted in Plaintiff's dismissal from IUSM on June 16, 2020. The expulsion was the eventual result after the University conducted a flawed and biased Title IX sexual misconduct process which deprived Doe of fundamental fairness, evidenced a gender bias against Doe as the male accused, demonstrated a willful ignorance of major inconsistencies in the complainant, "Jane Roe's,"[2] erroneous and false allegations against Plaintiff, deviated from the University's own stated policies and procedures, and imposed an arbitrary and capricious finding and sanction.

2.     Without sufficient supporting evidence, and as a result of Defendants' discriminatory and unlawful conduct, the University initially suspended Plaintiff Doe, a rising third-year medical student, for a period of one school year, resulting in a permanent notation on his academic record, a delayed curriculum, a delayed graduation date, and the consequent loss of anticipated career opportunities and prospective earnings. At the time, Plaintiff Doe had an unblemished disciplinary and academic record.

3.     Subsequently, IUSM then recommended Plaintiff Doe for expulsion from the medical school after subjecting Plaintiff to additional scrutiny in a separate disciplinary process, which included a "hearing" that was in actuality a mere sanctioning meeting, before the Student Promotions Committee ("SPC"). Doe requested reconsideration and filed an appeal, but the recommendation for dismissal remained. Dean Jay Hess ("Dean Hess"), in Plaintiff Doe's final exit interview, then reversed course and notified Plaintiff Doe that he would be permitted to return

---

[2] Plaintiff refers to Jane Roe pseudonymously and is prepared to confidentially disclose her identity to the Court.

to IUSM in the Spring of 2021, after taking an administrative leave of one year, during which time Plaintiff Doe would attend IU's Kelley School of Business to complete the MBA program.

4.      Despite assurances and expressions of utter confidence from Dean Hess, and after an additional unwarranted two-part review of his application by the Prior Misconduct Review Committee, Plaintiff Doe shockingly did not gain admission to the MBA program.

5.      Plaintiff appealed this decision immediately and sought assurances that he would be able to return to IUSM as planned in the Spring of 2021. However, on June 16, 2020, the University astonishingly once again expelled Plaintiff Doe.

6.      As a result of Defendants' imposition of the unwarranted and erroneous suspension and expulsion (the "Sanctions") against Plaintiff Doe, his lifelong aspiration of pursuing a career in medicine has been destroyed. He has also sustained economic injuries, the loss of additional educational and career opportunities, and severe psychological and emotional distress.

7.      When the University subjected Plaintiff to disciplinary action, they did so in an arbitrary and capricious way that deprived him of due process and discriminated against him because of his gender.

8.      Plaintiff Doe therefore brings this action to obtain relief based on claims for violations of u, and other state law causes of action to be included upon amendment of this Complaint[3].

**THE PARTIES**

---

[3] Plaintiff intends to amend the Complaint to include tort claims after the mandatory waiting period, pursuant to the Indiana Tort Claims Act. Ind. Code Ann. § 34-13-3-1.

9.      Plaintiff Doe is a natural person, citizen of the United States, and resident of the State of Florida. Doe matriculated into Indiana University School of Medicine's MD program in 2017 with an anticipated graduation date of 2021.

10.      Defendant Trustees of Indiana University is the legal name of the public educational institution under the laws of the State of Indiana. Upon information and belief, the Trustees of Indiana University govern several colleges under its parent umbrella of Indiana University, including IUSM, IUPUI, and IUKSB.

11.      Defendant Indiana University is a public research university that spans nine campuses, including Indianapolis, Indiana, with its main campus in Bloomington, Indiana.

12.      Defendant IUSM is the medical school of Indiana University. Its principal research and medical center are located on the Indiana University – Purdue University Indianapolis campus in Indianapolis, Indiana.

13.      Defendant Indiana University Purdue University – Indianapolis is a public research university in Indianapolis, Indiana, that is a result of the merger of Purdue University and Indiana University's Indianapolis locations.

14.      Defendant Indiana University Kelley School of Business is the business school of Indiana University, which offers an MBA program.

15.      Upon information and belief, Defendant Gregory Kuester is a citizen of the State of Indiana. During the relevant timeframe, he was an Investigator for Student Conduct at the University.

16.      Upon information and belief, Defendant Bradley Allen, Senior Associate Dean for Medical Student Education, is an employee of the University, at IUSM, and a citizen of the State

of Indiana. During the relevant timeframe, he served as the *ex officio* chairperson of one of the hearing processes that IUSM subjected Plaintiff Doe to.

17.     Upon information and belief, Defendant Jay Hess, Executive Vice President for University Clinical Affairs and Dean of IUSM, is an employee of the University, at IUSM, and a citizen of the State of Indiana. During the relevant timeframe, he first permitted Plaintiff Doe's return to IUSM, then subsequently expelled Plaintiff Doe.

## JURISDICTION AND VENUE

18.     This Court has federal question, diversity and supplemental jurisdiction, pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statues of the United States; (ii) Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000; and (iii) the state law claims[4] are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

19.     This Court has personal jurisdiction over Defendant Trustees of Indiana University on the ground that it is conducting business within the State of Indiana.

20.     This Court has personal jurisdiction over Defendant Indiana University on the grounds that it is conducting business within the State of Indiana.

21.     This Court has personal jurisdiction over Defendant Indiana University School of Medicine on the grounds that it is conducting business within the State of Indiana.

22.     This Court has personal jurisdiction over Defendant Indiana University Purdue University – Indianapolis on the grounds that it is conducting business within the State of Indiana.

---

[4] Plaintiff intends to amend the Complaint to include tort claims after the mandatory waiting period, pursuant to the Indiana Tort Claims Act. Ind. Code Ann. § 34-13-3-1.

23. This Court has personal jurisdiction over Defendant Indiana University Kelley School of Business on the grounds that it is conducting business within the State of Indiana.

24. This Court has personal jurisdiction over Defendant Kuester on the grounds that he was an employee at the University at all times relevant herein and personally acted within the State of Indiana and Southern District.

25. This Court has personal jurisdiction over Defendant Allen on the ground that he was an employee at the University, specifically IUSM, at all relevant times herein and personally acted within the State of Indiana and Southern District.

26. This Court has personal jurisdiction over Defendant Hess on the ground that he was an employee at the University, specifically IUSM, at all relevant times herein and personally acted within the State of Indiana and Southern District.

27. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the University and Defendants are considered to reside in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.    The University Faces Federal Pressure to Comply with Title IX

28. On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education issued a guidance document on sexual violence in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (hereinafter "DCL" or "2011 Dear Colleague Letter"), interpreting Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and its regulations, 34 C.F.R. Part 106 (2018). U.S. Department of Education, *Dear    Colleague*    (Apr.    4,    2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. Title IX's regulations

6

require colleges and universities to have prompt and equitable grievance procedures to resolve complaints of sex discrimination, including sexual harassment.

29.      While directing schools "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects," *Dear Colleague Letter*, *supra,* at 4, the DCL de-emphasized fair process by, among other things, being silent on a presumption of innocence, directing schools to "minimize the burden on the complainant," *id.* at 15–16, limiting cross-examination, *id.* at 12, requiring use of the "preponderance of the evidence" standard rather than the higher "clear and convincing evidence" standard, which some colleges were using, *id.* at 11, and prohibiting certain forms of alternative dispute resolution, *id*. at 8.

30.      The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

31.      The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a problem of social importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice,* NATIONAL PUBLIC RADIO (NPR): SPECIAL SERIES SEEKING JUSTICE FOR CAMPUS RAPES (Feb. 24, 2010), https://www.npr.org/templates/story/story.php?storyId=124001493?storyId=124001493.      The report described in detail the obstacles faced by sexual assault victims in obtaining redress through college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g. that women invite rape,

that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sex aggressor role.

32.     The DCL further relied on faulty statistics in sounding a "call to action" for campuses nationwide – that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault."  Relying on these faulty numbers, the DCL minimized due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternative dispute resolution.

33.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31.

34.     From 2014 to 2016, four separate reports were filed with the Department of Education's Office for Civil Rights, alleging the University violated Title IX in their handling of sexual assault reports.

35.     The reports were closed by voluntary resolution in February 2018 after OCR reviewed more than 450 case files, interviewed University administrators, and conducted focus groups with students from across campus.

36.     In February 2016, former Associate Dean of Students and Deputy Title IX Director Jason Casares resigned from the University after being accused himself of sexual assault. This allegation prompted the University's review of approximately seventeen (17) sexual misconduct cases heard the prior academic year.

37.     On September 22, 2017, the OCR withdrew the April 2011 Dear Colleague Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 29, 2014 on the ground that the April 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations that "lack the most basic elements of fairness and due process [and] are overwhelmingly stacked against the accused." *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

38.     The OCR put in place an interim guidance, U.S. Department of Education, *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf [hereinafter 2017 Q&A], while the agency conducted a rulemaking process that would eventually lead to binding Title IX rules.

39.     The 2017 Q&A, which was in effect during the events at issue in this Complaint, required that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

40.     In June 2018, mere months before Roe filed her complaint against Doe, IU undergraduate student Ellie Johnson began a social media campaign in which she publicly accused IU of violating its own policies when it found a student who had raped her not responsible for any

violations. Her posts to Twitter about the case sparked the creation of the "#westandwithellie" hashtag, which gained national media attention.

41.     In response, the University reaffirmed its commitment to victims of sexual assault.

42.     On August 29, 2018, it was announced that the U.S. Department of Education would be proposing new rules that, in part, serve to better protect individuals accused of sexual misconduct. https://www.nytimes.com/2018/08/29/us/politics/devos-campus-sexual-assault.html.

43.     On May 6, 2020, the Department of Education released its final regulations on Title IX, which are set to take effect on August 14, 2020. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106). The regulations make clear, *inter alia*, that schools can be found to discriminate on the basis of sex by treating either the complainant or the respondent unfairly; that parties must be provided a live hearing with cross-examination and access to the complainant, the evidence from the investigation, and a written decision carefully addressing the evidence; that respondents must be presumed not responsible; that all relevant evidence must be evaluated objectively; that investigators and decisionmakers must receive non-biased training, may not rely on sex stereotypes, and must be impartial; that any alleged conduct that would be the subject of an investigation is to occur within a school's "education program or activity" which includes "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution"; and the school must explain delays of the process in writing.

## II.   **Plaintiff Doe's History and Unblemished Academic Record**

44.     Plaintiff Doe grew up primarily in Long Island, New York, surrounded by family in a supportive and loving environment, and recognized from an early age his strong and ardent desire to become a medical doctor.

45.     Through the entirety of Plaintiff's life, he actively participated in his community, volunteering and participating in sports through high school.

46.     Plaintiff Doe matriculated to a state university[5] and remained an active and vibrant member of his college community, where he focused his efforts on helping others and preparing himself for future medical school attendance, and his subsequent anticipated career as a doctor. He graduated magna cum laude as a double major in Psychology and Biology, and received several awards for his outstanding achievements.

47.     Upon graduation, Plaintiff Doe volunteered as a Telephone Counselor at a suicide awareness and prevention hotline, working weekly for two years, as he applied to receive an additional advanced degree. He also worked as a clinical research coordinator at a university hospital. Additionally, he began a tutoring company which thrived and rapidly grew.

48.     In 2015, Plaintiff Doe received a Master of Science Degree in Molecular and Integrative Physiology.

49.     In or around January 2017, Doe gained acceptance to Indiana University's prestigious medical school, which accepts less than 8.5% of applicants, bringing him one step closer to his dream of becoming a doctor. *See What are the hardest medical schools to get into?* U.S. NEWS,  https://www.usnews.com/best-graduate-schools/top-medical-schools/hardest-to-get-into-rankings.

---

[5] Plaintiff does not refer to his undergraduate university by name in order to protect his identity.

50.     Doe began the MD program at IUSM in Fall 2017, with the aspiration of becoming an anesthesiologist. He desired to focus on the management of chronic pain using non-opioid medications to underserved areas, and to become involved in health care policy and planning on a larger scale.

51.     Plaintiff quickly became an active member of the IUSM community. Plaintiff Doe served on a class committee and a student interest group/club.[6]

52.     Prior to the events described herein, Plaintiff Doe had an unblemished academic and personal record.

**III.     University Policies and Contract with the Plaintiff**

53.     The 2018 – 2019 Student Sexual Misconduct Policy (the "Policy"), Code of Student Rights, Responsibilities, & Conduct (the "Code") and the Guidelines for Promotion, Suspension, Dismissal and Withdrawal (the "Guidelines") were in effect at the time of the investigation against Plaintiff Doe.

54.     The University used the Policy and Code during the Title IX investigatory process.

55.     During the SPC process, IUSM utilized the Guidelines.

56.     IUSM can conduct a Student Promotions Committee proceeding – a second proceeding – for a variety of reasons, including when there is a finding of responsibility from the Title IX process, to determine fitness for the medical profession. The SPC merely accepts the findings of the Title IX process without coming to their own independent conclusion regarding the alleged conduct and evidence set forth.

---

[6] Plaintiff Doe is prepared to provide a full list of his activities and involvements confidentially to the Court.

A. *Definitions Used in The Sexual Misconduct Policy and Code of Student Rights, Responsibilities, & Conduct*

57.     The Policy highlights that the University "prohibits discrimination on the basis of sex or gender in its educational programs and activities."

58.     Dating violence is defined as "violence or the threat of violence committed by any person who is or has been in a relationship of romantic or intimate nature. The existence of such a relationship will be determined based on a consideration of the length of the relationship, the type of relationship, and the frequency of interactions between the persons involved in the relationship."

59.     Sexual harassment is defined as "unwelcome conduct or behavior of a sexual nature."

60.     Sex/gender-based discrimination is defined as "verbal, nonverbal, graphic, or physical aggression, intimidation, or hostile conduct based on sex, sex-stereotyping, sexual orientation, or gender identity" not necessarily involving conduct of a sexual nature "when such conduct is sufficiently severe, persistent, or pervasive that it interferes with or limits an individual's ability to participate in or benefit from the university's education or work programs or activities."

61.     Pursuant to the Code, "[t]he [U]niversity may discipline a student for the following **acts of personal misconduct**" including:

    i)   "Physical abuse of any person, including…physical abuse that constitutes dating or domestic violence as defined in the Sexual Misconduct Policy[;]" and

    ii)   "Verbal abuse that constitutes dating or domestic violence as defined in the Sexual Misconduct Policy[.]"

13

62.     The Code also guarantees students have "the right to be free from discriminatory harassment" and "the right to be free from such discrimination by other students that has the effect of interfering with the student's ability to participate in programs or activities at the university."

B.  *Responsibilities of University Employees and Faculty Members*

63.     The Policies note that "[a]ny individual who is a Responsible Employee at the university, such as administrators…or faculty members, and who had received information or has knowledge of sexual misconduct *must* make a report to designated university officials or be subject to disciplinary action."

64.     Responsible employees include "university employees who have the authority to redress sexual misconduct, who have the duty to report incidents of sexual misconduct, or who a student could reasonably believe has this authority or duty." Individuals that are deemed responsible employees are inclusive, but not limited to, "[a]ll advisors, [a]ll student affairs administrators, [a]ll employees who work in offices that interface with students; and [a]ll supervisors and university officials."

65.     The Policy specifically articulates that responsible employees are "legally obligated" to report the information to the Title IX Deputy/Coordinator.

66.     The Policy ensures training will be provided to those involved in the entire process, including those "in reporting, receiving reports, investigating, adjudicating, and otherwise responding to charges of sexual misconduct at the university."

67.     The Policy specifically mentions that "investigators shall have the appropriate required and ongoing training on conducting sexual misconduct investigations, issues related to sexual misconduct, and applicable university policies and procedures."

68.     The Title IX Coordinator is "responsible for oversight of the investigation and resolution of *all reports* of sexual harassment, sexual violence, *stalking*, and domestic and *dating violence involving students*."

69.     Each campus of the University has their own Deputy Title IX Coordinator, who is responsible for tracking and reporting Title IX matters.

70.     The Polices also articulate that the University "is committed to safeguarding the privacy of the parties in a manner consistent with the objective to investigate and prevent incidents of sexual misconduct."

71.     More specifically, the Policies state that "[a]ll individuals with knowledge of an alleged incident of sexual misconduct are expected to safeguard the privacy of those involved and should refrain from discussing the incident with anyone other than appropriate university officials and law enforcement."

C.   *Procedures for Resolution of Complaints of Sexual Misconduct*

72.     The Policy notes that "the University will promptly respond to all reports of sexual misconduct alleged against a University student following the procedures outlined in this policy" and that the "investigation and determination of responsibility will generally be concluded within 60 days of the report."

73.     The Policy details that upon "receipt of a report of sexual misconduct by a ***victim/survivor***" the University will determine whether the behavior alleged falls within the scope of the Policy. Then, "the University will take immediate and appropriate steps to investigate the incident." (emphasis added).

74.     Once the University decides to move forward with sexual misconduct proceedings, "the Investigator(s) will notify the complainant and the student alleged [respondent] to have

engaged in the sexual misconduct" at which time, the University will provide the respondent a date by when they need to schedule an appointment to discuss the matter. Additionally, the University will inform the Respondent of the allegations against them and be given an opportunity to respond.

75.    The Policy notes that a "respondent is expected to participate in the investigation and all related procedures, including the Sexual Misconduct Hearing."

76.    During the process, the Policy notes that "the parties [both Complainant and Respondent] will have _equal opportunities to present information_." (emphasis added).

77.    The Policies continue to afford respondents the right to "have an advisor present" at _any_ related meeting or hearing.

78.    The University "_will have as a priority the interests of all parties involved_, in regard to fairness, dignity, privacy, and due process." (emphasis added).

79.    The Policy details what occurs during the investigation, which includes, "interviews with the complainant, the respondent, and other witnesses identified as having information relevant to the allegations made, as well as the examination of written statements by the parties, relevant documents, and other relevant information."

80.    Additionally, "information" that is relevant to the investigation can be submitted by complainants, respondents, witnesses provided by either party, and the University, pursuant to the Policy. The information ultimately included in the Investigation File is determined by the University.

81.    After completion of an investigation, the investigator will issue a Preliminary Investigation Report for review by the parties. The parties then have ten (10) calendar days, pursuant to the Policy, to review the Preliminary Investigation Report, as well as investigation file, and provide a response including "any clarifying information to the Investigator."

82.     After the ten (10) day review period, "the Investigator will review the information submitted...and determine whether and to what extent to incorporate such information into a Final Investigation Report."

83.     "At that time, the Investigator will determine the appropriate charge(s), if any, under the [Policy] and Student Code to be placed on respondent, and include the charge(s) in the Final Investigation Report."

84.     The preponderance of the evidence standard, more likely than not, is utilized to make determinations of responsibility.

85.     In the event that the Investigator places a charge upon the respondent, it will be included in the Final Investigation Report.

86.     Should a finding of responsibility result, a three-person panel – the hearing panel – forms the adjudicating board for a sexual misconduct hearing.

87.     The hearing panel members are "drawn from the pool of faculty [and] staff…who have completed the university's required annual training on issues related to sexual misconduct and university policies and procedures" with one panel member, at a minimum, being a student affairs administrator.

88.     Sexual misconduct hearings are *not* public, pursuant to the Policy. Each party is permitted one advisor to accompany them to the sexual misconduct hearing.

89.     At the sexual misconduct hearing, respondents are permitted to respond to allegations.

90.     The Policies permit "the hearing panel members, the complainant, and the respondent" to pose questions during the hearing. The parties may not directly question each other,

but have the right to submit the questions to the chair of the hearing panel for the chair to ask of the other party.

91.     The chair or other members of the hearing panel review the question prior to posing it to the other party "to prevent a question that is not permitted under these proceedings."

92.     After the sexual misconduct hearing occurs, the hearing panel determines whether the information in the Final Investigative Report supports a finding of responsibility using a preponderance of the evidence standard, and if so, imposes sanctions.

93.     The sanctioning official, or designee, reviews the sanctions to ensure they are "proportional to the severity of the violation and consistent with university standards." Sanctions can include anything from a written warning, up to, and including, expulsion.

94.     The respondent can appeal the decision of the hearing panel "to the Student Affairs official on the respective campus" with written notice, no later than ten (10) calendar days after the date the written decision of the [hearing panel] is sent."

95.     Appeals are permitted to proceed on two grounds: (i) "significant procedural error that reasonably would have affected the outcome of the student's case"; and/or (ii) "the sanction imposed is grossly disproportionate to the violation(s) committed, in light of all relevant aggravating and mitigating factors, and in consideration of applicable university guidelines."

96.     A decision on the appeal must be tendered within fifteen (15) calendar days of receipt, in writing, to both complainant and respondent.

97.     "The decision of the designated Student Affairs official is final and there will be no further appeals."

D.  _Policy Against Retaliation_

98.     The University, through the Policy, articulates a strong stance against retaliation.

99.     "Retaliation against anyone who has reported an incident of sexual misconduct, provided information, or participated in procedures or an investigation into a report of sexual misconduct is prohibited by the university and will not be tolerated."

100.    Acts of retaliation can include, but are not limited to, "intimidation, threats, and/or harassment, whether physical or communicated verbally or via written communication…as well as adverse actions or threats."

E.  *The Guidelines for Promotion, Suspension, Dismissal, and Withdrawal*

101.    The Guidelines for Promotion, Suspension, Dismissal, and Withdrawal (referred to hereinafter as the "Guidelines") apply "to all students enrolled in the courses…electives necessary to complete the requirements for the doctor of medicine degree in the IU School of Medicine."

102.    The Student Promotions Committee ("SPC") possesses the power at IUSM to recommend students for promotion or dismissal.

103.    The SPC is comprised of faculty members and represents the faculty at large.

104.    Students that fail "to maintain acceptable academic standard[s], ethics, or professional behavior" are required to appear before the SPC.

105.    The SPC in turn "will require one of the following options for a student to be removed from academic monitoring or academic probation and returned to good standing…successfully completing corrective action plan as determined by the School's Competency Committee."

106.    The SPC can recommend a student for dismissal/expulsion from IUSM for "being cited for lack of acceptable academic standards, ethics, or professional behavior."

107.    Once the SPC decides to recommend a student for dismissal, the student is prohibited from attending new courses, clerkships, and electives, per the Guidelines.

108.    After a student is recommended for dismissal/expulsion, a student can request reconsideration of the SPC's decision in writing to the chairperson of the SPC, within twenty-one (21) days of the recommendation.

109.    Pursuant to the Guidelines, the request for reconsideration must contain "new information not previously communicated" to the SPC.

110.    Upon a student's request, reconsideration can either be (i) granted, where "the student remains on academic probation and must complete the approved remediation plan," or (ii) denied, where "the original recommendation for dismissal is upheld."

111.    A student has twenty-one (21) days from the denial of reconsideration to submit an appeal, in writing, to the Chair of the Committee, to be heard by the Appeals Committee.

112.    The Appeals Committee's "sole purpose and responsibility is to provide fair and formal review of decisions made by the SPC."

113.    Faculty members do not participate in regular SPC meetings. And, the SPC chairperson does not vote, but participates in Appeal Committee hearings.

114.    Upon a student's submission of an appeal, the appeal can either be (i) granted, where "the student remains on academic probation and must complete the approved remediation plan," or (ii) denied, where "the recommendation for dismissal is forwarded to the Dean."

115.    A student recommended for dismissal "has twenty-one (21) calendar days to set a meeting with the Dean to discuss the Committee's decision with the Dean."

116.    The Dean's decision, pursuant to the Guidelines, "is final and may not be appealed."

117.    Advisors are permitted but an "advisor cannot attend meetings held by the SPC, the Appeals Committee, or with the Dean."

**IV.**     **The Relationship Between Plaintiff Doe and Jane Roe**

118.    Plaintiff Doe and Jane Roe, a fellow IUSM medical student, began dating in October 2017 and ultimately engaged in a long term, serious romantic relationship.

119.    During this time, Roe and Doe engaged in a consensual and loving relationship while completing their medical education. Though the relationship was at times tempestuous, they loved each other fiercely and planned to spend their lives together.

120.    In or around November 2017, Jane Roe effectively moved into Plaintiff's apartment, despite the existence of Roe's own apartment just one mile away from Doe's. Subsequently, Plaintiff and Roe spent each and every evening together.

121.    Throughout the winter, Plaintiff and Roe continued to spend a great deal of time together. Plaintiff and Roe spent the New Year holiday with Plaintiff's family in Hollywood, Florida. Both enjoyed their trip, and Roe got along nicely with Plaintiff's family. Additionally, Plaintiff and Roe attended St. Vitus known as "Doctor Prom" together, an event hosted by IUSM's student council.

122.    On January 23, 2018, Plaintiff Doe discovered that Jane Roe sent nude photos of herself to an old sexual partner. Doe also discovered that Roe had recently visited and, upon information and belief, engaged in sexual relations with that same old partner while Doe was in Florida. Consequently, Plaintiff ended the relationship with Roe due to the loss of trust.

123.    However, after a few days, Plaintiff and Roe resumed their relationship.

124.    Plaintiff and Roe then visited Chicago, Illinois for Valentine's Day, February 14, 2018. Roe gave Plaintiff a beautiful, heartfelt card, that detailed her love for Plaintiff and assembled candles in a fashion to spell out "I <3 U" interpreted as, I love you.

21

125.     On March 30, 2018, Plaintiff Doe, Jane Roe, and three fellow IUSM student friends embarked upon a trip to Florida for spring break through April 5, 2018. Roe disliked that Plaintiff invited their friends on this trip and made the trip unpleasant for Plaintiff. Roe constantly initiated public verbal battles with Plaintiff. Their friends witnessed and wondered what caused Roe's peculiar and disruptive behavior.

126.     On or about April 14, 2018, Jane Roe became extremely intoxicated during an evening out in Indianapolis. She returned to Plaintiff's apartment where she initiated a fight with Doe. That same evening, Roe physically assaulted Doe, grabbing his phone from him and hitting him twice.

127.     Plaintiff Doe and Roe completed their first year of medical school on or about May 19, 2018 and went to celebrate the occasion with friends. That evening, Doe spoke about returning home to New York to visit family, which Roe peculiarly took issue with. Doe and Roe proceeded to discuss their disagreement and once again ended their relationship.

128.     During late May or early June 2018, Doe and Roe again resumed their relationship.

129.     On or about June 4, 2018, Roe visited Doe with his family in New York, through June 11, 2018. During her visit, Roe became extremely intoxicated and voluntarily stripped naked in front of Doe's brother. Doe's grandmother also witnessed the event. Roe proceeded to become increasingly aggressive, and pushed and hit Doe. She also tried to violently push Doe into the pool. After this occurred, Roe became so intoxicated that she could no longer stand up. Due to Roe's heavy intoxication Doe and his brother expressed concern over her entering the pool, for the purposes of Roe's safety. In response, Roe violently attacked Doe by kicking and hitting him, and screaming at him.

130.     The next day, Roe wrote Doe and Doe's brother individual cards to apologize for her behavior and stated that it would never occur again. On the last day of her June 2018 visit, she wrote Doe's brother a card wishing him luck in his new job and signed it "Roe (future sister)" indicating the committed nature of the relationship between her and Doe.

131.     During the remainder of June 2018, Doe and Roe travelled throughout Italy and Greece together. They got into an argument on their first night in Italy, during which Roe struck Doe's left shoulder and arm twice. When Doe went to sleep in a separate bed, Roe threw a flower vase at Doe's head, intending to harm him, which hit the wall directly next to his head and shattered on the floor. The two later made up and approximately one week later, towards the end of their vacation, Roe proposed to Doe.

132.     On or about July 3, 2018, Plaintiff Doe picked up Roe from the airport upon her return from England. Doe and Roe spent the following week with Doe's family in New York. During this visit, Roe absurdly accused Doe's grandmother of poisoning her food.

## V.     The Alleged Incident of July 2018

133.     On or about July 11, 2018, Roe went out to have drinks with her father. Roe gave Doe the garage code to her father's house and then Doe met Roe and her father at a restaurant around 10:30 p.m.

134.     Doe, Roe, and Roe's father departed the restaurant and Doe drove them back to Roe's father's home. When they returned to the house, everyone continued to drink wine. Roe's father left the house at approximately 12:30 a.m.

135.     When Roe showed Doe her bedroom at her father's home, Doe noticed photos of Roe's daughter. Contrary to the relationship as demonstrated in the photographs, Roe had

previously told Doe that she had a daughter but that she was not a significant part of Roe's life, and she did not see her often.

136.    Doe and Roe began to argue when Roe unfairly blamed her relationship with Doe as the reason that she did not see her daughter as frequently as she would like.

137.    Doe decided to remove himself from the situation and leave Roe's father's house. As he walked out of the garage, Roe hit the button to close the garage door. As the door was closing, Doe realized that he had left his dog inside the house, at which point he tried to quickly fit beneath the closing garage door. In doing so, his thigh struck the garage door, causing it to come off of its track.

138.    Once inside the garage, Doe knocked on the interior door. Roe opened the door and Doe walked inside the house to retrieve his dog. Doe located his dog, picked him up, and held him near his chest.

139.    As Doe walked back through the house, holding the nearly fifty (50)-pound dog, he accidentally collided with Roe. He observed Roe stumble backwards but did not see her fall. Doe continued to his car and placed the dog inside. He then returned to the house to check on Roe, however the interior door was locked.

140.    Doe returned to the house the next morning to retrieve his cell phone that he had left.  While there, Roe gave him a gift for his birthday, a blanket with pet photographs.

141.    Doe offered to pay for the damage done to the garage door.

142.    The following day, on or around July 13, 2018, Roe sent Doe a birthday text message that stated, "Happy birthday [Doe]! You're the most loving, hardworking, and amazing person I've ever met. You always want to help people around you, you push me to be a better person. Most importantly, your devotion to your family and unwavering love for them is extremely

admirable. You're an incredible person and you deserve the world. Happy Birthday <3." Doe and Roe enjoyed a dinner together that evening at a restaurant, to celebrate Doe's birthday.

### VI.    Post-Alleged Incident Relationship of Doe and Roe

143.    On or about July 18, 2018, Jane Roe introduced Plaintiff Doe to her daughter for the first time, less than one week after the alleged incident at Roe's father's house. Doe and Roe spent the rest of their summer together with Roe's daughter. They visited parks and movie theaters, enjoyed time together at their respective apartments, and played games.

144.    In late summer 2018, Roe moved into a new apartment in close proximity to Doe's apartment, three blocks from Doe's apartment.

145.    In September 2018, Jane Roe demanded Plaintiff Doe to switch his clinical date because of a random assignment to a section that contained a fellow female classmate that Doe previously had a brief romantic interlude with. Roe, in her paranoid state, became enraged that Doe did comply with her unreasonable demand and started a verbal argument with Doe regarding this, which resulted in Roe packing up her things, and leaving Doe's apartment.

146.    Plaintiff Doe and Jane Roe ended their relationship again after this disagreement.

147.    On or around September 22, 2018, Roe ventured out to a bar with a few of her friends. Roe slandered Doe to her friends, claiming that Doe was a horrible and evil person and erroneously accused Doe of giving her a concussion.

148.    Recognizing the unhealthy nature of their on-again/off-again relationship, Doe contacted a therapist at IUSM in the beginning of October 2018 to seek advice regarding his relationship with Roe, specifically, how to end things once and for all. Doe participated in sessions with the therapist two times prior to October 26, 2018. The therapist told Doe, at both sessions, to

be careful and to watch out for Roe's behavior after ending the relationship, namely, to "expect the ridiculous" post-break up.

149.    On or about October 19, 2018, John Doe told Jane Roe that he could not be in the relationship any longer. He expressed that the relationship caused him to be tired and emotionally empty. Moreover, he communicated that Roe's constant pulling him closer and then pushing him away drained him.

150.    On October 25, 2018, Doe composed and sent a final email message to Roe, wherein he expressed that he wanted Roe to be happy, and recognized that although he and Roe shared an incredible "life" together, they were not right for each other in the long run. He concluded the message by wishing her a happy birthday, good luck on her exam, and to be happy.

151.    Roe replied to Doe's email with her final communication of, "I want you to never contact me again. Do not come to my place. Do not talk to me at school."

## VII.    The University Receives a Complaint from Roe

### A. *Doe Receives Initial Notification of Complaint*

152.    On October 26, 2018, the proctor of Plaintiff Doe's final exam approached Doe immediately prior to the exam and informed Doe that he needed proceed to the office of Dr. Marti Reeser, Assistant Dean for Health Professions and Pre-Doctoral Programs, upon completion of his exam.

153.    This left Doe in a troubled state to complete an important medical school exam.

154.    After Doe's exam, he met with Dr. Emily Walvoord, Associate Dean for Student Affairs, and Dr. Reeser, without the support of an advisor. Dr. Walvoord and Dr. Reeser informed Doe that someone had come forward and filed a complaint alleging that Doe assaulted them. Doe understood that it was Roe who had filed the complaint.

155.     At the conclusion of the meeting with Dr. Walvoord and Dr. Reeser, Plaintiff Doe concluded that Doe should steer clear of Roe. Doe reaffirmed to Dr. Walvoord and Dr. Reeser that he had no intention of getting back together with Roe.

156.     On or around October 29, 2018, Plaintiff Doe sought out Dr. Walvoord to show her text message from Jane Roe; however, she was unavailable. Doe presented to Dr. Reeser, in Dr. Walvoord's absence, text messages Jane Roe sent to Doe a mere ten (10) days prior to filing the complaint, as these messages clearly demonstrated Roe's motivation for filing the false report against Doe. One specific message read, ***"you're always around. I can't heal from you. It sucks. Why do you have to be here :(."***

157.     Dr. Reeser merely replied that he would pass the text messages along to Dr. Walvoord. Doe never learned of any further action.

158.     During November 2018, Plaintiff Doe, a once popular, well-liked IUSM student, was ostracized by his classmates, due to the false accusations spread by Roe. Doe found it difficult to focus, which proved problematic considering his rigorous medical student course load.

B.  *Doe Meets with Dr. Walvoord and Delays Exam*

159.     On or about November 15, 2018, Plaintiff Doe studied tirelessly for the first exam of his new course block, but could not focus due to the stressful situation created by Roe. At 7:00 a.m. the following day, and for the first time in his IUSM career, Doe requested a delay of the exam from Dr. Walvoord and his student advisor, which they granted him. Doe met with Dr. Walvoord in person, with tears in his eyes, and explained that he needed to delay the exam.

160.     During this meeting, Dr. Walvoord explained to Plaintiff Doe that she found the story very odd when Roe initially reported the information. Prior to this Title IX complaint, Dr. Walvoord and Plaintiff Doe enjoyed a close relationship due to their interaction with Doe's various

campus involvements. Dr. Walvoord suggested to Plaintiff Doe that he look into the MBA program as an avenue to get away from Roe, due to her erratic and unpredictable nature.

161.    Doe became even more deeply isolated at IUSM during the winter of 2018-2019 due to Roe's false accusations.

C.   *Roe Notifies the University to Proceed with an Official Complaint*

162.    On January 18, 2019, Plaintiff Doe received the official Title IX notice of investigation via email from Investigator Gregory Kuester ("Investigator Kuester").

163.    Apparently, Roe had now decided – three months after filing her initial report – to move forward with the charges.

164.    The notice indicated that the Office of Student Conduct had received information concerning Doe's possible involvement in several incidents taking place between November 2017 and July 2018.

165.    The initial allegation from October 2018 had now transformed into six separate allegations. In relevant portion, Roe alleged that Doe broke the garage door and pushed Roe through a door at Roe's father house, causing damage to the door and causing injuries to Roe, on July 12, 2018. The University later did not find Doe responsible for the other five allegations.

166.    The notice also imposed a No Contact Order prohibiting Doe from having any contact with Roe either directly or indirectly.

167.    Despite Roe's volatile and unpredictable nature, and Roe's own admission, upon information and belief to University, and also to Investigator Kuester, to physically assaulting Doe, the University imposed a no-contact order solely upon Plaintiff Doe. Doe requested that it be made mutual immediately upon its imposition, however, it was not until February 2019, after Doe submitted photographs of Roe repeatedly driving by his apartment and looking into Doe's window,

28

where he sat at his desk, for extended periods of time, that the University amended the No Contact Order to be mutual.

D. *Doe is Reassigned to a New Campus, Effectively Placing an Interim Suspension Upon Doe*

168.    Approximately one week after the investigation notice, Doe received a brand-new class schedule, that reassigned him to a new "virtual" campus. Although Doe pointed out that he and Roe had not had contact and avoided each other in classes, the hallways, and elsewhere entirely since the initial report in late October 2018, the University mandated that Doe complete his required courses online, which severely thwarted Doe's medical studies.

169.    As a result, the University in effect placed an interim suspension upon Doe based *solely* upon the allegations, without any investigation or opportunity to defend himself.

170.    Dr. Allen stated that Doe would not be permitted to access *any* Indianapolis campus resources, including the library. Any time that Doe required access to the Indianapolis campus (for instance, for exams), the University mandated that Doe request permission in advance. The University requested that Doe clean out his locker, and did not allow him to do so without an escort. The University did not allow Doe to participate in his assigned group discussions, which further hindered his studies.

171.    For Doe's required examinations, the University mandated that he check out a computer from the library. However, because he could not access the library, a University administrator had to check out and check back in the laptops for Doe during his examinations. This added step took up considerable time on important examination days.

172.    The University also did not allow Doe to take his exams in the same room as his classmates, which was the same room where he took all of his medical school exams. He had to

take the exams in a foreign environment in isolation. One exam in particular, the University forced

Doe to complete in an IUSM Administration office, alone.

173.    As a result, Doe remained even further isolated from his friends, classmates, and

necessary University resources for completion of his education.

**VIII.    The University Investigates Roe's False Allegations**

*A.   The University Performs an Investigation Riddled with Bias and Procedural Error*

174.    On January 29, 2019, Doe and his attorney met with Investigator Gregory Kuester

to discuss procedure for the investigation.

175.    On February 20, 2019, Doe, now the Respondent, appeared for his first

investigatory interview. During this meeting, Doe provided a variety of documents and evidence

demonstrating that Roe's, now the Complainant, claims were false including: photographs,

hundreds of text messages, emails, videos, a substance abuse evaluation, a letter from Doe's

therapist, and a lie detector test which he voluntarily subjected himself to, in order to establish his

innocence.

176.    At this meeting, Doe also provided a list of witnesses for Mr. Kuester to interview.

177.    Doe, Respondent, also noted that Roe, Complainant, had assaulted him on multiple

occasions, however the University failed to pursue *any* investigation of Roe's conduct.

178.    Over the course of Doe's interview with Kuester, he informed Investigator Kuester

of Roe's erratic pattern of behavior throughout the relationship, which called into question her

character and the veracity of her statements, including her abusive relationship with alcohol,

physical abuse, racist comments, and past history with complaints of a similar nature.

179.    On February 22, 2019, directly upon completing exams for the second year of

medical school, Deans Allen and Walvoord summoned Plaintiff Doe to their office.

180.    Given the short and essentially instantaneous notice for this meeting, Doe was unable to contact his attorney to accompany him.

181.    At the meeting, Dr. Allen and Dr. Walvoord informed Doe that they intended to complete the investigation prior to the beginning of the third year of medical school, which would commence in the beginning of August 2019. They noted that if the matter was not completed by that time, they would place Doe on an administrative suspension, effectively preventing Doe from continuing his education at IUSM, notwithstanding that no findings had yet been reached.

182.    After the meeting, Doe emailed Dr. Allen and Dr. Walvoord to determine which, if any campus resources, he still had access to. They informed him that he would not be able to use the library or any IUSM resources in Indianapolis. Associate General Counsel James Nussbaum ("Mr. Nussbaum") told Doe's attorney that the removal of Doe from campus was not only for the safety of Roe, but also for the safety of other students, notwithstanding that Doe had an unblemished record and was heavily involved on campus.

183.    Mr. Nussbaum stated, "if Title IX doesn't get him, the medical school will" – reflecting that Doe would somehow not remain a University student.

184.    On or around February 27, 2019, Doe contacted the University to inquire whether he could pursue an alternative resolution; namely, to attend classes to complete his MBA. However, IUSM informed Doe that no decision could be made until the hearing panel met.

185.    On March 5, 2019, Doe and his attorney met Investigator Kuester for an additional investigatory interview.

186.    On or around March 8, 2019, Doe and his attorney met with Investigator Kuester to review the version of events recorded by Investigator Kuester. During this meeting, Investigator Kuester revealed that he had collected text messages from Roe which he had not disclosed to Doe

31

during any of their three prior meetings. Despite the significance assigned to the text messages, Doe did not receive a meaningful opportunity to review or respond to these critical pieces of evidence in the investigatory phase.

187.    During March 2019, Investigator Kuester conducted select witness interviews. Astonishingly, Investigator Kuester failed to interview five witnesses – over *half* of the witnesses-that Plaintiff Doe provided.

188.    Roe denied access to her father for an interview with Investigator Kuester on two separate occasions, even though he was the *only* other person present on the evening of the July 12, 2018 incident.

189.    Investigator Kuester also did not ask to interview Doe's mother, despite her direct involvement, and Doe's offering of her as a witness, in the events that transpired.

190.    Of the witnesses that Investigator Kuester did interview, upon information and belief, several witnesses stated to Investigator Kuester that they were hesitant to appear for such an interview for fear of the actions Roe may take against them for speaking out. In fact, upon information and belief, one witness even expressed his concerns regarding potential retaliation by Roe and her fitness to become a doctor to his IUSM faculty advisor.

191.    Plaintiff Doe realized that the investigation took up a considerable amount of his time and energy, and requested to delay his Step 1 Board exam. Doe was granted an extension and rescheduled the exam for May 10, 2019, prior to when Doe was scheduled to start rotations.

192.    On March 28, 2019, the University released the preliminary investigation report, to which Doe was required to respond by April 7, 2019.

193.    On April 2, 2019, IUSM scheduled orientation and transitions for third year students, which included Doe. Doe contacted Dr. Allen regarding his effective interim suspension

– again, based on the allegations alone without any investigation – and the No Contact Order to inquire how it would work with his new schedule with an ongoing investigation. Doe highlighted that he complied with every step that the University mandated along the way.

194.    Dean Allen replied that Doe would not be permitted to attend a career fair planned for the following week or the class reception. He also informed Doe that IUSM arranged for Doe to complete his orientation at yet *another* new campus, the IUSM-West Lafayette campus, approximately one hour from Indianapolis, where he would have an apartment for the two-week course.

195.    Additionally, Dr. Allen informed Plaintiff Doe that he would not be permitted to engage in further curricular activity until IUSM completed the investigation.

196.    Doe reluctantly accepted this mandate because IUSM left him with no other option and relocated to the IUSM-West Lafayette campus, where he remained even further isolated from his classmates, friends, and resources.

197.    On April 8, 2019, Doe reached out to Investigator Kuester to inquire whether the No Contact Order could be modified given his compliance to date and the impact of the order on his education. Investigator Kuester responded a few days later, notifying Doe that the No Contact Order would not be modified or lifted.

198.    On April 11, 2019, Doe once again requested that Investigator Kuester interview his mother as a witness, given her personal knowledge of the alleged events. Kuester however, did not do so.

B.    *Doe Raises Concern Over Roe's University Connections*

199.    During the investigation, Doe learned that Roe engaged in an intimate relationship with a member of the IUSM faculty, who, upon information and belief, knew other University

administrators involved in the investigation. Doe brought this to the attention of the University given the clear conflict of interest. However, to Doe's knowledge, the University, took no action regarding this potentially improper relationship or the impact it may have on the investigation or subsequent proceedings.

200.    Doe raised concern over yet another University connection of Roe's – another separate professor emeritus[7], for which Roe conducted research for and considered her mentor. This professor and Roe maintained an extraordinarily close relationship. During Roe and Doe's romantic relationship, Roe introduced Doe to this professor as "one of the most important women in her life." This professor also attended Roe's medical school white coat ceremony as one of her guests for which she received only a limited single digit amount of tickets to. This professor's attendance at the white coat ceremony was a deviation from the normal, showing the close relationship of her and Doe, as it is not customary for professors to attend the white coat ceremony. Roe threatened Doe that she would involve this professor in the investigation. This professor is the same professor that supervised Roe while she engaged in falsification of documentation in conjunction with a grant. Doe informed the University of this threat by Roe, however, upon information and belief, the University, to Doe's knowledge, yet again, declined to take any action.

C. *The University Releases the Biased and Incomplete Final Report*

201.    On April 26, 2019, three weeks before Doe's important Step 1 Board Exam, the University released the Final Report (the "Final Report").

202.    The Final Report notified Doe that the University wrongfully charged with two violations of the Code of Student Rights, Responsibilities, and Conduct: (1) physical abuse that

---

[7] Plaintiff is prepared to disclose Roe's mentor's identity to the Court upon request.

constitutes dating or domestic violence, and (2) verbal abuse that constitutes dating or domestic violence, as defined in the Sexual Misconduct Policy, UA-03.

203.    The Report reflected that Investigator Kuester failed to conduct a thorough and impartial investigation. Specifically, the Final Report:

- Omitted critical details from the report that bolstered Doe's credibility and account of the events that transpired, indicating bias against Doe;

- Failed to include the plethora of evidence submitted by Doe which spoke to Roe's character, nature, and lack of credibility;

- Improperly credited witness accounts where the witness had no first-hand knowledge or even second-hand knowledge of the events that transpired. For instance, witness James Smith[8] noted in his interview he "heard" about an allegation contained in the report by Roe, but not from Roe or Doe. Peculiarly, he was credited even though he lacked any direct knowledge of any incident;

- Omitted inconsistencies in Roe's statements during the investigation. Roe's account changed each time she was interviewed – yet this remained absent from the Final Report; and

- Failed to redact pages that included inaccurate, prejudicial, and irrelevant information, which Doe did not receive an opportunity to review, dispute, or respond to in a meaningful manner.

204.    The University required Doe to either accept responsibility for all violations, or deny responsibility and move forward with a hearing (the "Hearing"). Doe maintained his innocence throughout, denied responsibility, and selected to move forward with a hearing.

205.    Upon his review of the Final Report, Doe again requested the opportunity to pursue an alternative resolution of this matter, rather than a formal disciplinary process. Investigator Kuester responded that after verification with other University officials, alternative resolution was not appropriate for this case, and tentatively set the hearing for May 10, 2019.

---

[8] Plaintiff refers to James Smith pseudonymously and is prepared to confidentially disclose his identity to the Court, if needed.

206.    The University attempted to schedule the Hearing for the same day, May 10, 2019, as Doe's board exam. Doe did not want to put himself at a severe disadvantage for both the exam and the hearing, and requested a new hearing date. On May 9, 2019 at 4:45 p.m., the day before his ever-important Step 1 Board Exam, the University informed Doe that they moved his Hearing to May 20, 2019.

207.    Doe completed his board examination on May 10, 2019.

208.    The week before the hearing, Doe compiled text messages, letters, videos and documents in preparation for the Hearing.

209.    On or around May 17, 2019, Doe's counsel transmitted information to the University, specifically to Mr. Nussbaum (the "May 2019 Letter"), including a video of Roe, where she spewed racist remarks both generally and regarding an IUSM class officer, and information concerning Roe's fraud in a grant funding project, to speak to her character, nature, and credibility.

210.    In this same May 2019 Letter, Doe's counsel also notified the University of Roe's intimate relationship with a Professor at IUSM, in potential violation of the provisions outlined in the University Academic Handbook.

211.    Astonishingly, the University took no action regarding any of the contents within the May 2019 Letter.

D.    *The University Conducts an Inadequate Hearing*

212.    The University compiled a hearing panel (the "Hearing Panel") comprised of three members to determine Doe's sanction, including: (i) Chairwoman Wende Ferguson, a member of the University's Sexual Assault Prevention, Intervention, and Response Task Force, (ii) Jose De Jesus Magallon Maciel, Resident Coordinator at IUPUI (who has since been promoted to Assistant

Director of Student Conduct at IUPUI), and (iii) Robert Yost, Professor at IUPUI (Purdue) School of Science of Indianapolis.

213.    Other individuals present at the Hearing, in addition to the three Hearing Panel members, included Investigator Kuester, Head of Student Conduct Kelly Freiberger, who also served as *both* the Hearing Panel "Moderator" and Jane Roe's escort for the day, Doe's attorney, and Jane Roe, who left after the first hour. A witness, fellow IUSM student Betty Boe[9], appeared for her questioning portion only.

214.    Members of the Hearing Panel and attendees had noted histories demonstrating bias against males. Chairwoman Wende Ferguson has a large social media presence, where she regularly posted around the time of Hearing regarding social justice issues, including, upon information and belief, women's issues. Upon information and belief, Ms. Freiberger, Hearing Panel "Moderator" and Roe's escort, has openly stated how important women's rights and social justice are to her.

215.    In addition, upon information and belief, Hearing Panel member Robert Yost is the only professor who teaches the IUPUI Biology class for biology majors. Roe attended IUPUI as an undergraduate and indeed majored in biology; therefore, the likelihood that he had her in his class is high.

216.    The University did not provide Doe an opportunity to object to the participation of *any* of the panel members.

217.    During the Hearing, it became apparent that the Hearing Panel members treated Doe in a disparate manner than Roe.

---

[9] Plaintiff refers to Betty Boe pseudonymously.

218. The Hearing Panel asked Roe simple questions for only a brief period of time. Throughout the questioning, Chairwoman Ferguson shook her head repeatedly in a disapproving manner towards Doe.

219. The University then afforded Doe the opportunity to ask Roe questions. However, in order to do so, Doe had to write down his questions onto a piece of paper and give it to Chairwoman Ferguson to repeat to Roe.

220. Chairwoman Ferguson reviewed the questions and *refused* to ask Roe the questions, as prepared by Doe. The Chairwoman instead read only portions of questions that she personally selected, which Roe answered accordingly.

221. After Roe completed her portion of the hearing, Doe began his opening statement. However, when he mentioned the lack of redactions in the Final Report, and began to address Roe's lack of credibility, Ms. Freiberger stopped Doe from continuing. Ms. Freiberger ordered both Doe and Roe to leave the room so that the Hearing Panel could discuss whether to allow this information in with general counsel for the University.

222. The Hearing Panel called for a break, and upon reentry into the Hearing, Chairwoman Ferguson questioned Doe on why he wanted to ask certain questions because, according to her, they allegedly were already answered by the investigation. Doe explained that the questions he selected helped to clarify certain facts that solidified his version of events.

223. After several discussions back and forth, ultimately, the Hearing Panel, through Chairwoman Ferguson, prevented Doe from discussing factors that affected Roe's credibility despite the significance of this information in making findings of this nature. *See ¶¶ 209-210*.

224. Specifically, Doe intended to introduce evidence regarding Roe's engaging in grant fraud at the University, her abuse of alcohol and prescription medications, and his concerns

regarding an impartial investigation due to Roe's various connections throughout the University. Though the foregoing was relevant to assessing Roe's honesty and credibility, the Hearing Panel prevented Doe from presenting this information.

225.   All returned to the Hearing Panel room to move forward with the Hearing, except for Roe, who inexplicably left. The Hearing Panel attempted to make contact with Roe, however, she did not respond to their requests for her return.

226.   At the Hearing, Chairwoman Wende Ferguson and Ms. Freiberger prevented Doe from finishing his opening statement. Doe asked to continue, but they did not allow him to do so. As a result, Doe could not adequately assert his innocence and defend himself against the charges.

227.   Doe requested that the record reflect his intent to provide potentially exculpatory and relevant information to his case, and the Hearing Panel's denial of this right. However, Chairwoman Ferguson denied this request as well.

228.   The Hearing continued with the Hearing Panel questioning Doe. The Hearing Panel asked Doe leading, accusatory, and difficult questions, particularly in comparison to Roe. Such questions exhibited their bias against, and unfair presumption of guilt of, Doe as the male accused. For example, Dr. Yost "asked" Doe, that he must have hit the garage door pretty hard to knock it off its tracks, drawing an incorrect assumption, which Doe rebutted. Chairwoman Ferguson, under the guise of a question to Doe, stated that it seemed like Doe loved his dog or cared about his dog more than he cared about his (then) girlfriend. Chairwoman Ferguson stated to Doe, again, under the pretext of an alleged question, "this is all over the fact that she [Roe] has a kid?" Doe replied that was not the case at all, and that this issue was about Roe's lies, Roe's withholding of important information from Doe – her partner – for such a long period of time, and that Roe, the potential mother of his future children stated that she viewed this child as a "mistake" she [Roe] was "getting

away from." However, the Hearing Panel cut Doe short while he "answered" their questions. Comparatively, the Hearing Panel asked Roe gentle questions about how she felt with comforting eyes.

229.     The Hearing Panel also questioned Doe in an incredibly harsh and berating tone of voice. In contrast, the same Hearing Panel spoke to Roe in the same manner as though one would speak to a small child or infant, with a soft and sympathetic tone of voice.

230.     Betty Boe, the lone witness – provided by Roe – that the University presented at the Hearing, appeared for questioning. Conversely, the University did not request the presence of any of Doe's witnesses at the Hearing.

231.     Doe asked Boe whether Roe participated in swimming just a day or so after the alleged incident at the subject of the investigation. Boe replied that she did not remember.

232.     Doe asked Boe to share exactly what Roe told her. Boe stated that Roe said Doe allegedly "pushed" Roe down a laundry chute and was "not a good person."

233.     Doe then asked Investigator Kuester about whether he verified the existence of the laundry chute. Doe did so to refute and discredit Roe's account because no such laundry chute existed in the house where the alleged incident occurred.

234.     Investigator Kuester replied that he was "almost positive" that Betty Boe meant to say laundry room not laundry chute, thus inferring that Investigator Kuester corrected Betty Boe's signed statement.

235.     One of the Hearing Panel members asked the Investigator whether Doe's story remained consistent. Investigator Kuester stated that Doe's account remained consistent throughout the entire investigation and that Doe was respectful and cordial throughout all interviews.

236.    Doe left the Hearing feeling as though the Hearing Panel entered the Hearing with a wrongful predetermination of guilt.

E. _The Hearing Panel Reaches an Unsupported Conclusion_

237.    On May 23, 2019, Doe received the Hearing Panel's decision letter. The Hearing Panel concluded that Doe was responsible for physical abuse within a dating relationship, in violation of the Sexual Misconduct Policy. The Hearing Panel did not find Doe responsible for verbal abuse.

238.    The Hearing Panel noted that it "relied primarily on the material facts not in dispute", a photo of a bruise on Roe's back, the amount of force it would take to cause damage to a doorframe, and text messages exchanged after the event. When, in fact, Doe did dispute the causation of the bruise – due to Roe's conflicting accounts as to how the bruise came about – as he maintained his innocence throughout.

239.    As a result of the erroneous findings, the University, communicated by Ms. Freiberger, imposed the following sanctions on May 23, 2019: (i) suspension from all University campuses until May 16, 2020; (ii) prohibition from participating in any academic program and all university-related activities; (iii) a requirement to seek an assessment from a licensed professional in the field of mental health that specializes in "interpersonal relationships,"; (iv) documentation from the licensed professional verifying that Doe is not considered a threat of harm to others; (v) a requirement that Doe complete the "Integrity Seminar" provided by the Academic Integrity Seminar Corporation; and (vi) continuation of the No Contact Order (collectively, the "Sanctions").

F. _Doe Files His Appeal of the Hearing Panel's Decision and Sanctions_

240.    On May 29, 2019, Plaintiff Doe timely submitted his appeal (the "Appeal") to Dr. Jason Spratt, on the grounds of significant procedural error that reasonably would have affected the outcome of the case, and the grossly disproportionate nature of the alleged violations. Here, he again asserted his innocence of the allegations.

241.    In his Appeal, Doe noted that the University conducted an investigation that was neither thorough nor impartial, in violation of their Policy and Code. He further highlighted that he submitted volumes of text messages, pictures, emails, a letter from his therapist, and even a lie detector test results to the Investigator in support of his innocence of the charges and overall credibility – all of which were overlooked in the investigation.

242.    Doe emphasized that a preponderance of the evidence was not achieved in the finding of responsibility, because: (i) both the Investigator and Hearing Panel disregarded Doe's account of events, which he supported with evidence; (ii) Doe maintained his innocence regarding Roe's allegation of a bruise on her back, for which Roe failed to provide hospital records regarding treatment, despite the repeated requests from the Investigator; (iii) photographic evidence highlighted Roe's inconsistent account of the alleged incident; (iv) text message evidence supported Doe's account of the events that transpired; (v) photo and video evidence that directly displayed Roe's character – once again highlighting Doe's credibility; and (vi) the Investigator overlooked Doe's evidence regarding Roe's alcohol abuse and erratic pattern of behavior.

243.    Additionally, Doe noted that the Hearing Panel did not allow Doe to present his full defense, as they erroneously cut him off, because they did not permit him to share Roe's falsified time logs while she participated in a grant funding project at IUSM and a video recording of Roe's racist comments.

42

244.     In fact, despite the relevance of these proffered materials that speak to Roe's lack of credibility and honesty, the Hearing Panel directed Doe and his advisor into a separate room, and after much back and forth, later informed Doe that he would not be permitted to present these materials in his defense. Then again, the Chairwoman denied his request to have the materials added to the file.

245.     Doe also noted that the Investigator failed to interview several of the witnesses that he provided, including, notably, Doe's mother.

246.     Furthermore, Doe emphasized that he informed numerous University faculty and staff members of Roe's violent and retaliatory behavior on several occasions – yet, the University failed to take any action or commence any investigation into the aforementioned actions, in violation of the Code and Policy.

247.     Doe also highlighted that he received disparate treatment in comparison to Roe because the University went above and beyond in accommodating her, yet banished Doe to a separate campus, depriving him of live lectures and campus resources. Additionally, Roe spoke freely about the investigation and process, in violation of the University's guarantee of confidentiality, yet faced no repercussions for her actions.

248.     Notably, Doe included that the University failed to provide him with the complete investigation file because they withheld information that Roe provided in her interview, again, in violation of the Code.

249.     Doe also emphasized that a bias against him, the male accused, permeated the entire Investigation process and Hearing to this point.

250.     Lastly, Doe noted in his Appeal that the Sanction was grossly disproportionate to the charge. He highlighted that he abided by the No Contact Order at all times and that a mutual no contact order would be sufficient.

251.     Dr. Spratt wholly disregarded each of Doe's arguments, wrongly asserted that Doe's due process rights were not violated, and denied Doe's appeal on June 7, 2019.

252.     As a result, the University required Doe to serve the one-year suspension.

**IX.     Student Promotions Committee and Subsequent Proceedings**

A. *The University Notifies Doe of Student Promotions Committee Requirement and Happenings During the Summer of 2019*

253.     On May 24, 2019, Doe received a notice from IUSM, specifically, Dr. Walvoord and Dr. Allen, informing Doe that a violation of the University's Sexual Misconduct Policy was also considered a violation of the Medical School's Professional Conduct Policy. Consequently, Doe would be required to appear before the Student Promotions Committee.

254.     Throughout Summer 2019, Roe continued to drive by Doe's apartment, and noticeably peered into Doe's windows, as to look for him, at least twice per week.

255.     Even though Doe notified the University, no action was taken.

256.     Doe intended to move forward with his own Title IX complaint against Roe, however, as the meeting approached, the investigator – hand selected by the University – suddenly no longer worked there. After feeling incredibly discouraged by not one single person believing his perspective, the unfair and biased process, the banishment to another campus before any investigation, the lack of any recourse for Roe's retaliation, and immense lack of supportive measures, along with a simultaneous notification that he would be required to appear before the SPC, Doe turned his efforts towards fighting to remain a medical student through the SPC process.

257.    Due to the stress and time spent on this erroneous investigation, Doe passed his Step 1 Board Exam but did not achieve anywhere near the score he initially anticipated, thus significantly harming his chances of gaining admission to a desirable residency program.

B.    *Doe Prepares for and Appears Before the Student Promotions Committee*

258.    After going through the entire Title IX process, IUSM subjected Plaintiff Doe to a second process, the SPC process, due to his status as a student at the medical school. Finally, after months of delay by IUSM, and after the erroneous finding of responsibility from the Student Conduct Office, Plaintiff Doe received his SPC Committee meeting date – October 28, 2019.

259.    As early as September 3, 2019, in order to adequately prepare for the SPC meeting, and given the lack of available information concerning the SPC process, Doe repeatedly requested materials from IUSM on the SPC, including, but not limited to, SPC procedure, the format of the meeting, what evidence and information Doe was permitted to submit, who would be present for the meeting, standards employed, and the policies utilized.

260.    After engaging counsel in these discussions, Doe was finally able to obtain some information concerning what to expect at the SPC meeting, on October 23, 2019, a mere five (5) days prior to the hearing and only two days prior to the deadline to submit materials in support of his defense to be considered by the Committee.

261.    Significantly, the University barred Doe from being accompanied by counsel in the SPC meeting; Dr. Reeser explained that this was the case simply because the policies "pre-date" the right to have an advisor.

262.    Consequently, Doe would possibly be required to appear before up to nineteen (19) committee members, all of whom were permitted to question him, without the assistance of counsel.

263.     Furthermore, Dr. Reeser confirmed "there is no standard of proof specified in the guidelines" when Doe questioned the standard that would be utilized to determine whether a violation had occurred.

264.     In response to Doe's inquiry about the materials he was permitted to present, Dr. Reeser indicated that the SPC would not review the findings of the Conduct Office which led to the one-year suspension. As such, Doe was limited to providing information focused on his eligibility to return to the medical school upon completion of the one-year suspension.

265.     This inability to present information relevant to the charges and his defense deprived Doe of a meaningful opportunity to have his case heard before an impartial panel, as the SPC merely accepted the findings of the Conduct Office as fact in determining a second sanction to impose upon Doe.

266.     Given the absence of any University policy prohibiting such "double-jeopardy", Doe was in effect charged with the same alleged violations twice, and ultimately submitted to two different, and compounding, sanctions.

267.     Plaintiff Doe timely submitted the narrow set of materials he was permitted to provide for the SPC meeting, on October 25, 2019; this included a statement about his journey to medical school, his involvement on campus, and a general discussion about his relationship with Roe.

268.     Plaintiff Doe met with the SPC on October 28, 2019 for approximately forty-five (45) minutes. The SPC received Doe's statement of October 25, 2019, a letter prepared by his counsel in May 2019 concerning the pending investigation, the May 23, 2019 decision letter, the final report and the appendix to the final report which consisted of photographs of the garage door at Roe's father's house, text messages between Roe and Doe's mother, photographs of Roe's

alleged injuries, text messages exchanged between Roe and Doe, Roe's medical bill statement from August 2, 2018 which contained only a summary of charges and fees paid but nothing regarding her medical care or records, and the appeal decision.

269.    Approximately fifteen (15) individuals from the University comprised the SPC and were present at the October 28, 2019 meeting. One SPC member attended the meeting virtually.

270.    During the SPC meeting, Doe asserted his innocence and presented the reasons why he should remain at IUSM. He gave a brief overview of his journey to medical school, and highlighted to the SPC his strong character, desire to help people, volunteerism throughout the entirety of his life, involvement in the IUSM community, and unblemished record to this point.

271.    Doe continued to share a brief overview of the prior relationship with Roe, where he stated that, after seeking the assistance of a therapist, he ended the relationship.

272.    Doe recounted key highlights of the investigation at the University, including the procedural flaws, evidence that speaks to his credibility and account of events that transpired, and history of violence from Roe (including her throwing a flower vase at Doe's head).

273.    He also informed the SPC of everything that he did to move forward from his prior relationship, including continuing therapy, spending time with family, and preparing to take the GMAT to apply and begin his MBA.

274.    After Doe's statement, the SPC asked Doe approximately six (6) questions, which he answered honestly and truthfully.

275.    Although Dr. Walvoord's role was to serve in a neutral *ex officio* capacity, she improperly complimented a student member of the SPC on the "toughness" of his question.

276.     On that same evening, Plaintiff Doe received a telephone call from Dr. Reeser in which he indicated that the SPC voted to recommend to the Dean of IUSM that Doe be dismissed from IUSM – effectively ending his medical career.

277.     Doe asked how the SPC reached their decision, to which Dr. Reeser replied, "on the single finding of responsibility from the University."

C.   *Doe Requests Reconsideration of the SPC's Decision*

278.     Plaintiff Doe requested reconsideration of the SPC's decision on November 18, 2019, as permitted by the Policies.

279.     A request for reconsideration before the SPC is permitted "after receiving a recommendation for dismissal by SPC. The student's request for reconsideration must be received, in writing, by the Chair of the Committee within twenty-one (21) calendar days of the date of the action. A student's request for reconsideration must provide new information not previously communicated to the Committee."

280.     Doe provided a thoughtful and lengthy request for reconsideration, where he detailed every inconsistency in the investigation, relationship history, and full account of Roe's lack of credibility.

281.     Doe also provided information on an additional University connection of Roe's. Roe's father's longtime partner/girlfriend is a professor emeritus at IUSM, however, upon information and belief, she is still featured on IUSM's website as being actively involved.[10] Again, when Doe brought this to the attention of University officials, upon information and belief, they declined to take any action to remedy any unfairness that flowed from this close connection.

---

[10] Plaintiff is prepared to disclose Roe's father's partner/girlfriend's identity to the Court upon request.

282.    Despite the overwhelming evidence presented by Plaintiff Doe to assert his innocence and provide insight on the situation, the University denied his request for reconsideration on November 26, 2019, erroneously stating that Doe did not provide any "new information."

283.    Assistant Professor of Clinical Medicine, Dr. Emily Machogu, failed to address the arguments raised in Doe's request for reconsideration, concluding, "[the SPC]'s role in this process is to respond to the decisions and findings of the investigation that has already been completed and finalized through IUPUI. Our role as a committee is to decide, *based upon the completed investigation,* whether your conduct met the standards of professional conduct required by the IU School of Medicine. Our role is not to hear a re-appeal of the case or to investigate any other student's behavior."

D. *Doe Files His Appeal of the Denial of Reconsideration and Meets with Appeal Committee*

284.    Plaintiff Doe again appealed this decision as a final administrative remedy for relief, as permitted by the Guidelines.

285.    On December 17, 2019, Plaintiff Doe timely submitted his final appeal, and on December 31, 2019, IUSM granted Plaintiff Doe an appeal hearing.

286.    Prior to the Appeal Committee meeting, Plaintiff Doe submitted documents again on January 10, 2020, which included an assertion of his innocence, his desire to continue at IUSM medical school, and become a doctor.

287.    On January 14, 2020, Plaintiff Doe met with the Appeal Committee. Plaintiff met with the Appeal Committee alone as IUSM does not permit counsel to attend any meetings in the SPC process. He again asserted his innocence and expressed his ardent desire to become a doctor.

288.    The Appeal Committee only asked Doe whether he learned any lessons from this process. Doe replied however, the Appeal Committee seemed disinterested and unfocused on Doe's answer, as though Doe's words had no impact on their already pre-determined decision about his standing at IUSM.

289.    The Appeal Committee remained unconvinced and unanimously voted to expel Plaintiff Doe from IUSM.

290.    The Appeal Committee then forwarded their decision of dismissal to the Dean of the Medical School.

E.    *Dean Jay L. Hess Meets with Doe and Grants Doe's Appeal of the SPC Decision*

291.    Plaintiff Doe met with Dean Jay L. Hess ("Dean Hess") on March 4, 2020, pursuant to the Guidelines, which state that student must meet with the Dean to discuss the Appeal Committee's decision.

292.    Prior to the meeting, Doe remained under the impression that IUSM would treat this meeting as an exit interview – nothing more than a mere formality – when indeed Plaintiff prepared to plead his innocence once again.

293.    As his advisor was not permitted to appear with him, Doe attended this meeting on his own. Dean Hess expressed his compassion for Doe and acknowledged that he spent "hours" going through over three hundred (300) pages of documents that Doe submitted in his defense over the duration of the investigation and SPC process.

294.    Doe expressed his innocence of the allegations, how committed he was to the relationship, and honest he was at all times throughout the investigation and entire SPC process (including Reconsideration and Appeal). Dean Hess acknowledged that Doe sounded very honest and apologetic.

295.    Dean Hess questioned Doe regarding what he was currently doing. Doe responded that he planned to take the GMAT and apply for the MBA program, which is something that he previously expressed interest in.

296.    To Doe's great relief, Dean Hess reversed course, as seemingly the only person at the University that understood Plaintiff Doe's plight, and overturned the recommendation of expulsion.

297.    Dean Hess expressed that he felt distance between Doe and Roe would be beneficial for "a variety of reasons" and decided that Doe should complete an additional one-year leave of absence from IUSM. Dean Hess stated that he possessed the authority to order this course of action because he is "the decision maker."

298.    Dean Hess expressed his utter confidence in, and all but guaranteed, that Doe would be accepted into Indiana University's Kelley School of Business ("IUKSB") by stating "*when you get in…*"

299.    The meeting concluded with Dean Hess permitting Doe to return to IUSM in Spring 2021. The specific terms of this agreement were to be outlined in a forthcoming letter.

300.    As the meeting concluded, Dean Hess stated to Doe, "see you up on stage in a few years" indisputably referencing that Doe would receive his IUSM diploma upon completion of the MD program.

301.    Nearly four weeks later, by letter dated March 27, 2020 (the "Hess Letter"), which Doe did not receive until March 31, 2020, Dean Hess stated that he would notify the SPC that he had granted Doe's appeal, and must complete all of the Sanctions from the Title IX investigation. Additionally, he placed further conditions upon Doe's return to IUSM, including: (i) one year of administrative leave (communicated during Doe's meeting with Dean Hess), to "be eligible to

return to medical school in April 2021, joining the Class of 2023"; (ii) auditing the Transitions 2 Course, prior to returning to clinical training; (iii) guidance from Dr. Allen regarding which campus would be "best suited for" Doe's training; (iv) a continuation of behavioral counseling, clearance from his provider that he is "cleared" to resume his studies at medical school, "experiencing no behavioral or other conditions that may adversely impact [his] ability to pursue medical education, and that [Doe] can withstand the rigors and pressure inherent in the medical education process"; and (v) that "any subsequent violation of academic or personal codes of conduct" would potentially impact or jeopardize is return in Spring 2021, as anticipated.

302.    The Hess Letter also detailed that Doe would be required to meet with Dr. Allen to "apply" for reinstatement, prior to September 1, 2020.

303.    Dean Hess noted in his letter that Dr. Allen would be the *sole individual* responsible for determining whether Doe has satisfactorily completed the requirements.

304.    The Hess Letter again reflected Dean Hess' assurance and guarantee of acceptance to the IUKSB MD/MBA program, reminding Doe that "Dr. [Marti] Reeser also works closely with our dual degree students and is available to talk with you further about those opportunities."

## X.    Occurrences After Doe's Meeting with Dean Hess and the Admissions Process

### A.    *University Officials Fail to Respond to Repeated Requests*

305.    After Doe's meeting, Doe's counsel reached out twice to Mr. Nussbaum to seek clarification on: (i) how the disciplinary findings and sanctions would be reflected in Doe's transcript and any corresponding documentation; (ii) what information would be disclosed to a third party regarding the Title IX matter, SPC decision, and appeal; (iii) what information would be visible to IUKSB in evaluation of Doe's application, how he should go about accurately presenting the outcome of the matter, and whether IUKSB already knew of the outcome; and (iv)

whether submission of documentation for completion of the Sanction could be completed electronically, due to COVID-19.

306.     Mr. Nussbaum declined to answer the questions and advised counsel to inform Doe to reach out to Dr. Allen directly for clarification.

307.     Doe reached out to Dr. Allen on April 9, 2020 to seek clarification on the same issues counsel previously sought clarification on and later followed up on April 23, 2020.

308.     However, Dr. Allen failed to respond, leaving Doe no choice but to apply to the IUKSB without any clarification on how the prior occurrences would impact him.

   B.  *Doe Applies to Indiana University's Kelley School of Business and is Subjected an Additional Process of Scrutiny and Review*

309.     After meeting with Dean Hess, Doe immediately and excitedly began working on his application to the IUKSB.

310.     In the beginning of April 2020, Doe spoke with IUKSB Director of Recruiting Becky Schlomann regarding application requirements and attended a Zoom conference for the MD/MBA program.

311.     On the Zoom conference, Doe learned that no GMAT would be required during this application cycle, the Application would be due on April 27, 2020 and IUKSB planned to notify prospective students of an application decision by May 8, 2020.

312.     Doe also learned that classes for the MD/MBA program at IUKSB would begin on June 1, 2020.

313.     Doe submitted his timely application to IUKSB on or around April 25, 2020, which IUKSB marked as "received."

314.     On his application, Doe fully, accurately, and truthfully recounted the details of the processes that the University subjected him to and ultimate outcome, in response to the behavior

53

disclosure question regarding whether he had ever been subject to any formal disciplinary action "for academic or non-academic reasons at any post-secondary institution, college, or university."

315.    Doe received notification from Ms. Schlomann on May 1, 2020 that he would be required to sign a FERPA release form due to his behavioral disclosure. Doe returned the FERPA form, as requested. The University contacted Doe once again for him to fill out a second FERPA form, as the first one was "not comprehensive." Doe returned the form, as requested.

316.    On May 7, 2020, Monica Henry, Associate Director of the IUPUI Graduate Office contacted Doe to inform him that the due to the "serious nature of [Doe's] disclosure" his application would be subject to additional review by the Prior Misconduct Review Committee ("PMRC") before any decision would be rendered on his candidacy for an MBA.

317.    Doe informed Dean Hess of this additional unwarranted review by the PMRC and sought Dean Hess's advice how to proceed. Dean Hess failed to reply.

318.    Doe followed up with Ms. Henry regarding the decision on his MBA program admission, who provided Doe with the information that the PMRC would meet on May 19, 2020.

*C. Doe Completes University Sanction Requirements from the Title IX Decision*

319.    After meeting with Dean Hess, Doe also sought to complete the remaining requirements from the University Sanction as a result of the Title IX Investigation.

320.    As indicated in the May 23, 2019 letter that detailed the Sanction imposed upon Doe, Doe completed each of the requirements set forth, including: (i) remaining away from University campuses through the required date of May 16, 2020, unless Doe explicitly received permission to enter a campus; (ii) refraining from participation in all academic programs and University related activities; (iii) assessment, continued therapy, and supporting documentation from Rachel Beehler, MSW, LSW; (iv) completion of the "Integrity Seminar" provided by the

Academic Integrity Seminar Corporation (Doe received verification of such completion on April 17, 2020); (v) abiding by the No Contact Order.

321.    Doe also met with Assistant Vice Chancellor, Johnny D. Pryor, virtually, on April 22, 2020, regarding Medical Ethics and the Integrity Seminar. Vice Chancellor Pryor later confirmed the meeting and completion of requirement on May 4, 2020.

322.    Ms. Freiberger confirmed completion of the Sanction on May 14, 2020.

D.   *Dr. Allen Fails to Respond to Doe's Requests for Required Meeting*

323.    Upon verification of completion of his Sanction, Doe contacted Dr. Allen to schedule a meeting numerous times, as required by Dean Hess in the Hess Letter.

324.    Dr. Allen failed to reply Doe's correspondence, thus preventing Doe from scheduling the required meeting.

E.   *The PMRC Requests a Supplemental Statement from Doe*

325.    Ms. Henry informed Plaintiff Doe on May 19, 2020 that the PMRC met and required a written response to alleged "inconsistencies" between Doe's behavioral disclosure, and the Hess Letter.

326.    In his supplemental statement, Doe recounted once again that Dean Hess granted his appeal of the SPC decision, provided that he has completed all Sanctions and requirements set forth by the Hess Letter that he was able to complete at the time (Dr. Allen had yet to reply to schedule a time to meet and Doe could not audit the Transitions 2 Course until April 2021), and asserted that his disclosure in the application was honest, accurate, and truthful.

327.    Doe submitted his timely response to the PMRC's request with a supplemental statement, and verification of completion of Sanction from Ms. Freiberger, on May 21, 2020.

F. _Doe is Incomprehensibly Denied Admission from IU's Kelley School of Business_

328.     Upon information and belief, orientation for the MD/MBA program occurred on May 27, 2020.

329.     Doe, still awaiting an answer on the IUKSB application decision, contacted Ms. Henry to inquire whether a decision was rendered regarding his candidacy, on May 28, 2020. Ms. Henry informed Doe that the PMRC would meet again on May 29, 2020, upon which time she would provide him with additional information.

330.     On Friday, May 29, 2020, at 4:42 PM, mere days before the commencement of courses for the MD/MBA program, Doe received notification from Ms. Henry that IUKSB inexplicably rejected him (the "Rejection").

331.     In the Rejection, Ms. Henry informed Doe that the PMRC determined that Doe's admission could not be approved "because of concerns that [Doe] withheld pertinent information and gave false or incomplete information."

332.     These assertions were unfounded as Doe accurately, honestly, and truthfully disclosed all alleged "misconduct" pursuant to the application guidelines, and even executed a FERPA release permitting the IUKSB to review all records related to the Title IX matter.

333.     Ms. Henry also noted in the Rejection that the decision "does not impact [Doe's] ability to enroll in classes at another college or university."

334.     The Rejection also highlighted that Doe would be able to reapply "after successfully completing the requirements set forth by the School of Medicine, including your full reinstatement in the MD program."

335.    However, completion of the requirements set forth in the Hess Letter were impossible by the IUKSB application deadline because Dr. Allen failed to reply to Doe's attempts to schedule a meeting and Doe could not audit the Transitions 2 course until April 2021.

336.    The rejection shocked Doe, as he had relied on Dean Hess's assertions and the Dean's essential guarantee of acceptance into the IUKSB. Consequently, he had *only* applied to the IUKSB.

G.   *Doe Learns that IUKSB Accepted Roe into the MD/MBA Program*

337.    Doe learned that, upon information and belief, Roe gained acceptance in the MD/MBA program and subsequently participated in orientation and courses.

338.    Upon information and belief, IUKSB did not subject Roe to the PMRC, as they did for Doe, despite the fact that Roe was also subject to the mutual No Contact Order.

339.    Doe was utterly shocked to hear that Roe, who knew of Doe's desire to enroll in the MD/MBA program from their prior relationship and the investigation, gained acceptance into the exact program he desired to complete, when she had never expressed an interest in this course of study previously.

H.   *Doe Requests Reconsideration of the IUKSB Admissions Decision*

340.    Doe, through his counsel, respectfully requested reconsideration of the IUKSB admissions decision.

341.    By letter dated June 2, 2020 letter (the "June IUKSB Letter") counsel highlighted that Plaintiff Doe represented himself, and his alleged prior misconduct, accurately and truthfully throughout the application and PMRC process, and noted that he signed not one but *two* FERPA release forms, as Doe had nothing to hide.

342.     Additionally, the June IUKSB Letter noted that Dean Hess expressed his utter confidence in Doe and all but guaranteed Doe's acceptance to the MBA program.

343.     Mr. Nussbaum replied on June 4, 2020 that he received the June IUKSB Letter, which he would forward to the PMRC for their review. Mr. Nussbaum noted that Doe would receive a final determination within thirty (30) days.

344.     Doe never received a notification of final determination.

### XI.     Doe is Inexplicably Dismissed from the Indiana University School of Medicine

345.     On June 16, 2020, Doe received a letter from Dean Hess, informing him that Dean Hess dismissed him from IUSM (the "Dismissal Letter").

346.     Doe was utterly shocked by the dismissal, as his lifelong dream of becoming a doctor crumbled before him.

347.     Citing to their meeting of March 4, 2020 and the letter dated March 27, 2020, Dean Hess asserted that Doe's statements in support of his IUKSB application did not accurately represent Dean Hess's decision concerning Doe's appeal.

348.     Doe refuted the IUKSB decision and PMRC's assertions, as he portrayed himself and the prior alleged misconduct accurately and truthfully throughout.

### XII.     Damages to Plaintiff Doe

349.     Plaintiff Doe has already suffered and will continue to suffer significant damages as a result of the University's erroneous finding of responsibility and subsequent expulsion.

350.     Plaintiff Doe is left in shambles, as IUSM's expulsion has effectively ended his medical career, before it has even begun.

351.     Unlike with undergraduate institutions, it is nearly impossible to transfer to another medical institution, even absent a disciplinary mark on one's record.

352.    In fact, it is the policy of many medical schools that they do not accept transfer students.

353.    Consequently, Doe will most likely not be able to gain admission to any other medical school, especially with a permanent erroneous notation on his record, which will prevent him from obtaining a residency position, and ultimately, will prevent him from ever becoming a practicing physician in this country.

354.    Even if Doe were to gain admission to a transfer institution, it would result in an extremely delayed graduation date, and potentially even require him to begin medical school all over again if he cannot complete his medical education in the six-year required period to do so. As a further result, Doe will suffer significant financial damage if required to pay tuition for an entire second medical education.

355.    In addition, Doe has also suffered severe emotional distress due to the erroneous and harmful accusations against him, and the lengthy drawn out disciplinary process where seemingly nobody at the University heard his repeated assertions of innocence.

### AS AND FOR A FIRST CAUSE OF ACTION[11]

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*
(Against Defendants the Trustees, IU, IUPUI, IUSM, and IUKSB)**

356.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

357.    Title IX of the Education Amendments of 1972 provides, in relevant part, that, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be

---

[11] Plaintiff intends to amend the Complaint to include tort claims after the mandatory waiting period, pursuant to the Indiana Tort Claims Act.

denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

358.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendants the Trustees, IU, IUPUI, and IUSM. *See Marshall v. Indiana Univ.,* 170 F. Supp. 3d 1201, 1210 (S.D. Ind. 2016) (highlighting that "[t]here is no dispute that" Indiana University, which also encompasses IUPUI, IUSM, and IUKSB, is "subject to Title IX's prohibition on sex discrimination.")

359.    Students attending public universities such as the University who have been accused of sexual misconduct, have a right to due process under Title IX. *See* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) (the "2001 OCR Guidance") at 22; April 2011 Dear Colleague Letter at 12.

360.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[12]

361.    The "prompt and equitable" procedures that a school must implement include, at a minimum:

i)      "Notice…of the procedure, including where complaints may be filed";

ii)     "Application of the procedure to complaints alleging [sexual] harassment";

---

[12] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn. 98-101.

iii) "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence"; and

iv) "Designated and reasonably prompt timeframes for the major stages of the complaint process."

362. Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

A. *Violations During the Title IX Investigation – Erroneous Outcome*

363. Challenges to university disciplinary proceedings for sex discrimination can fall into two categories: (1) "erroneous outcome" cases, in which the claim is that the plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

364. An "erroneous outcome" occurred in Plaintiff's case. Plaintiff Doe was innocent and wrongly found to have committed a violation of the University's Policy and Code, with gender bias as a motivating factor.

365. The Seventh Circuit recognizes the erroneous outcome theory of liability, following the standard articulated by the Second Circuit in *Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir. 1994).

366. To plead an erroneous outcome claim under Title IX, a Plaintiff found guilty of sexual assault by a university must allege: (1) facts sufficient to "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) show "gender bias was a motivating factor." *Doe v. Indiana Univ. - Bloomington,* No. 118CV03713TWPMJD, 2019 WL 341760, at *8 (S.D. Ind. Jan. 28, 2019). *See also Ayala v. Butler Univ.,* No.

116CV01266TWPDLP, 2018 WL 5117292, at *7 (S.D. Ind. Oct. 19, 2018), *appeal dismissed,* No. 18-3468, 2019 WL 2208439 (7th Cir. Jan. 24, 2019) (S.D. Ind. Jan. 28, 2019) (stating that a Plaintiff must articulate that "gender bias was a motivating factor" in the decision to impose the discipline).

367.    With respect to the first element, the University's finding that Plaintiff was guilty of sexual misconduct was utterly erroneous. The "pleading burden in this regard is not heavy" and can be met by alleging "particular procedural flaws affecting the proof." *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

368.    Facts casting much more than "articulable doubt" on the accuracy of the outcome are described in detail above, but such facts include, without limitation:

i)      Investigator Kuester overlooked unambiguous evidence that supported Doe's account of the events, including: photographs, hundreds of text messages, emails, videos, a substance abuse evaluation, a letter from Doe's therapist, and a lie detector test which Doe voluntarily subjected himself to, in order to establish his innocence.

ii)     Investigator Kuester failed to interview five witnesses – over *half* of the total amount that Doe provided for the Investigation.

iii)    Investigator Kuester omitted evidence of Roe's erratic pattern of behavior throughout the relationship, which called into question her character and the veracity of her statements, including her abusive relationship with alcohol, racist comments, and past history with complaints of a similar nature.

iv)     Investigator Kuester did not reveal evidence that he relied upon in drafting the Final Report – specifically, text messages furnished by Roe – until Doe's final investigatory interview; even then, Doe did not receive the opportunity to review the aforementioned evidence in a meaningful manner or to respond to the content within the messages during the investigatory phase.

v)      The Investigator declined to include a plethora of evidence in the Final Report that spoke to Roe's lack of credibility, character, and erratic and violent nature.

vi)     The Investigator wrongly credited interviewee James Smith in the Final Report, who did not have firsthand or even secondhand knowledge of any of the alleged events, to portray Doe in an unfavorable light.

vii)  At the Hearing, the Hearing Panel prevented Doe from finishing his opening statement. As a result, Doe could not adequately assert his innocence, lay out facts casting articulable doubt on Roe's account of the events that transpired and her credibility, and defend himself against the charges.

viii)  The Hearing Panel prevented Doe from introducing evidence regarding Roe's having engaged in grant fraud at the University, and her abuse of alcohol and prescription medications. Though the foregoing was relevant to assessing Roe's honesty and credibility, the Hearing Panel prevented Doe from presenting this information. Chairwoman Ferguson subsequently denied Doe's later request to include this information in the Investigative file.

ix)  At the Hearing, Investigator Kuester admitted to improperly correcting Betty Boe's account of "laundry chute" to "laundry room" when in fact, Doe refuted the existence of a laundry chute. By doing so, Kuester improperly credited a statement that not only he manufactured, but is not a true account of what occurred.

x)  The Hearing Panel reached a finding of responsibility that overlooked critical pieces of evidence provided by Doe, such as: (a) photographic evidence that highlighted Roe's inconsistent account of the alleged incident; (b) text message evidence that supported Doe's account of the events that transpired – supporting his innocence of the allegations; (c) photo and video evidence that directly displayed Roe's character, once again highlighting Doe's credibility; and (d) Doe's account of the circumstances under which the alleged incident arose, which support his innocence of the allegations, that Investigator Kuester acknowledged remained consistent throughout.

xi)  Conducting meetings without providing Doe the opportunity to have his advisor present or prepare relevant materials and evidence because of the extreme short notice.

xii)  The University, upon information and belief, to Doe's knowledge, did nothing to remedy or ensure an unbiased, fair, and impartial process despite possessing full knowledge of Roe's various connections throughout the University, including Roe's prior romantic involvement with a University professor and Roe's close personal relationship with her mentor, a professor emeritus at IUSM, who she conducted research for and threatened this professor's involvement in the Investigation to Doe. Upon information and belief, Roe's University connections knew individuals involved in the Investigation and Hearing process, therefore tainting the proceedings.

xiii)  The University discarded the aforementioned facts upon Appeal, resulting in an erroneous finding against Doe.

369.    Second, particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose several unjustly severe penalties upon Plaintiff Doe. These circumstances include, *inter alia:*

i)    The University initially placed the No Contact Order solely upon Doe, and not upon Roe. In fact, despite Doe's request for the No Contact Order to be made mutual for fear of his safety, the University only did so after Doe provided photographic evidence that Roe stalked him.

ii)    Removal of Plaintiff Doe from the Indianapolis campus in its entirety, effectively suspending him without any investigation and forcing him to complete his education online and later to complete orientation at a separate campus altogether; yet, Roe received full access to courses and campus without limitation, despite Doe's statements about her erratic and violent behavior and past transgressions.

iii)    Failure to commence any investigation against Roe despite her admission to having physically assaulted Doe to Investigator Kuester, and upon information and belief to other University faculty members.

iv)    Investigator Kuseter did not reveal evidence that he relied upon in drafting the Final Report – specifically, text messages furnished by Roe – until Doe's final investigatory interview; even then, Doe did not receive the opportunity to review the aforementioned evidence in a meaningful manner or respond to the content within the messages during the Investigatory phase.

v)    The Investigator failed to include critical details in the Final Report that supported Doe's credibility and account of the events that transpired.

vi)    The Investigator declined to include a plethora of evidence that spoke to Roe's lack of credibility, character, and nature.

vii)    The Investigator wrongly credited interviewee James Smith, who didn't have firsthand or even second-hand knowledge of any of the alleged events, to paint Doe in an unfavorable light.

viii)    The University scheduled the Hearing for the *same day* as Doe's ever important Step 1 Board Exam, and did not delay it, upon Doe's request, until the eleventh hour, in an attempt to block Doe from adequately preparing for these two critical events in his life and education.

ix)    The University assembled a Hearing Panel comprised of biased members, who predetermined Doe's guilt prior to the Hearing and any opportunity for Doe to defend himself against the allegations and assert his innocence, including Chairwoman Ferguson, who has a large social media presence, where she regularly

posted around the time of Hearing regarding upon information and belief, social justice issues, including, upon information and belief, women's issues. Upon information and belief, Hearing Panel member Robert Yost is the only professor who teaches the undergraduate Biology class for biology majors. Roe attended the University as an undergraduate and indeed majored in Biology, therefore, the likelihood that he had her in his class and knew her personally is high. Upon information and belief, Ms. Freiberger, Hearing Panel "Moderator" and Roe's escort, has openly stated how important women's rights and social justice are to her.

x)      Ms. Freiberger served as both moderator of the Hearing and Roe's escort, calling into question the impartiality of the Hearing, as the same individual cannot possibly serve in dual roles, one promising neutrality, and the other promising advocacy and support, and maintain impartiality.

xi)     The Hearing Panel prevented Doe from finishing his opening statement at the Hearing. As a result, Doe could not adequately assert his innocence, lay out facts casting articulable doubt on Roe's account of the events that transpired and her credibility, and defend himself against the charges.

xii)    Chairwoman Ferguson's repeated "disgusted" mannerisms toward Plaintiff Doe during the Hearing, including vehemently shaking her head in a disapproving manner.

xiii)   At the Hearing, the Chairwoman Ferguson refused to ask Roe the questions as prepared by Doe. In fact, Chairwoman Ferguson read only portions of questions that she personally and arbitrarily selected and gerrymandered instead to Roe, which Roe answered accordingly. As a result, Doe was not given an opportunity to fully confront or cross-examine his accuser, even though the finding came down to an assessment of which party's version of events was more credible. This fact alone casts some articulable doubt on the accuracy of the outcome. *See Doe v. Baum*, 903 F.3d 575, 585–86 (6th Cir. 2018) ("[B]ecause Doe alleged that the university did not provide an opportunity for cross-examination even though credibility was at stake in his case, he has pled facts sufficient to cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome.") (internal citations omitted).

xiv)    The Hearing Panel spoke to Doe in an incredibly harsh and berating tone of voice. Comparatively, the same Hearing Panel spoke to Roe in the same manner as though one would speak to a small child or infant, with a soft and sympathetic tone of voice.

xv)     The Hearing Panel questioned Doe in a harsh manner by asking him leading, accusatory, and difficult questions. For example, Dr. Yost "asked" Doe, "you must have hit the garage door pretty hard to knock it off its tracks," drawing an incorrect assumption, which Doe rebutted. Chairwoman Ferguson, under the guise of a question to Doe, stated "it seems like you loved your dog or cared about your dog

more than you cared about your girlfriend." Chairwoman Ferguson stated to Doe, again, under the pretext of an alleged question, "this is all over the fact that she [Roe] has a kid?" Doe replied that was not the case at all, and that this issue was about Roe's lies, Roe's withholding of important information from Doe – her partner – for such a long period of time, and that Roe, the potential mother of his future children stated that she viewed this child as a "mistake" she [Roe] was "getting away from." However, the Hearing Panel cut Doe short while he "answered" their questions. By comparison, Roe received gentle questions about how she felt with comforting eyes.

xvi)   A failure to present any of Doe's witnesses at the Hearing to the Hearing Panel; yet the lone witness who the University presented, Betty Boe, was proffered during the Investigation by Roe.

xvii)   Investigator Kuester's improper correction to of "laundry chute" to "laundry room" in Betty Boe's signed account of the alleged incident which Roe spoke to her about after the alleged occurrence, to inappropriately bolster Roe's account to support an improper finding of responsibility against Doe.

xviii)   The failure to afford Doe the requisite presumption of innocence; the University's Policy uses the term victim while referring to the referring reporting party/complainant.

xix)   Disparate treatment of Doe throughout the process, including banishing Doe to a separate "campus", while being overly accommodating to Roe.

xx)   Conducting meetings without providing Doe the opportunity to have his advisor present or prepare relevant materials and evidence because of the extreme short notice.

xxi)   Roe engaged in an intimate relationship with a member of the IUSM faculty, who, upon information and belief, knew individuals involved in the Investigation and resulting SPC process, therefore tainting the process. Upon information and belief, the University did nothing to prevent this permeating the process or ensure impartiality.

xxii)   Failure to bring any investigation forth into Roe despite University knowledge of falsification of documents in conjunction with the grant project.

xxiii)   Failure to act upon for Roe's retaliatory actions against Doe and violations of the No Contact Order, including stalking Doe by driving by his place of residence several times per week.

xxiv)   The training of those involved in the process undoubtedly utilizes the verbiage of the Policies, specifically, victim, which places those who are trained in a mindset to assume the complainant is the "victim" and the respondent is guilty.

xxv)    The University failed to address the above circumstances on Appeal, thus resulting in the standing of the finding against Doe.

370.    The foregoing demonstrates how a bias against Doe as the male accused led to the erroneous finding.

371.    In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1,500 institutions, issued a study, *"Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct."* The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication. In a process governed by the enforcement of Title IX gender equality, and in which the overwhelming majority of accused students are male, the survey reported that only five percent (5%) of schools have even one full-time employee to assist accused students; eighty-five percent (85%) have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available." The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

372.    The University also faced additional pressure to vindicate female complainants against male respondents because of embarrassing public attention drawn to the school's past failings.

373.    In June 2018, mere months before Roe filed her complaint against Doe, University undergraduate student Ellie Johnson began a social media campaign in which she publicly accused the University of violating its own policies when it found a student who had raped her not responsible for any violations. Her posts to Twitter about the case sparked the creation of the "#westandwithellie" hashtag, which gained national media attention.

374.    In response, the University reaffirmed its commitment to "victims" of sexual assault.

375.    The pressure on the University to vindicate female students alleging violations of the Policy in any manner caused the University to subject Plaintiff to a biased and unfair process, which was tilted in favor of the female complaint and against the male respondent.

376.    A university that is motivated to take adverse action against an accused male in order to respond to, or protect itself from, negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *See Doe v. Columbia Univ.,* 831 F.3d 46, 58 (2d. Cir. 2016) (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution "that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

377.    The University utilized the Policies and Code to treat John Doe (an accused male) differently from Roe, by promptly and aggressively responding to Roe's complaints while wholly ignoring Doe's complaints of similar harassment directed by Roe toward him.

378.    These actions were intended to deliberately treat Doe, an accused male, less favorably than Roe, the accusing female.

379.    The University officials possessed the authority to stop the wrongdoing. By doing nothing, they were deliberately indifferent to Doe and similarly situated male students charged with similar alleged violations under the Policy and Code.

380.    This unlawful discrimination in violation of Title IX proximately caused Plaintiff Doe to sustain substantial injury, damage, and loss, including, but not limited to, mental anguish, severe emotional distress, injury to reputation, past and future economic loss, deprivation of fair process, loss of educational opportunities, and loss of future employment prospects.

381.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual misconduct and be punished severely for it.

B.    _Violations of Title IX in the SPC Proceedings – Selective Enforcement_

382.    The University discriminated against Plaintiff Doe during the SPC, Reconsideration, and Appeal proceedings because of his sex in a manner that was so severe, pervasive, and/or objectively offensive, that it deprived him of access to educational opportunities. The University conducted their SPC Proceedings (including the Reconsideration and Appeal) in a biased manner against the male student, Doe, causing him to be unjustly deprived of educational opportunities on the basis of gender.

383.     The Guidelines apply "to *all* students enrolled in the courses…electives necessary to complete the requirements for the doctor of medicine degree in the IU School of Medicine."

384.     Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and decision to selectively enforce an unjust and severe penalty upon Plaintiff Doe. These circumstances include, *inter alia*:

i)    Failure to subject Roe to the same SPC process, despite knowing of her actions and behavior that called into question her fitness for the medical profession. For instance, the University knew of Roe's falsification of documents in conjunction with the grant project, her violent nature (specifically, when she threw a flower vase at Doe's head), and her racist commentary.

ii)   Failure to impose any sanctions upon Roe for the aforementioned conduct.

iii)  Failure to provide Doe with a meaningful opportunity to defend himself throughout the SPC proceedings (including Reconsideration and Appeal) because they limited the scope of their meetings on the "eligibility to return to medical school" and not on the Hearing Panel's decision or factors that lead to the decision.

iv)   A complete disregard for the new evidence presented upon Reconsideration that highlighted Doe's good character and credibility, while casting doubt upon Roe's account of events and her fitness to practice medicine.

v)    Unnecessary delays in scheduling meetings, responding to messages for clarification and scheduling, etc., and responding to the Appeal – yet the University expected Doe to adhere to all deadlines (which, Doe indeed did).

vi)   The individuals that served throughout the SPC proceedings (including Reconsideration and Appeal) knew of the errors in the flawed Investigation (*see* ¶ 368) and bias exhibited throughout the Investigation (*see* ¶ 369), yet failed to account for these errors and bias exhibited in their decision to recommend Doe for expulsion.

vii)  Complimentary remarks from the ex officio member of the SPC regarding the "toughness" of a question posed to Doe, indicating a predisposed bias against Plaintiff.

viii)    Through his own admission to Doe in the March 4, 2020 meeting, Dean Hess knew of the errors in the flawed Investigation (*see* ¶ 368) and bias exhibited throughout the Investigation (*see* ¶ 369), because he read over "300 pages of documents" provided by Doe, yet failed to account for these errors and bias exhibited in his ultimate decision to expel Doe.

385.     Plaintiff, based solely on his gender, suffered selective enforcement in the SPC proceedings (including Reconsideration and Appeal) which has limited his ability to participate in and benefit from IUSM's educational program.

386.     This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

387.     As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

C. _Violations of Title IX in the IUKSB Application Process and Decision_

388.     Doe experienced discrimination on the basis of sex, in comparison to his female comparator, during the IUKSB admissions process that resulted in his rejection from their MD/MBA program.

389.     Circumstances that suggest gender bias served as a motivating factor behind the decision to reject Doe include, _inter alia_:

i) IUKSB subjected Doe to an additional process, the PMRC, which, upon information and belief, Roe was not subjected to, despite the fact that the application also required Roe to disclose the No Contact Order on the behavioral history portion. This PMRC process required not one, but _two_ levels of additional scrutiny, because the PMRC first evaluated Doe's application (separate from the application process review) and then requested a supplemental statement.

ii) IUKSB accepted Roe into the very same program they rejected Doe from, despite knowing of Roe's behavioral history, violent actions, falsification of documentation in conjunction with the grant project, and racist comments, as these were contained in the documentation from the Investigation through Doe's FERPA release, which they received access to.

iii) The IUKSB and PMRC knew of the errors in the flawed Investigation (_see_ ¶ 368) and bias exhibited throughout the Investigation (_see_ ¶ 369) because they had access

to Doe's records, as Doe signed a FERPA release – displaying that he had nothing to hide, yet failed to take any of this into account when determining an admissions decision regarding Doe.

390.    Plaintiff suffered based on his gender in the application process which, in turn, has limited his ability to participate in and benefit from IUKSB's educational program.

391.    This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

392.    As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983: Denial of Fourteenth Amendment Procedural Due Process (Against the Trustees, IU, IUSM, IUPUI, Kuester, Allen, and Hess)

393.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

394.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

395.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

396.     The Due Process Clause applies where "charges of misconduct" by school authorities and a suspension "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Goss v. Lopez*, 419 U.S. 565, 575 (1975).

397.     A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process. The Due Process Clause "forbids arbitrary deprivations of liberty," such that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied." *Id.* at 574 (internal quotation marks omitted).

398.     Deprivation of the protected liberty interest, identified by the "stigma-plus" test, occurs where, as here, the State inflicted reputational damage accompanied by an alteration in legal status that deprived the person of aright he previously held. *See Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019) (highlighting that a liberty interest is protected upon satisfaction of the "stigma plus" test).

399.     Here, the suspension and resulting expulsion changed Plaintiff's legal status since he could no longer be a student, put his reputation and honor at stake, and seriously damaged his career prospects. He is thus entitled to procedural protections under the Due Process Clause. *See Doe v. Purdue Univ.*, 928 F.3d at 663 (7th Cir. 2019) (finding that plaintiff who was suspended for one year after University found him guilty of sexual violence had adequately alleged a liberty interest under the "stigma plus" test because he alleged reputational harm, a change to his legal status due to the suspension).

400.     Doe satisfies this test because Defendants inflicted reputational harm by wrongfully branding him as someone who engaged in sexual misconduct or dating violence and then changed

Doe's legal status by first placing an effective interim suspension based upon allegations alone, without an investigation, upon him from the Indianapolis campus.

401. The University then *further* altered his status by in fact imposing a suspension upon Doe, due to the wrongful finding against him by the Hearing Panel, of one year.

402. The most serious alteration in status occurred when the University *expelled* Doe, through Dean Hess's June 16, 2020 letter, as a result of the SPC process (including Reconsideration and Appeal) where the University merely accepted the findings of the Investigation and failed to make an independent evaluation and assessment.

403. As a result, Doe suffered extreme reputational damage. The initial finding of responsibility from the Investigation and Hearing Panel immediately caused Doe to be subjected to the SPC process (including Reconsideration and Appeal), which in turn made him allegedly ineligible to advance in his medical education and become a doctor. Doe would never have had to endure such a long and excruciating process with the SPC (including Reconsideration and Appeal) without the erroneous finding of responsibility from the Investigation.

404. Doe's reputational damage has impacted him immensely and will continue to impact him for the rest of his life. Doe is already ostracized from his peers and colleagues. As time goes on, he continues to suffer even more.

405. Doe will most likely not be able to gain admission to any other medical school due to the reputational damage, especially with a permanent erroneous notation on his record, which will prevent him from obtaining a residency position, and ultimately, will prevent him from ever becoming a practicing physician in this country. Unlike with undergraduate institutions, it is nearly impossible to transfer to another medical institution, even absent a disciplinary mark on one's record. In fact, it is the policy of many medical schools that they do not accept transfer students.

406.     Even if Doe were to gain admission to a transfer institution, it would result in an extremely delayed graduation date, and potentially even require him to begin medical school all over again if he cannot complete his medical education in the six-year required period to do so. Even so, Doe would need to overcome said reputational damage to obtain a residency placement.

407.     Doe suffered this treatment as a result of the numerous biased and unfair proceedings that lacked impartiality. Doe's protected interest in an impartial proceeding – which the University failed to provide – directly caused and impacted the reputational damage Doe suffered.

408.     As a result, Doe's lifelong dream of becoming a physician is shattered.

409.     A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

410.     In higher education, a "property interest is a matter of contract between the student and the university." *See Doe v. Purdue*, 928 F.3d at 660; *see also Bissessur v. Ind. Univ. Bd. of Trs.,* 581 F.3d 599, 601 (7th Cir. 2009) (noting that the "basic legal relation between a student and a private university or college is contractual in nature" and that the University stole from the student "the right to a continuing education or the right not to be suspended without good cause.")

411.     Prior to his sanction and ultimate expulsion, Plaintiff was a student in good standing at the University. His constitutionally protected property interested in his continued enrollment at IUSM and to be free from arbitrary expulsion arises from the policies, courses of conduct, practices and understandings established by the University, including the Student Sexual Misconduct Policy and the Guidelines for Promotion, Suspension, Dismissal and Withdrawal.

412.   Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between the University and Plaintiff.

413.   Plaintiff indeed applied to and enrolled at IUSM, and paid associated fees and expenses. Plaintiff did so in reliance on the understanding and with the reasonable expectation that the University would implement and enforce the provisions and policies set forth in its official publications, including the Policy, Code, and Guidelines.

414.   As a relationship between a student and a university is contractual in nature, Doe thus entered into a contract with the University through the aforementioned facts, entitling him to due process protections. *See Doe v. Purdue*, 928 F.3d at 661.

415.   The University provides that students have "the right to be free from discriminatory harassment" and "the right to be free from such discrimination by other students that has the effect of interfering with the student's ability to participate in programs or activities at the university." Such harassment is inclusive of sexual harassment and sex/gender-based discrimination.

416.   The Policy articulates that mandatory reporters are required to report these allegations to the proper University official.

417.   During the investigation process, the Policy requires that: (i) "the parties [both Complainant and Respondent] will have *equal opportunities to present information*" (emphasis added); (ii) a respondent has a right to "have an advisor present" at *any* related meeting or hearing; (iii) the University "*will have as a priority the interests of all parties involved*, in regard to fairness, dignity, privacy, and due process" (emphasis added); and (iv) interviews be conducted with the complainant, the respondent, and other witnesses identified as having information relevant to the allegations made, as well as the examination of written statements by the parties, relevant documents, and other relevant information."

418.    The University provides that students are to have a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation occurred before any sanctions are imposed.

419.    The University utilizes a preponderance of the evidence standard, more likely than not, to make determinations of responsibility.

420.    Through the Policy, the University articulates a strong stance against retaliation.

421.    The University breached these express and/or implied contracts with Doe and failed to provide Plaintiff with clearly established rights under the Due Process Clause of the Fourteenth Amendment by failing to provide him with a process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing.

422.    The United States Department of Education's Office for Civil Rights has also acknowledged that public universities are required to provide constitutional due process protections to students accused of sexual misconduct. This was reiterated in the April 2011 Dear Colleague Letter which stated that "[p]ublic and state supported schools *must* provide due process to the alleged perpetrator" in sexual misconduct cases. *Dear Colleague Letter* at p. 12.

423.    The allegations in this case resulted in the sanction of expulsion from medical school, and a permanent marking of Plaintiff's record, which will ultimately prevent him from ever practicing medicine, and will have further lifelong ramifications for Plaintiff with respect to his education, employment, and reputation.

424.    The Defendants violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness by, without limitation:

i)   Discriminating against Doe on the basis of sex or gender.

ii) Conducting a wholly unfair and biased Investigation, Hearing process, and SPC Process (including Reconsideration and Appeal), that lacked the requisite impartiality.

iii) Placing an effective interim suspension on mere allegations alone upon Doe from the Indianapolis campus without any investigation or hearing and well prior to any subsequent finding. Dr. Allen implemented this under the guise of a no contact order, however, in effect its reach went far beyond that – so much so that it effectively suspended Doe from the campus entirely, losing access to vital resources for his education.

iv) Failing to interview witnesses relevant to the Investigation. Investigator Kuester violated Doe's rights by declining to interview Doe's mother and four other witnesses that Doe furnished for the Investigation.

v) Failing to require Roe to answer relevant questions fully posed by Plaintiff during the Hearing. Here, Doe, a student at a public university, faced expulsion through a disciplinary proceeding, and thus, a serious private interest is at stake, heightened due process protections such as a formal hearing, the right to cross-examination and to question witnesses may be required. *Doe v. Baum,* 2018 WL 4265634, at **3-5 (6th Cir. Sept. 7, 2018). For instance, Chairwoman Ferguson refused to ask Roe the questions as prepared by Doe. In fact, Chairwoman Ferguson read only portions of questions that she personally and arbitrarily selected and gerrymandered instead to Roe, which Roe answered accordingly. As a result, Doe was not given an opportunity to fully confront or cross-examine his accuser, even though the finding came down to an assessment of which party's version of events was more credible.

vi) Denying Plaintiff Doe the right to *respond* in a meaningful and complete manner to the accusations against him because he did not receive the opportunity to finish his opening statement, or question or confront all of Roe's witnesses upon whose statements Investigator Kuester and the Hearing Panel chose to rely, resulting in a failure to provide "equal opportunities to present information."

vii) Failing to comprise a Hearing Panel of unbiased and impartial members.

viii)  Failing to provide an impartial Hearing process, as Ms. Freiberger served as both moderator of the Hearing and Roe's personal escort, calling into question the impartiality of the Hearing, as the same individual cannot appropriate serve in this dual capacity, one pledging impartiality, and the other promising advocacy and support.

ix) Failing to apply the proper standard of review during the Investigation. For instance, Investigator Kuester overlooked unambiguous evidence that supported Doe's account of the events, including: photographs, hundreds of text messages, emails, videos, a substance abuse evaluation, a letter from Doe's therapist, and a lie detector test which Doe voluntarily subjected himself to, in order to establish his innocence. Additionally, The Hearing Panel reached a finding of responsibility that overlooked critical pieces of evidence provided by Doe, such as (a) photographic evidence that highlighted Roe's

inconsistent account of the alleged incident; (b) text message evidence that supported Doe's account of the events that transpired – supporting his innocence of the allegations; (c) photo and video evidence that directly displayed Roe's character, once again highlighting Doe's credibility; and (d) Doe's account of the circumstances under which the alleged incident arose, which support his innocence of the allegations.

x)   Failing to investigate Roe for acts of violence against Doe, racist comments, and falsification of documents in conjunction with a grant project, despite being mandated reporters.

xi)  Failing to provide Doe with a safe educational environment free from discrimination and retaliation, despite the University's awareness of Doe's concerns regarding such.

xii) Dr. Allen and Dr. Walvoord's failure to permit Doe adequate time to contact his attorney to be present during meetings with the University regarding the Investigation.

xiii)   Failing to prioritize "the interest of all parties involved, in regard to fairness dignity, privacy and due process" – in essence, robbing Doe of due process and fundamental fairness.

xiv)   Failing to disclose the names of the SPC members that would be hearing Doe's case and thus, depriving him of an opportunity to challenge their participation.

xv)  Refusing to allow Plaintiff's attorney to accompany him to any portion of the SPC proceedings, including the SPC Hearing, Appeal Committee, or Meeting with Dean Hess, despite the severity of the charges at issue and potential ramifications of a finding of responsibility.

xvi)   Permitting the SPC to accept the findings reached by the Investigator as fact, rather than conducting its own separate investigation prior to issuing a new sanction.

xvii)   Failing to articulate a standard of proof during the SPC proceeding upon which Doe would be evaluated for further sanctioning.

xviii)   Subjecting Plaintiff to "double jeopardy" when IUPUI and IUSM issued separate, and compounding, sanctions for the same alleged violations.

xix)   Failing to provide Doe with a meaningful opportunity to defend himself throughout the SPC proceedings (including Reconsideration and Appeal) because they limited the scope of their meetings on the "eligibility to return to medical school" and not regarding the scope of the Investigation.

xx)  Failing to provide any remedy for the acts of retaliation that Doe suffered.

xxi)   Failing to provide Doe with a speedy process.

425.    Defendants deprived Doe of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication free from bias, his right to be informed of the evidence against him, his right to be innocent until shown to be responsible and not be subjected to the burden of proving his innocence, his right to be heard by an impartial fact finder, to fully question his accuser, challenge the credibility those adverse to him, and present evidence and witnesses in his defense.

426.    In attempting to demonstrate their compliance with the "April 2011 Dear Colleague Letter" the Defendants subjected Doe to an insufficient process when they failed to provide Doe with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary, and unwarranted decision motivated by gender bias.

427.    As a result, Defendants failed to provide Doe with the basic due process protections that they are required to provide students subjected to the Title IX process at a state school.

428.    Defendants Dr. Allen, Investigator Kuester and Dean Hess, as well as other agents, representatives, and employees of University, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights. Defendants all agreed to, approved, and ratified this unconstitutional conduct.

429.    Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication free of bias, his right to be innocent until shown to be responsible, and to not be subjected to the burden of proving his innocence, his right to be heard by an impartial factfinder, to question his accuser, challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense. Plaintiff will suffer lifelong damages as a result of the University's findings and sanction.

430.    Defendants, as well as other agents, representatives and employees of the University intentionally, willfully, wantonly, oppressively and maliciously violated Plaintiff's due process rights.

431.    Defendants all agreed to, approved, and ratified this unconstitutional conduct.

432.    Defendants Trustees, IU, IUSM, and IUPUI as well as other agents, representatives and employees of the University deprived Plaintiff of the requisite due process because the University had a pecuniary interest in the outcome of the adjudication. Specifically, the University had just recently, in February 2018, resolved multiple cases that were under investigation by OCR. Had Doe been found not responsible and the University subjected to another OCR investigation, it would potentially risk losing federal funding.

433.    Investigator Kuester was responsible for implementing the Policy and Code, and carrying out these processes in an unbiased and impartial manner. He failed to do so by: (i) conducting an insufficient, incomplete, and unfair Investigation; (ii) refusing to interview relevant witnesses furnished by Doe; (iii) ignoring material evidence that supported Doe's account of the events, including: photographs, hundreds of text messages, emails, videos, a substance abuse evaluation, a letter from Doe's therapist, and a lie detector test which Doe voluntarily subjected himself to, in order to establish his innocence; (iv) declining to investigate Roe for her known violent conduct; (v) improperly interpreting Betty Boe's signed account to mean laundry room when in fact she stated laundry chute, where Doe refuted the existence of a laundry chute to demonstrate Roe's inconsistent account; and (vi) not meeting the requisite standard of proof.

434.    Dr. Allen, in his official capacity and ex officio capacity, was responsible for implementing the Policy, Code, and Guidelines, and carrying out these processes in an unbiased and impartial manner, which he failed to do when he imposed an effective interim suspension upon

Doe on mere allegations alone – without any investigation whatsoever, failed to afford Doe the opportunity to have his attorney present as required by the University, and failed to conduct an SPC process (including Reconsideration and Appeal) free from bias.

435.    Dean Hess failed to uphold his responsibilities as Dean of IUSM, where he is responsible for overall performance and operations as an educational institution of higher learning, including compliance with federal and state laws, because he not only allowed the biased and flawed proceedings to occur, but erroneously expelled Doe as a result.

436.    As a result of these due process violations, Plaintiff suffered and will continue to suffer ongoing economic and non-economic damages and significant reputational damage. Again, in particular, the expulsion from IUSM will prevent Doe from pursuing his chosen career path as he will likely never gain acceptance to another medical school or residency program, destroying his chances of becoming a physician.

437.    Accordingly, Defendants are liable to Plaintiff for violations of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment and for all damages arising therefrom.

438.    As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, emotional distress, loss of educational opportunities, loss of career opportunities, economic injuries, and other direct and consequential damages.

439.    Plaintiff further seeks punitive damages against Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE**,** for the foregoing reasons, Plaintiff John Doe respectfully requests that this Court:

(i)    On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding Doe:

a. Damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, disbursements;

b. Expungement all records related to the investigation, adjudication, disciplinary findings, SPC proceeding, and appeals and reconsideration processes (including reconsideration and appeal) notations, and sanctions from his record; and

c. Immediate reinstate Plaintiff to the Indiana University School of Medicine.

(ii) On the second cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against Defendants awarding Doe an injunction vacating Doe's disciplinary findings and decision, granting expungement of the disciplinary records at subject in this complaint from Doe's school records at the University, and immediate reinstatement to IUSM.

(iii) Awarding Plaintiff such other and further relief as the Court deems just, equitable and proper, including attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiff John Doe, by counsel, herein requests a trial by jury of all triable issues in the present matter.

Dated:   **New York, New York**
       **July 30, 2020**

                              **Respectfully submitted,**

                              ***Attorneys for Plaintiff John Doe***

                              **NESENOFF & MILTENBERG, LLP**

                              **By: _/s/ Andrew T. Miltenberg_**
                              **Andrew T. Miltenberg, Esq.**
                              **(*pro hac vice* admission pending)**
                              **Stuart Bernstein, Esq.**
                              **(*pro hac vice* admission pending)**
                              **363 Seventh Avenue, Fifth Floor**
                              **New York, New York 10001**
                              **(212) 736-4500**
                              **amiltenberg@nmllplaw.com**
                              **sbernstein@nmllplaw.com**

**Tara J. Davis, Esq.**
(***pro hac vice*** **admission pending**)
**Regina M. Federico, Esq.**
(***pro hac vice*** **admission pending**)
**101 Federal Street, Nineteenth Floor**
**Boston, Massachusetts 02110**
**(617) 209-2188**
**tdavis@nmllplaw.com**
**rfederico@nmllplaw.com**

**DELK MCNALLY, LLP**
**By: */s/ Michael T. McNally***
**Michael McNally, Esq.**
**IN No. 23676-49**
**211 South Walnut Street**
**Muncie, Indiana 47305**
**(317) 442-4444**
**mcnally@delkmcnally.com**