**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| **JOHN DOE,**<br>            **Plaintiff,**<br><br>        **v.**<br><br>**THE TRUSTEES OF INDIANA UNIVERSITY, INDIANA UNIVERSITY SCHOOL OF MEDICINE, INDIANA UNIVERSITY PURDUE UNIVERSITY – INDIANAPOLIS, INDIANA UNIVERSITY KELLEY SCHOOL OF BUSINESS, GREGORY KUESTER, in his official and individual capacity, BRADLEY ALLEN, in his official and individual capacity, and JAY HESS, in his official and individual capacity,**<br><br>            **Defendants.** | **Civ. No. 1:20-CV-02006-JRS-MJD** |

**PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW IN SUPPORT**
**OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**
**AND AN EVIDENTIARY HEARING**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff John Doe*
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**

**-and-**

**DELK MCNALLY, LLP**
**211 South Walnut Street**
**Muncie, Indiana 47305**
**(317) 442-4444**

## <u>PRELIMINARY STATEMENT</u>

Plaintiff John Doe (hereinafter referred to as "Plaintiff" or "John Doe" or "Doe"), by his attorneys Nesenoff & Miltenberg, LLP and Delk McNally LLP, hereby moves, pursuant to Federal Rule of Civil Procedure 65(a) and Local Rule 65-2, for a preliminary injunction, enjoining Defendants Trustees of Indiana University ("Trustees"), Indiana University School of Medicine ("IUSM"), Indiana University Purdue University – Indianapolis ("IUPUI") (collectively, the "University"), and Dean Jay Hess (collectively "Defendants"), from enforcing the dismissal of Plaintiff John Doe from the Indiana University School of Medicine.

Plaintiff John Doe and Jane Roe ("Roe"), a fellow IUSM medical student, began dating in October 2017. (ECF No. 37-1 at ¶ 5.) After a passionate, yet tumultuous relationship that spanned approximately one year, in October of 2018, Doe ended the relationship with Roe. (ECF No. 37-1 at ¶¶ 6, 35.) Mere days later, Roe filed a complaint with the University alleging that Doe had assaulted her. (ECF No. 37-1 at ¶ 41.) On January 18, 2019, Doe was notified by Investigator Gregory Kuester that Roe had decided to move forward with her complaint, alleging various instances of misconduct throughout their relationship. (ECF No. 37-1 at ¶ 49.) The filing of this false complaint triggered an investigation and adjudication process conducted by the University which was riddled with procedural errors, instances of bias, a failure to consider exculpatory evidence, and culminated in a hearing during which Doe was provided neither a meaningful opportunity to be heard, nor an opportunity to fully cross-examine his accuser. (ECF No. 37-1 at ¶¶ 60-119.) Subsequently, IUSM's Student Promotions Committee held a hearing, which lacked the basic elements of a fair hearing, and ultimately led to Doe's dismissal from IUSM on October 28, 2019. (ECF No. 37-1 at ¶ 157.)

Doe appeared before an Appeal Committee on January 14, 2020, which voted to uphold the sanction of expulsion from IUSM. (ECF No. 37-1 at ¶¶ 167-169.) The Appeal Committee's decision was then forwarded to Dean of the Medical School, Dean Jay Hess for approval. (ECF No. 37-1 at ¶ 169.) On March 4, 2020, Doe met with Dean Hess to discuss the Appeal Committee's decision. (ECF No. 37-1 at ¶ 170.) Dean Hess exercised his authority to overturn the recommendation of expulsion. (ECF No. 37-1 at ¶ 175.) He notified Doe that he would be permitted to complete a one-year leave of absence from IUSM, during which time Doe could pursue his MBA from Indiana University's Kelley School of Business ("IUKSB"), fulfilling his previously expressed desire of obtaining a dual MD/MBA degree, before returning to IUSM in the spring of 2021 to complete his medical education. (ECF No. 37-1 at ¶¶ 176-178.)

Despite Dean Hess's assurance that Doe would be offered admission to IUKSB, and in disregard of Doe's detailed description concerning the prior disciplinary matter as well as his execution of a FERPA release permitting IUKSB to fully review all documents related to the Title IX matter, Doe was ultimately denied admission to IUKSB for the stated, and indisputably pretextual, reason that Doe withheld information from his application. (ECF No. 37-1 at ¶¶ 201-202; ECF No. 37-20). Thereafter, on June 16, 2020, Dean Hess notified Doe that he was once again expelled from IUSM. (ECF No. 37-1 at ¶ 216; ECF No. 37-21).

In the Amended Complaint filed with this Court on July 31, 2020 (ECF No. 8) Plaintiff sets forth in detail how Defendants engaged in Title IX prohibited sex discrimination, and deprived Plaintiff John Doe of his fundamental rights to a fair process when they erroneously found him responsible for physical abuse within a dating relationship. As demonstrated herein, Plaintiff meets the requirements for a preliminary injunction: (1) he will suffer irreparable harm prior to the resolution of his claims in this litigation; (2) traditional legal remedies are inadequate; and (3)

there is some likelihood of success on the merits of his claims. For the reasons detailed in Doe's Amended Complaint, Plaintiff's Declaration in Support of the Motion for Preliminary Injunction, and the accompanying affidavit of Dr. Suzanne M. Miller, absent the granting of the requested relief, Plaintiff will suffer irreparable damage to his chances of ever practicing medicine in the United States.

## STATEMENT OF FACTS

For a detailed recitation of the relevant facts, see Plaintiff's Amended Complaint, dated July 31, 2020, and Plaintiff John Doe's Declaration in Support of Motion for Preliminary Injunction dated October 6, 2020.

## ARGUMENT

### I.     The Requested Preliminary Injunction is Proper Under the Law

The purpose of a preliminary injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1453 (7th Cir. 1995). Plaintiff's motion for a preliminary injunction should be granted because, as will be discussed herein, Plaintiff satisfies the following elements for obtaining a preliminary injunction: "(i) without such relief, it will suffer irreparable harm before final resolution of its claims; (ii) traditional legal remedies would be inadequate; and (iii) it has some likelihood of success on the merits." *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cty. of Marion, Indiana*, 889 F.3d 432, 437 (7th Cir. 2018). Once a Plaintiff demonstrates this threshold showing, the court shifts its analysis to "whether the balance of the harm favors the moving party or whether the harm to other parties or the public sufficiently outweigh movants interests." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034, 1044 (7th Cir. 2017) (internal citations omitted). The court weighs these considerations on a sliding scale due to their

interdependent nature. *GoodCat, LLC v. Cook*, 202 F. Supp. 3d 896, 908–09 (S.D. Ind. 2016), *citing Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010).

While a preliminary injunction is considered an extraordinary measure, it should be issued when necessary to preserve the status quo pending the final outcome of a case. *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981). The preliminary injunction that Plaintiff seeks here would preserve the status quo of his being a student at IUSM pending a resolution of this litigation. Specifically, there are critical upcoming deadlines by which this matter is unlikely to be resolved. For instance, IUSM students are required to submit their preferred clerkship locations beginning December 10, 2020. (ECF No. 37-1 at ¶ 228.)

In a number of recent cases, federal courts have granted the kind of injunctive relief sought here, prohibiting schools from implementing discipline against students accused of sexual misconduct. *See e.g. Doe v. Univ. of Michigan,* 325 F. Supp. 3d 821 (E.D. Mich. 2018) (preliminary injunction granted where student accused of sexual assault established likelihood of success on merits of his claim that university's sexual misconduct policy, which afforded neither a live hearing nor cross-examination, violated his right to due process, and demonstrated irreparable harm because expulsion could drastically curtail future educational and employment opportunities, for which money damages could not compensate student); *Doe v. Pennsylvania State Univ.,* 276 F. Supp. 3d 300 (M.D. Pa. 2017) ("[p]re-medical school student who was accused of sexual misconduct by fellow student demonstrated immediate irreparable harm resulting from state university's immediate suspension and recommendation that student be suspended from highly competitive, accelerated seven-year joint medical school program while fellow student was a participant, as would support grant of temporary restraining order in student's action alleging violation of due process; suspension from program would presumably have lasted for six years,

and student would have had to explain, for the remainder of his professional life, lengthy tenure within program and, ultimately, delayed entry into professional workforce."); *Nokes v. Miami Univ.*, No. 1:17-CV-482, 2017 WL 3674910 (S.D. Ohio Aug. 25, 2017) (preliminary injunction granted prohibiting university from suspending student who alleged that the school had acted in violation of his constitutional due process rights to notice and confrontation of adverse witnesses); *Doe v. Rhodes Coll.*, Case No. 2:19-cv-02336 (W.D. Tenn. June 14, 2019), *see* https://www.natlawreview.com/article/federal-court-judge-private-college-denied-due-process-to-football-player-accused (granting a temporary restraining order upon finding a likelihood of success on the merits of a Title IX erroneous outcome claim, due to lack of accused student's right to cross-examine adverse witnesses). *See also Doe v. University of Cincinnati,* 223 F. Supp. 3d 704 (S.D. Ohio 2016); *Doe v. Brown Univ.,* 210 F. Supp. 3d 310, 313 (D.R.I. 2016); *Ritter v. Oklahoma*, 2016 WL 2659620 (W.D. Okla. May 6, 2016).

As demonstrated below, consideration of the relevant factors unquestionably supports Plaintiff John Doe's right to a preliminary injunction, preventing Defendants from enforcing their egregious decision to expel Plaintiff from IUSM. Plaintiff will suffer irreparable harm should the requested relief not be granted, including the inability to complete his medical education and earn a medical degree. The available legal remedies would be inadequate as money damages could not compensate him for the loss of his career, goodwill, name and reputation, and he is likely to succeed on the merits of his claims.

## II.     <u>Plaintiff Meets the Requirements for a Preliminary Injunction</u>

Plaintiff sufficiently meets the requirements set forth for a preliminary injunction, which in turn establishes that the requested relief should be granted.

### A. Plaintiff Will Suffer Irreparable Harm in the Absence of the Requested Relief

Plaintiff satisfies the first prong for a preliminary injunction, as he will suffer irreparable injury if the requested relief is not granted, and the dismissal is enforced. To make a showing of irreparable harm, the moving party must establish that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which money damages are inadequate. In the context of a university disciplinary proceeding, various courts have recognized that "[b]eing labeled a sex offender by a university has both an immediate and lasting impact on a student's life." *Doe v. Baum,* 903 F.3d 575, 582 (6th Cir. 2018). Further, where a plaintiff's "constitutional right to due process is 'threatened or impaired' the Court may presume irreparable injury." *Doe v. Univ. of Michigan,* 325 F. Supp. 3d at 829.

Plaintiff readily makes a showing of irreparable harm here. At the time the June 16, 2020 expulsion was issued, Plaintiff had expected to take a one-year leave of absence from IUSM, during which he would obtain his M.B.A, before resuming his third year of medical school in the spring of 2021, ultimately graduating with a joint M.D./M.B.A. degree. (ECF No. 37-1 at ¶¶ 176-178.) Without injunctive relief enjoining enforcement of this expulsion, Plaintiff will be unable to resume his medical school education. The permanent disciplinary notation on his record will prevent him from gaining admission to any other medical school, from obtaining a residency position, and will preclude him from ever becoming a practicing physician. (ECF No. 37-2 at ¶¶ 24-26.) Unlike with undergraduate institutions, it is nearly impossible to transfer medical schools, even absent a disciplinary mark on one's record. (ECF No. 37-2 at ¶ 18.) Further, even if Plaintiff were able to somehow resume his education at another institution, he would be required to start his education from the beginning, as he would be unable to complete his medical education within

the required six-year time period. This would result in an even further delayed graduation date, and further postponement for earning an income.

As described in further detail below, for these losses, money damages cannot make Doe whole. This is precisely the type of irreparable harm injunctive relief is intended to avert. Based on the foregoing, Plaintiff has adequately demonstrated that, absent the granting of an injunction, he will be irreparably harmed, as he will likely be unable to ever become a practicing physician in the United States. (ECF No. 37-2 at ¶ 26.) Accordingly, Plaintiff satisfies this prong of his request for injunctive relief.

**B.  Traditional Legal Remedies are Inadequate**

To demonstrate inadequacy of relief at law, a party must show that monetary damages do not provide a sufficient remedy. *Cumulus Radio Corp. v. Olson,* 80 F. Supp. 3d 900, 912 (C.D. Ill. 2015). "This does not require that he demonstrate that the remedy be wholly ineffectual... Rather, he must demonstrate that any award would be 'seriously deficient as compared to the harm suffered.'" *Whitaker*, 858 F.3d at 1046 (internal citations omitted).

In the instant action, it is readily apparent that monetary damages would not and cannot remedy the loss of Plaintiff Doe's medical degree, or the gap in his education were he somehow able to continue his medical education elsewhere. As the Court in *King v. DePauw Univ.* (No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014)) explained:

> If [plaintiff] is not permitted to complete this upcoming semester at DePauw – even if, as DePauw asserts, he could choose to attend another university and ultimately graduate on time – he will forever have a gap or a senior-year transfer on his record. The Court finds it inevitable that he would be asked to explain either situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct at DePauw. *Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the*

> *question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding.*

(emphasis added); *See also Whitaker*, 858 F.3d at 1046 (7th Cir. 2017) ("While monetary damages are used to compensate plaintiffs in tort actions, in those situations the damages relate to a past event, where the harm was inflicted on the plaintiff through negligence or something comparable. But this case is not the typical tort action, as [Plaintiff] has alleged *prospective* harm."); *Doe v. Middlebury Coll.,* No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) ("While Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career in July 2016 with this particular employment…Money damages cannot provide an adequate remedy for such imminent and non-speculative harm"); *Maczaczyj v. State of N.Y.*, 956 F. Supp. 403, 408 (W.D.N.Y. 1997) (plaintiff showed irreparable harm where, in absence of injunction, he would not be able to participate in his master's program, which would likely affect ability to engage in future employment of his choice and would have an unquantifiable effect on his mental health). Consequently, it is indisputable that money damages alone cannot adequately compensate Plaintiff for the harm he has already suffered, and will continue to suffer, if preliminary injunctive relief is not granted.

Furthermore, as the analysis of the adequacy of a remedy at law and irreparable harm elements tend to combine, this element is met for the additional reasons stated in the aforementioned section. *Somerset Place, LLC v. Sebelius,* 684 F. Supp. 2d 1037, 1042–43 (N.D. Ill. 2010) (*citing Roland Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 387 (7th Cir.1984)).

### C.  Plaintiff is Likely to Succeed on the Merits of His Claims

Plaintiff is also entitled to injunctive relief as he is likely to succeed on the merits of his claims. "A party moving for preliminary injunctive relief need not demonstrate a likelihood of

absolute success on the merits. Instead, [it] must only show that [its] chances to succeed on his claims are '*better than negligible*.'" (emphasis added). *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 966 (7th Cir. 2018) (*quoting Whitaker*, 858 F.3d at 1046). As described in the Amended Complaint and as further articulated below, Plaintiff easily satisfies his burden on this element.

### 1. *Title IX – Erroneous Outcome*

First, Plaintiff is likely to succeed on his Title IX – Erroneous Outcome claim. Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault, *Davis v. Monroe Bd. Of Education* (526 U.S. 629 (1999)), or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994). In either case, the statute is enforceable through an implied private right of action. *Yusuf,* 35 F.3d at 714.

To establish a Title IX "erroneous outcome" claim, it has been generally accepted that the plaintiff must demonstrate (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) "particular circumstances suggesting gender bias was a motivating factor behind the erroneous findings," such as (but not only) statements by disciplinary tribunal members and university officials and patterns of decision-making. *Yusuf,* 35 F.3d at 715; *see also Doe v. Indiana Univ. - Bloomington,* No. 118CV03713TWPMJD, 2019 WL 341760, at *8 (S.D. Ind. Jan. 28, 2019); *Ayala v. Butler Univ.,* No. 116CV01266TWPDLP, 2018 WL 5117292, at *7 (S.D. Ind. Oct. 19, 2018), *appeal dismissed,* No. 18-3468, 2019 WL 2208439 (7th Cir. Jan. 24, 2019) (S.D. Ind. Jan. 28, 2019) (stating that a

Plaintiff must articulate that "gender bias was a motivating factor" in the decision to impose the discipline). As refined by the Court in *Doe v. Purdue* (928 F.3d 652, 667–68 (7th Cir. 2019)), this standard can now be more succinctly stated as follows: "do the alleged facts, if true, raise a plausible inference that the university discriminated against John 'on the basis of sex'?" For the reasons detailed below, Doe easily satisfies this standard in the instant action.

An "erroneous outcome" occurred in Plaintiff Doe's case because Doe was innocent and wrongly found to have committed a violation of the University's Policy and Code, and gender bias was a motivating factor in the decision. Plaintiff satisfies the first prong of the erroneous outcome analysis, as facts casting much more than "articulable doubt" on the accuracy of the outcome are present in this matter. Such facts include, without limitation:

i) Investigator Kuester blatantly overlooked unambiguous evidence that supported Doe's account of the events, including: photographs, hundreds of text messages, emails, videos, a substance abuse evaluation, a letter from Doe's therapist, and a lie detector test which Doe voluntarily subjected himself to, in order to establish his innocence. (ECF No. 37-1 at ¶¶ 61, 125.)

ii) Investigator Kuester failed to interview five witnesses – over *half* of the total amount that Doe provided for the investigation. (ECF No. 37-1 at ¶ 73; ECF No. 37-9 at 7.)

iii) Investigator Kuester omitted evidence of Roe's erratic pattern of behavior throughout the relationship, which called into question her character and the veracity of her statements, including her abusive relationship with alcohol, racist comments, and past history with complaints of a similar nature. (ECF No. 37-1 at ¶ 64; ECF No. 37-9 at 7.)

iv) Investigator Kuester did not reveal evidence that he relied upon in drafting the Final Report – specifically, text messages furnished by Roe – until Doe's final investigatory interview; even then, Doe did not receive the opportunity to review the aforementioned evidence in a meaningful manner or to respond to the content within the messages during the investigatory phase. (ECF No. 37-1 at ¶ 72.)

v) The Investigator declined to include a plethora of evidence in the Final Report that spoke to Roe's lack of credibility, character, and erratic and violent nature. (ECF No. 37-1 at ¶ 90.)

vi)   The Investigator wrongly credited interviewee James Smith in the Final Report, who did not have firsthand or even secondhand knowledge of any of the alleged events, to portray Doe in an unfavorable light. (ECF No. 37-1 at ¶ 90.)

vii)   At the Hearing, Chairwoman Wende Ferguson, Jose De Jesus Magallon Maciel, and Robert Yost (collectively, the "Hearing Panel") prevented Doe from finishing his opening statement. As a result, Doe could not adequately assert his innocence, lay out facts casting doubt on Roe's account of the events and her credibility, or defend himself against the charges. (ECF No. 37-1 at ¶¶ 105, 110.)

viii)   The Hearing Panel prevented Doe from introducing evidence regarding Roe's having engaged in grant fraud at the University, and her abuse of alcohol and prescription medications. Though the foregoing was relevant to assessing Roe's honesty and credibility, the Hearing Panel prevented Doe from presenting this information. Chairwoman Ferguson subsequently denied Doe's later request to include this information in the investigative file. (ECF No. 37-1 at ¶¶ 108, 111; ECF No. 37-9 at 3, 7.)

ix)   At the Hearing, Investigator Kuester admitted to improperly correcting Betty Boe's account of "laundry chute" to "laundry room" when in fact, Doe refuted the existence of a laundry chute. By doing so, Kuester improperly credited a statement that he not only manufactured, but was also not a true account of what occurred. (ECF No. 37-1 at ¶¶ 116, 117; ECF No. 37-9 at 5.)

x)   The Hearing Panel reached a finding of responsibility that overlooked critical pieces of evidence provided by Doe, such as: (a) photographic evidence that highlighted Roe's inconsistent account of the alleged incident; (b) text message evidence that supported Doe's account of the events– supporting his innocence of the allegations; (c) photo and video evidence that directly displayed Roe's character, once again highlighting Doe's credibility; and (d) Doe's account of the circumstances under which the alleged incident arose, which supported his innocence of the allegations, and which Investigator Kuester acknowledged remained consistent throughout. (ECF No. 37-1 at ¶ 125.)

xi)   Conducting meetings without providing Doe the opportunity to have his advisor present or to prepare relevant materials and evidence due to short notice. (ECF No. 37-1 at ¶ 41.)

xii)   The University, upon information and belief, did nothing to remedy or ensure an unbiased, fair, and impartial process despite possessing full knowledge of Roe's various connections throughout the University, including Roe's prior romantic involvement with a University professor and Roe's close personal relationship with her mentor, a professor emeritus at IUSM, for whom she conducted research. Upon information and belief, Roe's University connections knew individuals involved in the investigation and hearing process, therefore tainting the proceedings. (ECF No. 37-1 at ¶¶ 86-87.)

11

xiii)   The University disregarded the aforementioned facts raised on Appeal, resulting in an erroneous finding against Doe. (ECF No. 37-1 at ¶ 134; ECF No. 37-10.)

Each of the aforementioned casts sufficient doubt on the outcome of the proceeding, satisfying the first prong of the erroneous outcome analysis. *See Yusuf*, 35 F.3d at 715 (highlighting that "a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof."); *Doe v. Miami Univ.,* 882 F.3d 579, 592 (6th Cir. 2018) (articulable doubt cast as administrative hearing panel did not sufficiently analyze evidentiary inconsistencies); *Norris v. Univ. of Colorado, Boulder,* 362 F. Supp. 3d 1001, 1011 (D. Colo. 2019); *Doe v. Marymount Univ.*, 297 F.Supp.3d at 585–86 (finding that articulable doubt can be cast by noting a combination of: (1) procedural deficiencies; (2) an adjudicator's decision lacking compelling evidence; and (3) inconsistency in accuser's statements).

Second, particular circumstances demonstrate that gender bias against Doe as the male accused was a motivating factor behind the erroneous decision finding Doe responsible for physical abuse within a dating relationship, as well as the decision to impose an unjustly harsh penalty of expulsion upon Plaintiff. These circumstances include, *inter alia:*

i)   The University initially placed the No Contact Order solely upon Doe, and not upon Roe. In fact, despite Doe's request for the No Contact Order to be made mutual for fear of his safety, the University only did so after Doe provided photographic evidence that Roe stalked him. (ECF No. 37-1 at ¶ 53.)

ii)   Removal of Plaintiff Doe from the Indianapolis campus in its entirety, effectively suspending him without *any* investigation whatsoever and forcing him to complete his education online and later to complete orientation at a separate campus altogether; yet, Roe received full access to courses and campus without limitation, despite Doe's statements about her erratic and violent behavior and past transgressions. (ECF No. 37-1 at ¶¶ 54-59.)

iii)     Failure to commence any investigation against Roe despite her admission to having physically assaulted Doe. (ECF No. 37-1 at ¶ 63.)

iv)     Investigator Kuester did not disclose evidence that he relied upon in drafting the Final Report – specifically, text messages furnished by Roe – until Doe's final investigatory interview; even then, Doe did not receive the opportunity to review the aforementioned evidence in a meaningful manner or to respond to the content within the messages during the investigatory phase. (ECF No. 37-1 at ¶ 72.)

v)     The Investigator failed to include critical details in the Final Report that supported Doe's credibility and account of the events. (ECF No. 37-1 at ¶ 90.)

vi)     The Investigator declined to include a plethora of evidence that spoke to Roe's lack of credibility, character, and nature. (ECF No. 37-1 at ¶ 90.)

vii)     The Investigator wrongly credited interviewee James Smith, who didn't have firsthand or even second-hand knowledge of any of the alleged events, to paint Doe in an unfavorable light. (ECF No. 37-1 at ¶ 90.)

viii)     The University scheduled the Hearing for the *same day* as Doe's ever important Step 1 Board Exam, and did not delay it, upon Doe's request, until the eleventh hour, in an attempt to block Doe from adequately preparing for these two critical events in his life and education. (ECF No. 37-1 at ¶ 93.)

ix)     The University assembled a Hearing Panel comprised of biased members, who predetermined Doe's guilt prior to the Hearing and deprived Doe of any opportunity to defend himself against the allegations and assert his innocence. Upon information and belief, Hearing Panel member Robert Yost was the only professor who taught the undergraduate Biology class for biology majors. Roe attended the University as an undergraduate and indeed majored in Biology; therefore, there was a high likelihood that he knew Roe personally. In addition, Ms. Freiberger served as both moderator of the Hearing and Roe's escort, calling into question the impartiality of the Hearing, as the same individual cannot possibly serve in dual roles, one promising neutrality, and the other promising advocacy and support, while maintaining impartiality. (ECF No. 37-1 at ¶¶ 99, 100, 102.)

x)     The Hearing Panel prevented Doe from finishing his opening statement at the Hearing. As a result, Doe could not adequately assert his innocence, lay out facts refuting Roe's account of the events and her credibility, or defend himself against the charges. (ECF No. 37-1 at ¶¶ 105, 110.)

xi)     Chairwoman Ferguson's repeated "disgusted" mannerisms toward Plaintiff Doe during the Hearing, included vehemently shaking her head in a disapproving manner. (ECF No. 37-1 at ¶ 102.)

xii)    At the Hearing, Chairwoman Ferguson refused to ask Roe the questions as prepared by Doe. In fact, Chairwoman Ferguson read only portions of questions that she personally and arbitrarily selected. As a result, Doe was not given an opportunity to fully confront or cross-examine his accuser, even though the finding came down to an assessment of which party's version of events was more credible. This fact alone casts some articulable doubt on the accuracy of the outcome. *See Doe v. Baum*, 903 F.3d at 585–86 ("[B]ecause Doe alleged that the university did not provide an opportunity for cross-examination even though credibility was at stake in his case, he has pled facts sufficient to cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome.") (internal citations omitted). (ECF No. 37-1 at ¶ 104.)

xiii)   The Hearing Panel spoke to Doe in a noticeably harsh and berating tone of voice. Comparatively, the same Hearing Panel spoke to Roe as one would speak to a small child or infant, with a soft and sympathetic tone of voice. (ECF No. 37-1 at ¶ 113.)

xiv)    The Hearing Panel questioned Doe in a harsh manner by asking him leading, accusatory, and difficult questions. For example, Dr. Yost "asked" Doe, "you must have hit the garage door pretty hard to knock it off its tracks," drawing an incorrect assumption, which Doe rebutted. Chairwoman Ferguson, under the guise of a question to Doe, stated "it seems like you loved your dog or cared about your dog more than you cared about your girlfriend." Chairwoman Ferguson stated to Doe, again, under the pretext of an alleged question, "this is all over the fact that she [Roe] has a kid?" Further, the Hearing Panel cut Doe short while he "answered" their questions. By comparison, Roe received gentle questions about how she felt with comforting eyes. (ECF No. 37-1 at ¶ 112.)

xv)     A failure to present any of Doe's witnesses at the Hearing to the Hearing Panel; yet the lone witness who the University presented, Betty Boe, was proffered during the investigation by Roe. (ECF No. 37-1 at ¶ 114.)

xvi)    The failure to afford Doe the requisite presumption of innocence; the University's Policy uses the term "victim" while referring to the reporting party/complainant. (ECF No. 37-3 at 10.)

xvii)   Disparate treatment of Doe throughout the process, including banishing Doe to a separate "campus", while being overly accommodating to Roe. (ECF No. 37-1 at ¶¶ 54-56.)

xviii)  Conducting meetings without providing Doe the opportunity to have his advisor present or to prepare relevant materials and evidence due to extremely short notice. (ECF No. 37-1 at ¶ 41.)

xix)    Roe engaged in an intimate relationship with a member of the IUSM faculty, who, upon information and belief, knew individuals involved in the Investigation and resulting Student Promotions Committee ("SPC") process, therefore tainting the

process. Upon information and belief, the University did nothing to prevent this from permeating the process, nor did it take steps to ensure impartiality. (ECF No. 37-1 at ¶ 86.)

xx)    Failure to bring forward any investigation of Roe's actions despite the University's knowledge of her falsification of documents in conjunction with the grant project. (ECF No. 37-1 at ¶ 87.)

xxi)   Failure to investigate Roe's retaliatory actions against Doe, or her repeated violations of the No Contact Order, including stalking Doe by driving by his place of residence several times per week. (ECF No. 37-1 at ¶¶ 129, 136; ECF No. 37-9 at 8.)

xxii)  The training of those involved in the process utilized the verbiage of the Policies, specifically, victim, which places those who are trained in a mindset to assume the complainant is the "victim" and the respondent is guilty. Specifically, upon information and believe, training materials utilized by the University expressly state: "To address the unacceptable incidences of sexual assault and similar crimes on the U.S college campuses, Indiana University is committed to…[s]upporting *victims* with full information about available resources, assisting *victims* in assessing resources, and at all times exhibiting personal care and concern to *victims*" and that in dispensing sanctions, the "impact on [the] *victim* and community" should be considered. (emphasis added). *See Doe v. Indiana Univ.*, Case No. 1:18-cv-03713-TWP-MJD (S.D. Ind. Jan. 3, 2019), ECF No. 49-7.

xxiii) The University failed to address the above circumstances on Appeal, thus resulting in upholding the erroneous finding against Doe. (ECF No. 37-1 at ¶ 134; ECF No. 37-10.)

The foregoing demonstrates how a bias against Doe as the male accused led to the erroneous finding.

In addition to the specific instances of bias laid out above, the University was under a great deal of pressure to vindicate female complainants against male complainants, in response to events preceding the filing of Roe's complaint against Doe. From 2014 to 2016, four separate reports were filed with the Department of Education's Office for Civil Rights, alleging the University violated Title IX in their handling of sexual assault reports. The reports were closed by voluntary resolution in February 2018 after OCR reviewed more than 450 case files, interviewed University administrators, and conducted focus groups with students from across campus. In February 2016,

former Associate Dean of Students and Deputy Title IX Director Jason Casares resigned from the University after being accused himself of sexual assault. This allegation prompted the University's review of approximately seventeen (17) sexual misconduct cases heard the prior academic year.

Thereafter, mere months before Roe filed her complaint, undergraduate student Ellie Johnson began a social media campaign in June 2018 which sparked the "#westandwithellie" hashtag, and gained national media attention. The University responded by reaffirming its commitment to "victims" of sexual assault. The pressure on the University to vindicate female students alleging violations of the Policy in any manner caused the University to subject Plaintiff to a biased and unfair process, which was tilted in favor of the female complaint and against the male respondent. A university that is motivated to take adverse action against an accused male in order to respond to, or protect itself from, negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *See Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d. Cir. 2016) (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution "that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

The University weaponized the Policies and Code to treat John Doe – the accused male – differently from Roe, by promptly and aggressively responding to Roe's complaint while completely disregarding Doe's complaints of similar harassment directed by Roe toward him. Through the very design and implementation of these actions, Doe, a male accused, experienced less favorable treatment than Roe, the female accuser. Even though the University officials

possessed the proper authority to put an end to the wrongdoing, they did nothing. By failing to act, they were deliberately indifferent to Doe and similarly situated male students charged with similar alleged violations under the Policy and Code.

### 2. *Title IX – Selective Enforcement*

Second, Plaintiff is likely to succeed on the merits of his Title IX-Selective Enforcement claim. Under this theory, a plaintiff must establish that "regardless of [his] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Doe v. Purdue Univ.,* 928 F.3d at 667. Doe was subjected to discrimination in comparison to his female accuser, when he underwent the SPC process that ultimately resulted in his expulsion, and when he subsequently sought admission to IUKSB. While Doe was required to appear before the Student Promotions Committee as a result of the findings in the Title IX proceeding, Roe's fitness to practice medicine was never questioned by the Committee despite the University's knowledge that she had: (i) falsified documents in conjunction with a grant project; (ii) engaged in a physical assault of Doe by throwing a flower vase at his head; and (iii) was depicted on video spewing racist commentary. (ECF No. 37-1 at ¶¶ 63, 87, 96-98.) The failure to pursue any disciplinary action against Roe, while pursuing false allegations against Doe amounted to willful indifference on the part of the University and selective enforcement of its policies and procedures.

Similarly, when applying to the IUKSB program, Doe was subjected to an additional level of scrutiny and consideration, by the Prior Misconduct Review Committee ("PMRC"). (ECF No. 37-1 at ¶ 189.) Conversely, while Roe was also required to disclose on the behavioral disclosure portion of her business school application that she was bound by a mutual No Contact Order and had engaged in violent actions towards her ex-boyfriend, upon information and belief, Roe's

application was not reviewed by the PMRC board. Instead, she was granted acceptance to the same program that ultimately rejected Doe. (ECF No. 37-1 at ¶¶ 208-209.)

The foregoing actions evidence proceedings initiated by a gender bias against Doe, and the imposition of an excessively severe penalty, and unjustified outcome, due to his status as the male accused.

### 3.  42 U.S.C. § 1983 – 14th Amendment Procedural Due Process

Plaintiff is also likely to succeed on his Fourteenth Amendment Procedural Due Process claim. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." When a right is protected by the Due Process Clause, a state "may not withdraw [it] on grounds of misconduct absent[ ] fundamentally fair procedures to determine whether the misconduct has occurred." *Doe v. Purdue Univ.,* 928 F.3d at 663 (internal citations and alterations omitted).

It is well established that the requirements of the Fourteenth Amendment Due Process clause apply to student disciplinary proceedings at public institutions. A public educational institution may not expel a student for misconduct (or even suspend him for as few as ten days) "without adherence to the minimum procedures required by [the Due Process] Clause." *Goss v. Lopez*, 419 U.S. 565, 573-74 (1975); *see also Gagne v. Trustees of Indiana Univ.,* 692 N.E.2d 489, 493 (Ind. Ct. App. 1998) ("a student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property, and a student facing expulsion from a public educational institution is entitled to the protections of due process.")

#### i.  Plaintiff has protected property interests within the meaning of the 14th amendment.

In the higher education context, "any property interest is a matter of contract between the student and the university." *Doe v. Purdue Univ.,* 928 F.3d at 660. Indiana law recognizes that an

implied contract exists between a student and a school. *Amaya v. Brater*, 981 N.E.2d 1235, 123-1240 (Ind. Ct. App. 2013) ("In *Neel v. Indiana University Board of Trustees,* 435 N.E.2d 607, 610 (Ind. Ct. App. 1982), we characterized the legal relationship between a student and a university as one of implied contract. We explained that, although courts have analyzed the relationship under many different legal doctrines, '[t]he most pervasive and enduring theory is that the relationship between a student and an educational institution is contractual in nature.'"); *Gordon v. Purdue Univ.,* 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007) ("'[T]he relationship between a student and an educational institution is contractual in nature. . . .'"). To establish the requisite property interest, "a university student must do more than show that he has a contract with the university; he must establish that the contract entitled him to the specific right that the university allegedly took, "such as the right to a continuing education or the right not to be suspended without good cause." *Doe v. Purdue Univ.*, 928 F.3d at 660.

As a relationship between a student and a university is contractual in nature, Doe thus entered into a contract with the University through the aforementioned facts, entitling him to due process protections. *See Doe v. Purdue*, 928 F.3d at 661. Within his Amended Complaint, Plaintiff articulates several specific contractual violations committed by Defendants in the course of the Title IX investigation and adjudication, which implicate his property interests. Plaintiff applied to and enrolled at IUSM, and paid the associated fees and expenses. (ECF No. 8 at ¶ 413.) In exchange for this consideration, IUSM agreed to adhere to the applicable policies and procedures in effect at the time of Doe's enrollment, including the 2018-2019 Student Sexual Misconduct Policy (the "Policy"), the Code of Student Rights, Responsibilities & Conduct (the "Code"), and the Guidelines for Promotion, Suspension, Dismissal and Withdrawal (the "Guidelines"). The Policy specified that the University "prohibits discrimination on the basis of sex or gender in its

educational programs and activities." (ECF No. 37-3 at 1.) Similarly, the Code guaranteed that students had "the right to be free from discriminatory harassment" and "the right to be free from such discrimination by other students that has the effect of interfering with the student's ability to participate in programs or activities at the university." (ECF No. 37-5 at 2.) For the reasons articulated above, *supra* § C (1), Defendants deprived Doe of these contractually guaranteed property rights, to an education free from discrimination.

### ii. Plaintiff has protected liberty interests within the meaning of the 14th amendment.

To plead a liberty interest due process claim under § 1983, a plaintiff must sufficiently allege "(1) that [he] had a cognizable liberty interest under the Fourteenth Amendment; (2) that [he] was deprived of that liberty interest; (3) and that the deprivation was without due process." *Mann v. Vogel,* 707 F.3d 872, 877 (7th Cir. 2013). The Seventh Circuit utilizes the "stigma-plus" test to determine whether a deprivation of a protected liberty interest has occurred. The stigma-plus test requires a plaintiff to demonstrate that (1) the state inflicted reputational damage, (2) which was accompanied by an alteration in legal status. *See Doe v. Purdue Univ.,* 928 F.3d at 661 (7th Cir. 2019). This test is met for instance, "when a state actor casts doubt on an individual's 'good name, reputation, honor or integrity' in such a manner that it becomes 'virtually impossible for the [individual] to find new employment in his chosen field.'" *Mann v. Vogel,* 707 F.3d at 878 (internal citations omitted).

There is no question that Defendants' actions in expelling Doe from medical school inflicted reputational damage as he will be unable to continue his medical education or pursue a career in medicine. With a permanent erroneous notation of expulsion on his record, he will be prevented from gaining admission to another medical school, obtaining a residency position, and ultimately, will be unable to become a practicing physician. (ECF No. 37-2 at ¶¶ 24-26.) The

actions of Defendants in expelling Doe have thus made it nearly impossible for Doe to find employment in his chosen field of medicine. Further, Defendants' actions in expelling Doe constitute a clear alteration in his legal status as he went from being a full-time medical school student in good standing, to a student who has been expelled from medical school. Consequently, Doe satisfies the stigma-plus test, implicating the procedural protections of the due process clause.

### iii. Defendants deprived Doe of his protected interests without the requisite due process.

Due process requires an impartial decision maker, an opportunity to be heard, and where important decisions turn on questions of fact, an opportunity to confront and question adverse witnesses. Here, the Defendants repeatedly denied Plaintiff these fundamental rights.

### 1. The Opportunity to Be Heard and Present Equal Information

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.E.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), *Marshall v. Lauriault*, 372 F. 3rd 175 (3rd Cir. 2004)). The "opportunity to be heard" is the "constitutional minimum." *Doe v. Baum*, 903 F.3d at 581. At the same time, the decision makers must also be willing to listen. *See, e.g., Carter v. Harris*, 64 F. Supp. 2d 1182, 1189 (M.D. Ala. 1999). It is well settled that "a body that has prejudged the outcome cannot render a decision that comports with due process." *Bakalis v. Golembeski*, 3 F.3d 318, 326 (7th Cir. 1994); see also *Pavel v. Univ. of Oregon*, 2017 WL 1827706 (D. Oregon May 3, 2017); *Playfair v. South Lemhi School Dist.* 2009 WL 2474205 (D. Idaho 2009) ("A hearing does not comport with due process if it 'is totally devoid of a meaningful opportunity to be heard' because the decision-makers have predetermined the outcome of the hearing") (quoting *Matthews v. Harney County Or., School Dist. No. 4*, 819 F.2d. 889 (9th Cir 1987)); *Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir.1987)

("Due process of law does not allow the state to deprive an individual of property where the state has gone through the mechanics of providing a hearing, but the hearing is totally devoid of a meaningful opportunity to be heard.")

Plaintiff was deprived of a meaningful opportunity to be heard when he appeared before a panel that lacked the necessary impartiality and approached the proceeding with a predetermined conclusion of guilt against Doe. The assigned Hearing Panel, which would ultimately decide whether Doe was responsible for the Title IX policy violations alleged in the final report, included Head of Student Conduct Kelly Freiberger, who served as both Hearing Panel moderator as well as Roe's escort – conflicting roles that required neutrality on the one hand, and advocacy and support to the alleged victim on the other. (ECF No. 37-1 at ¶¶ 99, 100.) This lack of neutrality and conflict of roles within the Hearing Panel contributed to a predetermined proceeding.

During the hearing of May 20, 2019, Doe was prevented from delivering his full opening statement to the Hearing Panel members, which addressed a lack of redactions in the final investigation report, and discussed issues impacting Roe's credibility. (ECF No. 37-1 at ¶¶ 105, 110.) Doe was stopped midway through the delivery of his statement by Ms. Freiberger, who ordered both Doe and Roe to leave the room so that the Hearing Panel could discuss with General Counsel whether to permit Doe to complete his opening statement. *Id.* Ultimately, the Hearing Panel prevented Doe from discussing the various factors that impacted Roe's honesty and credibility, such as her engaging in grant fraud at the University by falsifying time logs, her abuse of alcohol and prescription medications, a video recording of Roe spewing racist comments, and Roe's various personal connections within the University that impacted the impartiality of the investigation. (ECF No. 37-1 at ¶¶ 108, 126.) Despite the fact that the determination in a he said/she said matter such as this one comes down to the credibility of the parties, Doe was precluded from

presenting information that directly impugned Roe's credibility. When Doe requested that the hearing record reflect his intent to present potentially exculpatory information, and the Hearing Panel's denial of same, Ms. Ferguson refused. (ECF No. 37-1 at ¶ 111.)

The Hearing Panel demonstrated a clear presumption of guilt against Doe, further depriving him of his fundamental right to be heard. It was evident that the Hearing Panel had prejudged the matter and had no intent to actually hear what he had to say. In comparison to its questioning of Roe, the Hearing Panel asked Doe accusatory and leading questions, and made such inappropriate conclusory statements such as, it seemed as though Doe loved his dog more than his (then) girlfriend Roe. (ECF No. 37-1 at ¶ 112.) Further, while the Panel called Roe's witness to appear for the hearing, the sole witness, they failed to request the presence of any of Doe's witnesses. (ECF No. 37-1 at ¶ 114.) The conduct of the Hearing Panel resulted in a hearing that fell far short of a sufficiently meaningful opportunity to be heard, as required by the Fourteenth Amendment.

### 2. *The Opportunity to Confront and Cross-Examine Witnesses*

Defendants' decision ostensibly turned on a finding that Jane Roe's version of events was more credible than Doe's, yet Defendants denied Plaintiff any meaningful way of confronting his accuser. The Supreme Court has held that "in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). This is so because "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

Where a school disciplinary hearing turns almost entirely on the complainant's credibility, the accused student needs to be provided the right to challenge adverse testimony during the disciplinary proceedings. *Furey v. Temple Univ.*, 884 F. Supp.2d 223 (E.D. Pa 2012); *Winnick v.*

23

*Manning*, 460 F.2d 545, 550 (2d Cir. 1972).  As the *Winnick* court explained, in cases in which the question of student discipline turns on a question of credibility, and the decision maker has to choose between either the accused or his accuser, "cross-examination might … [be] essential to a fair hearing." *Id*. at 550. *See also Donohue v. Baker*, 976 F. Supp. 136, 146-47 (N.D.N.Y. 1997); *Doe v. Baum*, 903 F.3d at 581 ("Due process requires cross-examination in circumstances like these because it is 'the greatest legal engine ever invented' for uncovering the truth…Not only does cross-examination allow the accused to identify inconsistencies in the other side's story, but it also gives the fact-finder an opportunity to assess a witness's demeanor and determine who can be trusted. *Id.* So if a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process.") (internal citations omitted); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 403 (6th Cir. 2017) ("Cross-examination, 'the principal means by which the believability of a witness and the truth of his testimony are tested,' can reduce the likelihood of a mistaken exclusion and help defendants better identify those who pose a risk of harm to their fellow students.") In fact, on May 6, 2020, the Department of Education released its final regulations on Title IX, which took effect on August 14, 2020.[1] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. pt. 106). The regulations make clear, *inter alia*, that schools are now required to afford parties a live hearing with cross-examination, to ensure compliance with the statute.

Doe was denied his right of cross-examination as he was not afforded the right to directly challenge his accuser's allegations and testimony. Instead, Doe's opportunity to question Roe

---

[1] The Department of Education published the final regulations in the *Federal Register* on May 19, 2020.

consisted of him submitting proposed written questions to the Chairwoman of the Hearing, Ms. Ferguson, who would then unilaterally decide whether to pose such questions to Roe. (ECF No. 37-1 at ¶ 104.) Ms. Ferguson arbitrarily refused to ask Roe a number of questions submitted by Doe, instead asking only select portions of certain questions to Roe. *Id.* After a break in the proceedings, all returned to the hearing panel room except for Roe who inexplicably left and did not return for the remainder of the proceedings. (ECF No. 37-1 at ¶ 109.) Doe was therefore unable to meaningfully question his accuser, in violation of his procedural rights.

### 3.  *The SPC Meeting*

Doe was subsequently subjected to the IUSM Student Promotions Committee process, which included a meeting with the Committee on October 28, 2019, to determine Doe's status as a student of the medical school. (ECF No. 37-1 at ¶ 149.) Despite the high stakes of this proceeding, the SPC meeting demonstrated even more egregious violations of Doe's due process rights. The University prohibited Doe from being accompanied by counsel in the meeting on the grounds that the University's policies "pre-date" one's right to have an advisor. (ECF No. 37-1 at ¶ 142.) Consequently, Doe was required to appear before up to nineteen (19) members of the Committee, all of whom were permitted to question him about the allegations, without the assistance of counsel. (ECF No. 37-1 at ¶ 143.) Assistant Dean for Health Professions and Pre-Doctoral Programs Dr. Marti Reeser admitted that "there is no standard of proof" utilized by the Committee in reaching its decision regarding whether a policy violation occurred, and notified Doe that the SPC would not review the findings of the Conduct Office but would instead merely adopt the findings previously reached in the Title IX proceeding. (ECF No. 37-1 at ¶¶ 144, 145.) Accordingly, Doe was unable to present a full and meaningful defense to the charges while essentially being subjected to "double jeopardy" and disciplined twice for the same alleged

25

violations. (ECF No. 37-1 at ¶ 147.) As Roe did not appear for this meeting, Doe was again deprived of an opportunity to question his accuser or challenge her testimony. Unsurprisingly, the SPC adopted the findings reached by the initial Hearing Panel, and recommended dismissal of Doe from IUSM, effectively ending his medical career before it even began. (ECF No. 37-1 at ¶ 157.)

Based on the foregoing, it is respectfully submitted, that the "hearings" Defendants purported to conduct were nothing but a predetermined, sham of an investigation and hearing process that resulted in the denial of Plaintiff's constitutionally protected right to due process.

### D.  The Balance of Hardships Tips Decidedly in Plaintiff Doe's Favor

Plaintiff is further entitled to injunctive relief as the harm that John Doe will suffer if he is unable to return to his medical studies greatly outweighs any potential harm to the University. In fact, it can be argued and established that the Defendants would not incur any harm at all. *See, e.g.,* *Ritter v. Oklahoma*, 2016 WL 2659602, at *5 (W.D. Okla. May 6, 2016) (noting balance favors granting injunction because any harm to college is "inconsiderable" compared to harm to student if he was wrongfully expelled); *Doe v. Middlebury Coll.,* 2015 WL 5488109, at *4 (finding balance weighs in favor of student because "[t]he harm Middlebury will suffer if Plaintiff is allowed to remain a student for the fall semester is not as great as the harm Plaintiff will suffer if he is not permitted to return to campus but ultimately prevails in the case"); *King*, 2014 WL 4197507, at *14 (finding balance of equities "firmly" in student's favor: the "real, unavoidable consequences" he would suffer absent an injunction, even if he ultimately won the case, outweighed any harm to university).

If Plaintiff is unable to resume his medical school education, he will likely be unable to ever pursue a career in medicine. (ECF No. 37-2 at ¶ 26.) With a permanent erroneous notation of expulsion on his record, he will be precluded from gaining admission to another medical school,

obtaining a residency position, and ultimately, will be unable to become a practicing physician. (ECF No. 37-2 at ¶¶ 24-26.) Indisputably, Plaintiff faces severe hardships if injunctive relief is not granted. Thus, "in the absence of a preliminary injunction [Plaintiff] will continue to suffer real, unavoidable consequences even if he wins this suit." *King*, 2014 WL 4197507, at *14.

It is respectfully submitted that the Plaintiff has amply demonstrated that Defendants committed grave and serious violations of Plaintiff's due process rights. Plaintiff's injuries are concrete, while Defendants' are speculative at best. Staying the expulsion from IUSM will mitigate the concrete injury that Plaintiff has already suffered.

### E.  The Public Interest Weighs in Favor of Granting the Injunction

Granting a preliminary injunction and allowing Plaintiff to continue his education will also serve the public interest. The regime of the April 4, 2011 Dear Colleague Letter led to campus sexual misconduct tribunals where there is use of prosecutorial "investigation," lack of reasoned decision-making, presumption of male guilt, a failure to apply the burden of proof in fact, denial of meaningful appeal, manifest bias against males and unfair hearings. That the public is not served by such proceedings was recognized by Department of Education Secretary Betsy DeVos, who in vacating the April 4, 2011 Dear Colleague Letter rightly denounced these proceedings as involving denials of due process that are wholly un-American. Elizabeth DeVos, *Secretary DeVos Prepared Remarks on Title IX Enforcement*, U.S. DEPT. OF EDUC. (Sept. 7, 2017) www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

In the instant matter, there are serious doubts surrounding the legitimacy of Defendants' actions in expelling Plaintiff. That fact, when coupled with the fact that Plaintiff does not pose a threat to others strongly suggests that the public interest would best be served by allowing Plaintiff

to continue with his education while the flawed process that produced his sanction is exposed. Granting the requested preliminary injunction in this case serves the public interest.

### F. Bond Should Be Waived Because Defendants Will Not Be Harmed

Finally, Plaintiff moves the Court to waive security for any injunction it issues. The strict adherence to Federal Rule 65(c) can be waived by the Courts. "Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)." *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r, Indiana State Dep't of Health,* 2018 WL 10580407, at *8 (S.D. Ind. June 28, 2018). Specifically, if "there's no danger that the opposing party will incur any damages from the injunction," a court may choose not to require a bond." *Indiana Civil Liberties Union Found., Inc. v. Superintendent, Indiana State Police,* 2020 WL 3546018, at *14 (S.D. Ind. June 30, 2020). In the case at bar, Defendants are at no risk of any monetary loss with the granting of Plaintiff's application. The posting of a bond to the Plaintiff, a student, would be a hardship.

### <u>REQUEST FOR AN EVIDENTIARY HEARING</u>

Plaintiff hereby respectfully requests and moves for an evidentiary hearing on the motion for a preliminary injunction.

### <u>CONCLUSION</u>

For the reasons stated above, this Court should grant a preliminary injunction enjoining Defendants from enforcing the dismissal of Plaintiff John Doe from Indiana University School of Medicine, and permitting him to return to Indiana University School of Medicine, pending adjudication of the merits of the Amended Complaint. Furthermore, the Court should grant Plaintiff John Doe's request for an evidentiary hearing on his motion for preliminary injunction.

Dated:   New York, New York
        October 7, 2020

                      Respectfully submitted,

                      *Attorneys for Plaintiff John Doe*

                      **NESENOFF & MILTENBERG, LLP**

                      **By: */s/ Andrew T. Miltenberg***
                      **Andrew T. Miltenberg, Esq. (*pro hac vice*)**
                      **Stuart Bernstein, Esq. (*pro hac vice*)**
                      **363 Seventh Avenue, Fifth Floor**
                      **New York, New York 10001**
                      **(212) 736-4500**
                      **amiltenberg@nmllplaw.com**
                      **sbernstein@nmllplaw.com**

                      **Tara J. Davis, Esq. (*pro hac vice*)**
                      **Regina M. Federico, Esq. (*pro hac vice*)**
                      **101 Federal Street, Nineteenth Floor**
                      **Boston, Massachusetts 02110**
                      **(617) 209-2188**
                      **tdavis@nmllplaw.com**
                      **rfederico@nmllplaw.com**

                      **DELK MCNALLY, LLP**
                      **By: */s/ Michael T. McNally***
                      **Michael McNally, Esq.**
                      **IN No. 23676-49**
                      **211 South Walnut Street**
                      **Muncie, Indiana 47305**
                      **(317) 442-4444**
                      **mcnally@delkmcnally.com**