IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| vs. | ) Civ. No. 1:20-cv-02006-JRS-MJD |
| | ) |
| The Trustees of Indiana University, | ) |
| Indiana University School of Medicine, | ) |
| Indiana University Purdue University- | ) |
| Indianapolis, Indiana University Kelley | ) |
| School of Business, Gregory Kuester, in his | ) |
| official and individual capacity, Bradley | ) |
| Allen, in his official and individual capacity, | ) |
| and Jay Hess, in his official and individual | ) |
| capacity. | ) |
| | ) |
| *Defendants.* | ) |

**AFFIDAVIT OF JAY L. HESS, MD., Ph.D, MHSA**

I, Jay Hess, being first duly sworn upon my oath, state:

1. I am over the age of 18, competent to testify to the matters stated herein, and make this affidavit based upon my personal knowledge.

2. I am the Dean of the Indiana University School of Medicine ("IUSM") and have held that position since 2013. In my capacity as Dean I have responsibility for one of the largest medical schools in the United States, which consists of nine campuses, 1,900 students and 6,500 full and part-time faculty. I also serve as one of

1

four Executive Vice Presidents of Indiana University, with responsibility for overseeing the University's clinical affairs strategy.

3. I earned medical and doctorate degrees from the Johns Hopkins University School of Medicine. My residency training was in anatomic pathology and I completed fellowships in hematopathology and surgical pathology at Brigham and Women's Hospital/Harvard Medical School. I also hold a certificate in business administration from the Wharton School of the University of Pennsylvania, as well as a Masters in Health Services Administration from the University of Michigan School of Public Health.

4. Before coming to Indiana University, I served eight years as the Carl V. Weller Professor and Chair of the Department of Pathology, and professor of pathology and internal medicine, at the University of Michigan School of Medicine. Prior to that position I had served as the Director of Hematopathology at the University of Pennsylvania and as an Assistant Professor of pathology at Washington University School of Medicine.

**Experience with student misconduct and SPC matters at IUSM**

5. During my tenure as Dean of IUSM we have dealt with several student conduct cases each year. Typically, these have involved issues of academic performance, ability to provide competent clinical care or, rarely, academic misconduct (*i.e.*, cheating).

6. I am very familiar with the process followed by the Student Promotions Committee or SPC, including its Appeals Committee.

7. The IU School of Medicine is a unit of Indiana University, and the University is organized such that each unit is assigned administratively to a campus. IU School of Medicine's assigned campus is IUPUI, a core campus of Indiana University. As a unit assigned to IUPUI, IUSM is subject to the IUPUI policy and process on Title IX complaints. In matters where IUPUI conducts a proceeding to determine whether student misconduct occurred, such was the case with the Title IX panel convened to hear and make findings in Doe's case, the SPC does not second-guess those IUPUI findings or repeat the fact-finding process.

8. The SPC accepts those findings as they exist. The SPC's role is to take into account IUSM's own, unit-based expectations for aspiring physicians and to determine whether the student's conduct has a bearing on his or her fitness to practice medicine and ability to meet our high professional standards.

9. The SPC's role and process are on the IUSM's web site and students are informed of the SPC's oversight role for academic and conduct matters.

**Special expectations of medical students**

10. At IUSM we are training professionals who will make decisions and take actions that mean the difference between life and death for patients. Our graduates must show that they can consistently exercise good judgment, particularly in times of extreme stress and pressure.

11. Our school values emphasize respect for others and collaboration toward the goal of ensuring high quality and effective health care. Our professionals must be highly credible and trustworthy, capable of holding and communicating highly

sensitive and critical information. They must be honest and have integrity, as many of them will be responsible for careful and accurate documentation, ordering medicines and other forms of treatment, and performing life-altering procedures and prescribing controlled substances.

12. The stressors of clinical practice are substantial and medical doctors are not immune to these stressors. Our professional physicians must be worthy of society's respect, not only in their work environments but also in their daily lives. The behavior of a physician inside and outside the office or hospital can have a direct bearing on patient safety as well as on a community's trust in the profession itself and therefore must be exemplary.

13. When a student engages in violent or anti-social behaviors, such as punching walls, knocking people over, bruising people, and damaging property, it raises serious concerns about the ability of that student to meet our high standards.

### Scope of my authority in reviewing SPC decisions

14. During proceedings before the SPC, I have no role or involvement. I am, by policy, separated from that process.

15. When I review a decision of the SPC, I take the record that has been developed by the SPC and review it with care. I usually then meet with the student involved and have a conversation with him or her to better understand the student as a person, the story behind the conduct that has been established, and whether it appears that the student has the ability to return to a constructive path to

progressing through the medical education process and ultimately graduation from IUSM.

16. Like the SPC, I do not seek to "re-try" a case or make my own factual findings. I do not set aside any hearing panel's findings. I accept the findings as they exist and engage in an analysis of whether, in light of the conduct explained in the findings, the student can work to address his or her problems and still meet our high standards and values.

17. We sometimes refer to my review as an "appeal" of the sanction and/or conditions recommended by the SPC. The review that I conduct is confined to the sanction based on the conduct already found to have occurred. If I grant an appeal, it means that I have determined that a different or lesser sanction or set of conditions should be imposed. In that sense I am the final decision-maker on sanctions at IUSM.

18. In my seven years as Dean I have conducted this type of review approximately three to four times per year. On two occasions I concluded that a sanction different from the one imposed by the SPC was warranted. One of those occasions was Doe's case.

**My review and decision on Doe's appeal from the SPC sanction**

19. Sometime in February 2020 I received the SPC summary of Doe's case. It consisted of more than 300 pages of materials, including the final investigative report and final appendix from the IUPUI Title IX panel review process.

20. Consistent with my practice, I carefully reviewed all the materials in the SPC summary. Given the amount of information and detail, this process took several hours to complete.

21. We scheduled a meeting with Doe in my office on March 4, 2020. I typically allot one hour for these meetings so we have time for a discussion.

22. Going into the meeting with Doe I had serious concerns about his conduct and fitness to become a doctor. These concerns arose primarily from his documented lapses in judgment, difficulties in managing his anger, use of alcohol, and disruption of the lives of other students.

23. Many of the recorded actions of Doe had occurred in the midst of what appeared to be a mutually dysfunctional relationship. I had no question in my mind about Doe's behavior being inappropriate and wrong; it was. The question in my mind was whether this student could, with counseling and some hard work, return to a productive path at IUSM.

24. I began the meeting, as I normally do, by asking Doe to tell me what had happened. I wanted to see if Doe accepted responsibility for his actions and had learned from these events. Doe was highly critical of the Title IX process.

25. I explained to Doe what concerned me most about the record I had reviewed – how his conduct, as explained in this Affidavit, was inconsistent with the values and expectations of our school and profession. I engaged with him to explore whether his misconduct was isolated to the specific circumstances of this relationship

or was symptomatic of a broader problem that could affect his potential practice of medicine.

26. We spent some time discussing the complaining student, called Roe in this case. Doe confirmed that he had not filed a formal complaint against Roe.

27. I asked Doe if he had a concern about Roe practicing medicine. He told me he did not want to answer that question.

28. Near the end of the March 4 meeting Doe raised the idea of applying to attend the Kelley School of Business in its MBA program. I did not make any promises about his admission to Kelley, as it is a process involving another School over which I have no control.

29. At the conclusion of the meeting I informed Doe that I had decided to impose a sanction and conditions different from the recommendation of the SPC. I recall focusing on three points:

- I was imposing significant discipline in the form of an additional one-year suspension from the IUSM, in addition to his suspension that began in 2019;

- Doe would need to successfully complete behavioral therapy addressing the causes of his actions that led to the findings of misconduct; and

- To be reinstated as a student after completion of all the conditions I was imposing, I emphasized that Doe would be under scrutiny, and he would need to keep a pristine record, behave as an exemplary citizen and have no more behavioral problems.

I told Doe that I would send a confirming letter spelling out the sanctions and conditions on his potential reinstatement.

30. In the meeting I explained to Doe that I decided not to accept the recommendation of immediate dismissal made by the SPC committee.

31. I did not say to Doe, at any time, that I had overturned any action or finding by the IUPUI Title IX panel.

32. I did not say to Doe, at any time, that I had set aside any findings of the Title IX panel.

33. I did not say to Doe, at any time, that his potential reinstatement to the IUSM was without limitation or restriction.

**My March 27, 2020 letter to Doe imposing discipline and conditions**

34. As indicated at the March 4 meeting, I prepared and sent to Doe a letter dated March 27, 2020 setting out the sanction of a one-year suspension and imposing a number of conditions and restrictions on Doe and his potential reinstatement to the IUSM. These conditions included:

- Completing "all the sanctions outlined in the IUPUI Office of Student Conduct letter dated May 23, 2019";

- "*If allowed to return*, you would audit your Transitions 2 course to ensure you are ready to return to clinical training."

- "You will seek guidance from Dr. Brad Allen, Senior Associate Dean from Medical School Education, about which campus you feel will be best suited for your training."

- "You will need to continue behavioral counseling and sign a release that such information can be shared with the Dean's Office if requested. A clearance from your provider will also be required, stating that you are "cleared" to resume medical school, that you are experiencing no behavioral or other conditions that may adversely impact your ability to pursue medical education, and that you can withstand the rigors and pressure inherent in the medical education process."

- "Any subsequent violation of academic or personal codes of conduct as defined by the University or the School during your administrative leave may jeopardize your ability to return in May 2021 as anticipated."

- Upon completion of these additional requirements, you will be *eligible to meet with Dr. Allen, to apply for reinstatement.*"

A copy of my March 27 letter is Exhibit 17 (emphasis added)

35. As mentioned, I did not have any role in the admissions process at the Kelley School of Business, so I did not follow Doe's application there. However, I did learn that an issue had been raised by the Prior Misconduct Review Committee (PMRC) in that process.

### Issues arising from Doe's misstatements to the Kelley School

36. I received a June 1, 2020 email from Monica Henry (Exhibit 2051) in the IUPUI Graduate Office indicating that the PMRC had "serious concerns that [Doe] withheld pertinent information and gave false or incomplete information" as part of his application to the evening MBA program at the Kelley School.

37. Ms. Henry provided with her email a copy of Doe's application materials. Among other things, Doe represented that I had "*overturned the erroneous findings of an IUPUI Hearing Panel*" (first paragraph) and that "after eight months of additional meetings with Indiana University School of Medicine, my appeal was finally granted by Dean Jay Hess of IUSM and *the findings set aside*" (second paragraph). These statements by Doe were false and misleading. I had not overturned or set aside any findings; as explained to Doe, I had decided to change the discipline for his misconduct and to give him another chance.

38. Doe's application materials also stated in the first paragraph: "This appeal fully authorizes my return to IUSM without limits or restrictions." This statement by Doe was also false and misleading. As stated in my March 27 letter, I had imposed a number of restrictions and limitations on Doe's potential return to IUSM, all due to the misconduct issues reflected in the Title IX panel's findings, which I had accepted and not disturbed.

39. After reviewing Doe's application materials and the above misstatements, I wrote a June 10, 2020 email to Dean Ken Carow of the Kelley School and others associated with Doe's appeal of the decision (Exhibit 205$_1$) in which I concluded by stating that Doe's application to the Kelley School did not accurately reflect my discussion with him nor my March 27, 2020 letter to him.

40. Upon learning of Doe's conduct in connection with his application to the Kelley School, I determined that I should re-evaluate my earlier decision concerning his sanction for the misconduct found by the Title IX panel.

**My June 16, 2020 letter to Doe changing the sanction to dismissal**

41. Honesty and integrity are essential attributes for any student at IUSM and for any person to become a doctor. Careful attention to detail and accuracy in documentation created by a physician is a core manifestation of these essential attributes. Our profession has extraordinary privileges to authorize and record the prescription of powerful medications and treatments. With such privilege comes enormous responsibility. We must hold medical information confidential, and refrain from all manner of improper actions regulated by an array of federal and state laws,

regulations and codes of conduct. Most of the time our conduct must be governed by our own moral compasses, rather than oversight by others.

42. We cannot admit to our profession individuals who do not communicate honestly on academic matters. Such a person cannot be trusted with the lives of patients.

43. For this reason, on the few occasions when we have detected academic cheating by an IUSM student, the result has been dismissal.

44. In Doe's case, as mentioned I was already on the edge of retaining the SPC's recommendation of dismissal before the representations made by Doe in his Kelley School of Business application were brought to my attention for review and comment. I found it troubling that these representations were communicated after I made clear to Doe that he would have to maintain a pristine record and be an exemplary citizen in order to have a chance to be re-admitted to IUSM after completing the prescribed conditions.

45. That Doe, in such a short amount of time, had again engaged in misconduct that directly bore on his fitness to practice medicine told me that a more severe sanction was warranted.

46. Accordingly, in my June 16, 2020 letter to Doe (Exhibit 21), I quoted certain of Doe's misstatements to the Kelley School and informed him that I had "concluded that you are to be dismissed from the IU School of Medicine, immediately." This decision was based both on Doe's failure to comply with the conditions I had imposed and on his additional act of academic dishonesty.

**Claims of irreparable harm to Doe if he is not reinstated now**

47. I understand that Doe is suggesting to the Court that if he is not reinstated in December 2020, he will be irreparably harmed because (a) he will not be eligible for clerkship assignments made in December, and (b) he will be at risk of not completing his matriculation at IUSM within the six year limit that the School imposes as a policy.

48. Other witnesses can speak more directly to the mechanics of the clerkships, but my understanding is that, even after third and fourth-year clerkships have begun, the School can accommodate placing students in clerkships. So, there is no special or irreplaceable value in being part of the upcoming December 2020 clerkship assignments.

49. The six-year matriculation policy is a related point. We apply this policy to ensure that students are progressing sufficiently in their academic work and also are not getting into difficult situations with overwhelming student debt. The policy is just that – a policy implemented by the IUSM, not a law or regulation. If a Court should order the School to reinstate a student after litigation concluded, and to refrain from imposing the six-year rule on that student, then IUSM could and would comply with that order.

50. Accordingly, as Dean of the School of Medicine, if the Court ordered IUSM to reinstate Doe at the conclusion of this case, IUSM could provide him at that time the opportunity to complete the requirements for a medical degree.

## Consequences of a forced re-admission in 2020

51. On the other side of that coin, I believe that an order directing the IUSM to reinstate Doe as a student, at this juncture, would cause hardship and disruption of a significant magnitude to a student body that is acutely aware of and already distracted and disrupted by the situation.

52. Doe acknowledged when I met with him that his actions and relationship with Roe had become a point of distraction in the IUSM community and had affected many students' lives.

53. A forced re-admission of Doe in this environment would cause harm and disruption to IUSM, without addressing any risk of harm to Doe that cannot be cured by a similar order, if warranted, at a later date.

54. Further, if readmitted, Doe would be seeing patients, conducting physical examinations and preparing medical records, with little or no supervision. He would be in a position where holding sensitive medical information in confidence is crucial. The risk of reinstating someone who, for the reasons stated above, I have found unfit to practice medicine, would be extreme – for the profession, the School, and the welfare of our patient population.

55. Finally, a forced re-admission of Doe under these circumstances would undermine the seriousness of Doe's conduct in making dishonest and misleading statements in the Kelley School academic admission process. But for that lack of basic honesty, Doe would have had another chance to attain a medical degree at

IUSM. But I determined that this conscious, calculated choice by Doe demonstrated that he could not be permitted to do so at the IUSM.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE.

Executed On: 10/29/2020

Signature