EXHIBIT 80

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| vs. | ) Civ. No. 1:20-cv-02006-JRS-MJD |
| | ) |
| The Trustees of Indiana University, | ) |
| Indiana University School of Medicine, | ) |
| Indiana University Purdue University- | ) |
| Indianapolis, Indiana University Kelley | ) |
| School of Business, Gregory Kuester, in his | ) |
| official and individual capacity, Bradley | ) |
| Allen, in his official and individual capacity, | ) |
| and Jay Hess, in his official and individual | ) |
| capacity. | ) |
| | ) |
| *Defendants.* | ) |

## AFFIRMATION OF GREG KUESTER

I, Greg Kuester, being first duly sworn upon my oath, state:

1. I am over the age of 18, competent to testify to the matters stated herein, and make this affirmation based upon my personal knowledge.

2. From November 2018 to June 2019, I served as a sexual misconduct investigator for Indiana University Purdue University-Indianapolis ("IUPUI") in a short-term, interim position. Prior to my time at IUPUI, I was a sexual misconduct investigator for Purdue University. I am now an Independent Civil Rights

1

Investigator. Over the past three years, I've conducted investigations for several universities.

3. I am certified as an ATIXA civil rights investigator Level One and Level Two because I attended both these multi-day trainings. ATIXA is a professional association for Title IX coordinators and administrators focused on best practices and training. I was also trained by other sexual misconduct investigators at Purdue.

4. I have handled approximately seventy to eighty investigations and have never been accused of misconduct, failure to follow procedures, or bias to my knowledge.

**IUPUI Investigations**

5. When I joined IUPUI, Sara Dickey, Associate Dean of Students/Director of Student Conduct, IUPUI, assigned me onboarding including reviewing the Code of Student Rights, Responsibilities, and Conduct, the IU Sexual Misconduct Policy and Procedures, two investigation reports from previous cases, and FERPA training, and Clery CSA training.

6. The University's policy sets forth how the investigation will be conducted and includes that interim measures (like a no contact order) may be instituted. (UA-03 Sexual Misconduct Policy, Exhibit 1, p. 9.) The policy states information may be provided by "the parties, witnesses identified by any party, or the University." (*Id.*) Further:

> The investigation may include, but is not limited to, interviews with the complainant, the respondent and any other witnesses identified as having information relevant to the allegations made, as well as the examination of written statements by the parties, relevant documents,

and other relevant information. . . . The University shall determine what information and evidence will be included in the Investigation File.

(*Id.* at 11.)

7. The policy expressly states that the "prior sexual history" between the parties is not relevant. (*Id.* at 9.) Prior or subsequent conduct of the respondent may be considered. (*Id.*)

8. The policy includes a summary of rights of the complainant and respondent including: to be informed of the University policies and procedures, to be treated with respect, to have an advisor present, and to have an "adequate, reliable, and impartial" investigation. (*Id.* at 10.)

9. The policy states that "the University will have as a priority the interests of all parties involved, in regard to fairness, dignity, privacy, and due process." (*Id.* at 10.)

10. The policy expressly states that it applies regardless of gender. (*Id.* at 1.)

11. When I conducted a sexual misconduct investigation at IUPUI, it was standard practice to charge the respondent in situations where, based on the information gathered, a reasonable hearing panel could find the respondent responsible for the charges.

**Doe Investigation**

12. I investigated Jane Roe's sexual misconduct complaint against John Doe. (November 26, 2018 Email chain between Jane Roe and Greg Kuester, Exhibit 2010.)

13. When I notified Doe of the investigation in January 2019, I informed him of the no contact order as that is standard practice for IUPUI in a sexual misconduct investigation. (January 18, 2019 Notice of Investigation and No Contact Order, Exhibit 2011.)

14. I later extended the no contact order to Roe when Doe requested IUPUI do so in February 2019. (February 20, 2019 Extension of No Contact Order, Exhibit 2013; February 20, 2019 Email chain between Kuester and Doe, Exhibit 2016.) IUPUI issues a no contact order, where appropriate, for the respondent and issues a mutual no contact order if requested. As soon as Doe requested the mutual no contact order, it was put in place.

15. As part of my investigation, I did the following:

   a. Interviewed Roe several times (in person and by phone) both before and after meeting with Doe, reviewed documents she provided as part of the investigation, and emailed with Roe.

   b. Interviewed Doe with his attorney advisor present four times, reviewed documents he provided to me as part of the investigation, and emailed with Doe.

   c. Interviewed eight additional witnesses

   d. Reviewed all documents Doe and Roe provided me.

   (Final Investigation Report, Exhibit 2023, pp. 2-3.)

16. Doe was represented by counsel, Brad Keffer, who acted as his advisor and participated in every meeting I had with Doe.

17. Doe provided extensive documentation in the investigation. I received and reviewed more than 125 pages of text messages, pictures, and other materials.

18. All of the documents I received from Roe and Doe are included in the Preliminary Investigation Appendix and the Final Investigation Appendix. (Preliminary Investigation Appendix, Exhibit 2018; Final Investigation Appendix, Exhibit 2024.)

19. In investigations, and consistent with the University's policy, I gather information that is relevant. When considering who to interview, I do so pursuant to this relevance standard. Here, I interviewed eight witnesses in addition to the complainant and respondent. Both complainant and respondent suggested witnesses for me to consider, and I discussed with them what potential witnesses' information would be relevant based upon Doe and Roe's descriptions.

20. I followed University policy and practice including interviewing and gathering information from complainant and respondent, providing both several opportunities to provide information, and interviewing numerous witnesses.

21. In interviews, I informed Doe of information I gathered from Roe, including text messages between Doe and Roe that Doe had not provided me. These additional text messages included communications where Doe said he would "turn himself in" for his conduct on the night of July 11/early morning July 12, 2018 at Roe's father's house when Roe sustained injuries following an argument with Doe. (Final Investigation Report, Exhibit 2023, pp.25-26.) They also included materials and texts from Doe's mother where she apologized for his behavior on the night of

July 11/early morning July 12, 2018, asked if he had been drinking, and offered to pay for Roe's resulting hospital bills and damage. (*Id.* at 21-23.) I specifically asked Doe about these materials when we met in March. In that meeting, Doe reviewed the text messages with his attorney advisor, answered my questions, and provided his explanation about the messages. He had another opportunity to review and comment on them when he reviewed the Preliminary Investigation Report. Doe's statement to the contrary in his affidavit (paragraph 72) is incorrect. (Preliminary Investigation Report, Exhibit 2017, Doe's comments.) I did not overlook photographs, texts messages, emails, the lie detector test, Roe's alleged behavior, or any of the alleged evidence Doe references therein.

22. I handled this investigation as I handled all investigations. I used my training and experience and used my best efforts to make objective, even-handed decisions on relevance, credibility, what witnesses to interview, and the areas on which to follow up with complainant, respondent, and witnesses.

23. I selected the eight witnesses I interviewed based on what both parties told me the witnesses knew, and the belief they had information relevant to my investigation. For example, I interviewed witnesses who were present for the fight at Brother's bar, who saw Roe's injuries shortly afterward and were told by Roe that Doe had hurt her, and several people Doe said could provide information about his relationship with Doe because they were "our best friends" and knew them very well (March 6, 2019 Email from Doe to Kuester (forwarded to Spratt June 6, 2019), Exhibit 2040.) (All four said they were close friends with Doe, had been friends with Roe when

Doe and Roe were dating, and only had general information) (Final Investigative Appendix, Exhibit 2024, pp. 168-175).

24. I decided not to interview five people Doe identified – three of his former girlfriends, Roe's former boyfriend, and another student who could "answer some general questions regarding the relationship" and attended a trip with Doe, Roe, and three witnesses I did interview. Based on the parties' descriptions, none of these witnesses had information that was relevant to the investigation. I explained my reasoning for each of these decisions in an email I sent to Dean Spratt as part of his consideration of Doe's appeal. (June 7, 2019 Email from Kuester to Spratt, Exhibit 2041.)

25. Family members of the parties generally fall outside of the scope of relevant witnesses, unless they were directly connected to the allegations

26. I did decide I wanted to interview Doe's mother. I emailed Doe on April 15, 2019 to let him know I would like to interview his mother. (April 15, 2019 Email from Gregory Kuester to John Doe, Exhibit 2041, at IU_0492.) I followed up again on April 18, 2019. (April 18, 2019 Email from Gregory Kuester to John Doe Exhibit 2041.) Doe responded and said: "I've been giving it a lot of thought because I don't want to waste your time. I appreciate your willingness to interview my mom, but I think the main information she would be able to provide would be context about the texts that [Roe] provided and our relationship." Doe further stated he understood why I generally do not think testimony of family members providing contextual

7

information of this sort is relevant or helpful. (*Id.*) Doe never provided me his mother's contact information.

27. I also attempted to interview Roe's father. Roe did not provide her father's contact information.

28. I did not need either interview to complete my investigation or make my charging decision.

29. Doe asserts that certain relationships Roe had with medical school professors and a former professor influenced my investigation. I did not speak with Roe about her relationship with professors. Those relationships, regardless of whether they existed, were not relevant to the investigation and did not influence my investigation in any way.

30. It is important to me to conduct every investigation in a fair, impartial, thorough, and accurate manner. I did not conduct this investigation with bias for or against any participant.

31. Based on my investigation, I determined there was sufficient information that a reasonable hearing panel could find the respondent responsible for the allegations asserted, for the reasons set forth in my report including:

   a. Doe's statement that he and Roe had a hostile argument,
   b. the photographs of Roe's father's home showing damage to the garage door and interior door frame,
   c. the photographs of Roe's back showing bruising,

    d. text messages sent by Roe contemporaneously reporting the incident to Doe's mother and Doe's mother's response apologizing and asking if Doe had been drinking,

    e. Doe's text message soon after the altercation offering to turn himself in and saying he hated himself when he drank, and offering to pay for the hospital bills and damage to property,

    f. Roe's disclosures to witnesses during the boat trip four days after the July 2018 altercation,

    g. Witnesses observations of Roe's bruising four days after the July 2018 altercation,

    h. Other instances of Doe's anger toward Roe documented in the materials provided

    i. Roe's and Doe's versions of what happened during the July 2018 incident differed greatly. Both parties agreed the incident began with a heated argument and ended with Doe leaving upset. However, they differed regarding the damage to the garage door and the contact with each other that caused Roe's fall and resulting injuries. At the end of my investigation, I found Roe's version more believable and felt that a reasonable hearing panel might too.

    32. Although Doe and his attorney advisor, Mr. Keffer, hinted in meetings that they thought they would have additional relevant information, possibly gathered by a private investigator, no such information was ever provided to me.

33. I considered all information provided by Doe and Roe, I did not knowingly overlook any evidence in this investigation, and I did not ignore any evidence that appeared to be relevant to the allegations.

34. My investigation was based only on the facts in this matter, not based on gender of the complainant or respondent, and not influenced by any outside issues.

**Preliminary and Final Investigation Report**

35. When I determined I had interviewed all the relevant witnesses that I had access to (since Doe did not want me to interview his mother and Roe did not want me to interview her father), and after meeting with Doe numerous times, I prepared my Preliminary Investigation Report. (Preliminary Investigation Report, Exhibit 2017.)

36. IU's policy provides that both complainant and respondent must be provided an opportunity to review and comment on the preliminary report. Doe and Roe were both provided access to my preliminary report on March 28, 2019 and all the evidence I reviewed, which was included in an appendix to the preliminary report.

37. Doe and Roe both had the opportunity to respond to my findings, and all the evidence considered. Doe provided all of his comments in writing on April 5, 2019. (April 5, 2019 Email from Doe to Kuester, Exhibit 2020.) I reviewed his comments and revised my report to include points that Doe raised with me. (Red-lined report, Exhibit 2022.)

38. Roe reviewed the preliminary report but did not provide a response.

39. I circulated my draft Final Investigation Report within the OSC before I issued it.

40. I issued my Final Investigation Report and Appendix on April 26, 2019 and both Doe and Roe were provided access to the final report. (Final Investigation Report, Exhibit 2023; Final Investigation Appendix, Exhibit 2024.)

41. I determined there was sufficient information and grounds to charge Doe with physical and verbal abuse in a dating relationship.

**Redacted Information**

42. Shortly after Doe and Roe were provided access to my final report, Doe informed me that information that had been redacted in the preliminary report appendix was not redacted in the final version. Specifically, Roe had said Doe brought a firearm onto campus. I had redacted that information from the report because it was not relevant to the allegations of sexual misconduct and potentially prejudicial to the respondent in this investigation.

43. It is not uncommon to redact information from an investigation report. Information that is not relevant to the investigation may be redacted if it is unfairly prejudicial or confidential in nature. In fact, I had also redacted other information Doe provided me.

44. The failure to redact the information in the appendix was a temporary administrative drafting error. Our office corrected the error before the appendix was provided to any hearing officer.

45. The allegation regarding the firearm did not in any way inform my investigation or consideration of the charges I ultimately included in my report.

46. When I explained the error to Doe at the time, I told him it was an administrative mistake and it would be fixed before the hearing.

**Doe Hearing**

47. As investigator, I attended the Doe hearing. IUPUI's practice provides an opportunity for the decision-makers to hear live testimony from the complainant, respondent, the investigator, and other witnesses.

48. The hearing panel asked questions about my investigation. Professor Yost asked me about Betty Boe's reference to Roe being pushed against a laundry chute when Roe had said it was a laundry room door. I explained that, I believed Boe just misremembered what Roe had said since Roe's statement, Doe's statement, and the evidence all showed she hit a laundry room door. After the panelists completed their questions, I was then questioned by Doe directly. I answered all questions completely and truthfully.

49. I attended the entire hearing. I thought the hearing was handled well, respectfully, and thoroughly. I did not hear or observe any derogatory comments or behavior, any suggestive mannerisms, or any disrespect to any participant in the hearing, including Doe.

50. I did not and do not believe that Doe and Roe were treated differently in the hearing or in a disparate manner. I never saw Ms. Ferguson shake her head or do anything that suggested disapproval of Doe. I observed that all questions asked by

the hearing panel members were appropriate to the charges and the proceeding. I did not believe that any questions asked of Doe were accusatory or asked with a harsh tone.

51. After the hearing, I sent an email to Kelly Freiberger to let her know what a good job she did as the hearing coordinator. (May 22, 2019 Email from Kuester to Freiberger, Exhibit 2036.)

52. After the hearing, I sent an email to Sara Dickey telling her how smoothly the hearing ran and what a good job the hearing panel and coordinator did at the hearing. (June 7, 2019 Email from Kuester to Dickey, Exhibit 2043.)

**Additional Information**

53. I understand from reviewing Doe's affidavit that he alleges that the hearing officers, and I, as the investigator, should have considered information his counsel provided to General Counsel's Office a few days before the hearing. First, I was surprised Doe would argue he had any additional information because I had met with him four times where he provided oral statements, written statements, and copious document evidence. I had provided him with the Preliminary Investigation Report and given him an opportunity to comment on the report, in which he did. Additionally, Doe had my email address and we exchanged numerous emails over the course of the investigation. In each meeting, the lawyer who later provided documentation to General Counsel's Office participated and never said anything about new information.

54. Second, the information – an alleged relationship with a medical school professor, conduct regarding a grant, and alleged racist comments – would not have been relevant to my investigation. I investigated physical violence and verbal abuse within a dating relationship. In my opinion, the information does not bear on whether the incidents occurred or not. Like the allegation of Doe having a gun, I did not view the information as anything that I needed to include in my investigation. Instead, I viewed it as character evidence.

55. Doe already provided credibility information surrounding the incident to me – he offered the timing of the filing of Roe's complaint related to their breakup, a message where Roe said she wanted him away from her, her communications showing that they were together after the incident, etc. as evidence that he felt undermined her credibility. All of that credibility evidence was in the information provided and consider by the hearing panel.

**Doe's Allegations Against Roe**

56. In one of my meetings with Roe, she told me about several fights between Doe and Roe including a fight she and Doe had in Italy in June 2018. Roe said she instigated the argument and may have pushed him. She also said that she believed Doe struck her causing a bruise on her face. Doe recalled the argument but denied striking Roe. He said both had been drinking, had a fight, and he said she struck him and he grabbed her arms to subdue her. He also said she threw a vase in his direction.

57.     I mentioned this fight to Sara Dickey consistent with University policy which requires the reporting of any potential dating violence incidents. I recall participating in one conversation about the incident, but I do not think I participated in the decision about whether the University should pursue a case against Roe without Doe participating as a complainant. University policy states that the University will take appropriate steps consistent with complainant's interest that an investigation not be pursued. (UA-03 Sexual Misconduct Policy, Exhibit 1, p. 10.) My belief, based on my discussions with Doe, was that Doe did not want to pursue the investigation at that time. I understood that if Doe ever decided to move forward with a complaint, the University would act on it. But without him initiating it, the University did not view it as an investigation the University needed to conduct without his cooperation.

58.     When Doe appealed the finding of sexual misconduct, I understand he said the University should have investigated Roe for dating violence based on the Italy fight. I provided Dean Spratt who handled the appeal an email explaining all the communications I had with Doe that caused me to believe he did not want to initiate an investigation in early 2019. (June 6, 2019 Email from Kuester to Spratt, Exhibit 2040.) Those included at least four comments from Doe that he thought the incident was alcohol-related, he wanted to move on, and he did not want to hurt Roe. (*Id.*)

59. Doe stated in an email to me that he understood that for something to rise to a Title IX matter, it needs to negatively affect the complainant's education (April 5, 2019 Email from Doe to Kuester, Exhibit 2020.)

60. In May 2019, following the panel hearing and decision to suspend Doe, Doe reached out, first to Sara Dickey in the Office of Student Conduct, and then to me to discuss initiating an investigation of Roe's conduct. (June 12, 2019 Email Chain between Greg Kuester and John Doe, Exhibit 2044, 2045.) I agreed to meet. Doe rescheduled the meeting twice. (*Id.*) By the time he wanted to meet in June, my temporary assignment at IUPUI was coming to an end and I referred him back to Sara Dickey for follow up with the new investigator.

61. I believe my handling of Doe's possible complaint against Roe was consistent with how I handled Roe's complaint. I communicated with each of them to understand their interests and determine whether she or he was willing to move forward with an investigation. For example, Roe expressed concern about moving forward with the investigation on two occasions including because she said she was fearful of what Doe might do and concerned he had hired a private investigator. (November 26, 2018 Email chain between Roe and Kuester, Exhibit 2010; February 20, 2019 Email Chain between Kuester and Roe, Exhibit 2016.) However, she ultimately decided to continue and the matter was fully investigated.

**Doe's Affidavit**

62. I have reviewed the affidavit Doe submitted in support of his motion for preliminary injunction. In that affidavit, Doe raises topics that he did not report to

me, stated in passing, or were not relevant to the charges. When he provided comments to the preliminary investigation report, he did not identify any as a topic he thought should be called out for the hearing panel nor did he raise these issues in his statements to the panel. These items include: allegations about Roe being physical in April 2018 (paragraph 13), conduct in June 2018 around Doe's family including physical contact (paragraph 16), that he feared for his safety in October 2018 due to Roe's conduct (paragraph 43), and that witnesses expressed fear about providing testimony (paragraph 76),

63. Doe also misrepresents aspects of my report, including: that I improperly credited witness testimony when in fact I relied on the testimony because it substantiated what Roe reported (paragraph 90); suggesting Roe's report was inconsistent even though Doe was present when I testified at the hearing that Roe's testimony was consistent (paragraph 90); failing to redact information when, as noted above, Doe knows this was a temporary issue in a draft report and no one but Doe and Roe saw the information (paragraph 90); and that I overlooked evidence in the investigation when every piece of information referenced by Doe is contained in the Final Investigation Appendix and most, if not all, are cited in my Final Investigation Report (paragraph 124)

**Conclusion**

64. I handled this investigation consistent with my training, certifications, and other investigations I've conducted and stand behind my decision to charge Doe.

17

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed On: 10/30/2020

Signature

114285v1