**In the Matter Of:**

JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

1:20-cv-02006-JRS-MJD

**GREGORY KUESTER**

*November 04, 2020*



800.211.DEPO (3376)
EsquireSolutions.com

1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF INDIANA
2                      INDIANAPOLIS DIVISION

3

4

5

     JOHN DOE,
6    Plaintiff,

7

     vs.                        CIV. NO. 1:20-cv-02006-JRS-MJD
8

9    THE TRUSTEES OF INDIANA UNIVERSITY,
     INDIANA UNIVERSITY SCHOOL OF MEDICINE,
10   INDIANA UNIVERSITY PURDUE UNIVERSITY-
     INDIANAPOLIS, INDIANA UNIVERSITY KELLEY
11   SCHOOL OF BUSINESS; GREGORY KUESTER, IN HIS
     OFFICIAL AND INDIVIDUAL CAPACITY; BRADLEY
12   ALLEN, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY
     AND JAY HESS, IN HIS OFFICIAL AND INDIVIDUAL
13   CAPACITY,
     Defendants.

14

15   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

16

17

18                       DEPOSITION OF
                        GREGORY KUESTER

19                     November 4, 2020
                         5:00  p.m.
20              730 West Main Street; Suite 101
                   Louisville, Kentucky 40202
21

22

23

24

25      KATIE JO GLESING, Notary Commission No. NP0723431



```
 1                   APPEARANCES Of COUNSEL

 2

 3    On Behalf of the Plaintiff, JOHN DOE:

 4         STUART BERNSTEIN, ESQ.

 5         REGINA FEDERICO, ESQ.

 6         NESENOFF & MILTENBERG, LLP

 7         363 7th Avenue

 8         5th Floor

 9         New York, New York 10001

10         212.736.4500

11         212.736.2260 Fax

12         tdavis@nmllplaw.com

13         sbernstein@nmllplaw.com

14         (APPEARED VIA VIDEOCONFERENCE)

15

16    On Behalf of the Defendants, INDIANA UNIVERSITY:

17         JAMES NUSSBAUM, ESQ.

18         CLAIRE MCROBERTS, ESQ.

19         INDIANA UNIVERSITY

20         340 West 10th Street

21         Indianapolis, Indiana 462020

22         317.274.5506

23         jtnussbau@iu.edu

24         clahunte@iu.edu

25         (APPEARED VIA VIDEOCONFERENCE)
```



```
 1              APPEARANCES Of COUNSEL (CONTINUED)

 2

 3   On Behalf of the Defendants, THE TRUSTEES OF INDIANA

 4   UNIVERSITY, INDIANA UNIVERSITY SCHOOL OF MEDICINE,

 5   INDIANA UNIVERSITY PURDUE UNIVERSITY-INDIANAPOLIS,

 6   INDIANA UNIVERSITY KELLEY SCHOOL OF BUSINESS; GREGORY

 7   KUESTER, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY;

 8   BRADLEY ALLEN, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY;

 9   AND JAY HESS, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY:

10        ALICE MORICAL, ESQ.

11        HOOVER HULL TURNER, LLP

12        111 Monument Circle

13        Suite 4400

14        Indianapolis, Indiana 46244

15        317.822.0989

16        amorical@hooverhullturner.com

17        (APPEARED VIA VIDEOCONFERENCE)

18

19

20

21

22

23

24

25
```



```
 1                    INDEX OF EXAMINATION

 2

 3    WITNESS:  GREGORY KUESTER

 4    EXAMINATION                                    PAGE

 5    Direct Examination by Mr. Bernstein             6

 6    Cross Examination by Ms. Morical              130

 7    Redirect Examination by Mr. Bernstein         134

 8

 9                    CERTIFIED QUESTIONS

10                                                   PAGE

11    Q.  Okay.  Would you agree with me, sir, that

12    the 7th Circuit was extremely critical of the

13    investigation conducted by the investigators

14    at Purdue in that case?                         16

15

16

17

18

19

20

21

22

23

24

25
```



```
 1              DEPOSITION OF GREGORY KUESTER

 2                   November 5, 2020

 3

 4         COURT REPORTER:  And we are now on record.

 5    Will all parties please state your appearance, who

 6    you represent, how you are attending, and the

 7    location you are attending from, starting with the

 8    plaintiff's attorney?

 9         MR. BERNSTEIN:  Stuart Bernstein, Nesenoff &

10    Miltenberg, and I am in Plainview, New York.

11         COURT REPORTER:  All right.  And counsel,

12    Claire did just join.  I am going to let her in

13    real quick.  All right, and we can continue.

14         MS. FEDERICO:  Regina Federico, counsel for

15    the plaintiff.  I am the attorney with Nesenoff &

16    Miltenberg, and I am in located in Massachusetts.

17         MS. MORICAL:  Alice Morical, Hoover Hull

18    Turner, counsel for the defendant, and with me --

19    I'm in Indianapolis, and with me is James Nussbaum

20    and Claire McRoberts, both in-house counsel with

21    IU, and we are all in Indiana.

22         COURT REPORTER:  All right.  Mr. Kuester,

23    could you please state your full name for the

24    record?

25         THE WITNESS:  Gregory Forest Kuester.
```



1              COURT REPORTER:  All right.  And could you

2        please hold up your driver's license up to the

3        screen or up to the camera?  All right.  And,

4        counsel, does everybody stipulate that our witness

5        is, in fact, Mr. Kuester?

6              MS. MORICAL:  Yes, for the defendants.

7              MR. BERNSTEIN:  Yes, for the plaintiff.

8              COURT REPORTER:  Excellent.  And you can go

9        ahead and put that away.  And, sir, could you

10        please raise your right hand once that's put away?

11        All right. Do you solemnly swear or affirm that the

12        testimony you're about to give will be the truth,

13        the whole truth, and nothing but the truth?

14              THE WITNESS:  I do.

15              COURT REPORTER:  Thank you.

16              GREGORY KUESTER, having been first duly sworn,

17   testified as follows:

18                   DIRECT EXAMINATION

19   BY MR. BERNSTEIN:

20        Q.   Good afternoon, Mr. Kuester, my name is

21   Stuart Bernstein, and I represent John Doe in this case.

22              MR. BERNSTEIN:  You know what?  Let's just go

23        off the record for one second, please.  You know

24        what? Let's go off the record for one second,

25        please.



GREGORY KUESTER                                     November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                        7

```
 1              COURT REPORTER:  Off record.

 2                   (Off-the-record discussion.)

 3    BY MR. BERNSTEIN:

 4         Q.    And, Mr. Kuester, we're back, and we had a

 5    conversation off the record regarding my client's name

 6    and claimant's -- the plaintiff's name, and that we are

 7    using pseudonyms, and you and I were both -- there's an

 8    understanding we understand who we're talking with John

 9    Roe -- John Doe and Jane Roe, correct?

10         A.    Correct.

11         Q.    Okay.  Sir, is there -- make this loud I can't

12    -- sir, do you have any type of medical condition today

13    that you believe would prevent you from giving truthful

14    and accurate testimony at this deposition?

15         A.    No.

16         Q.    Have you taken any medications today, or

17    failed to take any medications today, that you feel

18    would prevent you from giving accurate and truthful

19    testimony today?

20         A.    No.

21         Q.    Have you ever appeared for a deposition

22    before?

23         A.    I have not been deposed.  I've been a part of

24    one out of law school, but I've never in front of one

25    before.
```



1    Q.   Okay.  When you say "a part of law school,"
2    meaning were you a witness, you just watched something,
3    or something else?
4    A.   I was an assisting an attorney with a
5    deposition.
6    Q.   And, sir, I know -- my question is that you
7    are currently a licensed attorney; is that correct?
8    A.   That's correct.
9    Q.   And where are you licensed, what states?
10   A.   Maryland.
11   Q.   Has your license to practice law ever been
12   revoked in any states?
13   A.   No.
14   Q.   And, if so, have you ever conducted a
15   deposition?
16   A.   No.
17   Q.   Besides the one that you assisted on in law
18   school?
19   A.   Assisting -- I'm using that word loosely.  I
20   was the paralegal.
21   Q.   Okay.  Understood, sir.  So, sir, briefly, if
22   at any time you need to take a break, please just let me
23   know, and I will certainly accommodate you whether you
24   just want to stretch your legs, go use the men's room,
25   talk to your attorney, or whatever, you just need a



1    break, please just let us know.  If possible, I just ask

2    that we don't take a break in the middle of a question

3    and answer, okay, sir?

4        A.    Understood.

5        Q.    Also, it's very important, and like you've

6    been doing, is that you give verbal answers because the

7    court reporter needs to take that down.  She can't take

8    down nods of the head or shakes of the hand, okay?

9        A.    Understood.

10       Q.    More importantly, I will try to let you answer

11   your question before I ask another one.  The court

12   reporter can't take down everything that you and I are

13   both saying, so let's try not to talk over each other. I

14   know it gets difficult with Zoom because there is that

15   delay and not sure if I'm finished or you're finished,

16   but let's just try our best so the court reporter, you

17   know, we don't mess her up.

18       A.    Okay.

19       Q.    And, sir, this is a question that I ask of

20   every witness, so please do not take any offense to it.

21   Have you ever been convicted of a crime?

22       A.    Maybe, like, a speeding violation.

23       Q.    Besides a traffic ticket.  Would you consider

24   that a traffic ticket?

25       A.    Yeah, a traffic ticket.



1      Q.    Okay.   Besides a traffic ticket, have you been

2   convicted of any other misdemeanor or a felony?

3      A.    No.

4      Q.    I do not have an official CV, and your

5   affirmation doesn't have background information, but am

6   I correct, sir, that you graduated from University of

7   Baltimore School of Law in 2013?

8      A.    That's correct.

9      Q.    And you have a bachelor's degree in economics

10  from Frostburg University in 2001?

11     A.    Frostburg State University, that's correct.

12     Q.    Okay.   Can you just briefly tell me, or tell

13  us what, if anything, professionally you did between

14  2001 and 2010, I presume, when you might have started

15  law school?

16     A.    Yeah, I worked in -- I mean, how detailed do

17  we you want me to get?

18     Q.    Well, let's first -- what did you -- give me

19  general, maybe, the areas, and then if I think I need

20  some more information of those specific areas, I can,

21  you know, ask you more specific questions.   Generally

22  what did you do, did you work, and if you were working,

23  what field?

24     A.    Went to law school right out of undergrade

25  University of Pittsburgh, was there for one year.   Now



1  that everybody knows about heart arrhythmia, I can share

2  that that's when it first started.  It devastated my

3  first year of law school, and I backed out of law school

4  after one year and decided to look for employment.  So

5  that brought me to 2002, '3-ish, I obtained a job with

6  American Express Financial Advisors.  I was a financial

7  advisor for one year.  In 2004 I decided to get back

8  into student affairs, higher education.  I became a

9  resident director at Bethany College in Bethany, West

10  Virginia.  I loved that.  I didn't really love the place

11  that I was working at, so I transferred to Binghamton

12  University, upstate New York.  I was a resident director

13  there for about five more years.  And it was shortly

14  after that my wife graduated law school, and we moved to

15  Baltimore where she began practicing, and that is when I

16  re-enrolled in law school at University of Baltimore.

17      Q.   Okay.  Now, at Binghamton did you conduct --

18  with regards to school misconduct hearings, what, if

19  any, role did you have during your time at Binghamton?

20      A.   All resident directors at Binghamton were

21  tasked with overseeing and administer -- administering

22  the student conduct issues.  I should say minor student

23  conduct issues such as marijuana and underage alcohol in

24  their buildings and in their communities.  In addition

25  to that, after a couple of years there I sought to be a



1  hearing board chair, where under that process, if a

2  student appealed a decision at the lower level, they

3  would have a hearing board -- or a hearing, and two-

4  hearing board chairs would oversee that.  I did that as

5  well.

6       Q.   So had -- so if you -- how many years of

7  experience would you say you have had in student conduct

8  manners?

9       A.   Are you counting --

10           MS. MORICAL:  Objection.  Ambiguous.

11      Q.   Okay.  From the time you obtained your

12  undergraduate degree in 2001 up until today, how many

13  years would you -- how many years have you spent being

14  part of student conduct hearings as an investigator, or

15  panel member, or something else?

16           MS. MORICAL:  Objection.  Ambiguous.

17      Q.   You can answer if you can, sir.

18      A.   Yeah, I would say that it's about eight years.

19      Q.   And --

20      A.   And in very different capacities every place I

21  worked.

22      Q.   That was my next question, thank you.  Have

23  you served in the role of an investigator in a student

24  conduct proceeding?

25      A.   I'm -- I'm not sure I'm understanding your



1    questions.

2        Q.    During those eight years have you ever served

3    as an investigator in student conduct proceedings?

4        A.    You mean, like, with your client?

5        Q.    I'm just talking about general.  This is just

6    a general question.  Have you ever been an investigator?

7        A.    Yeah, I -- I've been an investigator many

8    times.

9        Q.    Now -- okay.  So, now, with my next question,

10   can you tell me approximately how many times you've been

11   an investigator in a student conduct investigation?

12       A.    Well, I'm going to -- I'm going to take apart

13   the experience I did as a resident director of student

14   conduct because we did not consider that to be an

15   investigator.  On matters of Title IX, discrimination,

16   and those items, I've done between 70 and 80

17   investigations, and those have all occurred -- occurred

18   in the last three years.

19       Q.    And when you say the student conduct -- the

20   resident directors, you're talking about back at

21   Binghamton that you were doing minor underage drinking

22   and marijuana, those you did not consider

23   investigations?

24       A.    I mean, just to be clear, there's an

25   investigation aspect to those, but I never considered



GREGORY KUESTER                                    November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                      14

1  myself, and nobody called me an investigator, so I did

2  not --

3       Q.   Okay.

4       A.   -- include those in the 70 and 80.

5       Q.   So what you're saying, the 70 and 80 in three

6  years, are you talking about your time as a Title IX

7  investigator at Purdue University up until the present

8  time?

9       A.   That's correct.

10       Q.   Okay.  Do you follow -- in the Title IX area,

11  do you follow and monitor legal cases regarding Title IX

12  matters in investigations?

13       A.   Somewhat, would --

14       Q.   Okay.

15       A.   -- be my answer to that.

16       Q.   Okay.  Are you familiar, or have you had any

17  occasion to read a case by the -- out of the 7th Circuit

18  called Doe v. Purdue?

19       A.   I may have.

20       Q.   Well, when you say you may have, do you

21  have -- as you sit here today, do you have any

22  recollection of having read that case?

23       A.   I've read a case out of Purdue because I

24  worked at Purdue, but I don't know if it's the one

25  you're referring to.



1    Q.    Okay.  And that case that you read, do you

2    know if that was actually Chief Judge Amy Coney Barrett

3    who wrote that decision.  Do you -- does that refresh

4    your recollection?

5    A.    It does.  It does -- I do believe she was on

6    that.

7    Q.    And were you involved in that investigation?

8    A.    No, that occurred prior to my time at Purdue.

9    Q.    To your knowledge -- well, withdrawn.  Were

10   you trained when you started working at Purdue as an

11   investigator by Purdue?

12   A.    Yeah, I started in December, and they sent me

13   to my first training session in January right after the

14   break.

15   Q.    Do you know if your training was the same

16   training as the investigator got as the -- withdrawn. Do

17   you know if your training at Purdue was the same as the

18   investigator involved in the Doe v. Purdue case?

19   A.    I was the only investigator that went to that

20   training.

21   Q.    That's not my question, sir.  My question is,

22   do you know if it was the same training?  It could have

23   been the same program a year before or two years before.

24   To your knowledge, did you receive the same training at

25   Purdue as the investigator who was in the investigator



1  in the Doe v. Purdue case?

2      A.   I do not know -- I'm sorry.  Is somebody else

3  talking?

4      Q.   No.

5      A.   Okay.  I do not know the training that was

6  done to the invest -- I believe there were two

7  investigators in that case.  I do not know their

8  training.

9                CERTIFIED QUESTION

10      Q.   Okay.  Would you agree with me, sir, that the

11  7th Circuit was extremely critical of the investigation

12  conducted by the investigators at Purdue in that case?

13         MS. MORICAL:  Objection.  Calls for legal

14        conclusion.  Calls for speculation and lack of

15        relevance to this matter.

16         MR. BERNSTEIN:  Well, calls for legal

17        conclusion?  He's a licensed attorney, so I think

18        he can give his opinion and --

19         MS. MORICAL:  He is not --

20         MR. BERNSTEIN:  -- he indicated he read the

21        decision, and if he has -- and you can answer the

22        question.  Unless you -- I take that back -- unless

23        you're directing him not to answer.

24         MS. MORICAL:  Just to further speak to the

25        objection, he is here as a fact witness about the



1    investigation that he conducted in this case.  He

2    is not here as a lawyer, and he is not here to

3    provide any legal opinion, and so I -- it's

4    inappropriate for a fact witness to provide legal

5    opinions and to a matter he was not involved in, so

6    it lacks foundation.

7        MR. BERNSTEIN:  Okay.  I'm sorry.  Are you

8    finished?

9        MS. MORICAL:  I'm finished.

10        MR. BERNSTEIN:  Okay.  His training,

11   background, and knowledge is extremely relevant in

12   this case, so I'm not going to argue.  I'm not

13   going to fight,  That question is open.  You're

14   directing him not to answer, that's fine, and we'll

15   move on, and we'll, you know, we'll deal with it --

16   with the Court if we have to.  I'm not

17        MS. MORICAL:  Yeah, I'm going to direct him to

18   not provide a legal opinion on matters when he's

19   here as a fact witness on a case that he wasn't

20   involved in.

21        MR. BERNSTEIN:  Are you directing him not to

22   answer the question?

23        MS. MORICAL:  Yes.

24        MR. BERNSTEIN:  I don't think it asks for a

25   legal opinion.  You're putting that in.  Are you



1    directing him not to answer the question?

2        MS. MORICAL:  I -- you said that he is a

3    licensed attorney, and that's why you are allowed

4    to ask him the question.  That means you're asking

5    him --

6        MR. BERNSTEIN:  No, that's --

7        MS. MORICAL:  Let me finish.

8        MR. BERNSTEIN:  Sorry.

9        MS. MORICAL:  So, yes, I'm directing him not

10   to answer because I believe you've asked for a

11   legal opinion, and you said if I directed him not

12   to answer, we could move on.

13       MR. BERNSTEIN:  Well, I said if you could

14   direct him not to answer the question, not that

15   you're adding the part that I'm asking for a legal

16   conclusion. I'm not asking for a legal conclusion.

17   I'm asking -- he's told us he read the case.  I'm

18   asking him if that's what the case says.  You're

19   already saying it's a legal conclusion.  I'm not

20   asking him what the court's legal rationale was,

21   what the court ruled.  All I asked was a simple

22   fact question, did the court -- was the court

23   critical of the investigation conducted by his

24   former employer, and where he was trained, all

25   extremely relevant to his background when he came



```
 1   to your institution.  Again, if you're going to
 2   direct him not to answer the question, then fine,
 3   tell him -- direct him not to answer the question,
 4   but please do not add this caveat that I'm asking
 5   for a legal opinion.  I'm not.
 6       MS. MORICAL:  I believe that that question
 7   asked for a legal opinion.  You said on the record
 8   that you are asking him this because he's a
 9   licensed attorney.  I'm directing him not to answer
10   this question.
11       MR. BERNSTEIN:  First of all, that's not what
12   I said, okay?  Just so the record is clear, you
13   said, "asking for a legal conclusion," and my
14   response was, he's a licensed attorney.  I didn't
15   say I'm asking him the question because he's a
16   licensed attorney, so let's move on.  Your counsel
17   is directing you not to answer. Katie, can you
18   please just note that in the transcript?
19       COURT REPORTER:  Did you say read back?"
20   Sorry, you cut out just a little bit.
21       MR. BERNSTEIN:  I'm sorry.  Can you just mark
22   that in the transcript so if I need to get a ruling
23   from the Court?
24       COURT REPORTER:  Mark it?  Yes, absolutely.
25       MR. BERNSTEIN:  Thank you.  Thank you.
```



```
 1    BY MR. BERNSTEIN:
 2        Q.    Have you ever been deemed as an expert in the
 3    field of Title IX investigations?
 4              MS. MORICAL:    Objection.    Ambiguous.
 5        Q.    Have you ever been declared an expert by a
 6    judge with regards to Title IX investigations?
 7        A.    No.
 8        Q.    Have you ever held yourself out as an expert
 9    in the field of Title IX investigations?
10              MS. MORICAL:    Objection.    Ambiguous.
11        Q.    You can answer.
12        A.    I don't use the word "expert" to describe
13    myself.
14        Q.    Okay.    Are you being paid to appear today for
15    your testimony?    You know what, withdrawn.    You're a
16    named defendant.    Withdrawn.    Sir, is there a reason
17    that you left Purdue University in less than a year as a
18    Title IX investigator?
19        A.    Yes.
20        Q.    And what is that reason?
21        A.    I was commuting an hour and 15 minutes each
22    way.    I was tired of spending that two-hour 30-minute
23    time each day away from my family.
24        Q.    Okay.    And is that when you then became --
25    that's when you became self-employed as an independent
```



1    civil rights investigator?

2        A.   That's correct.

3        Q.   And in November of 2018 were you an employee

4    of Indiana University?

5        A.   Can I check the notes here?  Can I check my

6    notes?

7        Q.   Well, you know what, there's -- I'm going to

8    withdraw that question right now and -- so, sir, you

9    have documents in front of you that you're using today

10   to testify?

11       A.   I have my affidavit -- affirmation.

12       Q.   Okay.  Besides your affirmation, do have any

13   other documents or things that you are calling notes?

14       A.   No, I don't have any other notes.

15       Q.   Have you written notes?  Have you written

16   comments or anything on your affirmation?

17       A.   There's no markings on my affirmation.

18       Q.   Well, having looked at -- have you had an

19   opportunity to look at your affirmation?  Does that

20   refresh your recollection as to whether or not you were

21   an employee of Indiana University back in November of

22   2018?

23       A.   Yes, I see now on the front page.  I was just

24   checking the -- the dates sometimes I get years

25   confused.  November 2018 is when I started at Indiana



1    University.

2        Q.    Okay.  Were you an employee?

3        A.    Yes.

4        Q.    Okay.  Now, sir, I'm just looking at some

5    document from -- are you familiar with something called

6    LinkedIn?

7        A.    Yes.

8        Q.    And do you have a LinkedIn page?

9        A.    Yes.

10       Q.    And, sir, it says on your LinkedIn page that

11   you were a Title IX investigator for Purdue from

12   December '17 to November of '18, and then self-employed

13   starting in November '18 until present, and there's no

14   mention of the -- no mention of being employed by

15   Indiana University, so --

16       A.    That's correct.

17       Q.    -- is there a reason that your employment at

18   Indiana University is not on your LinkedIn page?

19       A.    I didn't put it on there.

20       Q.    And so how long were you employed at Indiana

21   University?

22       A.    It was -- it went until June of 2019.

23       Q.    And when did it start?

24       A.    November 2018.

25       Q.    Sir, were you asked to leave Indiana



1    University because of the investigation you conducted in

2    this matter?

3        A.    No.

4        Q.    So it's just a coincidence that your start

5    date and end date at Indiana coincides directly with my

6    client's investigation?

7            MS. MORICAL:  Objection to characterization

8        and ambiguous, but you can go ahead and answer.

9        A.    I didn't -- I'm sorry I didn't hear your

10   question.

11       Q.    My question is, is it just a coincidence that

12   your start date and end date at Indiana University

13   coincides with the exact dates of my client's

14   investigation?

15           MS. MORICAL:  Same objection.  It also

16       misstates the record.

17       Q.    You may answer, sir.

18       A.    Yeah, I guess -- I guess you -- you could

19   consider it a coincidence.  I mean, it was -- to be

20   clear, I don't think it was a coincidence that my start

21   date started with this investigation because I think

22   this investigation was one of two that they had coming

23   up, and they did not have an investigator for it, and I

24   got a call from Dean Spratt asking me if I could come

25   and investigate.  But as to your question as to the end,



1    yeah, I would say that would be more of a coincidence.

2         Q.    And so you left Indiana University

3    voluntarily?

4         A.    I did.

5         Q.    And is there a reason why you left Indiana

6    University in June of 2019?

7         A.    There is.

8         Q.    And what is that?

9         A.    They -- well, to be clear, I just -- just so

10   you know, I was doing investigations for other colleges

11   at the same time I was working at Indiana University,

12   and I was trying to build up a client list, and to be

13   frank, Indiana University, their pay rate was much lower

14   than I was -- than I was getting other places.

15        Q.    Were you asked to leave Indiana because they

16   were unhappy with your results?

17        A.    No, not whatsoever.

18        Q.    Were you critical of the Title IX

19   investigation conducted -- withdrawn.  And the fact that

20   it's not on -- Indiana is not mentioned on your LinkedIn

21   is just an oversight on your part?

22        A.    It's not an oversight.  What -- what it is,

23   it's -- when I put that on there -- if I put Indiana

24   University as a six-month employment on LinkedIn,

25   I'm -- I'm holding myself out as a -- somebody who skips



1   out of a lot of jobs, but what I end up doing is I

2   consider that to be one of the schools that I was

3   working for when I started my own business to -- to

4   provide investigation services for several different

5   schools because of what I did at IU was on a part-time

6   basis. So for -- for that social media aspect, it's just

7   trying to clarify that I was -- I was, you know -- and I

8   stayed in my -- in that self-employed thing that I'm

9   doing it for multiple schools that includes IU, but I

10  just didn't put IU on there specifically so it didn't

11  look like he can't stay at a place for more than six

12  months because that would be a mischaracterization of

13  what actually happened.

14      Q.   So you were trying to cast yourself in a

15  better light; is that what you would say?

16          MS. MORICAL:  Objection, mischaracterizes his

17      testimony.

18          MR. BERNSTEIN:  I'll withdraw the question.

19      I'll withdraw the question.

20  BY MR. BERNSTEIN:

21      Q.   Is it fair to say that you put yourself in the

22  best light possible to potential future employers?

23      A.   No, it's not even that.  It's just that I saw

24  my IU work consistent with the -- with the work that I

25  was doing elsewhere.  IU said, "Hey, can you come on a



1    part-time employee basis?"  Other colleges I worked for

2    say, "Let's do a contractual basis," but for me it was

3    basically the same thing, and I included them all under

4    that same umbrella.

5        Q.   Now, you indicated that you left Purdue

6    because of the commute.  Where -- did you have an office

7    at IU in November through June of 2019?

8        A.   Yes.

9        Q.   And where was your office located?

10       A.   My office was located on IUP campus.  IUPUI

11   campus.

12       Q.   That's Indianapolis?

13       A.   Correct.

14       Q.   And to your knowledge, is that where the

15   medical school is located?

16       A.   To my knowledge, it's located nearby.

17       Q.   Okay.  But have you ever seen the medical

18   school during the course of your investigation?

19           MS. MORICAL:  Just objection.  There are

20       multiple campuses.  Are you just asking if that's

21       where the med school's Indianapolis campus is

22       located?

23           MR. BERNSTEIN:  If my question was unclear,

24       thank you, and I will rephrase it.

25   BY MR. BERNSTEIN:



1      Q.    You indicated your office was at the IU

2   Indianapolis campus, correct?

3      A.    My office is at IUPUI.

4      Q.    What campus is that?

5      A.    The IUPUI campus.

6      Q.    Well, what does PUI stand for?

7      A.    Indiana University Purdue University -- I'm

8   sure somebody else at IUPUI could help me out, but it's

9   -- it's a conglomeration between Indiana University and

10  Purdue University.

11     Q.    Okay.  But it's located in Indianapolis,

12  Indiana?

13     A.    That's correct.

14     Q.    Okay.  Know where the medical school is

15  located?

16     A.    Which one?

17     Q.    And I -- forgive me, I should have done this

18  earlier.  When I use the word "IU," do you understand

19  that to be Indiana University?

20         MS. MORICAL:  Objection.  Just to clarify, he

21         -- and he can clarify this, but I believe he worked

22         for -- he was connected with IUPUI's office of

23         student conduct.

24         MR. NUSSBAUM:  Stuart, I didn't hear your

25         question.



```
 1   BY MR. BERNSTEIN:
 2        Q.   My question was, when I say, "IU," do you
 3   understand that to be Indiana University?
 4        A.   Yes.
 5        Q.   Okay.  So let's take a step back because I
 6   don't want to be confused, and I don't want to confuse
 7   the record.  Who were you employed by during November of
 8   2018 to November of 2019, to your knowledge?
 9        A.   I was -- it was my understanding that I was
10   employed by IUPUI and that IUPUI, of course, is
11   administratively governed by IU, and they -- and that
12   office that I worked in would over -- would oversee
13   student conduct cases or Title IX cases rather for not
14   only IUPUI, but IU medical and IU law schools.
15        Q.   Okay.  So where is IU medical school located?
16   If you know?
17        A.   I do not know.
18        Q.   Have you ever -- during the course of your
19   investigation, did you ever -- so you never visited the
20   IU medical school during your investigation?
21        A.   No.
22        Q.   Do you know if the IU medical school is
23   located in Indianapolis?
24        A.   I believe it is.
25        Q.   You mentioned previously that you have an
```



GREGORY KUESTER                                    November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                      29

```
 1   affirmation.  So you signed the affirmation?
 2        A.   Are you asking me if I signed an affirmation?
 3        Q.   Yes.
 4        A.   Yeah.
 5        Q.   Okay.  And you understand that when you signed
 6   that affirmation, you signed it under the penalty of
 7   perjury, correct?
 8        A.   That's my understanding.
 9        Q.   Just as it is your understanding as you are
10   testifying today, you are testifying under penalties of
11   perjury, correct?
12        A.   Uh-huh.
13        Q.   You got -- I'm sorry.  One of the other rules
14   I should have said is you need to give verbal answers --
15   well, I did.  But you can't say "uh-huh."  Can you
16   please preferably say yes?
17        A.   What was the question again?
18        Q.   Do you understand that you are testifying
19   today similarly under the penalties of perjury?
20        A.   Yes.
21        Q.   Okay.  And additionally, as a licensed
22   attorney, do you believe you have an ethical duty to be
23   truthful in your testimony?
24             MS. MORICAL:  Objection.  The -- whether he is
25        a licensed attorney has nothing to do with his
```



1       testimony here where he is here as a fact witness

2       for when he was an employee of IUPUI.

3            MR. BERNSTEIN:  Are you directing him not to

4       answer the question?

5            MS. MORICAL:  I guess I'm objecting based on

6       ambiguity and relevance, but I guess he can answer

7       the question if he can answer.

8       A.   Can you remind me of the question?

9   BY MR. BERNSTEIN:

10       Q.   Absolutely.  You know, again, if you -- thank

11  you for asking me, and if at any time during the

12  deposition you don't recall the question I just asked,

13  please let me know.  The question is, do you believe, as

14  a licensed attorney, you have an ethical obligation to

15  provide truthful testimony?

16       A.   I believe this process -- under this process,

17  I have an obligation to provide truthful testimony.

18       Q.   And what process is that?

19       A.   This deposition.

20       Q.   And when you signed that affirmation, did you

21  have an understanding it was being submitted to a judge

22  in part of motion practice?

23       A.   I had not thought about that, no.

24       Q.   Well, when you signed the affirmation, who did

25  you think -- or what was going to be used with it?



```
 1          MS. MORICAL:  Objection to the extent that it
 2      asks for any communications between counsel and
 3      you, Greg.  I'm directing you not to disclose any
 4      privileged communication.
 5  BY MR. BERNSTEIN:
 6      Q.   Okay.  And again, that was not my question. My
 7  question is, what did he think it was.  So nothing to do
 8  with what you were told, but yes, please -- I join in
 9  your counsel's statement that I do not want you to tell
10  me anything that you and your counsel have discussed. So
11  I'll ask the question again.  When you signed it, what
12  was your thought of what was going to be the use of that
13  document?
14      A.   My thought was that it was a -- the process of
15  litigation and that the document would be shared with
16  plaintiff counsel.
17      Q.   You never thought it was going to be shared
18  with the Judge?
19      A.   I didn't think one way or the other about
20  that.
21      Q.   Okay.  Did you write your affirmation?  What I
22  mean by that, did you actually type it out and write it
23  yourself?
24      A.   I did it in conjunction with counsel.
25      Q.   Okay.  So you typed part of it?  I'm asking if
```



1  you physically typed it.  I understand conjunction.  I
2  asked, did you physically type it out yourself?
3      A.    Are you asking me if I typed all of it or part
4  of it?
5      Q.    Yeah, any of it.  Did you type part of it?
6      A.    Oh, yeah.
7      Q.    Okay.  And when you typed it or created it in
8  conjunction with counsel, did you review any documents
9  prior to creating it?
10     A.    Yeah, I believe so.
11     Q.    Okay.  And what documents did you review?
12     A.    I reviewed the plaintiff's affirmation.  I
13 reviewed a -- a number of documents that was provided by
14 counsel to me.
15     Q.    Okay.  What documents did you review, sir?
16     A.    I can pull it up on my computer here.  I
17 reviewed -- prior to the affirmation, I reviewed the
18 preliminary report, the final report.  I reviewed the
19 complaint.  I reviewed part of the hearing transcript. I
20 reviewed one, two, three, four, five e-mails provided to
21 me from counsel.
22     Q.    Okay.  So when you said "complaint," can you
23 please explain what you meant as there's -- my client
24 has filed a complaint to start this lawsuit.  Is that
25 the complaint you're talking about?



1      A.    Yes.

2      Q.    And prior to signing your affirmation, did you

3   believe the document was accurate and truthful?

4      A.    Yes.

5      Q.    When was the last -- well, you have it with

6   you, actually.  Prior to testifying today, did you

7   review any documents?

8      A.    Yes.

9      Q.    What did you review, sir?

10      A.    My affirmation.

11      Q.    Anything else?

12      A.    I'm thinking for a minute.

13      Q.    Sure, take your time, sir.

14      A.    Yes.  I reviewed one portion of the final

15   report.

16      Q.    Which portion?

17      A.    The charging portion.

18      Q.    The charging portion?  Okay.  Were you -- you

19   mean your findings of the charges that you brought?

20      A.    Yes.

21      Q.    All right.  Prior to testifying, did you speak

22   to anyone other than your counsel in regards to your

23   upcoming testimony?

24      A.    No.

25      Q.    Did you speak to your wife?



```
 1        A.    My wife knew about it, but I did not speak to
 2   her about it.
 3        Q.    Okay.  Do you know Wende Ferguson?
 4        A.    Not personally, no.
 5        Q.    Well, what do you mean "not personally," sir?
 6        A.    I do not have a personal relationship with
 7   her?
 8        Q.    But you know who she is?
 9        A.    That's correct.
10        Q.    You worked with her?
11        A.    I don't know if I would use that phrase.  She
12   was present at a hearing that I attended.  But on -- I
13   did not work with her.
14        Q.    Okay.  What about Sara Dickey?  Did you work
15   with Sara Dickey?
16        A.    Yes, Sarah was my supervisor.
17        Q.    Okay.  When was the last time that you -- you
18   spoke to Sara Dickey?
19        A.    I think I e-mailed -- sorry, texted her about
20   two months ago.
21        Q.    On -- when you texted -- when you texted her
22   two months ago, did she respond?
23        A.    Yes.
24        Q.    Did you text her regarding this case?
25        A.    Nope.
```



1      Q.    Okay.  Did you -- after you texted her, did

2  you have an occasion to talk with her regarding this

3  case?

4      A.    No, I haven't talked to Sara in a long time.

5      Q.    Well, when you say "a long time," meaning at

6  least two months?

7      A.    That's correct.

8      Q.    Okay.

9      A.    I said "no, I have not talked to her in a long

10  time."

11     Q.    And do you know if she was deposed in this

12  case?

13          MS. MORICAL:  Objection to anything that he

14      knows from conversations with counsel.  If you want

15      --

16     Q.    I don't know how much clearer I can say this,

17  Alice, and to anyone and I appreciate it.  Sir, I don't

18  want you to tell me anything that you and your counsel

19  talked to.  So if I ask you a question, and I'll try to

20  be clearer, it's excluding anything that you and your

21  counsel talked to.  That's my fault, and I apologize.

22  Beside any conversations you had with your counsel, did

23  you know if Sara Dickey was deposed in this case?

24     A.    I have no knowledge.

25     Q.    Okay.  Do you know a Kelly Freiberger?



GREGORY KUESTER                                    November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                       36

1       A.    I do.

2       Q.    When was the last time you spoke with

3  Kelly Freiberger?

4       A.    I don't recall.

5       Q.    Was it more or less than the two months that

6  you spoke to Sara Dickey?

7       A.    It's been much longer than two months.

8       Q.    Is it safe to presume then, sir, that you have

9  no knowledge, absent conversation with your counsel,

10 whether Ms. Freiberger has appeared for a deposition or

11 is scheduled to appear for a deposition?

12      A.    No knowledge of her deposition.

13      Q.    Besides your wife, have you -- is there anyone

14 else that you spoke to regarding this matter?

15      A.    No.

16      Q.    Do you have any employees at your office?

17      A.    No.

18      Q.    Sir, would you agree that this case -- when I

19 say "this case," I mean Jane Doe's complaint against

20 John Doe -- was a what is known as a he-said/she-said

21 matter?

22           MS. MORICAL:  Objection.  Ambiguous.

23      Q.    You can answer it, counselor.

24      A.    I would not use that phrase.

25      Q.    Well, do you know -- have you heard the phrase



1    "he-said/she-said" beforehand?

2         A.    I have heard that before.

3         Q.    And what is your understanding of what that

4    phrase means?

5         A.    My understanding is that a "he-said/she-said"

6    is an investigation or a determination where the

7    evidence available are the words from one party and

8    another party, and there's no additional evidence to

9    seek the truth.

10        Q.    And you don't consider this matter one of

11   those?

12        A.    I would not characterize it as that.

13        Q.    As an investigator with over 70 to 80

14   investigations that you personally have conducted, do

15   you believe credibility is always an issue in an

16   investigation?

17             MS. MORICAL:  Objection.  Vague and ambiguous.

18        Q.    Over objection, you can answer.

19        A.    Credibility is often important, but it's not

20   always relevant.

21        Q.    Credibility of a witness is not always

22   relevant in an investigation?  Is that -- is that -- am

23   I -- did I hear your testimony correct?  I'm going to

24   try not to put words in your mouth.

25        A.    The -- can you repeat your question again?



1  Maybe I misunderstood your question.

2      Q.   I thought my question was, do you agree that

3  credibility -- well, I'll ask this question then.  Do

4  you agree that credibility of a witness -- withdrawn. Do

5  you believe that credibility of a party is always an

6  issue in the course of an investigation?

7      A.   It typically is.

8      Q.   Okay.  And if in the course of an

9  investigation you learned that a party blatantly lied

10  about a matter not having to do with the investigation,

11  so, you know, would you take that into consideration in

12  adjudicating that individual's credibility?

13          MS. MORICAL:  Objection.  Vague, ambiguous,

14      incomplete hypothetical.

15      Q.   You can answer, sir.  If you can.

16      A.   I don't understand what you're trying to ask

17  me.

18      Q.   Okay.  Fair enough.  Fair enough.  In the

19  course of an investigation, you believe or you learn

20  that one of the parties just out-and-out lied in another

21  matter.  Had nothing to -- had nothing to do with this,

22  but you learned about that in the course of the

23  investigation.  Do you understand that backdrop?

24      A.   Uh-huh.

25      Q.   Would you -- do you consider that relevant



GREGORY KUESTER                                 November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                    39

1   when adjudicating that party's credibility in the course
2   -- during the course of the investigation?
3            MS. MORICAL:  Objection.  Incomplete
4       hypothetical, vague and ambiguous, and misstates
5       the record.
6   BY MR. BERNSTEIN:
7       Q.   You can answer, sir.
8       A.   I would need to know more information to
9   answer that question.
10      Q.   If Jane -- if you learned that Jane Roe had
11  provided fraudulent documents to Indiana University
12  regarding her grant work, would that be important to
13  you?  In the -- as an investigator in judging her
14  credibility in this matter?
15           MS. MORICAL:  Objection.  Misstates the
16      record.
17      Q.   You can answer, sir.
18      A.   You know, I was tasked with investigating
19  whether or not the allegations that she brought forth
20  had occurred or not occurred, and whether there was a
21  policy violation.  So that information would not be
22  helpful for my determination.
23      Q.   So the fact that one of the parties is a
24  documented liar in another instance, that would not be
25  relevant to you?



1          MS. MORICAL:  Objection.  Misstating the

2     record.  That's nowhere in the record.

3          Q.    Because your client wouldn't let it come in.

4    So let me ask you this way then.  If hypothetically --

5    we're not talking about Jane Roe or John Doe -- was --

6    had a conviction for perjury, okay?  Would that be

7    relevant to you in judging their credibility in this

8    matter?  In this matter?

9          MS. MORICAL:  Objection.  Vague, ambiguous,

10    incomplete, hypothetical.

11         Q.    You can answer.

12         A.    Again, as an investigator, I would need more

13   information to make that determination.  Anytime there's

14   -- there's issues of credibility outside, I would need

15   to know how closely related they are.  As you know,

16   relevance issues are sliding scale. It's not a black and

17   white thing, and I would need more information to answer

18   that question.

19         Q.    So what more information would you need if

20   someone had a conviction for perjury?  Would you want to

21   know -- what more information would you need to know

22   besides that they are convicted of perjury?

23         A.    Someone who is convicted of perjury could

24   still be making truthful allegations in a case that I'm

25   investigating.



1      Q.   100 percent.  That wasn't my question, though.

2   My question was, would you consider it in judging their

3   credibility in this case?  I didn't say that that makes

4   them a liar all the time.  I agree with you, sir.  My

5   question was, would you consider it when adjudicating

6   their credibility?

7      A.   If it was brought to me, I would consider it.

8   I consider all evidence that is brought to me.

9      Q.   So do you agree that Indiana University

10  violated my client's rights by not letting him provide

11  the panel with evidence potentially casting light on

12  Jane Roe's credibility?

13          MS. MORICAL:  Objection.  Ambiguous, vague,

14       misstates the record, and calls for a legal

15       conclusion.

16  BY MR. BERNSTEIN:

17     Q.   You know what?  I'll withdraw the question --

18  I'll withdraw the question.  I'll come back to it after.

19  I'll come back to it after.  Sir, when you were hired by

20  Indiana University, did they require you to have any

21  training in the Title IX area?

22     A.   Are you asking if they required me as terms of

23  my coming on board or if they required me to do the

24  training afterwards?

25     Q.   If I wasn't clear, I apologize.  My question



 1   was, as part of you -- as part of them hiring you, did

 2   they require that you had training prior to you

 3   starting?

 4        A.   I think that that was a --

 5             MS. MORICAL:  I'm sorry.  Objection.  Vague

 6   and ambiguous.

 7        Q.   You can answer, sir.

 8        A.   Yeah, I think my prior training was an

 9   important consideration when they brought me on.

10        Q.   Was or was not?

11        A.   Was.

12        Q.   Okay.  And I assume when you spoke -- whoever

13   you spoke with prior to -- well, who hired you?

14        A.   Jason Spratt, Sara Dickey.

15        Q.   And to your knowledge, what is Mr. Spratt's

16   title?

17        A.   I believe he is dean of students.

18        Q.   At where?  I know there's a lot of campuses,

19   so if you know.

20        A.   At IUPUI.

21        Q.   Okay.  And what was Ms. Dickey's title?

22        A.   At the time it was an interim title, and I

23   don't recall what the title was.

24        Q.   Did you also say you worked with -- my

25   understanding from what I'm hearing your testimony is



1  that you would not conduct investigations at the

2  Bloomington campus?

3      A.    That is correct.  I never conducted any

4  investigations at Bloomington.

5      Q.    So what training did you advise Indiana

6  University that you had prior to your start in November

7  of 2018?

8      A.    I had done ATIXA training for civil rights

9  investigators level one and level two.

10     Q.    Any other training prior to start --

11  withdrawn.  When did that training occur?

12     A.    Those occurred at -- level one was in January

13  of 2018, I believe.  And I think level two was two weeks

14  later at the end of January, if I remember correctly.

15     Q.    Did you provide them with any -- withdrawn.

16  Did you receive any certificates or acknowledgement of

17  completion of those classes that you provided to

18  Indiana?

19     A.    I -- I do believe there is a certification

20  that comes with that.  I did not provide that to IUPUI.

21     Q.    Did they ask you for it?

22     A.    I don't recall.

23     Q.    So to your knowledge, with the exception of

24  what you told them, is there any other way that you know

25  of that Indiana University verified that you underwent



 1    this training?
 2         A.   I'm sorry.  I'm not understanding your
 3    question.
 4         Q.   Okay.  You said you didn't provide them with a
 5    certificate that you completed this training classes,
 6    correct?
 7         A.   Correct.
 8              MS. MORICAL:  Objection.  I think he testified
 9         he did not recall.
10         Q.   No, I asked if -- he said he didn't recall if
11    they asked him for it.  He said he didn't provide them
12    with.  So let's make sure the record is clear.  Am I
13    correct, sir?  That was your testimony?
14         A.   I think you stated it correctly.  Can you
15    state it again to make sure?
16         Q.   Sure.  You testified that you did not provide
17    them with certificates, and you're not sure -- you don't
18    recall if they requested you to provide them.
19         A.   That's accurate.
20         Q.   Okay.  So my question, I presume in your
21    interview or you wrote something down on an application.
22    That's when you advised them that you had completed
23    those classes, correct?
24         A.   Yes. I would have done that in my resume.
25         Q.   Okay.  And besides your resume, do you know of



1  any other way that IU -- that IUPUI verified that you

2  had actually completed those classes?

3       A.    Any other way they did or could have?

4       Q.    Any way they did.

5       A.    I don't -- I don't know what they did.

6       Q.    Now, I don't know if there's such a document,

7  if you have such a document, notes or anything, but can

8  you give a better estimate or tell us the day that you

9  started working at IUPUI?

10      A.    I might be able to find that date in my phone

11 calendar.

12      Q.    With your counsel's permission, I would ask

13 that you try to do that.

14           MS. MORICAL:  So you want a specific date in

15      November?

16      Q    I would like.  Or if -- let's see if we can do

17 it this way.  Do you know how from the -- from the day

18 that you started to the date that you received an

19 investigation, how much time elapsed, if any?  If you

20 could do it that way.

21      A.    Is that -- are you asking me a question?

22      Q.    Yeah.  Yeah.  You know, if -- I'm trying to

23 get a date on when you -- you know what, withdrawn.  I

24 would ask that he -- he look in the calendar with

25 counsel's permission.



1          MS. MORICAL:  Okay.  So Greg, you have your

2       phone there, and you're going to search for an e-

3       mail, or what were you going to do?

4          THE WITNESS:  Actually, now that I was

5       thinking about it, an e-mail from Sara Dickey

6       discussing my start date would probably be

7       available to me in my e- mail if you would like for

8       me to look for it.

9          MR. BERNSTEIN:  I would with counsel's

10      permission.

11         MS. MORICAL:  Okay.

12   BY MR. BERNSTEIN:

13      Q.   Okay.  If you can do that, sir, that would be

14   great.  Thank you.

15      A.   Doing it now.

16      Q.   Okay.  Great.

17      A.   Stuart, I've got an offer letter on November

18   8th.  Would you like for me to look for -- continue

19   looking for the date that I was first on campus as an

20   employee?

21      Q.   Let me ask you this so we don't have to do it

22   that way.  If you got the offer on November 8th, you

23   approximately -- do you know when you started?  The next

24   day?  Two weeks?  Or something like that?

25      A.   I -- I really don't remember.



1     Q.   Okay.  Yeah, if you could find the exact date,
2     I would appreciate it.
3     A.   All right.  It looks like the starting date
4     was set in the offer letter as November 15th.  So I
5     would assume that I either started on or real close to
6     that.
7     Q.   Okay.  That's helpful.  Thank you.  Do you
8     know when you received the assignment to work on this
9     case?
10    A.   No.
11    Q.   When you -- so November 15th, if we use that
12    as a start date approximately, did you receive any
13    training at IU?
14    A.   Yeah, I remember training during my first
15    couple days on campus in terms of -- yeah.  A variety of
16    things.
17    Q.   When you say "training" or "variety," what
18    kind of training did you receive at IU?
19    A.   For one, their database where they hold their
20    -- their cases was different than the one I had used at
21    Purdue, so I trained on that.
22    Q.   Okay.
23    A.   I recall Sara Dickey asking me to read two
24    reports to show me -- to familiarize myself with IU or
25    IUPUI's format.



1    Q.    Okay.  Any other training that you got?

2    A.    I do.

3    Q.    Prior to -- I'm sorry.  Prior to working on

4  John Doe's case?

5    A.    I do remember other training on the computer

6  that I did, but I don't necessarily remember the details

7  of it.  I want to say they were just, maybe, onboarding

8  training that was common for many employees.

9    Q.    And you use that term, and I know you used it

10  in your affirmation.  I circled it.  What do you mean by

11  "onboard training"?  I'm sorry.  I'm not familiar with

12  that term.

13    A.    Training that is required by all employees

14  when they come -- when they come on board.

15    Q.    Trained on -- like you indicated -- you said

16  that Ms. Dickey asked you to read two -- two reports to

17  get familiar with their format and some computer

18  database training.  If you can be more specific, any

19  other specific training that you received with regards

20  to IU's, you know -- IU -- I'm sorry.  Let me get --

21  with regards to IUPUI and how it affects your job as an

22  investigator.

23    A.    I also remember reviewing their policy.  But I

24  -- and I remember doing a couple days of in the office

25  of training.  But those are the specific things I



1   remember.

2        Q.   Okay.  You said "reviewing the policy."  So

3   what?  You got a copy of the policy, and you read it?

4        A.   That would be, probably, how it happened.

5        Q.   Okay.  But no one specifically sat down with

6   you and went through the policy with you to say, "This

7   is how we do things here"?  You just read the policy; is

8   that a fair statement?

9        A.   That's how I would remember it, yeah.

10       Q.   Now, sir, you have your affirmation there.  If

11  you could look at -- and so just for the record, it's

12  Exhibit, I think, 80.  If you could, look at Exhibit 80,

13  which is your affirmation.  Alice, am I right?  It's 80?

14            MS. MORICAL:  Yeah.

15       Q.   Okay.  Page 3, sir.

16       A.   Okay.

17       Q.   Paragraph 7.

18       A.   Uh-huh.

19       Q.   And you wrote, "the policy expressly states

20  that the 'prior sexual history' between the parties is

21  not relevant."  Correct?

22       A.   Correct.

23       Q.   That's not a true statement, is it, sir?

24            MS. MORICAL:  Objection to the extent that the

25            document --



GREGORY KUESTER                                    November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                      50

1     Q.   I'll withdraw it.  I'll withdraw the question.
2  That's not a true statement of IUPUI's sexual --
3  withdrawn.  Sir, that's not a true statement of IUPUI's
4  UA-03's policy, is it?
5          MS. MORICAL:  Objection.  Argumentative and
6      ambiguous.
7     Q.   It's not argumentative or ambiguous.  It's
8  absolute -- just a direct question.  That's not a true
9  statement of their policy, is it, sir?
10    A.   Are you -- I have my affirmation here.  I
11 don't have a copy of the policy here, but I assume that
12 they -- I assume that it is true.
13    Q.   Well, will you -- can you turn to Exhibit 1,
14 which is a copy of the policy?
15    A.   Hold on.  Okay.
16    Q.   Go to page 9.
17    A.   Okay.
18    Q.   And you see at the top, it says
19 "Investigation"?
20    A.   Yes.
21    Q.   Seven lines down at the end where the
22 sentence -- the sentence starts "Information."
23    A.   I see it.
24    Q.   And it says, "the policy states information
25 related to prior sexual history of the parties will be



1    prohibited, except in very limited circumstances

2    regarding prior sexual history between the parties where

3    such information may be relevant to the issue of

4    consent."  Do you see that, sir?

5         A.   I see that.

6         Q.   That's what the policy says, correct?  Not

7    that sentence that you put in, correct?

8              MS. MORICAL:  Objection.  That doesn't make

9         his statement false.  There's no issue of consent

10        in this case.  I have -- what are -- I don't

11        understand why you're suggesting that would make

12        his statement -- why you think he would make a

13        false statement in his affirmation.  If it's --

14   BY MR. BERNSTEIN:

15        Q.   I'm not going to debate with you.  But that is

16   a -- that is not an accurate and true statement to the

17   Judge that you wrote, correct?

18             MS. MORICAL:  Objection.  Mischaracterizes his

19        testimony, argumentative.

20        Q.   Sir, having read -- having now seen the policy

21   again right in front of you that we just read, and now

22   looking at paragraph 7, do you still believe that

23   paragraph 7 is a true and accurate statement that you

24   are conveying to the Judge in this case?

25        A.   Yes.



1     Q.   Okay.  Would you agree, sir, that -- well, let

2   me ask you this.  On Exhibit 1, to your Knowledge, is

3   that a policy that applies to all of IU's campuses, and

4   employees, and students?

5          MS. MORICAL:  Objection.  Lack of foundation.

6     Q    My found -- well, go to page 1.  My point is,

7   I just want -- the question is, if I say IU, I don't --

8   Alice, I don't want you to object or say it's not

9   correct because we're talking about the IUPUI.  So I

10  just want to make sure -- I think page 1 of that -- you

11  want to look at page 1?  Sir?

12    A.   Yes, I'm looking at page 1.

13    Q.   Okay.  And you agree that this is the policy

14  that was -- you used to adjudicate this matter, correct?

15    A.   It does appear to be the same policy.

16    Q.   And under "Scope" it says, "This Indiana

17  University policy is designated to all members of the

18  university community, all students, all employees."  Do

19  you see that?

20    A.   Uh-huh.

21    Q.   Yes?

22    A.   Yes.

23    Q.   So is it fair to say that there's one IU

24  policy for the purposes of Title IX investigations?

25         MS. MORICAL:  Again, objection.  If you want



1    to ask him if this is the policy in place at IUPUI,

2    that's fine.  I just don't think he knows what --

3    what policies apply to other campuses.  It's just

4    the way you're asking the question.

5         MR. BERNSTEIN:  Alice, that's my -- that's my

6    exact point.  I don't want to play games later on.

7    He said IUPUI is not on there.  It says, "this

8    Indiana University policy."

9         MR. MORICAL:  Right.  So -- and I want you to

10   be able to get that testimony.  It's just that

11   you're asking if it applies to all campuses.  I

12   don't think he knows -- it lacks foundation for

13   that.  I think it says little -- has foundation to

14   say it applies to IUPUI and his investigation.

15        MR. BERNSTEIN:  It says, "all students,." does

16   it not?

17        MS. MORICAL:  Do you want him to interpret the

18   university policy?

19        MR. BERNSTEIN:  Yeah, he's the investigator

20   who used it.  I absolutely want him to interpret it

21   and to be interpreting it later on.

22        MS. MORICAL:  And you want him to interpret

23   whether it applies to campuses that he didn't work?

24   I just didn't understand why that -- I thought that

25   we were trying to get to the same point, which is



1          the policy.
2               MR. BERNSTEIN:  I don't want -- I don't want
3          to see later on in the motion when I said "IU's
4          policy" -- "Oh, no.  He didn't say IUPUI's policy."
5               MS. MORICAL:  Right.  So I guess that's why
6          I'm just saying if you ask him the question, "Does
7          this policy apply to IUPUI?" that -- that question
8          he can answer.  I don't think he can answer if it
9          applied to Bloomington.  So I think we're saying
10         the same thing, it's just I'm trying to explain why
11         I was objecting to your question.
12              MR. BERNSTEIN:  And I think your objection is
13         incorrect because the document speaks for itself.
14         Well, let me ask you, sir.  Why does -- how do you
15         know that this applies to IUPUI?  IUPUI is not in
16         this document, is it?
17              THE WITNESS:  I don't know.  I haven't read
18         the entire document.
19    BY MR. BERNSTEIN:
20         Q.  Well, again, let's go to school.  Let's go to
21    page 1.  "This Indiana University policy is designed to
22    protect all members of the university community."  It
23    doesn't say IUPUI, does it?
24         A.  Not right there, it does not.
25         Q.  Doesn't say Bloomington, does it?



1    A.   I don't -- I didn't hear you read Bloomington,

2    no.

3    Q.   Well, you're looking at it.  I don't have to

4    read it.  You're looking at it, correct?

5    A.   Well, I'm on a laptop, Stuart, and I'm kind of

6    in between.

7    Q.   You know what, we'll do it the hard way,

8    Alice.  You got it.

9         MS. MORICAL:  I mean, it's in his affirmation.

10        It's the policy he followed.  I'm not -- we're not

11        going to argue.

12        MR. BERNSTEIN:  But IUPUI doesn't have a

13        policy.  That's my point.  IU had the policy.

14        MS. MORICAL:  IUPUI followed this policy.

15        That's what's in his affirmation.  I don't have

16        to --

17        MR. BERNSTEIN:  Really?  Where does it say

18        that?

19        MS. MORICAL:  Where does his affirmation --

20        MR. BERNSTEIN:  Say that IUPUI follows

21        Exhibit 1?

22        MS. MORICAL:  Well, he described that this is

23        the policy that he was following.

24        MR. BERNSTEIN:  Where does it say he's

25        following Exhibit 1?



1          MS. MORICAL:  I mean, he references Exhibit 1

2     in paragraph 6 of his affirmation.  I

3          MR. BERNSTEIN:  Paragraph 6.  The

4     university's.  So I'm supposed to understand that

5     the university -- well, we'll do it.  That's fine.

6     I have no problem.  I got no problem.  I got no

7     problem.  Would you agree with me that IUPUI

8     strives to provide all parties involved in a Title

9     IX investigation with a fair and impartial

10     investigation?

11          THE WITNESS:  Are you reading the policies?

12  BY MR. BERNSTEIN:

13     Q.   No, I'm asking you a question.

14     A.   Ask it again, please.

15     Q.   Do you agree that IUPUI strives to provide all

16  parties involved in a Title IX investigation with a fair

17  and impartial investigation?

18          MS. MORICAL:  Objection to the extent that

19     you're asking him to speak for the entity.

20          MR. BERNSTEIN:  Correct.  I'm asking him to

21     speak to his employer who hired him to be an

22     investigator.  I'm asking him to speak of whether

23     or not he's supposed to provide a fair and

24     impartial investigation.

25          MS. MORICAL:  That was -- I don't think that



```
 1        was your question.  If your question is
 2   BY MR. BERNSTEIN:
 3        Q.   MR. BERNSTEIN:  Do you not have an opinion as
 4   to whether or not IUPUI strives to provide all parties
 5   involved in the Title IX investigation with a fair and
 6   impartial investigation?  You don't have an opinion to
 7   that, sir?
 8        A.   I strive to do that when I'm investigating my
 9   cases.
10        Q.   And that would be my next question.  But my
11   question is, do you have an opinion as to whether IUPUI
12   strives to provide all parties involved in a Title IX
13   investigation with a fair and impartial investigation?
14        A.   I can only speak to the extent of what I did
15   and the employees that I worked with, and the answers to
16   those questions would be yes.
17        Q.   Okay.  Do you agree as an investigator, you
18   must be fair and impartial both to the complainant and
19   the respondent?
20        A.   Absolutely.
21        Q.   You agree that you can't favor one party over
22   the other?
23        A.   Correct.
24        Q.   Do you agree that you need to provide the same
25   resources to each party as impart --
```



1          MS. MORICAL:  Objection.  Vague and ambiguous.

2    BY MR. BERNSTEIN:

3      Q.   You can answer it, sir.

4      A.   I would need to know more information.

5      Q.   About what?  Which word in that -- which word

6    in the sentence do you need more information about so I

7    can see if I can help you?

8      A.   "Resources."

9      Q.   So to your knowledge, are there resources that

10   you would provide to a complainant that you would not

11   provide to a respondent?

12         MS. MORICAL:  Objection.  Still ambiguous.

13         MR. BERNSTEIN:  You understand -- do you not

14     understand?

15         MS. MORICAL:  He said he didn't understand.

16         MR. BERNSTEIN:  Do you not understand the word

17     "resources"?  Is that what you don't understand?

18         MS. MORICAL:  He said he needed clarification

19     on it, and you just used it again in another

20     question.

21         MR. BERNSTEIN:  Correct.  Because I rephrased

22     the question.

23         MS. MORICAL:  But you didn't clarify

24     resources.

25         MR. BERNSTEIN:  So my question is, as a Title



1    IX investigator with 70 to 80 investigations, are

2    you telling me you don't understand what the word

3    "resources" means in this matter?  In this context?

4        MS. MORICAL:  Objection.  Ambiguous and

5    argumentative.  He -- he asked you to clarify what

6    you think it means, and you told him you would, and

7    you didn't.

8        MR. BERNSTEIN:  So are you telling me -- new

9    question, okay?  We've got to get past that, Alice.

10   New question.  Are you -- is it my understanding

11   -- withdrawn.  Do you understand -- withdrawn.

12   What does the term "resources" mean to you in

13   connection with a Title IX investigation?

14       MS. MORICAL:  Objection.  Vague and ambiguous.

15   BY MR. BERNSTEIN:

16       Q.   You can answer, sir.

17       A.   Resources generally mean accommodations made

18   to the parties or things that are provided for them.

19       Q.   Okay.  Now, do you believe you need to provide

20   the same resources to each party as part of fairness?

21       MS. MORICAL:  Objection.  Vague, ambiguous.

22   Incomplete hypothetical.  Calls for speculation

23   because the investigator -- I don't know how it

24   relates to the investigator's role.

25   BY MR. BERNSTEIN:



1      Q.   Fair enough.  AS an investigator, do you

2  provide resources to parties in Title IX investigations?

3      A.   It depends.  I mean, "resource" is such a

4  broad word.  I don't know specifically what you're

5  talking about.  Typically, resources are provided at a

6  level different than the investigator.  Sometimes the

7  investigator might be involved in communicating those

8  resources or requests for resources, but it's not

9  typically the role of the investigator to do so.  But I

10  would -- I would add that there are resources that, you

11  know, we do provide such as communication.  Whenever I

12  communicate something, I would communicate it with both

13  sides evenly, if you would consider that a resource.

14      Q.   Okay.  Thank you.  Would you agree that if a

15  Title IX investigator was unfair and not impartial to

16  the respondent, that would be unfair in the proceeding?

17      A.   Your mic cut out on you a little bit.

18      Q.   I'm sorry, sir.  Would you agree that if a

19  Title IX investigator was unfair and not impartial --

20  withdrawn.  Would you agree that if a Title IX

21  investigator was not impartial that that would provide

22  for an unfair process?

23          MS. MORICAL:  Objection.  Vague, ambiguous,

24      and may call for a legal conclusion.

25          MR. BERNSTEIN:  Are you directing him not to



GREGORY KUESTER                                    November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                        61

1        answer?  Go back to the -- withdrawn.  Are you

2        directing him not to answer?

3            MS. MORICAL:  No.

4   BY MR. BERNSTEIN:

5        Q.   Okay.  So you can answer, please.

6        A.   Yeah, if somebody was not impartial, it

7   could -- I forget your question now, but yeah.  I agree.

8        Q.   Would it be an unfair process?

9        A.   It could.

10       Q.   Okay.  Would you agree that Mr. Doe in this

11  case was not treated as equally and fairly as the female

12  complainant?

13       A.   I did not observe that.

14       Q.   When you say you did not observe that, do you

15  believe that IUPUI provided John Doe with a fair and

16  impartial investigation?

17       A.   Absolutely.

18       Q.   You believe that IUPUI treated John Doe

19  equally as it treated Jane Roe?

20       A.   Let me just -- I'll answer that question.  Let

21  me just go back to the last question.  I can only speak

22  to the parts that I touched in the investigation, which,

23  of course, are much of it.  But all the parts that I

24  touched and I saw it was fair.  I do understand that

25  there were parts of the process that have extended past



1    me, and I can't speak to those.

2        Q.   Sure.  Well, what about IU -- what about

3    IUPUI's policy?  Do you believe IUPUI's policy provided

4    John Doe with a fair proceeding?

5        A. I -- I have no reason to believe it did not.

6        Q.   Okay.  You provided Jane Roe with interim

7    measures, more specifically, a no-contact order,

8    correct?

9        A.   Correct.

10       Q.   And that's something that you did, correct?

11       A.   The no-contact order came from me.  It was not

12   something that I initiated.

13       Q.   Well, sir, isn't it -- when you say it wasn't

14   initiated, didn't you put -- put it in John Doe's letter

15   of January 2019, Exhibit 2011?  2011?

16       A.   Yeah, I followed the policy.

17       Q.   So the policy -- and that policy is actually

18   an unfair policy because it only provides interim

19   measures to a complainant, correct?

20           MS. MORICAL:  Objection.  Misstates the

21       record.

22       Q.   Do you agree, sir, that IU's policy only

23   provides interim and remedial measures to a complainant?

24       A.   No.

25           MS. MORICAL:  Same objection.



```
 1        Q.   No?  Okay.  How about we go to Exhibit 1, page
 2   9?  Well, I'm going to withdraw the question.  I'm going
 3   to withdraw the question.  Do you agree that upon
 4   receipt of an allegation that IU only provides interim
 5   measures to a complainant?
 6             MS. MORICAL:  Objection.  Vague and ambiguous
 7        and -- okay.  Yeah, that's all.
 8   BY MR. BERNSTEIN:
 9        Q.   You can answer, sir.
10        A.   I can't answer that question.  It's too vague.
11   Interim measures are -- include a number of different
12   things, and I can't speak to what IU or IUPUI does in
13   all their investigations.
14        Q.   Okay.  Why don't we turn to page 9 of
15   Exhibit 1?  Let me know when you're there.
16        A.   I am there.
17        Q.   And you see three-quarters of the way down it
18   says "interim and remedial measures"?
19        A.   Okay
20        Q.   "Upon receiving a report or notice of alleged
21   sexual misconduct, the university will provide
22   appropriate and necessary interim measures to the
23   complainant."  Do you see that?
24        A.   I see that.
25        Q.   No mention of respondent, correct?  No mention
```



 1  of the accused?  Right?

 2      A.   Not in the first sentence, no.

 3      Q.   Well, why don't you look -- continue reading

 4  to yourself, and let me know if you see it there, where

 5  it talks about the respondent.

 6      A.   I do not see it in that paragraph.

 7      Q.   So IU's policy does not provide interim

 8  measures, or doesn't call for interim measures, to a

 9  respondent, does it, sir?

10          MS. MORICAL:  Objection.  Are you -- you're

11          just referring to, does this particular document

12          refer to interim measures?  I mean

13  BY MR. BERNSTEIN:

14      Q.   I'm talking about the document that's the

15  policy.  I'm talking about the policy in black and white

16  that says it.  IU's policy doesn't call for it, does it,

17  sir?

18      A.   I -- I would answer that by saying that it

19  does not reference the respondent in that paragraph.

20      Q.   And in fact, sir, in your experience of 70 to

21  80 investigations at other schools, most all other

22  schools provide mutual no-contact orders, don't they,

23  sir?

24      A.   No.

25      Q.   No?  Okay.  How about we turn to -- let's turn



1   to Exhibit 1024.

2       A.   Okay.

3       Q.   Let me know when you've got it there, sir.

4       A.   Okay.  I've pulled it up.

5            MS. MORICAL:  And for the record, 1024 is also

6       Exhibit 2015.  I don't know if it's been used in

7       another deposition, but I just wanted to make that

8       clear on the record.

9            MR. BERNSTEIN:  Well, I didn't see it as one

10      of the mutual -- if you want to go off the record.

11           MS. MORICAL:  Okay.  We can do it at a break,

12      and when you're -- get to that break, we should do

13      that. But I don't want you to finish this line of

14      questions.

15           MR. BERNSTEIN:  Okay.  We didn't see a

16      mutual -- I looked for the mutual numbers, and I

17      didn't see one.

18           MS. MORICAL:  Okay.

19           MR. BERNSTEIN:  So we might have to do it, but

20      we -- couldn't see.  So you have 1024 -- well, I'm

21      sorry, Alice. What number did you say?

22           MS. MORICAL:  I have it as Exhibit 2015, the

23      same date.

24           MR. BERNSTEIN:  The same date as -- okay.

25      We'll talk about it later.



1    BY MR. BERNSTEIN:

2        Q.    You see that document in front of you, sir?

3        A.    I have 1024 in front of me.

4        Q.    Okay.  And that's a document -- that's an e-

5    mail from you to Jane Roe, correct?

6        A.    The first one --

7        Q.    The last one.  The one that -- February 20th.

8        A.    No, the first one is from her to me.

9        Q.    On 1024?

10       A.    The --

11       Q.    The first page?

12       A.    Yeah, the Exhibit 1024 that I'm looking at

13   says "sent Wednesday February 20"?

14       Q.    Right.

15       A.    That's from her to me.

16       Q.    That's not the document I'm looking at. Alice,

17   what are you looking at?

18            MS. MORICAL:  That's what I have as well.  IU

19       1270 is the Bates.

20            MR. BERNSTEIN:  I have IU 2101.

21            MS. MORICAL:  1024 in Dropbox is IU 1270.

22            MR. BERNSTEIN:  So you're saying the first

23       e-mail from you is what day, sir?

24            THE WITNESS:  February 20, 2018.

25   BY MR. BERNSTEIN:



1      Q.   At what time?

2      A.   8:03:50 p.m.

3      Q.   On that document, is there an e-mail from you

4    to her on February 20th at 6:30 p.m.?

5      A.   Scanning down.  I don't think so.  No.

6           MR. BERNSTEIN:  Regina?  Regina?  Could you

7       look -- my document 1024 is IU0002101.

8           THE WITNESS:  Sir, can we do a bathroom break?

9    BY MR. BERNSTEIN:

10     Q.   Yeah, I was going to -- what I was going to

11   hope to do is let me know if we can find -- pull this

12   document up, and give you a chance to talk to your

13   counsel and look at it, and then  -- and take the break,

14   and do all that.  Regina, can you pull it up on a screen

15   share?  That's what happens when you have 3,000

16   documents in seven days.  Okay.  Any luck?  I can't hear

17   you, Regina.  Any luck?

18          MS. FEDERICO:  Can you hear me now?

19          MR. BERNSTEIN:  Yeah.

20          MS. FEDERICO:  Okay.  I was able to find it

21          MR. BERNSTEIN:  You're all breaking up.  Can

22       you screen share it?

23          MS. FEDERICO:  Can you hear me okay?

24          MR. BERNSTEIN:  Now we can.

25          MS. FEDERICO:  Okay.  Yes, I'm going to screen



```
 1    share in just a moment.  Hold on.  Before I screen

 2    share this, I would just like to remind everyone

 3    that we are using the pseudonyms, once more, of

 4    Jane Roe and John Doe.

 5         MR. BERNSTEIN:  Can everyone see it?

 6         MS. MORICAL:  Is this already an exhibit?

 7    Regina, do you know?

 8         MR. BERNSTEIN:  It was -- well we had it -- I

 9    thought we had it 1024.  We'll figure that out.  I

10    mean, I was told by going through it -- I was told

11    it was 1024.

12         MS. MORICAL:  Now, do you want to take a break

13    and then ask him a question about it when we come

14    back? Or what did you

15         MR. BERNSTEIN:  Yeah.  No, let him look at

16    it.  Keep it up on the screen.  If he wants time to

17    look at it, you guys take a break, and however you

18    want to work that.  We can take a break.  Can you

19    screen -- Regina, can someone scroll down because

20    it's actually the last paragraph in that e-mail I

21    want him to look at? Can he scroll down or you?

22         MS. FEDERICO:  I can scroll down.  Can you see

23    it?

24         MR. BERNSTEIN:  Well, one's able to be -- you

25    know, why don't we take a break, and Regina, can
```



```
 1        you send it -- can you send that document to Alice

 2        right now, please?

 3              MS. FEDERICO:  Yes, I will.

 4              MR. BERNSTEIN:  All right.  So Alice, we'll

 5        send it to you right now and take the time you need

 6        to talk to your client.

 7              MS. MORICAL:  Okay.  So we can go off the

 8        record?

 9              COURT REPORTER:  All right.  We are off the

10        record at 6:36 p.m.

11                    (Off the record.)

12              COURT REPORTER:  We are back on record at

13        6:54 p.m.

14  BY MR. BERNSTEIN:

15        Q.   Okay.  So, sir, looking at Exhibit 1024,

16  there's an e-mail from you at 1:30 p.m. to Ms. Roe.  See

17  that?

18        A.   Where?  Where on the document?

19        Q.   In the middle, there's an e-mail from --

20        A.   What's the date?

21        Q.   -- you.  It says, "Roe, thank you for your

22  patience."  Do you see that e-mail?

23        A.   Let me -- there's a lot.  Just let me get

24  through it here.  Oh, yeah, at the top.  It's at the top

25  of mine: "Thank you for your patience," yeah.
```



1      Q.   Okay.  And then you see third paragraph

2  starting, "In my meeting"?

3      A.   Okay.  Yeah.  "In my meeting," yeah.

4      Q.   And you see the last, the four lines down,

5  three lines down the end?  You write the last sentence,

6  "For what it's worth, most of the schools use MNCOS from

7  the beginning."  Do you see that?

8      A.   Uh-huh.

9      Q.   And so you agree with me, sir -- well, when

10  you wrote NMCOS, you meant "mutual no contact orders"?

11      A.   Yes.

12      Q.   So, in fact, sir, you agree that most other

13  schools use and give mutual no contact orders, correct?

14      A.   I -- you know, that was in 2019, and since

15  then I've investigated in a lot of different schools, so

16  I see it.  When you ask me today, I don't know if I

17  would use the word "most".  I've seen it all ways.  I've

18  seen schools use no -- no contact -- no no contacts,

19  I've seen schools do mutual, I've seen schools do one-

20  sided.  But when I answered that question in 2019, I

21  think I had only investigated at three schools, and I

22  might have been using those three schools as my backdrop

23  for that question.

24      Q.   Well, sir, so -- so -- so, sir, so let me ask

25  you this: When you wrote that e-mail to Ms. Roe, were



1   you -- were you trying to deceive her?

2           MS. MORICAL:  Objection.

3           THE WITNESS:  No.

4           MS. MORICAL:  Mischaracterizes his testimony.

5           MR. BERNSTEIN:  I -- I -- I didn't

6       mischaracterize.  I asked a question.  It's a

7       simple question.

8   BY MR. BERNSTEIN:

9       Q.   Were you trying to deceive her that most

10  schools use most -- use mutual no contact orders?

11      A.   No.

12      Q.   You were being truthful to her at that point?

13      A.   That's true.

14      Q.   And you were saying that to make -- to --

15  to -- to -- to explain why you're giving her -- why one

16  was being issued, when IU policy doesn't call for it,

17  correct?

18          MS. MORICAL:  Objection.  Misstates the record

19      and his testimony.

20  BY MR. BERNSTEIN:

21      Q.   You can answer.

22      A.   I don't understand the question.

23      Q.   What was the purpose of you telling her at the

24  end, "For what it's worth, most of the schools use MNCOS

25  from the beginning"?  What was -- why'd you say that?



GREGORY KUESTER                                          November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                            72

1        A.    To let her know that the -- the fact that she

2   was getting a no contact is standard procedure in -- in

3   my experience.

4        Q.    In most schools, not at IU though, correct?

5             MS. MORICAL:   Objection.   Misstates the

6        record.

7             THE WITNESS:   In IU, it was -- the policy was

8        to provide one to the respondent initially, and to

9        do it to the complainant if requested.

10  BY MR. BERNSTEIN:

11       Q.    Where does it say that in IU's policy, sir?

12       A.    I didn't say it's in the --

13       Q.    The last part -- the last part that you just

14  said.

15       A.    I don't know where it says that the policy --

16  What I said was it was the -- that was the -- the --

17  the -- the procedure, that was the -- the -- the way it

18  was described to me by my supervisor.

19       Q.    Well, let's turn to Exhibit 1020 -- 24, the

20  appendix, sir.   And turn to page 109, please.   Let me

21  know when you're there.

22       A.    Uh-huh.

23       Q.    What is "uh-huh"?   Are you there?

24       A.    I'll let you know when I'm there.

25       Q.    Perfect.



1          A.    It appears that because the document is so

2     large, it's taking a while to load.  Now I got an error

3     message that said, "Some pages failed to load".

4          Q.    Well, I hope it's not 109.

5          A.    It loaded the first few pages but when I

6     scroll down to 109, none of the pages in that range

7     loaded.  I'm reloading it now to see if it works.

8                MR. BERNSTEIN:  I can't be charged with

9          computer errors, can I, Alice?

10               MS. MORICAL:  Do you want to -- do you want

11         Regina to share screen it?

12               MR. BERNSTEIN:  I'm kind of joking.  Hopefully,

13         it's going to come up.  I was trying to be some

14         humor.

15               MS. MORICAL:  Okay.

16               MR. BERNSTEIN:  James just wants to throw

17         darts at me because we're...

18               THE WITNESS:  It seems to be loading this

19         time.  It's made it up to about page 60.  Up to

20         page 80. You said 109, correct?

21               MR. BERNSTEIN:  Yes, sir.

22               THE WITNESS: Almost there.  It looks like I'm

23         there.

24    BY MR. BERNSTEIN:

25         Q.    Okay.  And that's the three pictures?



GREGORY KUESTER                                    November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                      74

1          A.    Yes.

2          Q.    And are words on top of that?

3          A.    Yeah, I see the, "into my windows".

4          Q.    Right.  If looking at those words in these

5    pictures, can you tell me what is depicted on 109?

6          A.    What was depicted on the pictures?

7          Q.    Yeah.  What is this?  Do you know, remember?

8          A.    I -- I believe that Doe alleged that that was

9    Roe's vehicle, and those pictures were taken from Doe's

10   residence.

11         Q.    And that was one of the reasons he requested

12   the no contact order, correct?

13         A.    I don't recall the order in which that

14   might've occurred.

15         Q.    Well, let me ask you this: When he asked you

16   for the no contact order, was that in person?

17         A.    I don't recall.

18         Q.    Was there a date on those pictures?

19         A.    There's a date --

20         Q.    Was there a date in the -- in the description,

21   a date referencing when they were taken?

22         A.    There's a date written above the pictures,

23   correct.

24         Q.    Right.  And what date is that, sir?

25         A.    February 4, 2019.



1      Q.   Do you recall meeting with the respondent on

2   February 20, 2019?

3      A.   I would have to check my notes to know the

4   dates that I met with Respondent.

5      Q.   Okay.  Well, let's go to, if you want -- or

6   if, you know, your counsel -- well, if you look at --

7   only because I just don't want you to load and unload --

8   but if you look at Exhibit 2017, if counsel will allow

9   me, I -- I -- if she wants to go -- on page P6 -- this

10   is the preliminary investigative report respondent

11   meetings, investigator's meetings with respondent

12   January 29th, February 20th, March 5th and March 8th,

13   2019, okay?  Sir?

14      A.   Yes.

15      Q.   If -- if -- if I'm reading from your --

16   what -- if -- if that's what your report says, would you

17   agree that that's the dates that you met with him?

18      A.   Yes.

19      Q.   Okay.  And so one of the dates there is

20   February 20th.

21      A.   Okay.

22      Q.   Do you recall on February 20th, Roe -- I'm

23   sorry, Doe giving you these photographs and asking for a

24   mutual no contact order because Roe was parking and

25   coming in front of his house?



 1          MS. MORICAL:  Objection.  Asked and answered,

 2      and misstates the records.

 3  BY MR. BERNSTEIN:

 4      Q.   You can answer.

 5      A.   Again, I have no recollection of whether he

 6  asked me for a no contact order in a meeting, or via

 7  e-mail, or possibly --

 8      Q.   Well, let me ask you this, sir -- let's --

 9  let's -- let's try to apply some logic to this -- you

10  met with Roe on -- you met with Doe on February 20th,

11  correct?

12      A.   Yes.

13      Q.   And these pictures indicate this event

14  happened on February 4th, correct?

15      A.   They're -- they're dated by Doe as occurring

16  February 4th.

17      Q.   Well, let me ask you, sir: Do you -- did you

18  have any reason to doubt him?

19      A.   No, I do not.

20      Q.   Okay.  So these occurred on February 4th, you

21  met with him on February 20th, and according to your e-

22  mail in document 1024, on February 20th, you issue a no

23  contact order.  Would you agree with me, sir, that Doe

24  provided you those photographs at the February 20, 2019

25  meeting when he requested a no contact order?



1     A.   No.  I have no memory --

2     Q.   You don't agree with that?

3     A.   I have no memory of him providing those at

4   that meeting or whether he provided them at a subsequent

5   meeting.

6     Q.   Well, then why did you issue a no contact

7   order on February 20th?

8     A.   Because it was requested by Doe, I received

9   approval from my supervisor, and we put it in place.

10     Q.   Why did he request it?  You -- would you --

11   would you not ask the respondent why -- if it's not IU's

12   policy to issue a no contact order against the

13   complainant, would you not have asked Doe why he wanted

14   one?

15          MS. MORICAL:  Objection.  Misstates the

16       record.

17          THE WITNESS:  As I saw in that e-mail to Roe,

18       I believe I stated that he did not cite a specific

19       reason but it would make him feel more comfortable,

20       and that does ring a bell.

21   BY MR. BERNSTEIN:

22     Q.   Correct.  You put that in there because you

23   were not being honest with her, correct?

24          MS. MORICAL:  Objection.  Argumentative, and

25       misstates his testimony.



1  BY MR. BERNSTEIN:

2       Q.   Yes or no, sir?

3       A.   Well --

4       Q.   You were trying to be nice to the complainant,

5  correct?

6            MS. MORICAL:  Same objection.

7  BY MR. BERNSTEIN:

8       Q.   Yes or no, sir?

9       A.   I try to be fair and impartial to both parties

10  at all times.

11      Q.   Okay.  Well, let me ask you this: When you

12  issued the no contact order to Doe, all you did was

13  threaten him if he violated it, correct?

14           MS. MORICAL:  Objection.  Mischaracterizes the

15       record.

16  BY MR. BERNSTEIN:

17      Q.   Well -- well, let me ask you this: When you

18  saw those pictures, did you ever contact Roe to warn her

19  to stay away from him?

20      A.   I don't recall if I had that conversation with

21  her or not.

22      Q.   Did you ever threaten her or tell her that if

23  she violates it -- withdrawn.  So as you sit here today,

24  your -- it's another coincidence that the photographs

25  that took -- that were taken on February 4th -- 9th



1   of -- February 9th, 2019 -- you had a meeting with John

2   Doe on February 20th.  You issued a no contact order on

3   February 20th.  But you don't recall that he provided

4   you those pictures that day, correct?

5       A.   That's correct.  I have no recollection of him

6   using those pictures as evidence for him wanting a no

7   contact order.

8       Q.   Then why did he want -- then why did he give

9   those pictures to you, sir?  And why did you put them in

10  the appendix?

11      A.   I put them in the appendix -- it's standard

12  procedure to put anything that the respondent provides

13  to me in the appendix.

14      Q.   So everything the respondent provided you was

15  in the appendix?

16      A.   I -- I -- it's not everything, but --

17      Q.   You just said it was everything that the

18  respondent gave you.

19      A.   Right.

20      Q.   You're now changing your testimony?

21          MS. MORICAL:  Objection.  Stuart, you're being

22      argumentative.  He's clarifying his testimony.

23          MR. BERNSTEIN:  Fair enough.

24          MS. MORICAL:  Your witness did --

25          MR. BERNSTEIN:  I'll withdraw the question.



1              MS. MORICAL:  Okay.

2   BY MR. BERNSTEIN:

3       Q.   Did you put everything in the appendix that

4   John Doe provided you?

5       A.   Everything that was relevant to the

6   investigation --

7       Q.   Okay.  So then why are these pictures relevant

8   to the investigation?  If they happened after the case

9   was open, in the middle of the investigation, why were

10  they relevant, sir?

11      A.   I didn't say that everything in the appendix

12  is relevant.  I said everything that is relevant goes

13  into the appendix.

14      Q.   I have no idea what that answer means, but

15  that's not for me to determine.  What -- why did you put

16  these pictures in?  What is the relevancy of those

17  pictures that they made it into the appendix?

18      A.   It's standard procedure for an investigator at

19  IUPUI, or -- or in this case, IU Medical School

20  investigation, to include documents provided to the

21  investigator from either Complainant or Respondent to

22  put it in the appendix, and that's why.

23      Q.   We'll -- we'll -- we'll do it again, then: Did

24  you put every document that Doe gave you into the

25  appendix?



1          MS. MORICAL:  Objection.  Asked and answered.

2          MR. BERNSTEIN:  Well, he just -- he's giving

3      two different answers, so I'm trying to understand

4      which one it is.  First, he --

5          MS. MORICAL:  He --

6          MR. BERNSTEIN:  -- said only relevant

7      evidence, and now he said, "It's standard practice

8      to put everything that they give me."

9   BY MR. BERNSTEIN:

10     Q.   So my question to you is -- and I'll try to do

11  it one last time -- did you put every document into the

12  appendix that John Doe gave you?

13     A.   It's my belief that every document that was

14  relevant to the investigation went into the appendix.

15     Q.   Perfect.  Tell me the relevance of the

16  document, of the pictures depicted in -- on page 107 of

17  the appendix.  Tell me the relevance that -- of why you

18  put them in.

19         MS. MORICAL:  Objection.  Mischaracterizes his

20      testimony.

21  BY MR. BERNSTEIN:

22     Q.   You can answer.

23     A.   I don't recall specifically, exactly what

24  Doe said, but I remember at some point in time he shared

25  with me those photos as evidence that Roe was, as -- as



1  he described, "driving past his residence."

2      Q.    In fact, didn't he tell you that he was -- she

3  was parking in front of his residence?  Did he tell you

4  that?

5      A.    I have no -- I have no memory of him saying

6  that she was parking there.

7      Q.    And you have no memory of talking to Roe about

8  staying away from him, correct?

9          MS. MORICAL:  Objection to the extent that

10     mischaracterizes his testimony.

11 BY MR. BERNSTEIN:

12     Q.    Do You have any memory of telling Roe to stay

13 away from Doe's apartment?

14     A.    I don't recall having a conversation with her

15 either way.

16     Q.    And you don't -- and do you recall -- you said

17 you spoke to your supervisor.  Who -- who -- who did you

18 -- withdrawn.  Did you send an e-mail to your supervisor

19 requesting that you be able to give a no contact order?

20     A.    I don't recall if it was e-mail or in person.

21     Q.    Okay.  Who -- did you send an e-mail to

22 Sara Dickey?

23     A.    Sara Dickey was my supervisor.

24     Q.    I understand that.  Was it Sara Dickey that

25 you spoke to about this?



1        A.    About -- about the request from Doe to provide

2    a no contact against Roe?

3        Q.    Correct.

4        A.    Yes.  That would have been Sara Dickey.

5        Q.    Okay.  And would it have been IU's policy to

6    need a reason for IUPUI to issue a no contact order

7    against a complainant?  Would you need a reason for it?

8             MS. MORICAL:  Objection.  You've misstated

9         testimony.

10            MR. BERNSTEIN:  No, I didn't.  I'm not

11        misstating his testimony.  I asked a question.

12   BY MR. BERNSTEIN:

13       Q.    Would you need a reason to issue a no contact

14   order against the complainant?

15            MS. MORICAL:  And you were -- the first way

16        you asked the question is, "IU's policy requires a

17        reason."

18            MR. BERNSTEIN:  No, I don't --

19            MS. MORICAL:  That is what I -- that's what I

20        heard your question to be.

21            MR. BERNSTEIN:  I'll withdraw the question.

22   BY MR. BERNSTEIN:

23       Q.    Does IU's policy require a reason for you to

24   issue a no contact order against the complainant?

25       A.    I don't know.  That wouldn't have been my



```
1   decision as an investigator.
2        Q.   I didn't ask you the decision.  I asked you
3   your knowledge of the policy, which you -- well, we know
4   you weren't trained on it, but you read it twice.  So in
5   reading it twice, did you -- before you started this
6   investigation, did you have any knowledge of whether or
7   not you needed a reason to issue a no contact order
8   against a complainant?
9            MS. MORICAL:  Objection.  Asked and answered.
10  BY MR. BERNSTEIN:
11       Q.   You can answer.
12       A.   Stuart, I issued the no contact order to both
13  sides, but I did so -- I did not -- I was not involved
14  in the decision to do so to either.
15       Q.   We're not talking about both sides.  I am
16  asking you -- we've gone through the policy and we know
17  what the policy says, okay?  We -- we've established it.
18           My question to you is: Did you need a reason
19  to issue a no contact order against the complainant on
20  behalf of the respondent?
21           MS. MORICAL:  And you have asked that, and he
22       has answered it.
23           MR. BERNSTEIN:  No, he hasn't.  He's danced
24       around it, which is fine.
25           MS. MORICAL:  He said he doesn't know.  I
```



```
 1        don't --
 2   BY MR. BERNSTEIN:
 3        Q.   What do you mean you don't know?  Are you --
 4   so if that's what -- is it your testimony, you don't
 5   know if you need a reason in accordance with IU PUI's
 6   policy to issue a no contact order on behalf of a
 7   respondent to a complainant?
 8        A.   As someone who is not the decision maker as to
 9   whether or not no contact orders go out, I do not know
10   what's involved in that.
11        Q.   Okay.  Well, your name is on the no contact
12   order to John Doe, correct?
13        A.   That's correct.
14        Q.   So it's fair to say that you issued it,
15   correct?
16        A.   Yeah.  It would have come from my e-mail
17   account.
18        Q.   And you issued -- and you issued the one to
19   Jane Roe, correct?
20        A.   Yes.  Correct.
21        Q.   Nowhere in that does it say, "On behalf of,"
22   or "Based upon my supervisor, I'm issuing you a no
23   contact order."  It doesn't say that, does it?
24        A.   I -- I don't have it in front of me.
25        Q.   Well, let me ask you again.  Answer a -- an
```



1  opinion of whether it says that.

2      A.   I don't recall.

3      Q.   Okay.  Do you recall whether Ms. Dickey asked

4  you why we should issue a no contact order against the

5  complainant?

6      A.   I don't recall my conversation with Ms. Dickey

7  about the no contact order.

8      Q.   Do you have any recollection of ever speaking

9  with Jane Roe about the allegation that she parked in

10 front of John Roe's house?

11         MS. MORICAL:  Objection.  Asked and answered.

12 BY MR. BERNSTEIN:

13     Q.   You can answer.

14     A.   Yeah, I've answered this before.  I -- I don't

15 recall.

16     Q.   Do you recall ever advise -- withdrawn.

17 Between November 2018 and June of 2019 during your

18 period of time working at IUPUI as an investigator, was

19 it your -- was it your understanding that, in accordance

20 with the policy, if a respondent is intoxicated, that is

21 a -- a defense for a Title IX investigation?  Yes or no,

22 sir?  If you can answer yes or no.

23     A.   I don't understand your question.

24     Q.   All right.  I will try to maybe be a little

25 more plain language: Was it your understanding when you



1   were an investigator at IUPUI, if a respondent tells you

2   he was drunk, is that an excuse for any alleged Title IX

3   violation?

4        A.    No.

5        Q.    Okay.  In January of 2019, as you were an

6   investigator at IUPUI, did you consider yourself a

7   mandatory reporter for Title IX violations?

8        A.    I believe so, yes.

9        Q.    Did there come a time when you received

10  information that required you to make a report regarding

11  allegations of physical abuse by Roe as to Doe?

12       A.    Yes.

13       Q.    Do you know when that occurred?

14       A.    When the allegations from Roe regarding the

15  misconduct?

16       Q.    I'm sorry, say that again, sir.

17       A.    Are you asking about allegations from Roe

18  regarding Doe's conduct?

19       Q.    No.  My question is: Did there come a time

20  that you received information that required you to make

21  a report regarding allegations of physical abuse by Roe

22  as to Doe?

23       A.    Yes.  I remember Doe sharing that during the

24  course of the investigation.

25       Q.    And what -- actually, didn't Roe also share



```
 1   it?  Which one?
 2        A.   (No verbal response.)
 3        Q.   Well, didn't -- didn't Roe, in fact, tell you
 4   that she was physical with him?
 5        A.   I recall -- is there a certain incident you're
 6   -- you're referring to?
 7        Q.   In Italy.
 8        A.   I -- I recall them sharing different stories.
 9   I don't recall without citing -- looking at my report if
10   she admitted to being physical with him or not.
11        Q.   Well, let's go to 2017, the preliminary
12   investigative report.  Withdrawn.  Let's go -- before
13   that, let's go to page 3.
14        A.   What was the -- the number, what was the
15   document?
16        Q.   2017.
17        A.   Page 3?
18        Q.   Yes, sir.
19        A.   Okay.  I'm there.
20        Q.   Okay.  And you see under A, it says,
21   "Complainant Meeting"?
22        A.   Yes.
23        Q.   It says, "Investigator's meeting with
24   complainant January 16, 2019," correct?
25        A.   Yes.
```



1       Q.    Is it -- you wrote this report, sir.  So I'm
2   just asking: Does that mean that everything that follows
3   came from that meeting, correct?
4       A.    Yeah.  I believe so.
5       Q.    Okay.  So now turn to page 4.  You there?
6       A.    Yep.
7       Q.    And you see number 4, June of '18?
8       A.    Yes.
9       Q.    And four lines down, "Complainant remembered
10  that she instigated an argument with Respondent that
11  became physical and pushed him during the argument".  See
12  that?
13      A.    Let me just find that part.
14      Q.    Sure.
15      A.    I can see that.
16      Q.    Okay.  And is that when you -- when you heard
17  that, is that when you're required, as a mandatory
18  reporter, to advise Ms. Dickey of the incident?
19      A.    Yes.  I did advise Ms. Dickey of that.
20      Q.    Right.  And that's what you write in your
21  affirmation in paragraph 57: "I mentioned this fact to
22  Sara Dickey consistent with university policy."
23      A.    Yes.  That's -- yeah, that's correct.
24      Q.    Okay.  And actually, just for content, the
25  paragraph before 56, you actually talk about the -- the



1    event happening from Italy in June of '18, just so the

2    record is clear.  So that would have been in January of

3    2019 you told Ms. Dickey, correct?  Well, as a --

4        A.    Yeah.

5        Q.    -- mandatory reporter, you would have been

6    required to do it when you learned about it, correct?

7        A.    Correct.  I was just --

8        Q.    That would have been January of '19.

9            MS. MORICAL:  Wait.  Stuart, he's trying to

10           answer your question and you keep interrupting him.

11           MR. BERNSTEIN:  Oh, I'm sorry, I thought he --

12           I thought he said, "Correct," I'm sorry.

13           THE WITNESS:  Yeah, I was trying to scroll

14           back up and just reference the date again, and it

15           is January '16, so I'm sure I did it right away.

16   BY MR. BERNSTEIN:

17       Q.    Yeah, in accordance with the policy, correct?

18       A.    Yeah.  Under -- that's how I understood it,

19   yes.

20       Q.    Okay.  And according to the policy, the

21   university was obligated to take immediate action,

22   correct?

23           MS. MORICAL:  Objection.  Ambiguous.  Are you

24           referring to a specific part of the policy?

25   BY MR. BERNSTEIN:



1      Q.   Well, let me ask you this question: In

2   accordance with IUPUI policy, was it your understanding

3   that the university was required to take immediate

4   action?

5      A.   I was an investigator there.  I only took on

6   assignments handed to me.  They didn't make those

7   decisions.

8      Q.   Sir, that's -- if you really would just

9   respectfully listen to the question.

10     A.   I'm listening to your questions.

11     Q.   Let me tell you -- you're not, because I

12  didn't ask you about the decision.  I asked you simply:

13  Was it your understanding that the university was

14  required to take immediate action?  I didn't ask you if

15  they did, I didn't ask you if they didn't.  I just asked

16  you if that's your understanding of the policy.  And if

17  you don't have an understanding of the policy, just

18  please tell me you don't have an understanding of the

19  policy.

20          MS. MORICAL:  Is there some particular part of

21          the policy that you would like to review, or are

22          you just --

23          MR. BERNSTEIN:  Alice, we'll get there if I

24          have to, but if he has an understanding of the

25          policy and I don't have to do it, I won't.



1          MS. MORICAL:  And you're asking him of his

2     understanding of what other people are supposed to

3     do under the policy?

4          MR. BERNSTEIN:  I am asking him his

5     understanding of what the policy says.  And if he

6     doesn't -- if he doesn't know, then that's fine,

7     say you don't know.

8     BY MR. BERNSTEIN:

9          Q.   Do you know, sir?

10         A.   Yeah.  Because it was not my decision, I don't

11    know.  I don't know what to...

12         Q.   If you look at page -- "Policy speaks for

13    itself, and this gentleman -- his obligation" -- do you

14    know if the university ever investigated the incident

15    based upon your January 19, 2019 -- withdrawn.  Do you

16    know if the university took any action to investigate

17    the incident that you reported to Ms. Dickey in and

18    around June 19th -- January 19th -- let's try it again:

19    Do you know if the university took any action upon your

20    notification to Ms. Dickey in and around January 16,

21    2019?

22         A.   I -- I don't know what action they took.

23         Q.   Do you know if the university ever conducted

24    an investigation as to the incident?

25         A.   I know Doe reported -- or requested --



1      Q.    Stop right there, I'm sorry.

2            MR. BERNSTEIN:  Katie, if we can just change

3      it to "John" -- or "Doe," please.

4  BY MR. BERNSTEIN:

5      Q.    Okay.  I'm sorry, Mr. Kuester.  You can

6  continue.

7      A.    Apologies.  I know that Doe reported -- I

8  believe it was an e-mail to me later on, months after

9  January, where he requested to -- or have -- requested

10  that we investigate his allegations at that point.

11     Q.    In fact -- in fact, it wasn't until the day of

12  the hearing that the university (inaudible), correct?

13           COURT REPORTER:  Counsel, if you are speaking,

14     we can't hear you when you stand up.

15           MR. BERNSTEIN:  Sorry.  I'm sorry, I was just

16     looking for a document.

17  BY MR. BERNSTEIN:

18     Q.    In fact, it didn't happen until months later,

19  the day of the hearing, that the university took any

20  action to investigate the allegations that you reported

21  back in January of 2019, correct?

22     A.    No.

23           MS. MORICAL:  Objection.  That misstates the

24     record, and it's also vague and ambiguous.

25  BY MR. BERNSTEIN:



1      Q.   Well, let's go to Exhibit 2037.  Let me know

2    when you're there, sir.

3      A.   I'm there.

4      Q.   Okay.  Second -- if you turn to the second

5    page.

6      A.   Okay.

7      Q.   And you see at the bottom, there's an e-mail

8    from Ms. Dickey to John, May -- dated May 20th, 2019. Do

9    you see that?

10     A.   I see that.

11     Q.   And it says, "John, I wanted to reach out to

12   follow up to our brief meeting this morning.  If you

13   wish to pursue a formal complaint" -- do you see that?

14     A.   I see that.

15     Q.   And then above it, on May 20, 2019, John Doe

16   writes to Ms. Dickey, "Thank you for reaching out to

17   me."  You see that?  "I'd like to discuss pursuing this

18   investigation."

19     A.   I see that.

20     Q.   So, in fact, it wasn't until almost four

21   months after you reported it to Ms. Dickey that Ms.

22   Dickey took any action in investigating that; isn't that

23   correct?

24     A.   No.  That's not correct.

25     Q.   Okay.  There came a time that you asked some



1    questions about this incident, the -- the -- the --

2    about pursuing a claim, correct?  Withdrawn.  There came

3    a time that you were contacted with regards to Doe's

4    claim against Roe, correct?

5         A.    I remember a time where Doe reached out to me

6    expressing an interest in initiating a formal

7    investigation against her.

8         Q.    Well, sir, were you ever -- I'll ask you to

9    look at Exhibit 2041.

10        A.    I'm pulling it up now.  Okay.  I'm there.

11        Q.    And this is an e-mail from you to Ms. Dickey?

12        A.    The first page is an e-mail to -- from me to

13   Ms. Dickey, correct.

14        Q.    And you write, "Like I said on the phone, John

15   Doe never indicated any interest in pursuing the

16   complaint against Jane Roe"; you see that?

17        A.    No.  Where are you reading from?

18        Q.    Introduction says, "Sara."

19        A.    Okay.  "Like I said on the phone" -- yes.

20   That's correct.

21        Q.    Okay.  And then you go on to say -- and you

22   support your position with four bullet points, correct?

23        A.    Yes.  That -- that's correct.

24        Q.    And you bold and underlined the part that you

25   believe support your position that John Doe didn't ask



```
1   for an investigation, correct?
2        A.   Let me just read through, Stuart.
3        Q.   Sure.  Please.
4        A.   Yes.  I see now.
5        Q.   Okay.  And you see in the first bullet
6   point -- it's the first bold and underlined -- "And I
7   chalked it up to the alcohol," correct; you see that?
8        A.   Uh-huh.
9        Q.   So is it your -- is it your opinion --
10  withdrawn.  Is it your position that John Doe did not
11  seek an investigation because he chalked up her behavior
12  to alcohol?
13       A.   Let me just re-read that part.  It's my
14  understanding there, with that statement -- the other
15  statements I listed -- I listed here, my conversations
16  with him in meetings -- that he did not have an interest
17  in pursuing an investigation against her.
18       Q.   Well, first of all, as you testified earlier,
19  alcohol is never an excuse, correct?
20            MS. MORICAL:  Objection to the extent that
21       mis-testifies -- misstates his testimony.
22            MR. BERNSTEIN:  Fair enough.  I'll withdraw
23       the question.
24  BY MR. BERNSTEIN:
25       Q.   As you previously testified, the respondent
```



```
 1   -- the respondent's alcohol level is never a defense to

 2   a Title IX violation, correct?

 3            MS. MORICAL:  Again, objection to the extent

 4       that misstates his testimony.

 5   BY MR. BERNSTEIN:

 6       Q.   Is that a correct statement, sir?

 7       A.   I believe you're -- you're mixing apples and

 8   oranges.

 9       Q.   Is that a correct statement?

10       A.   Say it again.

11       Q.   A respondent's alcohol level is never a

12   defense to a Title IX violation?

13            MS. MORICAL:  Same objection.

14            THE WITNESS:  It's -- the respondent's alcohol

15       is not a defense to commit sexual assault, or

16       abuse, or anything like that.

17   BY MR. BERNSTEIN:

18       Q.   Is it your understanding, sir, that IUPUI is

19   obligated -- withdrawn.  Is it your understanding of IU

20   PUI's policy that they are required to investigate a

21   matter even if a complainant does not want to go

22   forward, an initial investigation?

23       A.   That would not have been my decision, and I

24   don't -- I don't recall of the policy at the time.

25       Q.   Sir, I -- again, and -- and I'm not asking you
```



1    if your decision -- I asked you of your understanding of

2    the policy.

3            MS. MORICAL:  And he answered that he does not

4        recall what the policy was at the time, so it's

5        asked and answered.

6            MR. BERNSTEIN:  He also answered that it's not

7        his job.

8    BY MR. BERNSTEIN:

9        Q.   And I'm not asking you that.  So is it your

10   understanding of the policy that an investigation has to

11   be decided -- has to be conducted -- withdrawn.

12           MR. BERNSTEIN:  Katie, where are we on time?

13       Katie?

14           COURT REPORTER:  We are at 2:21.

15           MR. BERNSTEIN:  No, that can't be.  2:21 of

16       actual time?

17           COURT REPORTER:  Yes, sir, that we've been on

18       record.

19   BY MR. BERNSTEIN:

20       Q.   Sir, as an investigator, is it your job to

21   investigate, correct?

22       A.   Correct.

23       Q.   It's not just your job to gather paper and put

24   it into a folder, correct?

25       A.   There's more to investigation than putting



1  paper into a folder.

2      Q.   I agree with you.  Okay.  I -- now, but you

3  didn't do that in this case, did you?

4          MS. MORICAL:  Objection.  Vague and ambiguous.

5  BY MR. BERNSTEIN:

6      Q.   Withdrawn.  Did you do anything more than

7  gather papers from the parties in this case?

8      A.   Yes.

9      Q.   Jane Roe gave you medical -- she gave you

10  receipts for medical expenses in this case, correct?

11      A.   I recall that, yes.

12      Q.   And that's the only part of the medical record

13  that she gave you, correct?

14          MS. MORICAL:  Is there a specific part in the

15      record, or are you asking him if he remembers?

16          MR. BERNSTEIN:  If he remembers.

17          THE WITNESS:  My memory is that she gave me

18      receipts for medical records.

19  BY MR. BERNSTEIN:

20      Q.   Okay.  Is it your memory that you actually

21  asked her on several occasions for the medical records

22  themselves?

23      A.   I did.  I do recall asking her for medical

24  re -- additional medical records.

25      Q.   And turn to page -- to Exhibit 1076.



GREGORY KUESTER                                    November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                      100

```
 1            MR. BERNSTEIN:  Katie, if you could tell me
 2       when we're at 2:50, I'd appreciate it.
 3            COURT REPORTER:  At 2:50?
 4            MR. BERNSTEIN:  Yeah.
 5            COURT REPORTER:  Absolutely.
 6            MR. BERNSTEIN:  Thank you.
 7            THE WITNESS:  What number, Stuart?
 8   BY MR. BERNSTEIN:
 9       Q.   1076.
10       A.   You cut out on me again, I'm sorry.
11       Q.   1076.
12       A.   Okay.
13       Q.   You got 30 seconds for this.
14       A.   All right.  I'm at 1076.
15       Q.   You there, sir?
16       A.   Yes.
17       Q.   Okay.  And it's a two-page document?
18       A.   Yes.
19       Q.   And go to page 2.  There's an e-mail from you
20   dated Wednesday, January 16th.
21       A.   Yes.
22       Q.   Okay.  And you see on number 1, it says,
23   "Don't forget to let me know when you find out about the
24   hospital regarding the medical write-up and payment of
25   bills"; you see that?
```



1      A.   Yes.

2      Q.   And then if you go to the first page, on the

3  next day, January 17th, after she tells you that she has

4  the receipts and she plans to pick up the full report,

5  you thank her, saying, "It's helpful as will be the

6  notes from the ER"; you see that?

7      A.   Yes.

8      Q.   And then above that, the same day, another

9  e-mail of January 17th, after she tells you that she's

10 not getting the records, that she didn't want to make

11 the drive, you say, "If you're able to obtain the notes

12 next time you're in the area, I think they could be

13 helpful"; you see that?

14     A.   Yes.

15     Q.   So three times in two days you asked Roe for

16 the medical -- for her to get you the medical records,

17 the notes, correct?

18     A.   Yes.

19     Q.   And am I correct that you did that because you

20 thought there was important information for the

21 investigation, correct?

22          MS. MORICAL:  Objection.  Misstates the

23     documents.

24 BY MR. BERNSTEIN:

25     Q.   Well, why did you -- did you -- did you think



1   that -- well, withdrawn.  You stated you thought that

2   the information would be helpful, correct?

3            MS. MORICAL:  Misstates -- objection.

4        Misstates the document.

5            MR. BERNSTEIN:  So did you think that --

6            MS. MORICAL:  Stuart, it says --

7            MR. BERNSTEIN:  Withdrawn.

8            MS. MORICAL:  -- "could be helpful."

9   BY MR. BERNSTEIN:

10       Q.   Do you think the medical -- do you think the

11  records could be help -- the medical records could be

12  helpful for you in the investigation?

13       A.   Yeah.  The medical records could be helpful.

14       Q.   Correct.  And that's why you asked her for

15  them three times in two days, correct?

16       A.   Correct.

17       Q.   And she did not give them to you, correct?

18       A.   I did not receive them.

19       Q.   And, in fact, she told you --

20       A.   No, I did not.

21       Q.   And, in fact, she told you she didn't want to

22  make the drive to get them, correct?

23       A.   I believe that's an e-mail.  I can read back

24  through if I -- if you need me to.

25       Q.   I -- I -- I -- do you recall if that was told



GREGORY KUESTER                                     November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                     103

1    to you?

2         A.   I don't recall, but I'm reading the e-mail

3    now.

4         Q.   That's what she said in the e-mail, correct?

5         A.   She said, "So I decided not to follow him, as

6    it would be a 40-minute drive away."

7         Q.   Correct.  And she also said that they wouldn't

8    add much.  Do you see that?

9         A.   Let me go back.

10        Q.   She writes, "So it turns out the notes won't

11   add much else than what's stated on the portal, so I

12   decided I didn't want to pick them up because it was a

13   40-minute drive." You see that?

14        A.   I see that.

15        Q.   And despite what she wrote, you responded, "I

16   think they could be helpful," correct?

17        A.   Correct.

18             MS. MORICAL:  Objection.  That

19        mischaracterizes.

20             MR. BERNSTEIN:  It doesn't say that, "I think

21        they could be helpful"?  He doesn't say that?

22             MS. MORICAL:  That's correct.  It's the

23        mischaracterization that led up to it that was the

24        reason for my objection.

25             MR. BERNSTEIN:  Okay.



```
 1   BY MR. BERNSTEIN:
 2        Q.   Sir, as an investigator, IUPUI in January of
 3   2019, did you have subpoena power?
 4        A.   No.
 5        Q.   As a Title IX investigator of IUPUI in
 6   January 2019, did you have the ability to ask Jane Roe
 7   for an authorization to obtain her medical records?
 8        A.   I don't know.
 9        Q.   You don't know if you had -- what -- what --
10   what don't you know, sir?  You don't know if you could
11   ask someone for an authorization?
12        A.   I don't know.  I don't know if I could have
13   done that or not.  I never asked to do that.
14        Q.   So it never entered your mind -- you never
15   thought about asking Jane Roe for an authorization for
16   records that you thought could be helpful?
17        A.   I never -- I wanted the documents, and I asked
18   her for them, and I was hopeful she would provide them.
19        Q.   And she didn't, correct?
20        A.   She did not provide the -- all of the
21   documents that I wanted.
22        Q.   As a trained investigator, it never came to
23   you -- you never thought to potentially ask her for an
24   authorization?
25        A.   I did not.
```



1    Q.   Now, do you think that that's good practice,
2  not to have asked her for an authorization, when you
3  believe that the information would be helpful?
4    A.   My theory was, I --
5    Q.   I didn't ask you your theory, sir.
6         MS. MORICAL:  Stuart --
7         MR. BERNSTEIN:  If you would answer the
8    question.
9         MS. MORICAL:  -- do not interrupt the witness
10   again.
11  BY MR. BERNSTEIN:
12   Q.   Answer the question.
13   A.   My thinking was, that I had asked her again.
14  She had said that it was 40 minutes away.  I -- I knew
15  that she had family in the area and she would go there
16  occasionally, so I asked her to please get the records
17  the next time she goes up.  And I was hopeful on the
18  date of that e-mail that I would still get the records.
19   Q.   And if you'd mailed an authorization to the
20  hospital, she wouldn't have to drive, and it would just
21  come in the mail, correct?
22   A.   I don't know how authorizations work.
23   Q.   You don't know how authorizations work?
24   A.   I can answer it again if you'd like.
25   Q.   No, that's fine.  It's on the record once.



```
 1   That's fantastic.  So now let me ask you a question.
 2          MS. MORICAL:  Could you please not be
 3      argumentative with the witness?
 4          MR. BERNSTEIN:  Absolutely.  I apologize, sir.
 5   BY MR. BERNSTEIN:
 6      Q.   Let me ask you this: But that didn't --
 7   withdrawn.  Can you turn to -- the fact that you didn't
 8   get the medical records, you still put into the final
 9   investigative report Roe's statement about what the
10   hospital nurse said, correct?
11      A.   I don't recall.
12      Q.   Let's go to the final investigative report,
13   2023, page 5.  Let me know when you're there.
14      A.   All right.  I'm on page five.
15      Q.   The fourth paragraph starts, "Complainant
16   reported".  Do you see that?
17      A.   First two both start that way, the third and
18   fourth one does.  Which one are you referring to?
19      Q.   The fourth paragraph.
20      A.   Okay.  One, two, three, four, yes.
21      Q.   And halfway in, three lines in, it says,
22   "According to complainant, hospital staff suspected that
23   her injuries were the result of domestic violence but
24   Complainant lied and told them she had just fallen."  Do
25   you see that?
```



1    A.    I see that.

2    Q.    And you believe that -- you don't believe that

3    that's prejudicial to put in hearsay information --

4    withdrawn -- put in information what the complainant

5    tells you of what someone from the hospital says about

6    domestic violence without getting the medical records?

7    You don't believe that that's prejudicial to the

8    respondent?

9    A.    I believe that including statements from the

10    complainant in my report is appropriate.

11    Q.    No matter -- so -- but it wasn't appropriate

12    to even think about getting an authorization to see if

13    those statements were even true, correct?

14          MS. MORICAL:  Objection.  Argumentative.

15    BY MR. BERNSTEIN:

16    Q.    You can answer.

17    A.    I made several attempts to get those

18    documents.

19    Q.    Turn to 80, your affirmation, paragraph 27.

20    A.    Yes.

21    Q.    "I also attempted to interview Roe's father.

22    Roe did not provide her father's contact information."

23    Do you see that?

24    A.    I see that.

25    Q.    And you believe Roe's father had relevant



1    information, and that's why you wanted to talk to him,

2    correct?

3        A.    I believe he may have had information.

4        Q.    Correct.  And that's why you wanted to talk to

5    him, correct?

6        A.    Correct.

7        Q.    And you wanted to talk to him from the

8    beginning of the -- you know, once the investigation

9    started early on, that you wanted to talk to him,

10   correct?

11       A.    I don't recall where in the investigation that

12   I decided that I would like to talk him.

13       Q.    Okay.  And you agree with me that IU PUI's

14   policy does not require you as an investigator to get

15   permission from a party to speak to a witness, correct?

16       A.    I can't speak to that.

17       Q.    You can't speak to that?  You have no

18   recollection of whether the policy requires you to get

19   permission?

20       A.    Permission to do what?

21       Q.    To speak to a witness.

22       A.    I can speak to a witness that I deem

23   appropriate without receiving permission from my

24   supervisor, if that's what you're asking.

25       Q.    No.  Without seeking permission from the



1    party.

2         A.    That is correct.

3         Q.    You don't need their permission, correct?

4         A.    That is correct.

5         Q.    But that didn't stop you in this case of

6    trying to get permission from the complainant, correct?

7         A.    You cut out on me, Stuart.

8         Q.    But that didn't stop you -- in this case you

9    specifically asked for permission to speak to Roe's

10   father, correct?

11        A.    It was a -- it was a practical matter, Stuart.

12   I didn't --

13        Q.    Could you not call me "Stuart"?

14        A.    Oh, I didn't finish --

15        Q.    I don't call you by your first name.  Please

16   don't call me "Stuart."  Thank you.

17        A.    What would you like me to call you?

18        Q.    You can call me "Mr. Bernstein" if you need

19   to -- feel that you have to address me by name.

20        A.    Can you pronounce your last name again for me?

21        Q.    Bernstein, B-E-R-N-S-T-E-I-N.

22        A.    All right.  Mr. Bernstein, where were we now?

23        Q.    You -- you asked permission of the complainant

24   to speak to her father, correct?

25              MS. MORICAL:  Objection.  You're



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
110

```
 1        mischaracterizing a document.
 2   BY MR. BERNSTEIN:
 3        Q.   You actually asked her permission, correct?
 4        A.   Permission for what?
 5        Q.   To speak to her father.
 6        A.   Yes.
 7        Q.   She didn't give you permission, so you didn't
 8   talk to her father, correct?
 9             MS. MORICAL:  Again, objection.
10        Mischaracterizes a document.
11   BY MR. BERNSTEIN:
12        Q.   Am I correct, sir?
13        A.   What I was saying before, when you interrupted
14   me, is to speak with her father was a practical matter.
15   I did not know her father's name, contact information,
16   address, any of those items.  So I -- I requested
17   permission to speak with his -- or her father so I could
18   obtain that information and hope to conduct an interview
19   with him.
20        Q.   And she didn't give you it, correct?
21        A.   She did not provide me with that information.
22        Q.   So you stopped and took no other action to try
23   to speak to her father, correct?
24        A.   I don't recall taking any other action.
25        Q.   I'm sorry, what, sir?
```



```
 1        A.   I don't recall if I took any other action or
 2   not.
 3        Q.   Have you ever heard of the Internet?
 4             MS. MORICAL:  Objection.  I'm sorry, what --
 5        I'm sorry, I didn't hear your question.
 6   BY MR. BERNSTEIN:
 7        Q.   Have you ever heard of the Internet?
 8        A.   Can we take a break?
 9        Q.   Absolutely.  We can take a break.
10             COURT REPORTER:  All right.  We are off record
11        at 7:52.
12                  (Off-the-record discussion.)
13             COURT REPORTER:  We are back on record at 8:03
14        p.m.
15   BY MR. BERNSTEIN:
16        Q.   Sir, did you know -- you did, in fact, know
17   that Jane Roe's father's house was in ███████,
18   Indiana, correct?
19        A.   Yeah.  At the time of that July incident, I
20   knew it was in ███████.
21        Q.   Okay.  And, again, you -- you -- you know --
22   you know about the Internet, correct?
23        A.   Heard of it.
24        Q.   Okay.  And you've heard of Google?
25        A.   Uh-huh.  Yes.
```



GREGORY KUESTER                                    November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                      112

1    Q.   Did you ever think of doing a Google search to

2    see where Ms. Roe's father's house was?

3    A.   I -- I believe I -- I made an attempt at that,

4    yes.

5    Q.   Okay.  And, in fact, it -- it -- it took me

6    all of 14 -- less than a minute yesterday to obtain his

7    address, which was 24 minutes and 17.5 miles away from

8    the Indiana school --

9        MS. MORICAL:  Objection -- no, objection.  Mr.

10       Bernstein, you are now testifying about something

11       that you did yesterday, and I would prefer that you

12       not testify and you ask the witness questions.

13   BY MR. BERNSTEIN:

14   Q.   It took less than a minute to get -- do you

15   agree that -- did you try -- you tried to get his phone

16   number and house number?  Did you try to do that?

17   A.   I didn't know -- I didn't know his name.

18   Q.   You didn't know his name?  In this whole

19   investigation you never learned Jane Roe's father's

20   name?

21   A.   Yeah.  I asked to interview her father.  I

22   never was provided his name.

23   Q.   And so you never attempted to do any type

24   of -- withdrawn.  Did you ask -- did you ask for her

25   father's name?



1      A.   I asked to speak with him, and that request, I

2  assumed that I would receive his name.

3      Q.   Respectfully, sir, that's not the question I

4  asked.  Did you ever ask her specifically: "What is your

5  father's name?"

6      A.   No.  I never asked that specific question.

7      Q.   You don't think that that -- you -- as an

8  investigator to provide John Doe with a fair and

9  impartial investigation, you don't think it required you

10 to ask Jane Roe her father's name to see if you can get

11 the information to speak with him?

12     A.   I wasn't interested in his name as much as I

13 was interested in speaking with him, and I asked to

14 speak with him on multiple occasions.

15     Q.   Right.  And she said no.  So you're an

16 investigator.  Shouldn't you use some investigative

17 techniques to maybe find her father and be able to speak

18 to him without her permission?  That never entered your

19 mind, sir?

20          MS. MORICAL:  Objection.  Argumentative, and

21      as you know, his affirmation speaks to this issue.

22          MR. BERNSTEIN:  No, it doesn't.  It says, "I

23      tried to speak to" -- that's all it says.  It's one

24      sentence on paragraph 27.

25          MS. MORICAL:  Right.  And then he said that he



1    did not need the information to complete his

2    investigation, and you are asking as though he did

3    need the information to complete the investigation.

4        MR. BERNSTEIN:  I'm not the investigator who

5    asked her --

6        MS. MORICAL:  You're arguing.

7        MR. BERNSTEIN:  -- but let's move on.

8        MS. MORICAL:  -- with him.

9        MR. BERNSTEIN:  All right.  Fine.

10   BY MR. BERNSTEIN:

11       Q.   So you didn't -- are you ever -- as an

12   investigator back in -- January of 2019, have you ever

13   heard a document called an impact statement?

14       A.   I don't recall.

15       Q.   You don't recall -- do you know what an impact

16   statement is today?

17       A.   No.

18       Q.   You're not familiar with a document that a

19   complainant submits explaining how the incident has

20   affected them?

21       A.   I've worked with a lot of different schools.

22   I've heard of that before.  I think we might have called

23   it something different in different schools.

24       Q.   Fair enough.  Whatever you want to call that

25   type of document where a complainant submits something



1   and how it affected her, is that something typically

2   that goes in -- or is used -- excuse me, after a finding

3   of responsibility?

4            MS. MORICAL:  Objection.  He is here as a

5        witness for an IU investigation.  So you're asking

6        him about what would happen at another school?

7            MR. BERNSTEIN:  No.  I'm asking him, "That

8        type of document is something that would be used

9        after a finding of responsibility, correct?"

10           MS. MORICAL:  That is -- lack of foundation,

11       and outside of the role of the investigator.

12   BY MR. BERNSTEIN:

13       Q.   You can answer, sir.

14       A.   I have no -- no knowledge of IU PUI's policies

15   after a decision is made.  My -- my -- my role is to

16   write the report, issue the charge, and then attend the

17   hearing, and then at that point I am -- I am done.

18       Q.   Okay.  As an investigator, information that

19   goes to -- withdrawn.  As an investigator, would you

20   agree with me that information of how an incident

21   affected the complainant is not relevant towards the

22   issue of responsibility.  Do you agree with that?

23           MS. MORICAL:  Objection to the extent that

24       that misstates his affirmation.

25           MR. BERNSTEIN:  Why does it have to admit an



1    affirmation?  It has nothing to do with an

2    affirmation. I asked him the question.  What does

3    that have to do with an affirmation?

4         MS. MORICAL:  His affirmation, as you've

5    already said, is his testimony.  So if you are

6    misstating his affirmation, you're misstating his

7    testimony.  That my objection.  I'm not trying

8    to --

9         MR. BERNSTEIN:  Add time in, because you're --

10   now you're just wasting my time --

11        MS. MORICAL:  No.

12        MR. BERNSTEIN:  -- and wasting the record and

13   clouding it.  It has nothing -- I didn't say

14   anything about his affirmation.  I asked him a

15   question as an investigator.

16        MS. MORICAL:  Mr. Bernstein, you are again

17   getting -- you are again getting worked up.

18        MR. BERNSTEIN:  You're right, because

19   you're -- you're making -- you're clouding the

20   record and -- and -- and using my time up.  Yeah.

21   You're right.  I said nothing about his

22   affirmation.  I asked a simple question.

23   BY MR. BERNSTEIN:

24        Q.  As an investigator, information from the

25   complainant of how the incident affected her, do you



 1  agree that that does not affect responsibility finding?

 2        MS. MORICAL:  Objection.  Lack of foundation.

 3  BY MR. BERNSTEIN:

 4     Q.   Sir, can you answer?

 5     A.   I -- I don't understand what you're getting

 6  at.

 7     Q.   Okay.  Let me ask you this question, sir: The

 8  statement that a complainant -- a statement from Roe

 9  that the incident has caused her to miss classes, fail a

10  test, subsequently receive an area of concern notation

11  from the School of Medicine that states that she shuts

12  down when she's in the same room as Respondent, this

13  information has nothing whatsoever to do with the issue

14  of responsibility, correct?

15        MS. MORICAL:  Objection.  Lack of foundation,

16     and ambiguous.

17  BY MR. BERNSTEIN:

18     Q.   Does that information go to the issue of

19  responsibility, sir?

20        MS. MORICAL:  Same objection.

21        THE WITNESS:  That information is in the

22     report because I think it's important for the

23     hearing board to have that full picture.

24  BY MR. BERNSTEIN:

25     Q.   Why does -- that information, how is that



1    relevant to whether or not John Doe pushed Jane Roe at

2    the time in question?  What is the relevance to that

3    issue?

4        A.   I'm not understanding what you're -- what

5    you're asking.

6        Q.   The relevance of the information that we just

7    talked about, how the incident affected -- withdrawn.

8    How does Jane Roe's statement that these issues have

9    caused her to miss classes, fail a test, subsequently

10   receive an area of concern notification from the School

11   of Medicine, and that she shuts down when she's in the

12   same room with Respondent, how does that -- how is that

13   relevant to the issue of whether the -- John Doe was

14   responsible for the incident in question?

15       A.   As an investigator, it's my role to share the

16   story that is provided to me with the hearing board so

17   they can make the decision.  I include lots of

18   information that might not be specifically relevant to

19   what you're referring to, such as the fact that they're

20   in medical school, or the fact that they're, you know,

21   studying this, or that they're in their second year of

22   medical school.  And I thought that that information

23   that I obtained from the complainant was important for

24   the report.

25       Q.   So it was important for the panel to know that



1  she failed a test as to whether or not John Doe violated

2  policy back in July of 2018?

3      A.   I can -- I would answer it the same way.

4      Q.   Okay.

5         COURT REPORTER:  Counsel, we're at that time.

6  We have ten minutes.

7         MR. BERNSTEIN:  Thank you.

8  BY MR. BERNSTEIN:

9      Q.   And you included that in the report, correct?

10     A.   I'd have to double-check to verify it.

11     Q.   And who made the -- there came an issue with

12 regards to guns, an allegation of guns, correct?

13     A.   What was the question?

14     Q.   The claimant said there were allegations

15 regarding guns, correct?

16     A.   Yeah.  Correct.

17     Q.   And who made that -- and who made the decision

18 to omit it from the evidence in this case?

19     A.   I believe it was a decision with me in

20 consultation with Sara Dickey, and possibly also

21 additional people, but I think it was a collaborative

22 decision.

23     Q.   If Sara Dickey testified it was your decision,

24 would she -- would that be correct?  Would her testimony

25 be correct?



1    A.    Well, I think it might have been initiated,

2    suggested by me early on, but I -- I recall seeking

3    approval for that decision.  And my memory would be

4    Sara Dickey, but it could have been -- it could have

5    been Emily -- Emily Springston.

6    Q.    Let me ask you this question: Is it your

7    testimony tonight that you did not have the final -- it

8    was not your decision whether or not to include that

9    information in the record?

10   MS. MORICAL:  Objection.  Asked and answered.

11   BY MR. BERNSTEIN:

12   Q.    You can answer.

13   A.    Like I said, my -- I -- I do believe it was

14   initiated by me, because I saw that information come in.

15   I thought it might be information that should be

16   redacted and I -- I sought confirmation from above.

17   Q.    Sir, I -- I -- I understand -- my question is,

18   I understand you saw it first, but then you sought

19   approval to keep it out, or did you make the decision to

20   keep it out, or somebody else?

21   MS. MORICAL:  Asked and answered.

22   BY MR. BERNSTEIN:

23   Q.    You can answer, sir.

24   A.    When I saw that information come in, it wasn't

25   relevant to the allegations that the -- that Roe had



GREGORY KUESTER                                    November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                    121

```
 1    brought, and I thought it might qualify for a redaction.
 2    And I recall -- as I recall, I would have sought
 3    approval for that because I was a new employee at IUPUI,
 4    and I wanted to make sure that their policy was in
 5    conjunction with my thoughts on that.
 6         Q.   So when you testified that you sought
 7    approval, does that mean someone else made the decision
 8    for you?
 9              MS. MORICAL:  Objection.  Asked and answered.
10    BY MR. BERNSTEIN:
11         Q.   I don't understand -- ambiguous.  What does
12    "approval" mean?  What do you mean when you say,
13    "approval"?
14         A.   When that information came in, I -- I -- I
15    qualified it as information that should be reacted.  But
16    keep in mind the context here: I was a new investigator.
17    So any time -- and I -- that probably would have been
18    the first time I redacted information from a report.  So
19    because of that, and anything new like that, I would
20    want to check with IU policy prior to doing so, and
21    that's what I would have done here.
22         Q.   Okay.  So someone -- is it fair to say someone
23    signed off on your request before you redacted it?
24              MS. MORICAL:  Objection.  That misstates his
25         testimony.
```



1              THE WITNESS:  I would say it's fair to say

2        that I -- I sought -- I sought somebody else's

3        opinion on that.

4    BY MR. BERNSTEIN:

5        Q.   And you got their approval, correct?

6              MS. MORICAL:  Objection.  Misstates his

7        testimony.

8    BY MR. BERNSTEIN:

9        Q.   You can answer, sir.

10       A.   I -- I don't -- I don't recall who it was with

11   or where it came from, to be frank, so I don't -- I --

12   so --

13       Q.   I understand that, but it was someone.  I

14   understand you can't tell me who it was, but someone

15   authorized you to redact it, correct?

16             MS. MORICAL:  Objection.  Misstates his

17       testimony.

18   BY MR. BERNSTEIN:

19       Q.   "Yes," sir?

20       A.   I don't know if I would use the word

21   "authorize."  What I would use is the word -- is they

22   confirmed that my suspicion was the proper one.

23       Q.   Okay.  So, sir, can you go to your affidavit,

24   your affirmation?

25       A.   Yes.



1      Q.    Paragraph 52.

2      A.    Okay.

3      Q.    And you see that it says, "After the hearing,

4   I sent an e-mail to Sara Dickey telling her how smoothly

5   the hearing ran and what a good job the hearing panel

6   and coordinator did at the hearing."  Do you see that?

7      A.    Yes.

8      Q.    And so in reading this statement -- withdrawn.

9   What was the purpose of you adding that statement into

10  your affirmation?

11     A.    I'm -- I'm sorry?

12     Q.    What was the purpose of that statement and

13  paragraph in your affidavit?

14     A.    I think it speaks for itself.

15     Q.    I'm sorry?

16     A.    I think it speaks for itself.

17     Q.    What was the purpose of you writing it?  Why

18  did you write it?

19     A.    So I could share that, after the hearing, I

20  sent an e-mail to Sara Dickey telling her how smoothly

21  the hearing ran, and what a good job the hearing panel

22  did, the coordinator at the hearing.

23     Q.    Okay.  And, in fact, that's an extremely

24  misleading statement in your affirmation, is it not?

25          MS. MORICAL:  Objection.  Argumentative, and



 1        misstates the affirmation and the document.

 2   BY MR. BERNSTEIN:

 3        Q.   Yes or no, sir?

 4        A.   I did not put any misleading statements in my

 5   affirmation.

 6        Q.   And, in fact, that statement is actually

 7   borderline untruthful; isn't it, sir?

 8             MS. MORICAL:  Same objection.

 9             THE WITNESS:  I do not agree.

10   BY MR. BERNSTEIN:

11        Q.   Okay.  Let's go to Exhibit 2043.  Are you

12   there, sir?

13        A.   It's coming up now.  Yeah, I got it.

14        Q.   And that's the affidavit -- that's the e-mail

15   to Sara Dickey that you're talking about in paragraph

16   52, correct?

17        A.   Yes.

18        Q.   And --

19        A.   I think so.

20        Q.   -- if you look in the last full paragraph

21   that -- the last paragraph starts, "Lastly."  Do you see

22   that?

23        A.   Yep.

24        Q.   If you go down one, two, three, four, five,

25   six, seven lines -- and you write -- and, again, did you



1   write this e-mail?

2       A.   Yes.

3       Q.   And you wrote it on June 7th, 2019?

4       A.   Yes.

5       Q.   And when you wrote it, were you being honest?

6       A.   Yes.

7       Q.   And you were being truthful, correct?

8       A.   Yes.

9       Q.   Okay.  And you wrote, "On the May 20th

10  hearing, I was asked specific questions by the hearing

11  panel and the respondent but was never given the

12  opportunity to address several notes that I had reported

13  during the previous testimony.  I asked the hearing

14  chair at one point if I could address some earlier

15  topics but was denied.  This was a mistake.  The

16  investigator who is most familiar with the facts and

17  relevant issues should be given the opportunity to shed

18  light on any topic that they think would be helpful to

19  the hearing panel's determination."  See that?

20      A.   I see that.

21      Q.   And you still believe that your paragraph 52

22  is a truthful statement?

23      A.   Well, yeah.

24      Q.   Yes or no, sir?

25      A.   So if -- Mr. Bernstein, if you read the rest



1    of my e-mail, I was very complimentary of -- of things

2    that went on in the hearing, so yes, that is a true

3    statement.

4        Q.   Correct.  And you're also very critical.  You

5    said it was "a mistake": "I'm the investigator.  I have

6    the" -- "familiar with the most information and relevant

7    issues, and the hearing" -- "and the chairperson didn't

8    let me do it."  Did you put that in your affidavit to

9    the judge?

10            MS. MORICAL:  Objection.  Mischaracterizes a

11       document which is an exhibit to the affirmation.

12   BY MR. BERNSTEIN:

13       Q.   Did you put that in the affirmation to the

14   judge, sir?

15       A.   Which part?

16       Q.   The part where you're critical of the chair.

17       A.   I don't --

18            MS. MORICAL:  Objection.  Mischaracterizes the

19       document.

20   BY MR. BERNSTEIN:

21       Q.   You can answer, sir.

22       A.   I -- I'm not critical of the chair.

23       Q.   You're not?

24       A.   No.

25       Q.   "This is a mistake" is not criticism?



1        A.    Not of the chair.

2        Q.    Well, really?  "I asked the hearing chair at

3    one point if I could address some early topics but was

4    denied.  This was a mistake."  That's not critical of

5    the chair?

6        A.    No.  I believe the chair was following policy.

7              MS. MORICAL:  Mr. Bernstein, you are being

8         very unprofessional, and I want on the record that

9         you apologize to this witness at a break for being

10        unprofessional.

11             MR. BERNSTEIN:  No, I apologize --

12             MS. MORICAL:  You're being unprofessional.

13             MR. BERNSTEIN:  -- I wasn't unprofessional --

14        I apologize for snapping when he kept calling me by

15        my first name, and I don't think that's

16        professional or appropriate in a deposition.  So

17        that's what the record should reflect.  And I asked

18        him not to call me by "Stuart," and I asked him to

19        call me "Mr. Bernstein."

20             MS. MORICAL:  That's all on the record.

21             MR. BERNSTEIN:  So --

22             MS. MORICAL:  Your apology is not on the

23        record, and so I --

24             MR. BERNSTEIN:  And I apologize for snapping,

25        not for anything else.  It was inappropriate for



1        him to continue to call me first name, and you

2        probably should have directed him not to because

3        this is not a friendship, this is not an

4        adversarial proceeding.  And so I let it go, and

5        then finally, yes, I "snapped," for a lack of a

6        better word, and I apologize to him for doing that.

7        But there is nothing else that I apologize for, nor

8        should I.  And this testimony that he is not

9        critical of the -- well, I won't say that because

10       then you'll yell at me, and rightfully so.  So I

11       won't say that.

12   BY MR. BERNSTEIN:

13       Q.   So it's your testimony that you didn't say

14   that -- well, you just added now that the chair was

15   "following policy."  You didn't say that, did you, in

16   the e-mail?

17       A.   No.  I was speaking to other IU employees, and

18   I assumed that they -- that they knew that it was not

19   Wendy that I was taking criticism with, it was the --

20   the -- the protocol.  And that's why I say at the end

21   here, the investigator who is most familiar with the

22   facts and relevant issues should be given the

23   opportunity to shed light and that would be helpful for

24   the hearing panel's decision.  So what I was requesting

25   was maybe in the future revisions that an opportunity



1  for the investigator to speak freely towards the end

2  would be helpful to hearing board determinations.

3      Q.   And is that in this e-mail?

4      A.   No, I -- I gave you the context of my e-mail.

5      Q.   But that's not in this e-mail, correct? You're

6  only adding this tonight, when confronted with your

7  affirmation and this e-mail, correct?

8          MS. MORICAL:  Objection.  Argumentative.  He

9      answered your question about the context.

10         MR. BERNSTEIN:  This is the --

11         MS. MORICAL:  And you are now --

12         MR. BERNSTEIN:  -- cross examination.  I'm not

13     being argumentative.

14         MS. MORICAL:  -- over time.

15         MR. BERNSTEIN:  I'm asking a question.  He can

16     say "no."

17         MS. MORICAL:  You're now over time.

18         MR. BERNSTEIN:  Am I, Katie?

19         COURT REPORTER:  Yes, sir.

20         MR. BERNSTEIN:  Okay.  I have no further

21     questions.  Thank you very much, sir.

22         MS. MORICAL:  I have a few questions on those

23     questions.

24         MR. BERNSTEIN:  Oh, okay.

25              CROSS EXAMINATION



1    BY MS. MORICAL:

2        Q.   And so I'm going to move around a little bit,

3    Mr. Kuester.  Please let me know if you need more

4    context, or, you know, have any clarifications on my

5    questions.  And I'll try and do this quickly since it's

6    8:30 at night.  Did you attend all of the Atixess

7    (phonetic) training for level I and level II?

8        A.   Yes.

9        Q.   Could we look at Exhibit 2024, which is the

10   final investigation appendix?  And I'd like you to look

11   at page 177.  I don't know if it needs to reload or if

12   you've still got it.

13            MR. BERNSTEIN:  Exhibit -- I'm sorry?

14            THE WITNESS:  2024.  What page?

15   BY MS. MORICAL:

16       Q.   Page 176, or IU 434.

17       A.   Yeah.  I've got to wait for it to load.  I'm

18   sorry, what -- what page again?

19       Q.   176 if you're doing it from the document

20   pages.

21       A.   Almost there.  All right.  I'm there.

22       Q.   Did Doe have an opportunity -- I'm sorry, let

23   me -- is page 176 to the end, Doe's comments to the

24   preliminary investigation report?

25       A.   Yes.  It appears that, yeah.



1      Q.   And then could we look at your affirmation

2   paragraph 21, page 6?

3      A.   Yes.

4      Q.   In the affirmation, do you say, "He," Doe,

5   "had an opportunity to review and comment on them when

6   he reviewed the preliminary investigation report"?

7      A.   Yes.

8      Q.   And then you say there's cite to the

9   preliminary -- there's a cite in this paragraph to

10  Exhibit 2017.  Is that the document you meant to refer to

11  in your affirmation?

12     A.   You mean where it says, "preliminary

13  investigation report"?

14     Q.   Right.

15     A.   No.  It should be "the final investigation

16  report."

17     Q.   And should it be the -- and just to clarify:

18  Should it be the report, or is it the appendix?

19     A.   Oh, yeah.  The appendix, I guess.

20     Q.   Thank you.  I just wanted to clear that issue

21  up with the affirmation.  You testified about the

22  training that you received when you started at IUPUI. Do

23  you recall anything additional that you did for training

24  when you started at IUPUI?

25         MR. BERNSTEIN:  Note my objection.



GREGORY KUESTER                                      November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                      132

1              MS. MORICAL:  You can go ahead and answer.

2              MR. BERNSTEIN:  You can answer.

3              THE WITNESS:  I -- I -- we did -- I -- I

4         recall a lot of things that we did.  I think a lot

5         of them, you know, occurred -- occurred in my

6         office or in Sara's office, just discussing policy

7         and procedure, and how things might have differed

8         from -- differed from previous colleges that I'd

9         worked for, and that sort of thing.

10   BY MS. MORICAL:

11        Q.   Did you ever review the policy during the

12   course of any investigations?

13        A.   All the time.  A -- I -- I always consult the

14   policy during every investigation.

15        Q.   You testified that you reported Doe's - you

16   reported the -- the Roe Italy incident to, I think you

17   said to Ms. Dickey.  Did -- and you said that it wasn't

18   your decision about what happened.  Were you informed

19   about what the decision was in that 20 -- early 2019

20   time period about the decision on whether to move

21   forward with an investigation for Doe's complaint at

22   that time?

23              MR. BERNSTEIN:  Objection to the form of the

24         question.  Compound, leading.

25              THE WITNESS:  I'm sorry, Alice, can you ask --



```
 1   BY MS. MORICAL:
 2       Q.   Do you want me to ask it again?  It's late.  So
 3   first, to orient you, you testified --
 4            MR. BERNSTEIN:  Objection.
 5   BY MS. MORICAL:
 6       Q.   Just to orient, do you recall your testimony
 7   about reporting the incident in Italy to Ms. Dickey?
 8            MR. BERNSTEIN:  Objection.  Misstates the
 9            testimony, ambiguous.
10            THE WITNESS:  I do recall -- yeah, I -- I
11            definitely recall sharing with her the -- the fact
12            that both of them were physical with the other
13            during the time in Italy, with Ms. Dickey.
14   BY MS. MORICAL:
15       Q.   And then you testified that you were not
16   involved in the decision about what would happen.  Did
17   Ms. Dickey inform you what decision was made with regard
18   to a potential complaint by Doe at that time?
19            MR. BERNSTEIN:  Objection.  Leading, compound.
20            This is a direct examination, not cross.
21            THE WITNESS:  Can I answer?
22   BY MS. MORICAL:
23       Q.   Yep.
24       A.   I think -- I think -- I think the sentiment
25   was that -- as I recall, that he would have the
```



1  opportunity -- I remember I think both Emily Springston

2  and Sara Dickey saying that he had the opportunity at

3  any moment to file a formal complaint.  And I doubt that

4  we -- we -- you know, we would move forward at that

5  time.

6      Q.   Do you recall if you informed Doe of that

7  decision?

8      A.   I don't specifically recall it, but I -- I

9  feel like I must have because that would have definitely

10  been something that I -- I would have shared with him.

11          MS. MORICAL:  I have no further questions.

12          MR. BERNSTEIN:  I have some questions on these

13      questions.

14                  REDIRECT EXAMINATION

15  BY MR. BERNSTEIN:

16      Q.   Is it your understanding of IU PUI's policy

17  that the university can go forward with an investigation

18  even if the complainant doesn't want to go forward?

19      A.   Again, I -- I don't recall the -- the policy

20  at IU at the time that I was there with regard to that.

21  As an investigator, I was the one that was handed the

22  investigations.

23      Q.   Well, you stated a couple of times to your

24  counsel that if he wanted to go forward, that they would

25  investigate, correct?  So you -- you know the policy



1  that if a complainant wants to go forward, they would go

2  forward, correct?

3          MS. MORICAL:  Objection.  He said that he was

4      informed of a decision, not of a policy.

5  BY MR. BERNSTEIN:

6      Q.   So is it my understanding -- well, you -- you

7  -- you told your counsel that you always read the policy

8  during every investigation, correct?

9      A.   I consult the -- the policy at any time that I

10 feel that it's necessary during an investigation, and

11 that almost always occurs.

12     Q.   Okay.  But as you sit here today, you don't

13 recall what the policy was back in November to June of

14 2018 to '19, whether or not the university could go

15 forward with a complaint without the consent of the

16 complainant, correct?

17     A.   Well, some parts of the policy are relevant to

18 my investigation and others are not.  The policy is

19 robust.  I don't consult every part of the policy just

20 to -- to read it.  Yeah.  I consult the policy any time

21 my investigation dictates so.

22     Q.   Okay.  So you -- so is it fair to say that you

23 don't know whether or not the university could go

24 forward in accordance with the policy without the

25 complainant's consent; is that --



1          MS. MORICAL:  Objection.  You're

2      characterizing a policy.

3  BY MR. BERNSTEIN:

4      Q.  Is that accurate?

5      A.  I don't recall the policy at the time with

6  regard to whether they would -- that IU or IUPUI would

7  move forward without the -- without -- I don't recall.

8      Q.  Well, didn't -- in this case, didn't IUPUI go

9  forward despite the fact that Jane Roe requested not to

10 go forward?

11         MS. MORICAL:  Note objection.  Misstates the

12     record.

13         MR. BERNSTEIN:  It's a question.  This is

14     cross-examination.  That's a question.  He --

15         MS. MORICAL:  You -- well, you are asking him

16     a question that you know is not what's in the

17     record.  I think that that -- I have a right to

18     object.

19 BY MR. BERNSTEIN:

20     Q.  Okay.  You can answer the question, sir.

21     A.  No.  What you said is not correct.

22     Q.  Okay.  And, in fact, IU went -- IUPUI went

23 forward in this case despite Complainant's request not

24 to because of the gun allegation, correct?

25     A.  No.  That's not correct.



1    Q.   Now, you asked -- you were asked questions by

2    your counsel regarding John Doe reviewing -- having the

3    opportunity to review the report, the investigation

4    report, correct?

5    A.   I'm sorry, can you restate?

6    Q.   I believe you were asked questions regarding

7    whether or not John Doe had the right or was given the

8    right to review the investigative report, correct?

9    A.   I don't recall that, no.

10   Q.   Okay.  Well, was John Doe given access to

11   review the investigative report?

12   A.   Absolutely.

13   Q.   And you provided him that access?  Is that

14   your responsibility as an investigator?

15   A.   I don't know if the -- it doesn't -- it --

16   it's my responsibility to write the report.  I believe

17   it was an administrative delivery to him that did not

18   come from me.

19   Q.   So if Ms. Dickey testified that -- withdrawn.

20   And in accordance, do -- is this an issue -- is this an

21   area of the policy that you would have read up on in

22   terms of John Doe being provided access to review the

23   report?

24   A.   I want to add additional information to my

25   last answer.  The -- when the -- when it goes out, I



1  believe there is a letter from me with the prelim report

2  that states what is expected of the parties, but I

3  believe it was another administrator in our office that

4  sent that, if that answers your question.

5      Q.    It doesn't, but that's okay.  Is the area of

6  access the -- withdrawn.  Is the -- the area where the

7  policy discussed -- discusses a party's access to the

8  preliminary investigative report, is that something in

9  your domain as an investigator where you would have

10  reviewed and looked at the policy?

11          MS. MORICAL:  Objection.  Ambiguous.

12  BY MR. BERNSTEIN:

13      Q.    You can answer.

14      A.    I apologize, I -- I -- I'm having difficulty

15  following your questions.

16      Q.    Okay.

17      A.    I think it's --

18      Q.    You testified a couple of times that there

19  are areas of the policy that you didn't read or didn't

20  know because it was not something in your

21  responsibility. And I understand that and I appreciate

22  that, so my question --

23          MS. MORICAL:  Objection.  That

24      mischaracterizes his testimony.

25  BY MR. BERNSTEIN:



1    Q.   Okay.  I am asking: Is the area or the part of

2    the policy that discusses the party's access to the

3    reports, is that something that you would have reviewed

4    and known as part -- as being an investigator?

5    A.   I think so.

6    Q.   Okay.  What's your understanding back in

7    January -- November to -- November of '18 to June of

8    '19, with regards to the party's access to the

9    preliminary investigative report?

10        MS. MORICAL:  And I think -- I mean, if you

11        want to -- are you asking him about a specific part

12        of the policy?  And you've now gone beyond the

13        scope of my questions.

14        MR. BERNSTEIN:  I don't think it's beyond the

15        scope of your question, just because -- in the

16        scope of your question, you were talking about

17        access and reviewing the investigative report,

18        so --

19        MS. MORICAL:  My question was, did John Doe

20        have that opportunity, and if it's a document in

21        the record.  So it's where he --

22        MR. BERNSTEIN:  And that's --

23        MS. MORICAL:  -- that opportunity.

24        MR. BERNSTEIN:  Are you directing him not to

25        answer?



1          MS. MORICAL:  Are you directing him to a

2     specific part of the policy?

3          MR. BERNSTEIN:  Would that make it easier?

4          MS. MORICAL:  I don't -- so you want to ask

5     him this last -- is this your last question on this

6     topic about --

7          MR. BERNSTEIN:  There's two or three questions

8     on that.  And, you know, you asked that, and I -- I

9     think it's perfectly -- I see Mr. Kuester is

10    getting -- I think time is becoming an issue and I

11    would like to try just to get through this very

12    quickly, and I have, like, two or three questions

13    in this area.

14         MS. MORICAL:  Okay.  Well, so, what's your

15    question?

16 BY MR. BERNSTEIN:

17    Q.   So, sir, is the part of the policy that

18 addresses the party's access to the final and

19 preliminary investigative report, is that something that

20 you would have been familiar with as an investigator?

21    A.   Yes.

22    Q.   Okay.  As you -- and, again, if you -- do you

23 recall what IU PUI's policy was back in November of '18

24 to June of '19, with regards to a party's access to the

25 preliminary investigative report?



```
 1        A.   I have no memory what the policy is on

 2   preliminary report review.

 3        Q.   Okay.  To the best of your recollection, was

 4   the IU's policy the same as to the preliminary

 5   investigative report as it was to the final

 6   investigative report?

 7             MS. MORICAL:  Objection.  Lack of foundation.

 8        He has no recollection, so how could he have any

 9        recollection about whether it was the same or

10        different?

11             MR. BERNSTEIN:  I'm asking -- that's two

12        different questions.

13   BY MR. BERNSTEIN:

14        Q.   Do you recall if it was the same or different,

15   sir?  And you can say you don't remember, "I don't

16   know."

17        A.   Ask the question again, please.

18        Q.   Was the policy --

19             MR. BERNSTEIN:  Well, Alice, you're right,

20        because he says he doesn't remember the

21        preliminary, so he couldn't -- a fair point.

22   BY MR. BERNSTEIN:

23        Q.   Can you turn to Exhibit 1, sir?  And we're

24   almost done.  Do you have it?

25        A.   Yeah.  What page?
```



1      Q.   Page -- page 11.

2      A.   Okay.

3      Q.   And it starts on -- it starts with a -- a

4  small "a."

5      A.   Which one?

6      Q.   On page 11 at the top, it starts with -- I

7  just want to make sure we're on the right page.

8      A.   Yeah, the -- the top starts with a small "a."

9  It's --

10     Q.   Right.  "If sexual misconduct," right?  So if

11 you can read -- I know, to save time, if you look at

12 paragraphs E and G, tell me if the policy was the same

13 for preliminary investigative reports and final

14 investigative reports, with regards to a party's access.

15         MS. MORICAL:  I'm just going to object.  This

16     document speaks for itself, and we're now past

17     time.

18         MR. BERNSTEIN:  It's the last question.

19         MS. MORICAL:  Okay.

20         MR. BERNSTEIN:  See, I've put everything away.

21     I can say I've put everything away.

22         THE WITNESS:  Are you asking me if E and F are

23     the same?

24 BY MR. BERNSTEIN:

25     Q.   No.  I believe it was E and G, sir.



1          A.    Okay.

2          Q.    As to the party's act -- as to the party's

3    access to the preliminary final report.

4          A.    I --

5              MS. MORICAL:  I guess, objection.  Ambiguous

6         about "access."

7              THE WITNESS:  And I'll also say, Mr.

8         Bernstein, that the preliminary report is more in

9         the realm of the investigator because that -- that

10        report and the -- and the response to it comes

11        directly back to me, whereas the -- as I recall at

12        IU, the final report, although put together by me,

13        is -- it's sent off by a different administrator in

14        our office.

15   BY MR. BERNSTEIN:

16         Q.    Does that mean that you can't answer the

17   question if the fact is the same, if E and G are the

18   same?  If you can't answer it, just say, "I can't answer

19   it."

20         A.    I'm reading through it, but -- but, you know,

21   my -- I don't have any -- I don't have any memory of

22   what access to the final report would be.

23             MS. MORICAL:  So is your question, are -- do

24        E and G read the same?

25             MR. BERNSTEIN:  Yeah.



GREGORY KUESTER                                    November 04, 2020
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY                    144

1          THE WITNESS:  I would have to read them to --
2      to let you know if they read the same.  I can do
3      that if you would like for me to.
4  BY MR. BERNSTEIN:
5      Q.   Yeah.  I would.
6      A.   It appears there's differences between the
7  two.
8          MR. BERNSTEIN:  Thank you, sir.  I have no
9      further questions.
10         MS. MORICAL:  I have no questions on those
11     questions.
12         COURT REPORTER:  All right.  And, counsel, we
13     are now off record at 8:43 if there are no further
14     questions.
15              (Deposition concluded at 8:43 p.m.)
16
17
18
19
20
21
22
23
24
25



```
 1                        CERTIFICATION

 2

 3              I, KATIE JO GLESING, a Shorthand Reporter

 4    and notary public, within and for the STATE, do hereby

 5    certify:

 6              That GREGORY KUESTER, the witness whose

 7    examination is hereinbefore set forth, was first duly

 8    sworn in by me and that this transcript of said

 9    testimony is a true record of the testimony given by

10    said witness.

11              I further certify that I am not related to

12    any of the parties to this action by blood or marriage,

13    and that I am in no way interested in the outcome of

14    this matter.

15

16    IN WITNESS WHEREOF, I have hereunto set my hand this 6th

17    day of November, 2020.

18

19

20                        _____

21

22                        KATIE JO GLESING

23

24

25
```



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: 1..5

**1**

**1**
50:13
52:2,6,
10,11,12
54:21
55:21,25
56:1
63:1,15
100:22
141:23

**100**
41:1

**1020**
72:19

**1024**
65:1,5,20
66:3,9,
12,21
67:7
68:9,11
69:15
76:22

**107**
81:16

**1076**
99:25
100:9,11,
14

**109**
72:20
73:4,6,20
74:5

**11**
142:1,6

**1270**
66:19,21

**14**
112:6

**15**
20:21

**15th**
47:4,11

**16**
88:24
90:15
92:20

**16th**
100:20

**17**
22:12

**17.5**
112:7

**176**
130:16,
19,23

**177**
130:11

**17th**
101:3,9

**18**
22:12,13
89:7 90:1
139:7
140:23

**19**
90:8
92:15
135:14
139:8
140:24

**19th**
92:18

**1:30**
69:16

**2**

**2**

**100:19**

**20**
66:13,24
75:2
76:24
94:15
132:19

**2001**
10:10,14
12:12

**2002**
11:5

**2004**
11:7

**2010**
10:14

**2011**
62:15

**2013**
10:7

**2015**
65:6,22

**2017**
75:8
88:11,16
131:10

**2018**
21:3,22,
25 22:24
28:8
43:7,13
66:24
86:17
119:2
135:14

**2019**
22:22
24:6 26:7
28:8
62:15
70:14,20
74:25

**75:2,13**
76:24
79:1
86:17
87:5
88:24
90:3
92:15,21
93:21
94:8,15
104:3,6
114:12
125:3
132:19

**2023**
106:13

**2024**
130:9,14

**2037**
94:1

**2041**
95:9

**2043**
124:11

**20th**
66:7 67:4
75:12,20,
22 76:10,
21,22
77:7
79:2,3
94:8
125:9

**21**
131:2

**2101**
66:20

**24**
72:19
112:7

**27**
107:19

**113:24**

**29th**
75:12

**2:21**
98:14,15

**2:50**
100:2,3

**3**

**3**
49:15
88:13,17

**3,000**
67:15

**3-ish**
11:5

**30**
100:13

**30-minute**
20:22

**4**

**4**
74:25
89:5,7

**40**
105:14

**40-minute**
103:6,13

**434**
130:16

**4th**
76:14,16,
20 78:25

**5**

**5**



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: 52..advise

106:13

**52**
123:1
124:16
125:21

**56**
89:25

**57**
89:21

**5th**
75:12

---

**6**

**6**
56:2,3
131:2

**60**
73:19

**6:30**
67:4

**6:36**
69:10

**6:54**
69:13

---

**7**

**7**
49:17
51:22,23

**70**
13:16
14:4,5
37:13
59:1
64:20

**7:52**
111:11

**7th**

14:17
16:11
125:3

---

**8**

**80**
13:16
14:4,5
37:13
49:12,13
59:1
64:21
73:20
107:19

**8:03**
111:13

**8:03:50**
67:2

**8:30**
130:6

**8:43**
144:13

**8th**
46:18,22
75:12

---

**9**

**9**
50:16
63:2,14

**9th**
78:25
79:1

---

**A**

**A.i**
62:5

**ability**
104:6

**absent**
36:9

**absolute**
50:8

**absolutely**
19:24
30:10
53:20
57:20
61:17
100:5
106:4
111:9
137:12

**abuse**
87:11,21
97:16

**access**
137:10,
13,22
138:6,7
139:2,8,
17
140:18,24
142:14
143:3,6,
22

**accommodate**
8:23

**accommodations**
59:17

**accordance**
85:5
86:19
90:17
91:2
135:24
137:20

**account**
85:17

**accurate**
7:14,18
33:3
44:19
51:16,23
136:4

**accused**
64:1

**acknowledgement**
43:16

**act**
143:2

**action**
90:21
91:4,14
92:16,19,
22 93:20
94:22
110:22,24
111:1

**actual**
98:16

**add**
19:4
60:10
103:8,11
116:9
137:24

**added**
128:14

**adding**
18:15
123:9
129:6

**addition**
11:24

**additional**
37:8
99:24
119:21
131:23

137:24

**additionally**
29:21

**address**
109:19
110:16
112:7
125:12,14
127:3

**addresses**
140:18

**adjudicate**
52:14

**adjudicating**
38:12
39:1 41:5

**administer**
11:21

**administering**
11:21

**administrative**
137:17

**administratively**
28:11

**administrator**
138:3
143:13

**admit**
115:25

**admitted**
88:10

**adversarial**
128:4

**advise**



43:5
86:16
89:18,19

**advised**
44:22

**advisor**
11:7

**Advisors**
11:6

**affairs**
11:8

**affect**
117:1

**affected**
114:20
115:1,21
116:25
118:7

**affects**
48:21

**affidavit**
21:11
122:23
123:13
124:14
126:8

**affirmation**
10:5
21:11,12,
16,17,19
29:1,2,6
30:20,24
31:21
32:12,17
33:2,10
48:10
49:10,13
50:10
51:13
55:9,15,
19 56:2
89:21
107:19

113:21
115:24
116:1,2,
3,4,6,14,
22 122:24
123:10,24
124:1,5
126:11,13
129:7
131:1,4,
11,21

**afternoon**
6:20

**agree**
16:10
36:18
38:2,4
41:4,9
52:1,13
56:7,15
57:17,21,
24 60:14,
18,20
61:7,10
62:22
63:3
70:9,12
75:17
76:23
77:2 99:2
108:13
112:15
115:20,22
117:1
124:9

**ahead**
23:8
132:1

**alcohol**
11:23
96:7,12,
19 97:1,
11,14

**Alice**

35:17
49:13
52:8 53:5
55:8 59:9
65:21
66:16
69:1,4
73:9
91:23
132:25
141:19

**allegation**
63:4 86:9
119:12
136:24

**allegations**
39:19
40:24
87:11,14,
17,21
93:10,20
119:14
120:25

**alleged**
63:20
74:8 87:2

**allowed**
18:3

**ambiguity**
30:6

**ambiguous**
12:10,16
20:4,10
23:8
36:22
37:17
38:13
39:4 40:9
41:13
42:6
50:6,7
58:1,12
59:4,14,
21 60:23

63:6
90:23
93:24
99:4
117:16
121:11
133:9
138:11
143:5

**American**
11:6

**Amy**
15:2

**answers**
9:6 29:14
57:15
81:3
138:4

**Anytime**
40:13

**apartment**
82:13

**Apologies**
93:7

**apologize**
35:21
41:25
106:4
127:9,11,
14,24
128:6,7
138:14

**apology**
127:22

**appealed**
12:2

**appeared**
7:21
36:10

**appears**
73:1
130:25

144:6

**appendix**
72:20
79:10,11,
13,15
80:3,11,
13,17,22,
25 81:12,
14,17
130:10
131:18,19

**apples**
97:7

**application**
44:21

**applied**
54:9

**applies**
52:3
53:11,14,
23 54:15

**apply**
53:3 54:7
76:9

**approval**
77:9
120:3,19
121:3,7,
12,13
122:5

**approximately**
13:10
46:23
47:12

**area**
14:10
41:21
101:12
105:15
117:10
118:10
137:21



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: areas..Bernstein

138:5,6
139:1
140:13

**areas**
10:19,20
138:19

**argue**
17:12
55:11

**arguing**
114:6

**argument**
89:10,11

**argumentative**
50:5,7
51:19
59:5
77:24
79:22
106:3
107:14
113:20
123:25
129:8,13

**arrhythmia**
11:1

**asks**
17:24
31:2

**aspect**
13:25
25:6

**assault**
97:15

**assignment**
47:8

**assignments**
91:6

**assisted**
8:17

**assisting**
8:4,19

**assume**
42:12
47:5
50:11,12

**assumed**
113:2
128:18

**ATIXA**
43:8

**Atixess**
130:6

**attempt**
112:3

**attempted**
107:21
112:23

**attempts**
107:17

**attend**
115:16
130:6

**attended**
34:12

**attorney**
8:4,7,25
16:17
18:3
19:9,14,
16 29:22,
25 30:14

**authorization**
104:7,11,
15,24
105:2,19
107:12

**authorizations**
105:22,23

**authorize**
122:21

**authorized**
122:15

---

**B**

**B-E-R-N-S-T-E-I-N**
109:21

**bachelor's**
10:9

**back**
7:4 11:7
13:20
16:22
19:19
21:21
28:5
41:18,19
61:1,21
68:14
69:12
90:14
93:21
102:23
103:9
111:13
114:12
119:2
135:13
139:6
140:23
143:11

**backdrop**
38:23
70:22

**backed**
11:3

**background**
10:5
17:11
18:25

**Baltimore**
10:7
11:15,16

**Barrett**
15:2

**based**
30:5
85:22
92:15

**basically**
26:3

**basis**
25:6
26:1,2

**Bates**
66:19

**bathroom**
67:8

**began**
11:15

**beginning**
70:7
71:25
108:8

**behalf**
84:20
85:6,21

**behavior**
96:11

**belief**
81:13

**bell**
77:20

**Bernstein**
6:19,21,
22 7:3
16:16,20
17:7,10,
21,24
18:6,8,13
19:11,21,

25 20:1
25:18,20
26:23,25
28:1
30:3,9
31:5 39:6
41:16
46:9,12
51:14
53:5,15,
19 54:2,
12,19
55:12,17,
20,24
56:3,12,
20 57:2,3
58:2,13,
16,21,25
59:8,15,
25 60:25
61:4 63:8
64:13
65:9,15,
19,24
66:1,20,
22,25
67:6,9,
19,21,24
68:5,8,
15,24
69:4,14
71:5,8,20
72:10
73:8,12,
16,21,24
76:3
77:21
78:1,7,16
79:23,25
80:2
81:2,6,9,
21 82:11
83:10,12,
18,21,22
84:10,23
85:2
86:12



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: Bethany..certification

90:11,16,
25  91:23
92:4,8
93:2,4,
15,17,25
96:22,24
97:5,17
98:6,8,
12,15,19
99:5,16,
19  100:1,
4,6,8
101:24
102:5,7,9
103:20,25
104:1
105:7,11
106:4,5
107:15
109:18,
21,22
110:2,11
111:6,15
112:10,13
113:22
114:4,7,
9,10
115:7,12,
25  116:9,
12,16,18,
23  117:3,
17,24
119:7,8
120:11,22
121:10
122:4,8,
18  124:2,
10  125:25
126:12,20
127:7,11,
13,19,21,
24  128:12
129:10,
12,15,18,
20,24
130:13
131:25

132:2,23
133:4,8,
19
134:12,15
135:5
136:3,13,
19
138:12,25
139:14,
22,24
140:3,7,
16
141:11,
13,19,22
142:18,
20,24
143:8,15,
25  144:4,
8

**Bethany**
11:9

**bills**
100:25

**Binghamton**
11:11,17,
19,20
13:21

**bit**
19:20
60:17
130:2

**black**
40:16
64:15

**blatantly**
38:9

**Bloomington**
43:2,4
54:9,25
55:1

**board**
12:1,3,4
41:23

48:14
117:23
118:16
129:2

**bold**
95:24
96:6

**borderline**
124:7

**bottom**
94:7

**break**
8:22  9:1,
2  15:14
65:11,12
67:8,13
68:12,17,
18,25
111:8,9
127:9

**breaking**
67:21

**briefly**
8:21
10:12

**broad**
60:4

**brought**
11:5
33:19
39:19
41:7,8
42:9
121:1

**build**
24:12

**buildings**
11:24

**bullet**
95:22
96:5

**business**
25:3

---

C

---

**calendar**
45:11,24

**call**
23:24
60:24
64:8,16
71:16
109:13,
15,16,17,
18  114:24
127:18,19
128:1

**called**
14:1,18
22:5
114:13,22

**calling**
21:13
127:14

**calls**
16:13,14,
16  41:14
59:22

**campus**
26:10,11,
21  27:2,
4,5  43:2
46:19
47:15

**campuses**
26:20
42:18
52:3
53:3,11,
23

**capacities**
12:20

**case**
6:21
14:17,22,
23  15:1,
18  16:1,
7,12
17:1,12,
19  18:17,
18  34:24
35:3,12,
23  36:18,
19  40:24
41:3  47:9
48:4
51:10,24
61:11
80:8,19
99:3,7,10
109:5,8
119:18
136:8,23

**cases**
14:11
28:13
47:20
57:9

**cast**
25:14

**casting**
41:11

**caused**
117:9
118:9

**caveat**
19:4

**certificate**
44:5

**certificates**
43:16
44:17

**certification**



GREGORY KUESTER

November 04, 2020

JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY    Index: CERTIFIED..complete

43:19

CERTIFIED
16:9

chair
12:1
125:14
126:16,22
127:1,2,
5,6
128:14

chairperson
126:7

chairs
12:4

chalked
96:7,11

chance
67:12

change
93:2

changing
79:20

characteriz
ation
23:7

characteriz
e
37:12

characteriz
ing
136:2

charge
115:16

charged
73:8

charges
33:19

charging
33:17,18

check
21:5 75:3
121:20

checking
21:24

Chief
15:2

circled
48:10

Circuit
14:17
16:11

circumstanc
es
51:1

cite
77:18
131:8,9

citing
88:9

civil
21:1 43:8

claim
95:2,4

claimant
119:14

claimant's
7:6

clarificati
on
58:18

clarificati
ons
130:4

clarify
25:7
27:20,21
58:23
59:5
131:17

clarifying
79:22

classes
43:17
44:5,23
45:2
117:9
118:9

clear
13:24
19:12
23:20
24:9
41:25
44:12
65:8 90:2
131:20

clearer
35:16,20

client
13:4
24:12
32:23
40:3 69:6

client's
7:5 23:6,
13 41:10

close
47:5

closely
40:15

clouding
116:13,19

coincidence
23:4,11,
19,20
24:1
78:24

coincides
23:5,13

collaborati
ve

119:21

College
11:9

colleges
24:10
26:1
132:8

comfortable
77:19

comment
131:5

comments
21:16
130:23

commit
97:15

common
48:8

communicate
60:12

communicati
ng
60:7

communicati
on
31:4
60:11

communicati
ons
31:2

communities
11:24

community
52:18
54:22

commute
26:6

commuting
20:21

complainant
57:18
58:10
61:12
62:19,23
63:5,23
72:9
77:13
78:4
80:21
83:7,14,
24 84:8,
19 85:7
86:5
88:21,24
89:9
97:21
106:15,
22,24
107:4,10
109:6,23
114:19,25
115:21
116:25
117:8
118:23
134:18
135:1,16

complainant
's
135:25
136:23

complaint
32:19,22,
24,25
36:19
94:13
95:16
132:21
133:18
134:3
135:15

complete
114:1,3



completed
  44:5,22
  45:2

completion
  43:17

complimenta
ry
  126:1

compound
  132:24
  133:19

computer
  32:16
  48:5,17
  73:9

concern
  117:10
  118:10

conclusion
  16:14,17
  18:16,19
  19:13
  41:15
  60:24

condition
  7:12

conduct
  11:17,22,
  23 12:7,
  14,24
  13:3,11,
  14,19
  27:23
  28:13
  43:1
  87:18
  110:18

conducted
  8:14
  16:12
  17:1
  18:23
  23:1

24:19
37:14
43:3
92:23
98:11

Coney
  15:2

confirmatio
n
  120:16

confirmed
  122:22

confronted
  129:6

confuse
  28:6

confused
  21:25
  28:6

conglomerat
ion
  27:9

conjunction
  31:24
  32:1,8
  121:5

connected
  27:22

connection
  59:13

consent
  51:4,9
  135:15,25

considerati
on
  38:11
  42:9

considered
  13:25

consistent

25:24
89:22

consult
  132:13
  135:9,19,
  20

consultatio
n
  119:20

contact
  70:10,13,
  18 71:10
  72:2
  74:12,16
  75:24
  76:6,23,
  25 77:6,
  12 78:12,
  18 79:2,7
  82:19
  83:2,6,
  13,24
  84:7,12,
  19 85:6,
  9,11,23
  86:4,7
  107:22
  110:15

contacted
  95:3

contacts
  70:18

content
  89:24

context
  59:3
  121:16
  129:4,9
  130:4

continue
  46:18
  64:3 93:6
  128:1

contractual
  26:2

conversatio
n
  7:5 36:9
  78:20
  82:14
  86:6

conversatio
ns
  35:14,22
  96:15

conveying
  51:24

convicted
  9:21 10:2
  40:22,23

conviction
  40:6,20

coordinator
  123:6,22

copy
  49:3
  50:11,14

correct
  7:9,10
  8:7,8
  10:6,8,11
  14:9 21:2
  22:16
  26:13
  27:2,13
  29:7,11
  34:9 35:7
  37:23
  43:3
  44:6,7,
  13,23
  49:21,22
  51:6,7,17
  52:9,14
  55:4
  56:20

57:23
58:21
62:8,9,
10,19
63:25
66:5
70:13
71:17
72:4
73:20
74:12,23
76:11,14
77:22,23
78:5,13
79:4,5
82:8 83:3
85:12,13,
15,19,20
88:24
89:3,23
90:3,6,7,
12,17,22
93:12,21
94:23,24
95:2,4,
13,20,22,
23 96:1,
7,19
97:2,6,9
98:21,22,
24 99:10,
13
101:17,
19,21
102:2,14,
15,16,17,
22 103:4,
7,16,17,
22 104:19
105:21
106:10
107:13
108:2,4,
5,6,10,15
109:2,3,
4,6,10,24
110:3,8,



12,20,23
111:18,22
115:9
117:14
119:9,12,
15,16,24,
25 122:5,
15 124:16
125:7
126:4
129:5,7
134:25
135:2,8,
16
136:21,
24,25
137:4,8

**correctly**
43:14
44:14

**counsel**
19:16
31:2,10,
16,24
32:8,14,
21 33:22
35:14,18,
21,22
36:9
67:13
75:6,8
93:13
119:5
134:24
135:7
137:2
144:12

**counsel's**
31:9
45:12,25
46:9

**counselor**
36:23

**counting**

12:9

**couple**
11:25
47:15
48:24
134:23
138:18

**court**
7:1 9:7,
11,16
17:16
18:21,22
19:19,23,
24 69:9,
12 93:13
98:14,17
100:3,5
111:10,13
119:5
129:19
144:12

**court's**
18:20

**created**
32:7

**creating**
32:9

**credibility**
37:15,19,
21 38:3,
4,5,12
39:1,14
40:7,14
41:3,6,12

**crime**
9:21

**critical**
16:11
18:23
24:18
126:4,16,
22 127:4
128:9

**criticism**
126:25
128:19

**cross**
129:12,25
133:20

**cross-
examination**
136:14

**cut**
19:20
60:17
100:10
109:7

**CV**
10:4

_____

         **D**
_____

**danced**
84:23

**darts**
73:17

**database**
47:19
48:18

**date**
23:5,12,
21 45:10,
14,18,23
46:6,19
47:1,3,12
65:23,24
69:20
74:18,19,
20,21,22,
24 90:14
105:18

**dated**
76:15
94:8
100:20

**dates**
21:24
23:13
75:4,17,
19

**day**
20:23
45:8,17
46:24
66:23
79:4
93:11,19
101:3,8

**days**
47:15
48:24
67:16
101:15
102:15

**deal**
17:15

**dean**
23:24
42:17

**debate**
51:15

**deceive**
71:1,9

**December**
15:12
22:12

**decided**
11:4,7
98:11
103:5,12
108:12

**decision**
12:2 15:3
16:21
84:1,2,14
85:8
91:12
92:10

97:23
98:1
115:15
118:17
119:17,
19,22,23
120:3,8,
19 121:7
128:24
132:18,
19,20
133:16,17
134:7
135:4

**decisions**
91:7

**declared**
20:5

**deem**
108:22

**deemed**
20:2

**defendant**
20:16

**defense**
86:21
97:1,12,
15

**degree**
10:9
12:12

**delay**
9:15

**delivery**
137:17

**denied**
125:15
127:4

**depends**
60:3

**depicted**



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: deposed..domestic

74:5,6
81:16

**deposed**
7:23
35:11,23

**deposition**
7:14,21
8:5,15
30:12,19
36:10,11,
12 65:7
127:16

**describe**
20:12

**description**
74:20

**designated**
52:17

**designed**
54:21

**detailed**
10:16

**details**
48:6

**determination**
37:6
39:22
40:13
125:19

**determinations**
129:2

**determine**
80:15

**devastated**
11:2

**Dickey**
34:14,15,
18 35:23
36:6

42:14
46:5
47:23
48:16
82:22,23,
24 83:4
86:3,6
89:18,19,
22 90:3
92:17,20
94:8,16,
21,22
95:11,13
119:20,23
120:4
123:4,20
124:15
132:17
133:7,13,
17 134:2
137:19

**Dickey's**
42:21

**dictates**
135:21

**differed**
132:7,8

**differences**
144:6

**difficult**
9:14

**difficulty**
138:14

**direct**
6:18
17:17
18:14
19:2,3
50:8
133:20

**directed**
18:11
128:2

**directing**
16:23
17:14,21
18:1,9
19:9,17
30:3 31:3
60:25
61:2
139:24
140:1

**directly**
23:5
143:11

**director**
11:9,12
13:13

**directors**
11:20
13:20

**disclose**
31:3

**discrimination**
13:15

**discuss**
94:17

**discussed**
31:10
138:7

**discusses**
138:7
139:2

**discussing**
46:6
132:6

**discussion**
7:2
111:12

**document**
22:5
31:13,15
33:3

45:6,7
49:25
54:13,16,
18 64:11,
14 66:2,
4,16
67:3,7,12
69:1,18
73:1
76:22
80:24
81:11,13,
16 88:15
93:16
100:17
102:4
110:1,10
114:13,
18,25
115:8
124:1
126:11,19
130:19
131:10
139:20
142:16

**documented**
39:24

**documents**
21:9,13
32:8,11,
13,15
33:7
39:11
67:16
80:20
101:23
104:17,21
107:18

**Doe**
6:21 7:9
14:18
15:18
16:1
36:20

40:5
41:10,15,
18 62:4
68:4 74:8
75:23
76:10,15,
23 77:8,
13 78:12
79:2
80:4,24
81:12,24
83:1
85:12
87:11,22,
23 92:25
93:3,7
94:15
95:5,15,
25 96:10
113:8
118:1,13
119:1
130:22
131:4
133:18
134:6
137:2,7,
10,22
139:19

**Doe's**
36:19
48:4
62:14
74:9
82:13
87:18
95:3
130:23
132:15,21

**domain**
138:9

**domestic**
106:23
107:6



**double-check**
119:10

**doubt**
76:18
134:3

**drinking**
13:21

**drive**
101:11
102:22
103:6,13
105:20

**driving**
82:1

**Dropbox**
66:21

**drunk**
87:2

**duty**
29:22

_____

**E**

**e-**
46:2,7
66:4
76:21

**e-mail**
46:5
66:23
67:3
68:20
69:16,19,
22 70:25
76:7
77:17
82:18,20,
21 85:16
93:8 94:7
95:11,12
100:19

101:9
102:23
103:2,4
105:18
123:4,20
124:14
125:1
126:1
128:16
129:3,4,
5,7

**e-mailed**
34:19

**e-mails**
32:20

**earlier**
27:18
96:18
125:14

**early**
108:9
120:2
127:3
132:19

**easier**
140:3

**economics**
10:9

**education**
11:8

**elapsed**
45:19

**else's**
122:2

**Emily**
120:5
134:1

**employed**
22:14,20
28:7,10

**employee**

21:3,21
22:2 26:1
30:2
46:20
121:3

**employees**
36:16
48:8,13
52:4,18
57:15
128:17

**employer**
18:24
56:21

**employers**
25:22

**employment**
11:4
22:17
24:24

**end**
23:5,12,
25 25:1
43:14
50:21
70:5
71:24
128:20
129:1
130:23

**entered**
104:14
113:18

**entire**
54:18

**entity**
56:19

**equally**
61:11,19

**ER**
101:6

**error**
73:2

**errors**
73:9

**established**
84:17

**estimate**
45:8

**ethical**
29:22
30:14

**evenly**
60:13

**event**
76:13
90:1

**evidence**
37:7,8
41:8,11
79:6
81:7,25
119:18

**exact**
23:13
47:1 53:6

**examination**
6:18
129:12,25
133:20
134:14

**exception**
43:23

**excluding**
35:20

**excuse**
87:2
96:19
115:2

**exhibit**
49:12
50:13

52:2
55:21,25
56:1
62:15
63:1,15
65:1,6,22
66:12
68:6
69:15
72:19
75:8 94:1
95:9
99:25
124:11
126:11
130:9,13
131:10
141:23

**expected**
138:2

**expenses**
99:10

**experience**
12:7
13:13
64:20
72:3

**expert**
20:2,5,8,
12

**explain**
32:23
54:10
71:15

**explaining**
114:19

**Express**
11:6

**expressing**
95:6

**expressly**
49:19



**extended**
61:25

**extent**
31:1
49:24
56:18
57:14
82:9
96:20
97:3
115:23

**extremely**
16:11
17:11
18:25
123:23

---

**F**

**fact**
16:25
17:4,19
18:22
24:19
30:1
39:23
64:20
70:12
72:1 82:2
88:3
89:21
93:11,18
94:20
102:19,21
106:7
111:16
112:5
118:19,20
123:23
124:6
133:11
136:9,22
143:17

**facts**

125:16
128:22

**fail**
117:9
118:9

**failed**
7:17 73:3
119:1

**fair**
25:21
38:18
49:8
52:23
56:9,16,
23 57:5,
13,18
60:1
61:15,24
62:4 78:9
79:23
85:14
96:22
113:8
114:24
121:22
122:1
135:22
141:21

**fairly**
61:11

**fairness**
59:20

**fallen**
106:24

**false**
51:9,13

**familiar**
14:16
22:5
48:11,17
114:18
125:16
126:6

128:21
140:20

**familiarize**
47:24

**family**
20:23
105:15

**fantastic**
106:1

**father**
107:21,25
109:10,24
110:5,8,
14,17,23
112:21
113:17

**father's**
107:22
110:15
111:17
112:2,19,
25 113:5,
10

**fault**
35:21

**favor**
57:21

**February**
66:7,13,
24 67:4
74:25
75:2,12,
20,22
76:10,14,
16,20,21,
22,24
77:7
78:25
79:1,2,3

**FEDERICO**
67:18,20,
23,25
68:22

69:3

**feel**
7:17
77:19
109:19
134:9
135:10

**felony**
10:2

**female**
61:11

**Ferguson**
34:3

**field**
10:23
20:3,9

**fight**
17:13

**figure**
68:9

**file**
134:3

**filed**
32:24

**final**
32:18
33:14
106:8,12
120:7
130:10
131:15
140:18
141:5
142:13
143:3,12,
22

**finally**
128:5

**financial**
11:6

**find**

45:10
47:1
67:11,20
89:13
100:23
113:17

**finding**
115:2,9
117:1

**findings**
33:19

**fine**
17:14
19:2 53:2
56:5
84:24
92:6
105:25
114:9

**finish**
18:7
65:13
109:14

**finished**
9:15
17:8,9

**folder**
98:24
99:1

**follow**
14:10,11
94:12
103:5

**forget**
61:7
100:23

**forgive**
27:17

**form**
132:23

**formal**
94:13



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: format..helpful

95:6
134:3

**format**
47:25
48:17

**forward**
97:22
132:21
134:4,17,
18,24
135:1,2,
15,24
136:7,9,
10,23

**found**
52:6

**foundation**
17:6 52:5
53:12,13
115:10
117:2,15
141:7

**fourth**
106:15,
18,19

**frank**
24:13
122:11

**fraudulent**
39:11

**freely**
129:1

**Freiberger**
35:25
36:3,10

**friendship**
128:3

**front**
7:24
21:9,23
51:21
66:2,3

75:25
82:3
85:24
86:10

**Frostburg**
10:10,11

**full**
101:4
117:23
124:20

**future**
25:22
128:25

---

**G**

**games**
53:6

**gather**
98:23
99:7

**gave**
79:18
80:24
81:12
99:9,13,
17 129:4

**general**
10:19
13:5,6

**generally**
10:21
59:17

**gentleman**
92:13

**give**
9:6 10:18
16:18
29:14
45:8
67:12
70:13

79:8 81:8
82:19
102:17
110:7,20

**giving**
7:13,18
71:15
75:23
81:2

**good**
6:20
105:1
123:5,21

**Google**
111:24
112:1

**governed**
28:11

**graduated**
10:6
11:14

**grant**
39:12

**great**
46:14,16

**Greg**
31:3 46:1

**guess**
23:18
30:5,6
54:5
131:19
143:5

**gun**
136:24

**guns**
119:12,15

**guys**
68:17

---

**H**

**halfway**
106:21

**hand**
9:8

**handed**
91:6
134:21

**happen**
93:18
115:6
133:16

**happened**
25:13
49:4
76:14
80:8
132:18

**happening**
90:1

**hard**
55:7

**he-said/
she-said**
36:20
37:1,5

**head**
9:8

**hear**
23:9
27:24
37:23
55:1
67:16,18,
23 93:14
111:5

**heard**
36:25
37:2
83:20

89:16
111:3,7,
23,24
114:13,22

**hearing**
12:1,3,4
32:19
34:12
42:25
93:12,19
115:17
117:23
118:16
123:3,5,
6,19,21,
22
125:10,
13,19
126:2,7
127:2
128:24
129:2

**hearings**
11:18
12:14

**hearsay**
107:3

**heart**
11:1

**held**
20:8

**helpful**
39:22
47:7
101:5,13
102:2,8,
12,13
103:16,21
104:16
105:3
125:18
128:23
129:2



**Hey**
25:25

**higher**
11:8

**hired**
41:19
42:13
56:21

**hiring**
42:1

**history**
49:20
50:25
51:2

**hold**
47:19
50:15
68:1

**holding**
24:25

**honest**
77:23
125:5

**hope**
67:11
73:4
110:18

**hopeful**
104:18
105:17

**hospital**
100:24
105:20
106:10,22
107:5

**hour**
20:21

**house**
75:25
86:10
111:17

112:2,16

**humor**
73:14

**hypothetical**
38:14
39:4
40:10
59:22

**hypothetically**
40:4

― **I** ―

**idea**
80:14

**II**
130:7

**impact**
114:13,15

**impart**
57:25

**impartial**
56:9,17,
24 57:6,
13,18
60:15,19,
21 61:6,
16 78:9
113:9

**important**
9:5 37:19
39:12
42:9
101:20
117:22
118:23,25

**importantly**
9:10

**inappropriate**
17:4
127:25

**inaudible**
93:12

**incident**
88:5
89:18
92:14,17,
24 95:1
111:19
114:19
115:20
116:25
117:9
118:7,14
132:16
133:7

**include**
14:4
63:11
80:20
118:17
120:8

**included**
26:3
119:9

**includes**
25:9

**including**
107:9

**incomplete**
38:14
39:3
40:10
59:22

**incorrect**
54:13

**independent**
20:25

**Indiana**

21:4,21,
25 22:15,
18,20,25
23:5,12
24:2,5,
11,13,15,
20,23
27:7,9,
12,19
28:3
39:11
41:9,20
43:5,18,
25 52:16
53:8
54:21
111:18
112:8

**Indianapolis**
26:12,21
27:2,11
28:23

**individual's**
38:12

**inform**
133:17

**information**
10:5,20
39:8,21
40:13,17,
19,21
50:22,24
51:3
58:4,6
87:10,20
101:20
102:2
105:3
107:3,4,
22 108:1,
3 110:15,
18,21
113:11

114:1,3
115:18,20
116:24
117:13,
18,21,25
118:6,18,
22 120:9,
14,15,24
121:14,
15,18
126:6
137:24

**informed**
132:18
134:6
135:4

**initial**
97:22

**initially**
72:8

**initiated**
62:12,14
120:1,14

**initiating**
95:6

**injuries**
106:23

**instance**
39:24

**instigated**
89:10

**institution**
19:1

**interest**
95:6,15
96:16

**interested**
113:12,13

**interim**
42:22
62:6,18,



23 63:4,
11,18,22
64:7,8,12

**Internet**
111:3,7,
22

**interpret**
53:17,20,
22

**interpreting**
53:21

**interrupt**
105:9

**interrupted**
110:13

**interrupting**
90:10

**interview**
44:21
107:21
110:18
112:21

**intoxicated**
86:20

**Introduction**
95:18

**invest**
16:6

**investigate**
23:25
92:16
93:10,20
97:20
98:21
134:25

**investigated**
70:15,21

92:14

**investigating**
39:18
40:25
57:8
94:22

**investigation**
13:11,25
15:7
16:11
17:1
18:23
23:1,6,
14,21,22
24:19
25:4
26:18
28:19,20
37:6,16,
22 38:6,
9,10,19,
23 39:2
45:19
50:19
53:14
56:9,10,
16,17,24
57:5,6,13
59:13
61:16,22
80:6,8,9,
20 81:14
84:6
86:21
87:24
92:24
94:18
95:7
96:1,11,
17 97:22
98:10,25
101:21
102:12
108:8,11

112:19
113:9
114:2,3
115:5
130:10,24
131:6,13,
15
132:14,21
134:17
135:8,10,
18,21
137:3

**investigations**
13:17,23
14:12
20:3,6,9
24:10
37:14
43:1,4
52:24
59:1 60:2
63:13
64:21
132:12
134:22

**investigative**
75:10
88:12
106:9,12
113:16
137:8,11
138:8
139:9,17
140:19,25
141:5,6
142:13,14

**investigator**
12:14,23
13:3,6,7,
11,15
14:1,7
15:11,16,

18,19,25
20:18
21:1
22:11
23:23
37:13
39:13
40:12
48:22
53:19
56:22
57:17
59:1,23
60:1,6,7,
9,15,19,
21 80:18,
21 84:1
86:18
87:1,6
91:5
98:20
104:2,5,
22 108:14
113:8,16
114:4,12
115:11,
18,19
116:15,24
118:15
121:16
125:16
126:5
128:21
129:1
134:21
137:14
138:9
139:4
140:20
143:9

**investigator's**
59:24
75:11
88:23

**investigators**
16:7,12
43:9

**involved**
15:7,18
17:5,20
56:8,16
57:5,12
60:7
84:13
85:10
133:16

**issue**
37:15
38:6
51:3,9
76:22
77:6,12
83:6,13,
24 84:7,
19 85:6
86:4
113:21
115:16,22
117:13,18
118:3,13
119:11
131:20
137:20
140:10

**issued**
71:16
78:12
79:2
84:12
85:14,18

**issues**
11:22,23
40:14,16
118:8
125:17
126:7
128:22



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

**issuing**
85:22

**Italy**
88:7 90:1
132:16
133:7,13

**items**
13:16
110:16

**IU**
25:5,9,
10,24,25
26:7
27:1,18
28:2,11,
14,15,20,
22 45:1
47:13,18,
24 48:20
52:7,23
55:13
62:2
63:4,12
66:18,20,
21 71:16
72:4,7
80:19
85:5
97:19
108:13
115:5,14
121:20
128:17
130:16
134:16,20
136:6,22
140:23
143:12

**IU's**
48:20
52:3 54:3
62:22
64:7,16
72:11
77:11

83:5,16,
23 141:4

**IU0002101**
67:7

**IUP**
26:10

**IUPUI**
26:10
27:3,5,8
28:10,14
30:2
42:20
43:20
45:1,9
48:21
52:9
53:1,7,14
54:7,15,
23 55:12,
14,20
56:7,15
57:4,11
61:15,18
63:12
80:19
83:6
86:18
87:1,6
91:2
97:18
104:2,5
121:3
131:22,24
136:6,8,
22

**IUPUI's**
27:22
47:25
50:2,3
54:4 62:3

**IX**
13:15
14:6,10,
11 20:3,

6,9,18
22:11
24:18
28:13
41:21
52:24
56:9,16
57:5,12
59:1,13
60:2,15,
19,20
86:21
87:2,7
97:2,12
104:5

———————

**J**

———————

**James**
73:16

**Jane**
7:9 36:19
39:10
40:5
41:12
61:19
62:6 66:5
68:4
85:19
86:9
95:16
99:9
104:6,15
111:17
112:19
113:10
118:1,8
136:9

**January**
15:13
43:12,14
62:15
75:12
87:5
88:24

90:2,8,15
92:15,18,
20 93:9,
21 100:20
101:3,9
104:2,6
114:12
139:7

**Jason**
42:14

**job**
11:5
48:21
98:7,20,
23 123:5,
21

**jobs**
25:1

**John**
6:21 7:8,
9 36:20
40:5 48:4
61:15,18
62:4,14
68:4 79:1
80:4
81:12
85:12
86:10
93:3
94:8,11,
15 95:14,
25 96:10
113:8
118:1,13
119:1
137:2,7,
10,22
139:19

**join**
31:8

**joking**
73:12

**judge**
15:2 20:6
30:21
31:18
51:17,24
126:9,14

**judging**
39:13
40:7 41:2

**July**
111:19
119:2

**June**
22:22
24:6 26:7
86:17
89:7 90:1
92:18
125:3
135:13
139:7
140:24

———————

**K**

———————

**Katie**
19:17
93:2
98:12,13
100:1
129:18

**Kelly**
35:25
36:3

**kind**
47:18
55:5
73:12

**knew**
34:1
105:14
111:20
128:18



800.211.DEPO (3376)
EsquireSolutions.com

**knowledge**
  15:9,24
  17:11
  26:14,16
  28:8
  35:24
  36:9,12
  42:15
  43:23
  52:2 58:9
  84:3,6
  115:14
**Kuester**
  6:20 7:4
  93:5
  130:3
  140:9

———————————

**L**

———————————

**lack**
  16:14
  52:5
  115:10
  117:2,15
  128:5
  141:7
**lacks**
  17:6
  53:12
**language**
  86:25
**laptop**
  55:5
**large**
  73:2
**Lastly**
  124:21
**late**
  133:2
**law**
  7:24 8:1,

  11,17
  10:7,15,
  24 11:3,
  14,16
  28:14
**lawsuit**
  32:24
**lawyer**
  17:2
**leading**
  132:24
  133:19
**learn**
  38:19
**learned**
  38:9,22
  39:10
  90:6
  112:19
**leave**
  22:25
  24:15
**led**
  103:23
**left**
  20:17
  24:2,5
  26:5
**legal**
  14:11
  16:13,16
  17:3,4,
  18,25
  18:11,15,
  16,19,20
  19:5,7,13
  41:14
  60:24
**legs**
  8:24
**letter**
  46:17

  47:4
  62:14
  138:1
**letting**
  41:10
**level**
  12:2
  43:9,12,
  13 60:6
  97:1,11
  130:7
**liar**
  39:24
  41:4
**license**
  8:11
**licensed**
  8:7,9
  16:17
  18:3
  19:9,14,
  16 29:21,
  25 30:14
**lied**
  38:9,20
  106:24
**light**
  25:15,22
  41:11
  125:18
  128:23
**limited**
  51:1
**lines**
  50:21
  70:4,5
  89:9
  106:21
  124:25
**Linkedin**
  22:6,8,
  10,18

  24:20,24
**list**
  24:12
**listed**
  96:15
**listen**
  91:9
**listening**
  91:10
**litigation**
  31:15
**load**
  73:2,3
  75:7
  130:17
**loaded**
  73:5,7
**loading**
  73:18
**located**
  26:9,10,
  15,16,22
  27:11,15
  28:15,23
**logic**
  76:9
**long**
  22:20
  35:4,5,9
**longer**
  36:7
**looked**
  21:18
  65:16
  138:10
**loosely**
  8:19
**lot**
  25:1
  42:18

  69:23
  70:15
  114:21
  132:4
**lots**
  118:17
**loud**
  7:11
**love**
  11:10
**loved**
  11:10
**lower**
  12:2
  24:13
**luck**
  67:16,17

———————————

**M**

———————————

**made**
  59:17
  73:19
  80:17
  107:17
  112:3
  115:15
  119:11,17
  121:7
  133:17
**mail**
  46:3,7
  66:5
  76:22
  105:21
**mailed**
  105:19
**make**
  7:11
  40:13
  44:12,15
  51:8,11,



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

12 52:10
65:7
71:14
77:19
87:10,20
91:6
101:10
102:22
118:17
120:19
121:4
140:3
142:7

**maker**
85:8

**makes**
41:3

**making**
40:24
116:19

**mandatory**
87:7
89:17
90:5

**manners**
12:8

**March**
75:12

**marijuana**
11:23
13:22

**mark**
19:21,24

**markings**
21:17

**Maryland**
8:10

**matter**
16:15
17:5 23:2
36:14,21
37:10

38:10,21
39:14
40:8
52:14
59:3
97:21
107:11
109:11
110:14

**matters**
13:15
14:12
17:18

**meaning**
8:2 35:5

**means**
18:4 37:4
59:3,6
80:14

**meant**
32:23
70:10
131:10

**measures**
62:7,19,
23 63:5,
11,18,22
64:8,12

**med**
26:21

**media**
25:6

**medical**
7:12
26:15,17
27:14
28:14,15,
20,22
80:19
99:9,10,
12,18,21,
23,24
100:24

101:16
102:10,
11,13
104:7
106:8
107:6
118:20,22

**medications**
7:16,17

**Medicine**
117:11
118:11

**meeting**
70:2,3
75:1
76:6,25
77:4,5
79:1
88:21,23
89:3
94:12

**meetings**
75:11
96:16

**member**
12:15

**members**
52:17
54:22

**memory**
77:1,3
82:5,7,12
99:17,20
120:3
141:1
143:21

**men's**
8:24

**mention**
22:14
63:25

**mentioned**

24:20
28:25
89:21

**mess**
9:17

**message**
73:3

**met**
75:4,17
76:10,21

**mic**
60:17

**middle**
9:2 69:19
80:9

**might've**
74:14

**miles**
112:7

**mind**
104:14
113:19
121:16

**mine**
69:25

**minor**
11:22
13:21

**minute**
33:12
112:6,14

**minutes**
20:21
105:14
112:7
119:6

**mis-
testifies**
96:21

**mischaracte
rization**
25:12
103:23

**mischaracte
rize**
71:6

**mischaracte
rizes**
25:16
51:18
71:4
78:14
81:19
82:10
103:19
110:10
126:10,18
138:24

**mischaracte
rizing**
110:1

**misconduct**
11:18
63:21
87:15
142:10

**misdemeanor**
10:2

**misleading**
123:24
124:4

**misstated**
83:8

**misstates**
23:16
39:4,15
41:14
62:20
71:18
72:5 76:2
77:15,25
93:23



96:21
97:4
101:22
102:3,4
115:24
121:24
122:6,16
124:1
133:8
136:11

**misstating**
40:1
83:11
116:6

**mistake**
125:15
126:5,25
127:4

**misunderstood**
38:1

**mixing**
97:7

**MNCOS**
70:6
71:24

**moment**
68:1
134:3

**monitor**
14:11

**months**
25:12
34:20,22
35:6
36:5,7
93:8,18
94:21

**MORICAL**
12:10,16
16:13,19,
24 17:9,
17,23

18:2,7,9
19:6
20:4,10
23:7,15
25:16
26:19
27:20
29:24
30:5 31:1
35:13
36:22
37:17
38:13
39:3,15
40:1,9
41:13
42:5 44:8
45:14
46:1,11
49:14,24
50:5
51:8,18
52:5,25
53:9,17,
22 54:5
55:9,14,
19,22
56:1,18,
25 58:1,
12,15,18,
23 59:4,
14,21
60:23
61:3
62:20,25
63:6
64:10
65:5,11,
18,22
66:18,21
68:6,12
69:7
71:2,4,18
72:5
73:10,15
76:1
77:15,24

78:6,14
79:21,24
80:1
81:1,5,19
82:9
83:8,15,
19 84:9,
21,25
86:11
90:9,23
91:20
92:1
93:23
96:20
97:3,13
98:3
99:4,14
101:22
102:3,6,8
103:18,22
105:6,9
106:2
107:14
109:25
110:9
111:4
112:9
113:20,25
114:6,8
115:4,10,
23 116:4,
11,16
117:2,15,
20
120:10,21
121:9,24
122:6,16
123:25
124:8
126:10,18
127:7,12,
20,22
129:8,11,
14,17,22
130:1,15
132:1,10
133:1,5,

14,22
134:11
135:3
136:1,11,
15
138:11,23
139:10,
19,23
140:1,4,
14 141:7
142:15,19
143:5,23
144:10

**morning**
94:12

**motion**
30:22
54:3

**mouth**
37:24

**move**
17:15
18:12
19:16
114:7
130:2
132:20
134:4
136:7

**moved**
11:14

**multiple**
25:9
26:20
113:14

**mutual**
64:22
65:10,16
70:10,13,
19 71:10
75:24

---

**N**

**named**
20:16

**nearby**
26:16

**necessarily**
48:6

**needed**
58:18
84:7

**nice**
78:4

**night**
130:6

**NMCOS**
70:10

**no-contact**
62:7,11
64:22

**nods**
9:8

**notation**
117:10

**note**
19:18
131:25
136:11

**notes**
21:5,6,
13,14,15
45:7 75:3
101:6,11,
17 103:10
125:12

**notice**
63:20

**notification**



92:20
118:10

**November**
21:3,21,
25 22:12,
13,24
26:7
28:7,8
43:6
45:15
46:17,22
47:4,11
86:17
135:13
139:7
140:23

**number**
32:13
63:11
65:21
88:14
89:7
100:7,22
112:16

**numbers**
65:16

**nurse**
106:10

**NUSSBAUM**
27:24

O

**object**
52:8
136:18
142:15

**objecting**
30:5
54:11

**objection**
12:10,16
16:13,25

20:4,10
23:7,15
25:16
26:19
27:20
29:24
31:1
35:13
36:22
37:17,18
38:13
39:3,15
40:1,9
41:13
42:5 44:8
49:24
50:5
51:8,18
52:5,25
54:12
56:18
58:1,12
59:4,14,
21 60:23
62:20,25
63:6
64:10
71:2,18
72:5 76:1
77:15,24
78:6,14
79:21
81:1,19
82:9 83:8
84:9
86:11
90:23
93:23
96:20
97:3,13
99:4
101:22
102:3
103:18,24
107:14
109:25
110:9

111:4
112:9
113:20
115:4,23
116:7
117:2,15,
20 120:10
121:9,24
122:6,16
123:25
124:8
126:10,18
129:8
131:25
132:23
133:4,8,
19 135:3
136:1,11
138:11,23
141:7
143:5

**obligated**
90:21
97:19

**obligation**
30:14,17
92:13

**observe**
61:13,14

**obtain**
101:11
104:7
110:18
112:6

**obtained**
11:5
12:11
118:23

**occasion**
14:17
35:2

**occasionally**
105:16

**occasions**
99:21
113:14

**occur**
43:11

**occurred**
13:17
15:8
39:20
43:12
74:14
76:20
87:13
132:5

**occurring**
76:15

**occurs**
135:11

**off-the-record**
7:2
111:12

**offense**
9:20

**offer**
46:17,22
47:4

**office**
26:6,9,10
27:1,3,22
28:12
36:16
48:24
132:6
138:3
143:14

**official**
10:4

**omit**
119:18

**onboard**
48:11

**onboarding**
48:7

**one's**
68:24

**one-**
70:19

**open**
17:13
80:9

**opinion**
16:18
17:3,18,
25 18:11
19:5,7
57:3,6,11
86:1 96:9
122:3

**opinions**
17:5

**opportunity**
21:3
125:12,17
128:23,25
130:22
131:5
134:1,2
137:3
139:20,23

**oranges**
97:8

**order**
62:7,11
74:12,13,
16 75:24
76:6,23,
25 77:7,
12 78:12
79:2,7
82:19
83:6,14,
24 84:7,
12,19
85:6,12,



23 86:4,7

**orders**
64:22
70:10,13
71:10
85:9

**orient**
133:3,6

**out-and-out**
38:20

**oversee**
12:4
28:12

**overseeing**
11:21

**oversight**
24:21,22

_____

**P**

**p.m.**
67:2,4
69:10,13,
16  111:14

**P6**
75:9

**pages**
73:3,5,6
130:20

**paid**
20:14

**panel**
12:15
41:11
118:25
123:5,21
125:11

**panel's**
125:19
128:24

**paper**
98:23
99:1

**papers**
99:7

**paragraph**
49:17
51:22,23
56:2,3
64:6,19
68:20
70:1
89:21,25
106:15,19
107:19
113:24
123:1,13
124:15,
20,21
125:21
131:2,9

**paragraphs**
142:12

**paralegal**
8:20

**parked**
86:9

**parking**
75:24
82:3,6

**part**
7:23  8:1
12:14
18:15
24:21
30:22
31:25
32:3,5,19
42:1
59:20
72:13
89:13
90:24
91:20

95:24
96:13
99:12,14
126:15,16
135:19
139:1,4,
11 140:2,
17

**part-time**
25:5 26:1

**parties**
38:20
39:23
49:20
50:25
51:2
56:8,16
57:4,12
59:18
60:2 78:9
99:7
138:2

**parts**
61:22,23,
25 135:17

**party**
37:7,8
38:5,9
57:21,25
59:20
108:15
109:1

**party's**
39:1
138:7
139:2,8
140:18,24
142:14
143:2

**past**
59:9
61:25
82:1
142:16

**patience**
69:22,25

**pay**
24:13

**payment**
100:24

**penalties**
29:10,19

**penalty**
29:6

**people**
92:2
119:21

**percent**
41:1

**Perfect**
72:25
81:15

**perfectly**
140:9

**period**
86:18
132:20

**perjury**
29:7,11,
19 40:6,
20,22,23

**permission**
45:12,25
46:10
108:15,
19,20,23,
25 109:3,
6,9,23
110:3,4,
7,17
113:18

**person**
74:16
82:20

**personal**

34:6

**personally**
34:4,5
37:14

**phone**
45:10
46:2
95:14,19
112:15

**phonetic**
130:7

**photographs**
75:23
76:24
78:24

**photos**
81:25

**phrase**
34:11
36:24,25
37:4

**physical**
87:11,21
88:4,10
89:11
133:12

**physically**
32:1,2

**pick**
101:4
103:12

**picture**
117:23

**pictures**
73:25
74:5,6,9,
18,22
76:13
78:18
79:4,6,9
80:7,16,
17 81:16



800.211.DEPO (3376)
EsquireSolutions.com

GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: Pittsburgh..provide

Pittsburgh
  50:4,9,
  10:25

place
  11:10
  12:20
  25:11
  53:1 77:9

places
  24:14

plain
  86:25

plaintiff
  31:16

plaintiff's
  7:6 32:12

plans
  101:4

play
  53:6

point
  52:6
  53:6,25
  55:13
  71:12
  81:24
  93:10
  96:6
  115:17
  125:14
  127:3
  141:21

points
  95:22

policies
  53:3
  56:11
  115:14

policy
  39:21
  48:23
  49:2,3,6,
  7,19

50:4,9,
11,14,24
51:6,20
52:3,13,
15,17,24
53:1,8,18
54:1,4,7,
21 55:10,
13,14,23
62:3,16,
17,18,22
64:7,15,
16 71:16
72:7,11,
15 77:12
83:5,16,
23 84:3,
16,17
85:6
86:20
89:22
90:17,20,
24 91:2,
16,17,19,
21,25
92:3,5,12
97:20,24
98:2,4,10
108:14,18
119:2
121:4,20
127:6
128:15
132:6,11,
14
134:16,
19,25
135:4,7,
9,13,17,
18,19,20,
24 136:2,
5 137:21
138:7,10,
19 139:2,
12 140:2,
17,23
141:1,4,

18 142:12

portal
  103:11

portion
  33:14,16,
  17,18

position
  95:22,25
  96:10

possibly
  76:7
  119:20

potential
  25:22
  133:18

potentially
  41:11
  104:23

power
  104:3

practical
  109:11
  110:14

practice
  8:11
  30:22
  81:7
  105:1

practicing
  11:15

prefer
  112:11

preferably
  29:16

prejudicial
  107:3,7

prelim
  138:1

preliminary
  32:18

75:10
88:11
130:24
131:6,9,
12 138:8
139:9
140:19,25
141:2,4,
21 142:13
143:3,8

present
  14:7
  22:13
  34:12

presume
  10:14
  36:8
  44:20

prevent
  7:13,18

previous
  125:13
  132:8

previously
  28:25
  96:25

prior
  15:8
  32:9,17
  33:2,6,21
  42:2,8,13
  43:6,10
  48:3
  49:20
  50:25
  51:2
  121:20

privileged
  31:4

problem
  56:6,7

procedure
  72:2,17

79:12
80:18
132:7

proceeding
  12:24
  60:16
  62:4
  128:4

proceedings
  13:3

process
  12:1
  30:16,18
  31:14
  60:22
  61:8,25

professional
  127:16

professionally
  10:13

program
  15:23

prohibited
  51:1

pronounce
  109:20

proper
  122:22

protect
  54:22

protocol
  128:20

provide
  17:3,4,18
  25:4
  30:15,17
  41:10
  43:15,20
  44:4,11,



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: provided..reach

16,18
56:8,15,
23 57:4,
12,24
58:10,11
59:19
60:2,11,
21 63:21
64:7,22
72:8 83:1
104:18,20
107:22
110:21
113:8

**provided**
32:13,20
39:11
43:17
59:18
60:5
61:15
62:3,6
76:24
77:4
79:3,14
80:4,20
112:22
118:16
137:13,22

**providing**
77:3

**pseudonyms**
7:7 68:3

**PUI**
27:6

**PUI's**
85:5
97:20
108:13
115:14
134:16
140:23

**pull**
32:16

67:11,14

**pulled**
65:4

**pulling**
95:10

**Purdue**
14:7,18,
23,24
15:8,10,
11,17,18,
25 16:1,
12 20:17
22:11
26:5
27:7,10
47:21

**purpose**
71:23
123:9,12,
17

**purposes**
52:24

**pursue**
94:13

**pursuing**
94:17
95:2,15
96:17

**pushed**
89:11
118:1

**put**
22:19
24:23
25:10,21
37:24
51:7
62:14
77:9,22
79:9,11,
12 80:3,
15,22,24
81:8,11,

18 98:23
106:8
107:3,4
124:4
126:8,13
142:20,21
143:12

**putting**
17:25
98:25

_____

**Q**
_____

**qualified**
121:15

**qualify**
121:1

**question**
8:6 9:2,
11,19
12:22
13:6,9
15:21
16:9,22
17:13,22
18:1,4,
14,22
19:2,3,6,
10,15
21:8
23:10,11,
25 25:18,
19 26:23
27:25
28:2
29:17
30:4,7,8,
12,13
31:6,7,11
35:19
37:25
38:1,2,3
39:9
40:18

41:1,2,5,
17,18,25
44:3,20
45:21
50:1,8
52:7 53:4
54:6,7,11
56:13
57:1,10,
11 58:20,
22,25
59:9,10
61:7,20,
21 63:2,
3,10
68:13
70:20,23
71:6,7,22
79:25
81:10
83:11,16,
20,21
84:18
86:23
87:19
90:10
91:1,9
96:23
105:8,12
106:1
111:5
113:3,6
116:2,15,
22 117:7
118:2,14
119:13
120:6,17
129:9,15
132:24
136:13,
14,16,20
138:4,22
139:15,
16,19
140:5,15
141:17
142:18

143:17,23

**questions**
10:21
13:1
57:16
65:14
91:10
95:1
112:12
125:10
129:21,
22,23
130:5
134:11,
12,13
137:1,6
138:15
139:13
140:7,12
141:12
144:9,10,
11,14

**quickly**
130:5
140:12

_____

**R**
_____

**ran**
123:5,21

**range**
73:6

**rate**
24:13

**rationale**
18:20

**re-enrolled**
11:16

**re-read**
96:13

**reach**
94:11



**reached**
95:5

**reaching**
94:16

**reacted**
121:15

**read**
14:17,22,
23 15:1
16:20
18:17
19:19
47:23
48:16
49:3,7
51:20,21
54:17
55:1,4
84:4 96:2
102:23
125:25
135:7,20
137:21
138:19
142:11
143:24
144:1,2

**reading**
56:11
64:3
75:15
84:5
95:17
103:2
123:8
143:20

**real**
47:5

**realm**
143:9

**reason**
20:16,20
22:17
24:5 62:5

76:18
77:19
83:6,7,
13,17,23
84:7,18
85:5
103:24

**reasons**
74:11

**recall**
30:12
36:4
42:23
43:22
44:9,10,
18 47:23
74:13,17
75:1,22
78:20
79:3
81:23
82:14,16,
20 86:2,
3,6,15,16
88:5,8,9
97:24
98:4
99:11,23
102:25
103:2
106:11
108:11
110:24
111:1
114:14,15
120:2
121:2
122:10
131:23
132:4
133:6,10,
11,25
134:6,8,
19 135:13
136:5,7
137:9

140:23
141:14
143:11

**receipt**
63:4

**receipts**
99:10,18
101:4

**receive**
15:24
43:16
47:12,18
102:18
113:2
117:10
118:10

**received**
45:18
47:8
48:19
77:8
87:9,20
131:22

**receiving**
63:20
108:23

**recollectio
n**
14:22
15:4
21:20
76:5 79:5
86:8
108:18
141:3,8,9

**record**
6:23,24
7:1,5
19:7,12
23:16
28:7
39:5,16
40:2
41:14

44:12
49:11
62:21
65:5,8,10
69:8,10,
11,12
71:18
72:6
77:16
78:15
90:2
93:24
98:18
99:12,15
105:25
111:10,13
116:12,20
120:9
127:8,17,
20,23
136:12,17
139:21
144:13

**records**
76:2
99:18,21,
24
101:10,16
102:11,13
104:7,16
105:16,18
106:8
107:6

**redact**
122:15

**redacted**
120:16
121:18,23

**redaction**
121:1

**REDIRECT**
134:14

**refer**
64:12

131:10

**reference**
64:19
90:14

**references**
56:1

**referencing**
74:21

**referring**
14:25
64:11
88:6
90:24
106:18
118:19

**reflect**
127:17

**refresh**
15:3
21:20

**regard**
133:17
134:20
136:6

**Regina**
67:6,14,
17 68:7,
19,25
73:11

**related**
40:15
50:25

**relates**
59:24

**relationshi
p**
34:6

**relevance**
16:15
30:6
40:16



81:15,17
118:2,6

**relevancy**
80:16

**relevant**
17:11
18:25
37:20,22
38:25
39:25
40:7
49:21
51:3
80:5,7,
10,12
81:6,14
107:25
115:21
118:1,13,
18 120:25
125:17
126:6
128:22
135:17

**reload**
130:11

**reloading**
73:7

**remedial**
62:23
63:18

**remember**
43:14
46:25
47:14
48:5,6,
23,24
49:1,9
74:7
81:24
87:23
95:5
134:1
141:15,20

**remembered**
89:9

**remembers**
99:15,16

**remind**
30:8 68:2

**repeat**
37:25

**rephrase**
26:24

**rephrased**
58:21

**report**
32:18
33:15
63:20
75:10,16
87:10,21
88:9,12
89:1
101:4
106:9,12
107:10
115:16
117:22
118:24
119:9
121:18
130:24
131:6,13,
16,18
137:3,4,
8,11,16,
23 138:1,
8 139:9,
17
140:19,25
141:2,5,6
143:3,8,
10,12,22

**reported**
92:17,25
93:7,20
94:21

106:16
125:12
132:15,16

**reporter**
7:1 9:7,
12,16
19:19,24
69:9,12
87:7
89:18
90:5
93:13
98:14,17
100:3,5
111:10,13
119:5
129:19
144:12

**reporting**
133:7

**reports**
47:24
48:16
139:3
142:13,14

**represent**
6:21

**request**
77:10
83:1
113:1
121:23
136:23

**requested**
44:18
72:9
74:11
76:25
77:8
92:25
93:9
110:16
136:9

**requesting**
82:19
128:24

**requests**
60:8

**require**
41:20
42:2
83:23
108:14

**required**
41:22,23
48:13
87:10,20
89:17
90:6
91:3,14
97:20
113:9

**requires**
83:16
108:18

**residence**
74:10
82:1,3

**resident**
11:9,12,
20 13:13,
20

**resource**
60:3,13

**resources**
57:25
58:8,9,
17,24
59:3,12,
17,20
60:2,5,8,
10

**respectfull
y**
91:9
113:3

**respond**
34:22

**responded**
103:15

**respondent**
57:19
58:11
60:16
63:25
64:5,9,19
72:8
75:1,4,
10,11
77:11
79:12,14,
18 80:21
84:20
85:7
86:20
87:1
89:10
96:25
107:8
117:12
118:12
125:11

**respondent'
s**
97:1,11,
14

**response**
19:14
88:2
143:10

**responsibil
ity**
115:3,9,
22 117:1,
14,19
137:14,16
138:21

**responsible**
118:14



**rest**
125:25

**restate**
137:5

**result**
106:23

**results**
24:16

**resume**
44:24,25

**review**
32:8,11,
15 33:7,9
91:21
131:5
132:11
137:3,8,
11,22
141:2

**reviewed**
32:12,13,
17,18,19,
20 33:14
131:6
138:10
139:3

**reviewing**
48:23
49:2
137:2
139:17

**revisions**
128:25

**revoked**
8:12

**rightfully**
128:10

**rights**
21:1
41:10
43:8

**ring**
77:20

**robust**
135:19

**Roe**
7:9 39:10
40:5
61:19
62:6 66:5
68:4
69:16,21
70:25
75:22,24
76:10
77:17
78:18
81:25
82:7,12
83:2
85:19
86:9
87:11,14,
17,21,25
88:3
95:4,16
99:9
101:15
104:6,15
107:22
113:10
117:8
118:1
120:25
132:16
136:9

**Roe's**
41:12
74:9
86:10
106:9
107:21,25
109:9
111:17
112:2,19
118:8

**role**
11:19
12:23
59:24
60:9
115:11,15
118:15

**room**
8:24
117:12
118:12

**ruled**
18:21

**rules**
29:13

**ruling**
19:22

---

**S**

---

**safe**
36:8

**Sara**
34:14,15,
18 35:4,
23 36:6
42:14
46:5
47:23
82:22,23,
24 83:4
89:22
95:18
119:20,23
120:4
123:4,20
124:15
134:2

**Sara's**
132:6

**Sarah**
34:16

**sat**
49:5

**save**
142:11

**scale**
40:16

**Scanning**
67:5

**scheduled**
36:11

**school**
7:24 8:1,
18 10:7,
15,24
11:3,14,
16,18
26:15,18
27:14
28:15,20,
22 54:20
80:19
112:8
115:6
117:11
118:10,
20,22

**school's**
26:21

**schools**
25:2,5,9
28:14
64:21,22
70:6,13,
15,18,19,
21,22
71:10,24
72:4
114:21,23

**scope**
52:16
139:13,
15,16

**screen**
67:14,22,
25 68:1,
16,19
73:11

**scroll**
68:19,21,
22 73:6
90:13

**search**
46:2
112:1

**seconds**
100:13

**seek**
37:9
96:11

**seeking**
108:25
120:2

**self-
employed**
20:25
22:12
25:8

**send**
69:1,5
82:18,21

**sentence**
50:22
51:7 58:6
64:2 70:5
113:24

**sentiment**
133:24

**served**
12:23
13:2

**services**
25:4

**session**



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: set..speeding

15:13

**set**
47:4

**sexual**
49:20
50:2,25
51:2
63:21
97:15
142:10

**shakes**
9:8

**share**
11:1
67:15,22
68:1,2
73:11
87:25
118:15
123:19

**shared**
31:15,17
81:24
134:10

**sharing**
87:23
88:8
133:11

**shed**
125:17
128:23

**shortly**
11:13

**show**
47:24

**shuts**
117:11
118:11

**sided**
70:20

**sides**

60:13
84:13,15

**signed**
29:1,2,5,
6 30:20,
24 31:11
121:23

**signing**
33:2

**similarly**
29:19

**simple**
18:21
71:7
116:22

**simply**
91:12

**sir**
7:11,12
8:6,21
9:3,19
10:6
12:17
15:21
16:10
20:16
21:8
22:4,10,
25 23:17
32:15
33:9,13
34:5
35:17
36:8,18
38:15
39:7,17
41:4,19
42:7
44:13
46:13
49:10,15,
23 50:3,9
51:4,20
52:1,11

54:14
57:7 58:3
59:16
60:18
62:13,22
63:9
64:9,17,
20,23
65:3
66:2,23
67:8
69:15
70:9,12,
24 72:11,
20 73:21
74:24
75:13
76:8,17,
23 78:2,8
79:9
80:10
86:22
87:16
88:18
89:1 91:8
92:9 94:2
95:8
97:6,18,
25 98:17,
20 100:15
104:2,10
105:5
106:4
110:12,25
111:16
113:3,19
115:13
117:4,7,
19
120:17,23
122:9,19,
23 124:3,
7,12
125:24
126:14,21
129:19,21
136:20

140:17
141:15,23
142:25
144:8

**sit**
14:21
78:23
135:12

**six-month**
24:24

**skips**
24:25

**sliding**
40:16

**small**
142:4,8

**smoothly**
123:4,20

**snapped**
128:5

**snapping**
127:14,24

**social**
25:6

**sort**
132:9

**sought**
11:25
120:16,18
121:2,6
122:2

**speak**
16:24
33:21,25
34:1
56:19,21,
22 57:14
61:21
62:1
63:12
108:15,

16,17,21,
22 109:9,
24 110:5,
14,17,23
113:1,11,
14,17,23
129:1

**speaking**
86:8
93:13
113:13
128:17

**speaks**
54:13
92:12
113:21
123:14,16
142:16

**specific**
10:20,21
45:14
48:18,19,
25 77:18
90:24
99:14
113:6
125:10
139:11
140:2

**specifically**
25:10
49:5 60:4
62:7
81:23
109:9
113:4
118:18
134:8

**speculation**
16:14
59:22

**speeding**
9:22



800.211.DEPO (3376)
EsquireSolutions.com

GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: spending..talking

**spending**
20:22

**spent**
12:13

**spoke**
34:18
36:2,6,14
42:12,13
82:17,25

**Spratt**
23:24
42:14

**Spratt's**
42:15

**Springston**
120:5
134:1

**staff**
106:22

**stand**
27:6
93:14

**standard**
72:2
79:11
80:18
81:7

**start**
22:23
23:4,12,
20 32:24
43:6,10
46:6
47:12
106:17

**started**
10:14
11:2
15:10,12
21:25
23:21
25:3

45:9,18
46:23
47:5 84:5
108:9
131:22,24

**starting**
22:13
42:3 47:3
70:2

**starts**
50:22
106:15
124:21
142:3,6,8

**state**
10:11
44:15

**stated**
44:14
77:18
102:1
103:11
134:23

**statement**
31:9
49:8,23
50:2,3,9
51:9,12,
13,16,23
96:14
97:6,9
106:9
114:13,16
117:8
118:8
123:8,9,
12,24
124:6
125:22
126:3

**statements**
96:15
107:9,13
124:4

**states**
8:9,12
49:19
50:24
117:11
138:2

**stay**
25:11
78:19
82:12

**stayed**
25:8

**staying**
82:8

**step**
28:5

**stop**
93:1
109:5,8

**stopped**
110:22

**stories**
88:8

**story**
118:16

**stretch**
8:24

**strive**
57:8

**strives**
56:8,15
57:4,12

**Stuart**
6:21
27:24
46:17
55:5
79:21
84:12
90:9 96:2
100:7

102:6
105:6
109:7,11,
13,16
127:18

**student**
11:8,22
12:2,7,
14,23
13:3,11,
13,19
27:23
28:13

**students**
42:17
52:4,18

**students,**
53:15

**studying**
118:21

**submits**
114:19,25

**submitted**
30:21

**subpoena**
104:3

**subsequent**
77:4

**subsequently**
117:10
118:9

**suggested**
120:2

**suggesting**
51:11

**supervisor**
34:16
72:18
77:9
82:17,18,

23 85:22
108:24

**support**
95:22,25

**supposed**
56:4,23
92:2

**suspected**
106:22

**suspicion**
122:22

---

**T**

**taking**
73:2
110:24
128:19

**talk**
8:25 9:13
35:2
65:25
67:12
69:6
89:25
108:1,4,
7,9,12
110:8

**talked**
35:4,9,
19,21
118:7

**talking**
7:8 13:5,
20 14:6
16:3
32:25
40:5 52:9
60:5
64:14,15
82:7
84:15
124:15



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: talks..told

139:16

**talks**
64:5

**tasked**
11:21
39:18

**techniques**
113:17

**telling**
59:2,8
71:23
82:12
123:4,20

**tells**
87:1
101:3,9
107:5

**ten**
119:6

**term**
48:9,12
59:12

**terms**
41:22
47:15
137:22

**test**
117:10
118:9
119:1

**testified**
44:8,16
96:18,25
119:23
121:6
131:21
132:15
133:3,15
137:19
138:18

**testify**
21:10

112:12

**testifying**
29:10,18
33:6,21
112:10

**testimony**
7:14,19
20:15
25:17
29:23
30:1,15,
17 33:23
37:23
42:25
44:13
51:19
53:10
71:4,19
77:25
79:20,22
81:20
82:10
83:9,11
85:4
96:21
97:4
116:5,7
119:24
120:7
121:25
122:7,17
125:13
128:8,13
133:6,9
138:24

**text**
34:24

**texted**
34:19,21
35:1

**theory**
105:4,5

**thing**
25:8 26:3

40:17
54:10
132:9

**things**
21:13
47:16
48:25
49:7
59:18
63:12
126:1
132:4,7

**thinking**
33:12
46:5
105:13

**thought**
30:23
31:12,14,
17 38:2
53:24
68:9
90:11,12
101:20
102:1
104:15,
16,23
118:22
120:15
121:1

**thoughts**
121:5

**threaten**
78:13,22

**three-quarters**
63:17

**throw**
73:16

**ticket**
9:23,24,
25 10:1

**time**
8:22
11:19
12:11
14:6,8
15:8
20:23
24:11
30:11
33:13
34:17
35:4,5,10
36:2 41:4
42:22
45:19
67:1
68:16
69:5
73:19
81:11,24
86:18
87:9,19
94:25
95:3,5
97:24
98:4,12,
16 101:12
105:17
111:19
116:9,10,
20 118:2
119:5
121:17,18
129:14,17
132:13,
20,22
133:13,18
134:5,20
135:9,20
136:5
140:10
142:11,17

**times**
13:8,10
78:10
101:15

102:15
134:23
138:18

**tired**
20:22

**title**
13:15
14:6,10,
11 20:3,
6,9,18
22:11
24:18
28:13
41:21
42:16,21,
22,23
52:24
56:8,16
57:5,12
58:25
59:13
60:2,15,
19,20
86:21
87:2,7
97:2,12
104:5

**today**
7:12,16,
17,19
12:12
14:21
20:14
21:9
29:10,19
33:6
70:16
78:23
114:16
135:12

**told**
18:17
31:8
43:24
59:6



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: tonight..university

68:10
90:3
102:19,
21,25
106:24
135:7

**tonight**
120:7
129:6

**top**
50:18
69:24
74:2
142:6,8

**topic**
125:18
140:6

**topics**
125:15
127:3

**touched**
61:22,24

**traffic**
9:23,24,
25 10:1

**trained**
15:10
18:24
47:21
48:15
84:4
104:22

**training**
15:13,15,
16,17,20,
22,24
16:5,8
17:10
41:21,24
42:2,8
43:5,8,
10,11
44:1,5

47:13,14,
17,18
48:1,5,8,
11,13,18,
19,25
130:7
131:22,23

**transcript**
19:18,22
32:19

**transferred**
11:11

**treated**
61:11,18,
19

**true**
49:23
50:2,3,8,
12 51:16,
23 71:13
107:13
126:2

**truth**
37:9

**truthful**
7:13,18
29:23
30:15,17
33:3
40:24
71:12
125:7,22

**turn**
50:13
63:14
64:25
72:19,20
89:5 94:4
99:25
106:7
107:19
141:23

**turns**

103:10

**two-**
12:3

**two-hour**
20:22

**two-page**
100:17

**type**
7:12
31:22
32:2,5
112:23
114:25
115:8

**typed**
31:25
32:1,3,7

**typically**
38:7
60:5,9
115:1

———————

**U**

**UA-03's**
50:4

**uh-huh**
29:12,15
38:24
49:18
52:20
70:8
72:22,23
96:8
111:25

**umbrella**
26:4

**unclear**
26:23

**underage**
11:23

13:21

**undergrade**
10:24

**undergradua
te**
12:12

**underlined**
95:24
96:6

**understand**
7:8 27:18
28:3
29:5,18
32:1
38:16,23
51:11
53:24
56:4
58:13,14,
15,16,17
59:2,11
61:24
71:22
81:3
82:24
86:23
117:5
120:17,18
121:11
122:13,14
138:21

**understandi
ng**
7:8 12:25
28:9
29:8,9
30:21
37:3,5
42:25
44:2
59:10
86:19,25
91:2,13,
16,17,18,

24 92:2,5
96:14
97:18,19
98:1,10
118:4
134:16
135:6
139:6

**understood**
8:21 9:4,
9 90:18

**underwent**
43:25

**unfair**
60:15,16,
19,22
61:8
62:18

**unhappy**
24:16

**university**
10:6,10,
11,25
11:12,16
14:7
20:17
21:4,21
22:1,15,
18,21
23:1,12
24:2,6,
11,13,24
27:7,9,
10,19
28:3
39:11
41:9,20
43:6,25
52:17,18
53:8,18
54:21,22
56:5
63:21
89:22



GREGORY KUESTER
JOHN DOE vs TRUSTEES OF INDIANA UNIVERSITY

November 04, 2020
Index: university's..write

90:21
91:3,13
92:14,16,
19,23
93:12,19
134:17
135:14,23

university'
s
56:4

unload
75:7

unprofessio
nal
127:8,10,
12,13

untruthful
124:7

upcoming
33:23

upstate
11:12

_____

V

_____

vague
37:17
38:13
39:4 40:9
41:13
42:5 58:1
59:14,21
60:23
63:6,10
93:24
99:4

variety
47:15,17

vehicle
74:9

verbal
9:6 29:14

88:2

verified
43:25
45:1

verify
119:10

violated
41:10
78:13
119:1

violates
78:23

violation
9:22
39:21
87:3
97:2,12

violations
87:7

violence
106:23
107:6

Virginia
11:10

visited
28:19

voluntarily
24:3

_____

W

_____

wait
90:9
130:17

wanted
65:7
77:13
94:11
104:17,21
108:1,4,
7,9 121:4

131:20
134:24

wanting
79:6

warn
78:18

wasting
116:10,12

watched
8:2

ways
70:17

Wednesday
66:13
100:20

weeks
43:13
46:24

Wende
34:3

Wendy
128:19

West
11:9

whatsoever
24:17
117:13

white
40:17
64:15

why'd
71:25

wife
11:14
33:25
34:1
36:13

windows
74:3

withdraw
21:8
25:18,19
41:17,18
50:1
63:2,3
79:25
83:21
96:22

withdrawn
15:9,16
20:15,16
24:19
38:4
43:11,15
45:23
50:3
59:11
60:20
61:1
78:23
82:18
86:16
88:12
92:15
95:2
96:10
97:19
98:11
99:6
102:1,7
106:7
107:4
112:24
115:19
118:7
123:8
137:19
138:6

word
8:19
20:12
27:18
58:5,16
59:2 60:4
70:17

122:20,21
128:6

words
37:7,24
74:2,4

work
10:22
25:24
34:13,14
39:12
47:8
53:23
68:18
105:22,23

worked
10:16
12:21
14:24
26:1
27:21
28:12
34:10
42:24
57:15
114:21
116:17
132:9

working
10:22
11:11
15:10
24:11
25:3 45:9
48:3
86:18

works
73:7

worth
70:6
71:24

write
31:21,22
70:5
89:20

