## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| **JOHN DOE,** | |
| **Plaintiff,** | |
| **v.** | **Civ. No. 1:20-CV-02006-JRS-MJD** |
| **THE TRUSTEES OF INDIANA UNIVERSITY,** *et al.* | |
| **Defendants.** | |

### PLAINTIFF JOHN DOE'S AMENDED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff John Doe (hereinafter referred to as "Plaintiff," "John Doe" or "Doe"), by his attorneys, Nesenoff & Miltenberg, LLP and Delk McNally LLP, hereby submits this amended brief in support of his motion for preliminary injunction, in accordance with the Court's Scheduling Order, ECF No. 48. Plaintiff seeks an injunction, pursuant to Federal Rule of Civil Procedure 65(a) and Local Rule 65-2, enjoining Defendants Trustees of Indiana University ("Trustees"), Indiana University School of Medicine ("IUSM"), Indiana University Purdue University – Indianapolis ("IUPUI") (collectively, the "University" or "IU"), and Jay Hess (collectively "Defendants"), from enforcing the dismissal of Plaintiff from Indiana University School of Medicine, and permitting Doe to select his clinical rotation preferences in December 2020 so that he may begin rotations in the spring of 2021.

As established through discovery conducted in accordance with the Court's Scheduling Order and as described herein, Plaintiff meets the requirements for a preliminary injunction: (1) he will suffer irreparable harm absent the requested relief; (2) traditional legal remedies are inadequate; (3) there is a likelihood of success on the merits of his claims; and (iv) the balance of harm overwhelmingly favors

the Plaintiff. Absent the granting of the requested relief, Plaintiff will suffer irreparable harm to his chances of ever becoming a practicing physician in the United States.

**STATEMENT OF FACTS**

Plaintiff John Doe was expelled from Indiana University School of Medicine on June 16, 2020 without any notice regarding the conduct leading to such expulsion, and without any opportunity to defend himself. (ECF No. 69-20, Ex. 21, IUSM Dismissal). As will be demonstrated below, Dean Hess acknowledges that Plaintiff was expelled without notice or a hearing, contrary to university policy and in violation of Doe's fundamental rights. (Hess Dep. Tr. 87:3-9, 103:3-7, ECF No. 84-7, Ex. 92 at 88, 104); (Reeser Dep. Tr. 76:23-77:3, ECF No. 84-6, Ex. 91 at 76-77).

Plaintiff matriculated at Indiana University School of Medicine in the fall of 2017, with an expected graduation in the spring of 2021. (ECF No. 88-10, Ex. 1082, SPC Report at 3). During the fall 2017 semester, Plaintiff began dating fellow IUSM student Jane Roe. (ECF No. 69-13, Ex. 14, SPC Appeal at 5-6). After a year-long relationship that included several break-ups and reconciliations, Doe ended the relationship with Roe in October, 2018. *Id.* Mere days later, Roe filed a complaint with the University alleging Doe had assaulted her on several occasions. (Dickey Dep. Tr. 68:5-8, ECF No 72-1, Ex. 85 at 69); (ECF No. 88-2, Ex. 1030, Incident Report at 3-4).

On January 18, 2019, Doe was notified by Gregory Kuester ("Mr. Kuester"), an interim investigator retained by the University, that a formal investigation regarding Roe's allegations against him was being initiated. (ECF No. 77-13, Ex. 2011, Notice Letter at 1-2). Mr. Kuester, who was never trained in IU's policies, proceeded to conduct a faulty investigation in which he failed to obtain critical evidence such as Roe's medical records, included in the final investigative report highly inflammatory and prejudicial information regarding Doe that was not relevant to the charges, made unwarranted relevancy determinations regarding the evidence, and failed to seek the testimony of Roe's father who likely had material information concerning Roe's claims. (Kuester Dep. Tr. 48:18-49:9, 99:8-18, 104:5-

25, 107:21-108:6, 108:13-109:4, 110:3-24, ECF No. 84-1, Ex. 86 at 49-50, 100, 105, 108-111); (Doe

Dep. Tr. 16:4-6, 10-13; ECF No. 71-10, Ex. 84 at 16). Mr. Kuester's deficient investigation culminated

in the issuance of a report to which Doe was permitted to respond, but of which he was not provided

a hard copy. (Dickey Dep. Tr. 52:10-53:2, ECF No. 72-1, Ex. 85 at 53-54).

On May 20, 2019, Doe appeared before a hearing panel, comprised of Chairperson Wende'

Ferguson ("Ms. Ferguson"), faculty member Robert Yost ("Mr. Yost"), and residence coordinator

Jose Magallon Maciel ("Mr. Maciel"). (Hearing Tr. 2:12-14, 3:6-9, ECF No. 80-1, Ex. 2035 at 2-3).

Prior to the start of the hearing, Director of Student Conduct and Deputy Title IX Coordinator Sara

Dickey ("Ms. Dickey") notified Ms. Ferguson, Chairperson and a voting member of the panel, that

Roe had previously alleged Doe brought a firearm to campus, notwithstanding that this information

had been redacted from the report due its prejudicial and highly inflammatory nature. (ECF No. 71-

4, Ex. 77(B), Ferguson Aff. at 6, ¶ 33); (ECF No. 71-3, Ex. 76, Dickey Aff. at 4, ¶ 17).

While Doe participated in the hearing, IU's conduct deprived him of a meaningful opportunity

to be heard, when he was precluded from making an uninterrupted statement regarding his defense

to the charges and the Chair declined to ask Roe all questions that Doe submitted, without any

explanation for such refusal. (Ferguson Dep. Tr. 71:17-73:1, ECF No. 84-2, Ex. 87 at 72-74); (Hearing

Tr. 17:5-18:16, 33:10-37:6, ECF No. 80-1, Ex. 2035 at 17-18, 33-37); (ECF No. 69-5, Ex. 5, Question

List). Ultimately, the Panel concluded that Doe was responsible for dating violence in relation to an

encounter that occurred on July 12, 2018[1] and imposed a one-year suspension. (ECF No. 69-6, Ex. 6,

Decision Letter). Doe appealed the improper finding and sanction. (ECF No. 69-8, Ex. 8, Appeal).

The University denied his appeal on June 7, 2019. (ECF No. 69-9, Ex. 9, Appeal Denial).

---

[1] For purposes of this memorandum, Plaintiff provides a brief overview of the factual background. For a more detailed recitation of the underlying events, Plaintiff respectfully refers the Court to his Amended Complaint, ECF No. 8.

Subsequent to the Title IX hearing and appeal process, on May 24, 2019, Doe was notified that he would be subjected to a second disciplinary process, which required him to appear before IUSM's Student Promotions Committee ("SPC"). (ECF No. 69-7, Ex. 7, SPC Notice). After an unexplained delay in the proceeding, Doe appeared before the SPC on October 28, 2019. (ECF No. 71-1, Ex. 68, SPC Agenda at 2). The purpose of the SPC was to accept the findings reached by the Title IX hearing panel and merely assign appropriate sanctions, rather than to "re-investigate" the matter. (ECF No. 74-2, Ex. 1056, Email re SPC at 2). After a brief meeting during which Doe was unable to present any witnesses, question his accuser, or be accompanied by counsel, the SPC recommended that Doe be dismissed from the medical school. (ECF No. 74-2, Ex. 1056, Email re SPC at 2-3, 5); (ECF No. 69-11, Ex. 11, SPC Decision at 1).

Doe sought reconsideration of the SPC's decision, which was denied, and subsequently appealed the SPC finding, which was also denied, before a final review of the matter was sent to Dean of Indiana University School of Medicine Jay Hess ("Dean Hess"), for final approval. (ECF No. 88-5, Ex. 12, SPC Reconsideration); (ECF No. 69-12, Ex. 13, Denial of Reconsideration); (ECF No. 69-14, Ex. 15, SPC Appeal); (ECF No. 69-15, Ex. 16, Appeal Denial). Doe met with Dean Hess on March 4, 2020. (ECF No. 71-6, Ex. 79, Hess Aff. at 6, ¶ 21). At the meeting, Dean Hess vacated the SPC's recommendation of expulsion. (ECF No. 88-9, Ex. 1059, Hess Recording at 24:59-24:11). Dean Hess notified Doe that he could complete an additional one-year leave of absence from IUSM, during which time Doe could pursue his MBA from the Kelley School of Business ("IUKSB"), and continue his counseling before returning to IUSM in the spring of 2021 to complete his medical education. (ECF No. 69-16, Ex. 17, March 27 Letter); (Hess Dep. Tr. 41:5-12, ECF No. 84-7, Ex. 92 at 42).

In reliance on Dean Hess's assurances, Doe applied to IUKSB but was ultimately denied admission on May 29, 2020 for the stated reason that Doe withheld information and gave false or incomplete information in his application. (ECF No. 69-19, Ex. 20, IUKSB Denial). Thereafter, on

June 16, 2020, Dean Hess, via letter, notified Doe that he was immediately expelled from IUSM due to perceived misrepresentations made in his application to IUKSB. (ECF No. 69-20, Ex. 21, IUSM Dismissal). Dean Hess did not reference any other conduct that contributed to this decision in the June 16 letter. *Id.* The expulsion was imposed without any prior notice from IUSM that there was a concern regarding statements made by Doe in his application, and without any opportunity for Doe to appear for a meeting or hearing, or to respond to the charges. (Hess Dep. Tr. 87:3-9, 103:3-7, ECF No. 84-7, Ex. 92 at 88, 104); (Reeser Dep. Tr. 76:23-77:3, ECF No. 84-6, Ex. 91 at 76-77). The expulsion effectively ended Doe's medical career before it even began. (ECF No. 88-1, Ex. 1000, Doe Aff. at 8, ¶ 23); (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 16-25).

Absent the injunctive relief requested herein, enjoining Defendants from enforcing the expulsion and permitting Doe to resume his medical school education immediately, Doe will be irreparably harmed. The timing of this request is critical due to the "six-year rule" within which Doe is required to complete his medical education. If Doe is to have any chance of ever becoming a practicing physician in the United States, he must be permitted to select his clinical rotation preferences in December 2020 and begin his rotations in April 2021, so that he may graduate on time, in the spring of 2023. (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 26-28).

<u>**ARGUMENT**</u>

## I.   <u>The Legal Standard for a Preliminary Injunction</u>

The purpose of a preliminary injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1453 (7th Cir. 1995). Plaintiff's motion for a preliminary injunction should be granted because he establishes the following elements: "(i) without such relief, [Doe] will suffer irreparable harm before final resolution of its claims; (ii) traditional legal remedies would be inadequate; and (iii) [Doe] has some likelihood of success on the merits." *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cty. of Marion, Indiana*, 889

F.3d 432, 437 (7th Cir. 2018). Once a Plaintiff meets this threshold, the court shifts its analysis to "whether the balance of the harm favors the moving party or whether the harm to other parties or the public sufficiently outweigh movants interests." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034, 1044 (7th Cir. 2017) (internal citations omitted). The court weighs these considerations on a sliding scale due to their interdependent nature. *GoodCat, LLC v. Cook*, 202 F. Supp. 3d 896, 908–09 (S.D. Ind. 2016), *citing Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010).

While a preliminary injunction is considered an extraordinary measure, it should be issued when necessary to preserve the status quo pending the final outcome of a case. *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981). The preliminary injunction that Plaintiff seeks here would preserve the status quo of his being a student at IUSM pending the resolution of this litigation. Specifically, there are critical upcoming deadlines by which this matter is unlikely to be resolved, including selection of clinical rotation preferences in December 2020.

In a number of recent cases, federal courts have granted the kind of injunctive relief sought here, thus prohibiting schools from implementing discipline against students accused of sexual misconduct. *See e.g. Doe v. Univ. of Michigan,* 325 F. Supp. 3d 821 (E.D. Mich. 2018) (preliminary injunction granted where student accused of sexual assault established likelihood of success on merits of his claim that university's sexual misconduct policy, which afforded neither a live hearing nor cross-examination, violated his right to due process, and demonstrated irreparable harm because expulsion could drastically curtail future educational and employment opportunities, for which money damages could not compensate student); *Doe v. Pennsylvania State Univ.,* 276 F. Supp. 3d 300 (M.D. Pa. 2017) ("[p]re-medical school student demonstrated immediate irreparable harm resulting from state university's immediate suspension and recommendation that student be suspended from highly competitive, accelerated seven-year joint medical school program, as would support grant of temporary restraining order in student's action alleging violation of due process..."); *Nokes v. Miami*

*Univ.*, No. 1:17-CV-482, 2017 WL 3674910 (S.D. Ohio Aug. 25, 2017) (preliminary injunction granted prohibiting university from suspending student who alleged school acted in violation of his constitutional due process rights to notice and confrontation of adverse witnesses); *Doe v. Rhodes Coll.*, Case No. 2:19-cv-02336 (W.D. Tenn. June 14, 2019), *see* https://www.natlawreview.com/ article/federal-court-judge-private-college-denied-due-process-to-football-player-accused   (granting temporary restraining order upon finding a likelihood of success on the merits of a Title IX erroneous outcome claim, due to lack of right to cross-examine adverse witnesses). *See also Doe v. University of Cincinnati,* 223 F. Supp. 3d 704 (S.D. Ohio 2016); *Doe v. Brown Univ.,* 210 F. Supp. 3d 310, 313 (D.R.I. 2016); *Ritter v. Oklahoma*, 2016 WL 2659620 (W.D. Okla. May 6, 2016).

As demonstrated below, consideration of the relevant factors indisputably supports Plaintiff's right to an injunction, prohibiting Defendants from enforcing the expulsion of Plaintiff from IUSM, and permitting him to select his clinical rotation preferences in December 2020 so that he may begin rotations in April 2021. Plaintiff is likely to succeed on the merits of his claims for the reasons described herein. Plaintiff will suffer irreparable harm should the requested relief not be granted, as he will be unable to complete his medical education within the requisite time period and will thus be unable to earn a medical degree. Finally, the available legal remedies would be inadequate as money damages could not compensate him for the loss of his career, goodwill, name, and reputation.

II.     **Plaintiff Meets the Requirements for a Preliminary Injunction**

A. **Plaintiff Will Suffer Irreparable Harm in the Absence of the Requested Relief**

Plaintiff satisfies the first prong for a preliminary injunction, as he will suffer irreparable harm if the requested relief is not granted. To make a showing of irreparable harm, the moving party must establish that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which money damages are inadequate. In the general context of a university disciplinary proceeding, various courts have recognized that "[b]eing labeled a sex offender by a

university has both an immediate and lasting impact on a student's life." *Doe v. Baum,* 903 F.3d 575, 582 (6th Cir. 2018). Further, where a plaintiff's "constitutional right to due process is 'threatened or impaired' the Court may presume irreparable injury." *Doe v. Univ. of Michigan,* 325 F. Supp. 3d at 829.

There is no question that Doe will be irreparably harmed if he is unable to immediately resume his medical school education, select rotation preferences in December 2020 for rotations beginning in April 2021, and be back on track to graduate in the spring of 2023. This timing is critical due to the "six-year rule" within which Doe is required to complete his medical education, the near impossibility of transferring to another institution, and the extremely diminished chance of his gaining acceptance into a residency program as the gap in his education continues to increase.

Dr. Suzanne M. Miller, Plaintiff's expert, is an emergency physician and owner of MDadmit, a medical admissions consulting service dedicated to assisting health professional school and residency applicants. (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 2, 16). Dr. Miller has sat on admissions committee, served as the co-chair of the Eliot House Pre-Medical Committee at Harvard University, and has written four books on medical admissions. (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 2, 16). She is intimately familiar with the process for obtaining a residency position in the United States, as well as how applicants are evaluated on various criteria by residency committees. Contrarily, Dr. Marti Reeser, whose testimony Defendants rely solely upon to rebut Dr. Miller, has never sat on a residency application committee (Reeser Dep. Tr. 64:20-22, ECF No. 84-6, Ex. 91 at 64), does not know what residency committees look at when examining an applicant (Reeser Dep. Tr. 66:18-67:10, ECF No. 84-6, Ex. 91 at 66-67), and has never sat on a committee that examines transfer applications to medical schools. (Reeser Dep. Tr. 67:11-13, ECF No. 84-6, Ex. 91 at 67).

As described in Dr. Miller's affidavit dated October 30, 2020 (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 2, 16), the timing of Plaintiff's reinstatement to medical school is "critical to his chances of becoming a practicing physician in the US." IUSM, like many other medical schools, has a "six-year

rule" that requires students to complete all of their pre-clinical and clinical requirements within six years. Indeed, IUSM's letter to Doe dated October 29, 2019 which outlined the SPC's decision to dismiss Plaintiff, noted: "Matriculated August 2017, six-year rule requires graduation by August 2023." (ECF No. 69-11, Ex. 11, SPC Decision Letter).

In the January 16, 2020 decision letter which denied Doe's appeal of the SPC decision, IUSM again noted as follows: "This letter summarizes your academic performance at the IU School of Medicine to date: Matriculated August 2017, six-year rule requires graduation by August 2023." (ECF No. 69-15, Ex. 16, Appeal Denial). While Dr. Reeser in his affidavit attempts to recharacterize this rule as a "policy" that can easily be changed (ECF No. 71-9, Ex. 82, Reeser Aff. at ¶ 29), when questioned during his deposition about this rule, he acknowledged that he would "defer to the letter," which describes the six-year requirement as a rule, and explained the purpose of this rule as ensuring "that a student gets through medical school in a timely manner so that they can go out and practice medicine." (Reeser Dep. Tr. 56:9-25, ECF No. 84-6, Ex. 91 at 56).

Dr. Reeser contends that there is no urgency in this matter, as IUSM could make an exception to the six-year policy and make accommodations for Doe's readmission if required to do so at a later time. (ECF No. 71-9, Ex. 82, Reeser Aff. at ¶ 29). This baseless statement is a red herring. Even if Doe were to be readmitted to IUSM a few years from now, the impact on his chances of gaining admission to a residency program would nonetheless be deleterious and Doe would suffer irreparable harm. Dr. Miller notes that "the US is known as one of the hardest countries in the world in which to gain permission to practice medicine." (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 4). This is reflected in the rigorous application process utilized by US-based residency programs, as well as the increasingly competitive match process. (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 4, 10). Consequently, the greater the gap in his education, the more questions will undoubtedly be raised by residency committees when assessing Doe's candidacy, particularly as compared to students whose resumes include a gap for

forced time off as opposed to voluntary leave. (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 9-10, 13, 17, 22) (highlighting the highly competitive match process, the extensive residency application process which requires explanation of disruption of medical education, and that any institutional action "dramatically decreases a student's chance of matching into a US residency program.")

Moreover, it is also unlikely that Doe would be able to continue his education elsewhere while this litigation is pending, as transfer to another medical school is near impossible. Contrary to Dr. Reeser's testimony, Dr. Miller states: "[e]xpulsion from medical school decreases even a stellar student's chances of becoming a physician in the US to <1% because, unlike in undergraduate institutions, it is nearly impossible to transfer or gain advanced standing (apply to a different medical school in years two, three or four after already completing year(s) of medical school coursework) to a US medical school even for applicants without questions of integrity/misconduct." (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 18).

Defendants attempt to minimize the difficulty in transferring medical schools through Dr. Reeser's affidavit, stating he is aware of "multiple instances where IUSM students have been facing dismissal…and then successfully gained admission to another medical school," and claiming he is unaware of any requirement "that a transfer applicant be 'in good standing' to apply or complete a transfer" to another medical school. (ECF No. 71-9, Ex. 82, Reeser Aff. at ¶ 31, 32). This statement is neither accurate nor applicable to the instant matter. When questioned about the circumstances of these other students, Dr. Reeser testified that the two students he could specifically recall were not formally expelled but instead chose to withdraw from IUSM, and the transfer institutions to which they gained admission were international. (Reeser Dep. Tr. 67:17-68:21, ECF No. 84-6, Ex. 91 at 67-68). Unlike Dr. Miller, Dr. Reeser was unaware of the percentage of successful transfer applications for medical schools within the U.S. (Reeser Dep. Tr. 70:21-71:1, ECF No. 84-6, Ex. 91 at 70-71).

Based on the foregoing, Doe's only reasonable chance of ever becoming a practicing physician in the U.S. is to begin clinical rotations with IUSM's class of 2023, in the spring of 2021. (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 28). As described in further detail below, for these losses, money damages cannot make Doe whole. This is precisely the type of irreparable harm that injunctive relief is intended to avert. Based on the foregoing, Plaintiff has adequately demonstrated that, absent the granting of an injunction, he will be irreparably harmed.

### B. Traditional Legal Remedies are Inadequate

To demonstrate inadequacy of relief at law, a party must show that monetary damages do not provide a sufficient remedy. *Cumulus Radio Corp. v. Olson,* 80 F. Supp. 3d 900, 912 (C.D. Ill. 2015). "This does not require that he demonstrate that the remedy be wholly ineffectual… Rather, he must demonstrate that any award would be 'seriously deficient as compared to the harm suffered.'" *Whitaker*, 858 F.3d at 1046 (internal citations omitted). In the instant action, it is readily apparent that monetary damages would not and cannot remedy the loss of Plaintiff's medical degree, or the gap in his education were he somehow able to continue his medical education elsewhere. *See King v. DePauw Univ.* (No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014)). *See also Whitaker*, 858 F.3d at 1046 ("While monetary damages are used to compensate plaintiffs in tort actions, in those situations the damages relate to a past event, where the harm was inflicted on the plaintiff through negligence or something comparable. But this case is not the typical tort action, as [Plaintiff] has alleged *prospective* harm."); *Doe v. Middlebury Coll.,* No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) ("While Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career in July 2016 with this particular employment…Money damages cannot provide an adequate remedy for such imminent and non-speculative harm"); *Maczaczyj v. State of N.Y.*, 956 F. Supp. 403, 408 (W.D.N.Y.

1997. It is indisputable that money damages alone cannot adequately compensate Plaintiff for the harm he has already suffered, and will continue to suffer, if injunctive relief is not granted.

Furthermore, as the analysis of the adequacy of a remedy at law and irreparable harm elements tend to combine, this element is met for the additional reasons stated in the aforementioned section. *Somerset Place, LLC v. Sebelius,* 684 F. Supp. 2d 1037, 1042–43 (N.D. Ill. 2010) (*citing Roland Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 387 (7th Cir.1984)).

### C.  Plaintiff is Likely to Succeed on the Merits of His Claims

Plaintiff is also entitled to injunctive relief as he is likely to succeed on the merits of his claims. "A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, [it] must only show that [its] chances to succeed on his claims are '*better than negligible*.'" (emphasis added). *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 966 (7th Cir. 2018) (*quoting Whitaker*, 858 F.3d at 1046). As described below, Plaintiff satisfies his burden on this element.

### 1.  *42 U.S.C. § 1983 – 14th Amendment Procedural Due Process*

Plaintiff is likely to succeed on his Fourteenth Amendment Procedural Due Process claim. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." When a right is protected by the Due Process Clause, a state "may not withdraw [it] on grounds of misconduct absent[ ] fundamentally fair procedures to determine whether the misconduct has occurred." *Doe v. Purdue Univ.,* 928 F.3d at 663 (internal citations and alterations omitted).

It is well established that the requirements of the Fourteenth Amendment Due Process clause apply to student disciplinary proceedings at public institutions. A public educational institution may not expel a student for misconduct (or even suspend him for as few as ten days) "without adherence to the minimum procedures required by [the Due Process] Clause." *Goss v. Lopez,* 419 U.S. 565, 573-74 (1975); *see also Gagne v. Trustees of Indiana Univ.,* 692 N.E.2d 489, 493 (Ind. Ct. App. 1998) ("a

student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property, and a student facing expulsion from a public educational institution is entitled to the protections of due process.") Here, Dean Hess expelled Plaintiff from IUSM due to perceived misrepresentations on his business school application, without any process whatsoever, let alone the minimum process required by the Due Process Clause.

### i. *Plaintiff has protected property interests within the meaning of the 14th amendment.*

In the higher education context, "any property interest is a matter of contract between the student and the university." *Doe v. Purdue Univ.,* 928 F.3d at 660. Indiana law recognizes that an implied contract exists between a student and a school. *Amaya v. Brater*, 981 N.E.2d 1235, 123-1240 (Ind. Ct. App. 2013) ("In *Neel v. Indiana University Board of Trustees,* 435 N.E.2d 607, 610 (Ind. Ct. App. 1982), we characterized the legal relationship between a student and a university as one of implied contract. We explained that, although courts have analyzed the relationship under many different legal doctrines, '[t]he most pervasive and enduring theory is that the relationship between a student and an educational institution is contractual in nature.'"); *see also Gordon v. Purdue Univ.,* 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007). To establish the requisite property interest, "a university student must do more than show that he has a contract with the university; he must establish that the contract entitled him to the specific right that the university allegedly took, "such as the right to a continuing education or the right not to be suspended without good cause." *Doe v. Purdue Univ.*, 928 F.3d at 660.

As a relationship between a student and a university is contractual in nature, Doe thus entered into a contract with the University through the aforementioned facts, entitling him to due process protections. *See Doe v. Purdue*, 928 F.3d at 661. In exchange for Plaintiff's enrollment and payment of tuition and fees, the University agreed to adhere to the applicable policies and procedures in effect at the time of Doe's enrollment, including the 2018-2019 Student Sexual Misconduct Policy (the "Policy") (ECF No. 69-1, Ex. 1), the Code of Student Rights, Responsibilities & Conduct (the "Code")

(ECF No. 69-3, Ex. 3), and the Guidelines for Promotion, Suspension, Dismissal and Withdrawal (the "Guidelines") (ECF No. 69-2, Ex. 2). The Policy specified that the University "prohibits discrimination on the basis of sex or gender in its educational programs and activities." (ECF No. 69-1, Ex. 1, Policy at 1). The Guidelines provide that any student cited "for lack of acceptable academic standards, ethics, or professional behavior" (ECF No. 69-2, Guidelines, Ex. 2 at 4, ¶ 11(F)) "will be **required** to appear before the SPC to discuss why he/she should not be dismissed from school." (emphasis added) (ECF No. 69-2, Guidelines, Ex. 2 at 4, ¶ 11). For the reasons discussed below, Defendants deprived Doe of these contractually guaranteed property rights.

### ii. Plaintiff has protected liberty interests within the meaning of the 14th amendment.

To plead a liberty interest due process claim under § 1983, a plaintiff must sufficiently allege "(1) that [he] had a cognizable liberty interest under the Fourteenth Amendment; (2) that [he] was deprived of that liberty interest; (3) and that the deprivation was without due process." *Mann v. Vogel,* 707 F.3d 872, 877 (7th Cir. 2013). The Seventh Circuit utilizes the "stigma-plus" test to determine whether a deprivation of a protected liberty interest has occurred. The stigma-plus test requires a plaintiff to demonstrate that (1) the state inflicted reputational damage, (2) which was accompanied by an alteration in legal status. *See Doe v. Purdue Univ.,* 928 F.3d at 661 (7th Cir. 2019). This test is met, for instance, "when a state actor casts doubt on an individual's 'good name, reputation, honor or integrity' in such a manner that it becomes 'virtually impossible for the [individual] to find new employment in his chosen field.'" *Mann v. Vogel,* 707 F.3d at 878 (internal citations omitted).

There is no question that Defendants' actions in expelling Doe from medical school inflicted reputational damage as he will be unable to continue his medical education or pursue a career in medicine. With a permanent erroneous notation of expulsion on his record, he will be prevented from gaining admission to another medical school, obtaining a residency position, and ultimately, will be unable to become a practicing physician. (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 18, 24-28). Further,

Defendants' actions in expelling Doe constituted a clear alteration in his legal status as he went from being a full-time medical school student in good standing to a student who has now been dismissed from medical school. Consequently, Doe satisfies the stigma-plus test, implicating the procedural protections of the due process clause.

### iii. Defendants deprived Doe of his protected interests without the requisite due process.

Due process requires notice, an impartial decision maker, an opportunity to be heard, and where important decisions turn on questions of fact, an opportunity to confront and question adverse witnesses. Here, the Defendants denied Plaintiff these fundamental rights, when they dismissed him from IUSM on two separate occasions, each time without affording him the requisite level of process.

### 1) Dismissal from IUSM-June 16, 2020

Although Doe was suspended, then expelled, then suspended again, for the alleged sexual assault against Roe, the most egregious conduct was an independent expulsion that occurred on June 16, 2020, when Dean Hess summarily expelled Doe from IUSM without any prior notice and without any opportunity to be heard. Doe was informed by letter from Dean Hess that he was dismissed from IUSM for the stated reason that information Doe provided in his application to IUKSB was inconsistent with what Dean Hess had represented during their meeting on March 4, 2020 and in his subsequent letter of March 27, 2020 concerning Doe's return to the medical school. (ECF No. 69-20, Ex. 21, Dismissal Letter). The perceived misrepresentations made by Doe in his application to the business school were the sole basis for Doe's dismissal. (ECF No. 69-20, Ex. 21, Dismissal Letter); (Hess Dep. Tr. 78:1-80:7; 86:19-22, ECF No. 84-7, Ex. 92 at 79-81, 87). The June 16, 2020 dismissal letter made no reference to Doe's prior appearance before the SPC (Hess Dep. Tr. 86:25-87:2, ECF No. 84-7, Ex. 92 at 87-88), nor did it reference any other conduct that influenced the decision to expel Doe. (ECF No. 69-20, Ex. 21, Dismissal Letter).

IUSM's Guidelines make clear that a student may be recommended for dismissal on several grounds such as "[b]eing cited for lack of acceptable academic standards, ethics, or professional behavior," which includes lying. (ECF No. 69-2, Guidelines, Ex. 2 at 4, ¶ 11(F)); (Hess Dep. Tr. 82:14-22, ECF No. 84-7, Ex. 92 at 83). The Policy explicitly states that "Any student who meets any of the below criteria will be **_required_** to appear before the SPC to discuss why he/she should not be dismissed from school." (emphasis added) (ECF No. 69-2, Ex. 2 at 4, ¶ 11). Dean Hess and Dr. Reeser both confirmed that before someone is expelled from IUSM, they *must* receive some type of meeting or hearing regarding the charges leading to the expulsion. (Hess Dep. Tr. 81:23-82:4, ECF No. 84-7, Ex. 92 at 82-83); (Reeser Dep. Tr. 30:24-31:20, ECF No. 84-6, Ex. 91 at 30-31). Dean Hess testified:

> Q:      So it's not typical, it's mandatory that any student prior to dismissal would be required to appear before the SPC to discuss why he or she should not be dismissed, correct sir?
>
> A:      That's correct, and the –
>
> Q:      Okay.
>
> A:      --students appear before the SPC. (Hess Dep. Tr. 83:11-17, ECF No. 84-7, Ex. 92 at 84).

Dr. Reeser likewise confirmed as follows:

> A:      In my role – in under – and as we carry out the duties of that committee, students typically will meet with the committee before any formal -- final action is determined. There could be interim measures such as suspension that, as we referred to earlier, that Dr. Allen has authority to do.
>
> Q.      Right.  So not referring to interim, but more permanent sanctions if a student is facing something that may require them to be removed from the Medical School. I'm just trying to understand if that SPC meeting is something they have to go through before that becomes a formal removal.
>
> A.      Yes. (Reeser Dep. Tr. 31:6-20, ECF No. 84-6, Ex. 91 at 31).

Despite the undisputed requirement that a student appear before the SPC prior to being dismissed from IUSM, Doe was never provided any type of meeting or hearing. In fact, Dean Hess never requested or sought to have Doe appear before the SPC with respect to the perceived

misrepresentations made in his business school application. (Hess Dep. Tr. 87:3-9, ECF No. 84-7, Ex. 92 at 88); (Reeser Dep. Tr. 76:23-77:3, ECF No. 84-6, Ex. 91 at 76-77). Doe was consequently deprived of the opportunity to share his perspective, answer any questions concerning the statements made in his application, or argue why he should not be dismissed from medical school. Furthermore, at no time was Doe even contacted prior to receipt of the June 16 dismissal letter, by Dean Hess or anyone else at IUSM, to put him on notice that statements made in his application were potentially misrepresentative and thus under review. (Hess Dep. Tr. 103:3-7, ECF No. 84-7, Ex. 92 at 104). Instead, Dean Hess unilaterally issued the Draconian measure of Doe's immediate expulsion from the medical school, without any semblance of process, in deprivation of Doe's fundamental rights and in clear violation of the Guidelines.

### 2) *Title IX Investigation and May 20, 2019 Hearing*

Defendants deprived Doe of his right to a meaningful opportunity to be heard when they conducted a proceeding riddled with violations of IU's policies. Defendants selected an interim investigator, who was not trained in any of IU's policies, to conduct the investigation of the allegations against Doe. Mr. Kuester began his position with the University in November of 2018, shortly after Ms. Dickey received Roe's initial report against Doe. (Dickey Dep. Tr. 16:11-13, ECF No. 72-1, Ex. 85 at 17). Ms. Dickey assigned Mr. Kuester to serve as investigator on Roe's case "within a day or two of his start date." (Dickey Dep. Tr. 17:6-9, ECF No. 72-1, Ex. 85 at 18). IU's Policy is clear that "All investigators shall have the appropriate required and ongoing training on conducting sexual misconduct investigations, issues related to sexual misconduct and applicable University policies and procedures." (ECF No. 69-1, Ex. 1, Policy at 9). In addition, a respondent to an investigation is promised "to have allegations investigated by individuals who are properly trained to investigate and resolve allegations of sexual misconduct." (ECF No. 69-1, Ex. 1, Policy at 10). Notwithstanding, Mr. Kuester never provided proof of his alleged training to serve as an investigator and was never trained

on IU's policies. His only "training" consisted of receiving a copy of the Policy and reading it. (Kuester Dep. Tr. 48:15-49:9, ECF No. 84-1, Ex. 86 at 49-50). Mr. Kuester's lack of training was apparent through his deficient investigation, in which he failed to seek Roe's medical records, did not pursue the interview of a potentially material witness, and included highly inflammatory information in the investigation report.

Mr. Kuester violated IU's policies when he failed to conduct the "adequate, reliable, and impartial investigation" to which Doe was entitled. (ECF No. 69-1, Ex. 1, Policy at 10). Roe claimed as part of her allegations that she suffered injuries which required her to seek medical attention. (ECF No. 88-2, Ex. 1030, Incident Report at 4). Though she provided Mr. Kuester with receipts for her medical bills, she failed to provide him with copies of the actual medical records for inclusion in the investigation report. Mr. Kuester testified that the medical records could be helpful (Kuester Dep. Tr. 102:10-16, ECF No. 84-1, Ex. 86 at 103), as demonstrated by his repeated requests to Roe to provide him with a copy of the records. (ECF No. 74-18, Ex. 1076, Email January 16-17, 2019). Yet, Roe never produced the medical records from her visit to the hospital the day after one of the alleged instances of assault. (Kuester Dep. Tr. 102:17-20, ECF No. 84-1, Ex. 86 at 103). Mr. Kuester not only failed to request Roe provide an authorization to obtain these records but incredibly, never even thought to ask her for one. (Kuester Dep. Tr. 104:9-25, ECF No. 84-1, Ex. 86 at 105); (ECF No. 88-15, Ex. 2023, Final Report at 3). It is without question that a properly trained investigator would have pursued such critical documentary evidence. Even more egregious, despite Mr. Kuester's failure to obtain this material evidence, he nonetheless felt it appropriate to include in the report Roe's hearsay account of what the nurse who treated her supposedly stated during her hospital visit. (ECF No. 88-15, Ex. 2023, Final Report at. 5); (Kuester Dep. Tr. 106:6-10, ECF No. 84-1, Ex. 86 at 107).

Mr. Kuester further demonstrated his ineptitude as an investigator, and lack of adequate training, when he failed to take any affirmative action to interview Roe's father, who may have had

relevant information regarding Roe's charges related to the July 2018 encounter. (Kuester Dep. Tr. 107:21-108:6, ECF No. 84-1, Ex. 86 at 108-109). While Mr. Kuester understood that he was not required to obtain Roe's permission to speak with any witness as part of the investigation (Kuester Dep. Tr. 108:22-109:4, ECF No. 84-1, Ex. 86 at 109-110), he did request permission from Roe to speak with her father. (Kuester Dep. Tr. 110:3-6, ECF No. 84-1, Ex. 86 at 111). When Roe declined, Mr. Kuester did not take any other action to contact the witness. (Kuester Dep. Tr. 110:13-111:2, ECF No. 84-1, Ex. 86 at 111-112). Although Mr. Kuester alleged not to know Roe's father's name, he failed to so much as ask Roe to provide his name so that he could contact Roe's father directly. (Kuester Dep. Tr. 110:13-111:2, ECF No. 84-1, Ex. 86 at 111-112). As Roe's father was the only witness present during portions of the July 2018 alleged incident for which Doe was ultimately found responsible (ECF No. 88-15, Ex. 2023, Final Report at 5) it was imperative that Mr. Kuester obtain his testimony. Mr. Kuester failed to do so here, in violation of his obligations to perform a thorough investigation.

Finally, Mr. Kuester violated Doe's rights to an impartial investigation when he included in the Investigation Report highly prejudicial information regarding the purported impact this matter had on Roe. Specifically, Mr. Kuester included Roe's claims that Doe's conduct had caused her to miss classes, suffer academically, shut down when in the same room as Doe, and resulted in her avoiding IUSM events or visiting the library. (ECF No. 88-15, Ex. 2023, Final Report at 8). He included no such similar information in regard to the impact this matter had on Doe, as the accused. Mr. Kuester's decision to include this irrelevant information was in error as the claimed "impact" had no bearing on whether Doe was responsible for the misconduct alleged. Mr. Kuester testified that he included the "impact" information because his role as investigator was "to share the story that is provided to me with the hearing board so they can make a decision." (Kuester Dep. Tr. 118:15-17, ECF No. 84-1, Ex. 86 at 119). This statement is belied by his failure to provide the hearing board with certain information provided by Doe, including: Roe's false allegation that Doe brought a firearm to campus and Roe's

19

relationship with a medical school professor. As an investigator, Mr. Kuester's role was to gather all the facts and provide a neutral report to the hearing panel. (ECF No. 69-1, Ex. 1, Policy at 11). The inclusion of this "impact" information was outside the bounds of his responsibilities as investigator, and likely contributed to the hearing panel's preconception of responsibility against Doe.

Upon completion of the investigation, IU's Policy requires that the investigator "provide their Preliminary Investigation Report to the parties. At that time, the parties will be provided access to the Investigation File..." (ECF No. 69-1, Ex. 1, Policy at 11). Doe was never provided a hard copy of the Preliminary Investigation Report and was not permitted to make a copy to be shared with his advisor, which impaired his ability to review and adequately respond to the report. (ECF No. 69-8, Ex. 8, Appeal at 9); (Dickey Dep. Tr. 52:10-53:2, ECF No. 72-1, Ex. 85 at 53-54).

At least ten days prior to the hearing, the panel members were provided with a hard copy of the Final Investigation Report and the Final Investigation Appendix. (Freiberger Dep. Tr. 55:5-9, ECF No. 84-5, Ex. 90 at 55); (ECF No. 71-5, Ex. 78, Freiberger Aff. at 4, ¶ 12, 14); (ECF No. 71-4, Ex. 77B, Ferguson Aff. at 5, ¶ 26-27). Doe, the party accused of misconduct, was never provided a hard copy of the Final Investigation Report in advance of the hearing. (Doe Dep. Tr. 28:7-23, ECF No. 71-10, Ex. 84 at 28). The Policy is clear that "the Final Investigation Report will be submitted to the hearing panel for the determination of responsibility, **and** the parties will be provided the Final Investigation Report and notified of next steps of the sexual misconduct process." (emphasis added) (ECF No. 69-1, Ex. 1, Policy at 11(g)). The failure to provide Doe with a tangible copy of the Final Report, while at the same time providing a copy to the panel members was a violation of IU's Policy and a hindrance on Doe's ability to prepare his defense.

On the morning of Doe's hearing, Ms. Dickey informed Ms. Ferguson about the allegations concerning the firearm and notified her that Doe was provided access mistakenly to an unredacted copy of the Final Investigation Report Appendix, which failed to redact this information. (ECF No.

71-4, Ex. 77(B), Ferguson Aff. at 6, ¶ 33). The other two panel members were not advised of this information. (ECF No. 71-3, Ex. 76, Dickey Aff. at 6-7, ¶ 25). Offering this highly damaging material to the Chair of the hearing, which both the investigator and Deputy Title IX Coordinator had previously determined should be redacted from the report on the grounds that it was "potentially prejudicial or inflammatory" (ECF No. 71-3, Ex. 76, Dickey Aff. at 4, ¶ 17), was a fatal error and one that deprived Doe of the fair and impartial panel of decisionmakers to which he was entitled.

On May 20, 2019, Doe appeared before the Title IX hearing panel comprised of Chairperson Wende' Ferguson, Robert Yost and Jose Magallon Maciel, to determine Doe's responsibility on the allegations brought forth by Roe. (Hearing Tr., ECF No. 80-1, Ex. 2035). The Policy guarantees at Section e(ii), that "Both the complainant and respondent will have equal opportunity to provide a statement to the hearing panel" (ECF No. 69-1, Ex. 1, Policy at 12). As such, Doe prepared a statement to be read to the panel in which he highlighted discrepancies in Roe's account and pointed out evidence disputing her allegations. (ECF No. 69-4, Ex. 4, Opening Statement). Doe also intended to challenge Roe's credibility by addressing her false allegations concerning a firearm, discussing a video that established Roe was an admitted liar, and presenting evidence that Roe had engaged in University Grant fraud. (ECF No. 69-4, Ex. 4, Opening Statement). The policy does not authorize the Chair of the Hearing to prevent a party from completing his or her statement, nor does it prohibit the introduction of "new evidence" at the hearing." (ECF No. 69-1, Ex. 1, Policy). However, midway through Doe's opening statement, Ms. Ferguson apparently changed the rules when she interrupted Doe to prevent him from continuing. (Hearing Tr. 17:5-18:16, 33:10-37:6, ECF No. 80-1, Ex. 2035 at 17-18, 33-37). At Ms. Ferguson's direction, a break was taken and a meeting held between Ms. Ferguson, Ms. Dickey, and Student Conduct Coordinator Kelly Freiberger ("Ms. Freiberger") to discuss the "new evidence" that Doe sought to discuss. (Dickey Dep. Tr. 43:23-45:7, ECF No. 72-1, Ex. 85 at 44-46). They decided that Doe would not be permitted to present the "new evidence" (*Id.*)

in direct contravention of the Policy which does not restrict the content of a party's statement. (ECF No. 69-1, Ex. 1, Policy at 12). Despite the credibility issues implicated by the evidence Doe sought to introduce, which are always relevant when facts are in dispute, and notwithstanding the absence of any policy provision authorizing such action, Ms. Ferguson arbitrarily prevented Doe from completing his statement to the hearing panel, violating both IU's policies as well as his right to a meaningful opportunity to be heard. Ms. Ferguson placed on the record her decision limiting his opening statement. (Hearing Tr. 36:17-37:6, ECF No. 80-1, Ex. 2035 at 36-37); (Ferguson Dep. Tr. 65:13-66:3, ECF No. 84-2, Ex. 87 at 66-67).

Ms. Ferguson did not stop there. IU's Policy provides that "The complainant and respondent may not directly question each other, but may submit questions to the Chair, to be asked of the other party." (ECF No. 69-1, Ex. 1, Policy at 12). The Policy does not restrict the types of questions that may be posed, other than to say "[t]he Chair or other panel members will review questions prior to posing to the other party to prevent questioning that is not permitted under these proceedings." (ECF No. 69-1, Ex. 1, Policy at 12). The types of questioning "not permitted under these proceedings," however, is not defined. (*Id.*) In accordance with the Policy, Doe presented a list of questions to be posed to Roe through the Chair. (Hearing Tr. 17:5-21, ECF No. 80-1, Ex. 2035 at 17); (ECF No. 69-5, Ex. 5, Question List). Doe's written list of thirteen questions for Roe concerned their relationship and the alleged conduct at issue. (ECF No. 69-5, Ex. 5, Question List).

Upon receipt of Doe's written questions, Ms. Ferguson initiated a break in the proceedings to allow Doe to neatly write out the questions. (Hearing Tr. 17:5-18:7, ECF No. 80-1, Ex. 2035 at 17-18). When the hearing resumed, Ms. Ferguson did not state on the record that any conversation between her, Doe, and his advisor ever took place, let alone that Doe agreed to limit his drafted questions of Roe. (Hearing Tr. 17:5-18:16, ECF No. 80-1, Ex. 2035 at 17-18). Ms. Ferguson testified that she reached an agreement with Doe and his advisor regarding which of his thirteen questions the

22

panel would ask Roe. (Ferguson Dep. Tr. 62:20-22, ECF No. 84-2, Ex. 87 at 63). Doe disputes that

such an agreement took place, (Doe Dep. Tr. 57:1-15, ECF No. 71-10, Ex. 84 at 57), and no reference

to this agreement was made on the record, (Hearing Tr. 17:5-18:16, ECF No. 80-1, Ex. 2035  at 17-

18) (Ferguson Dep. Tr. 70:24-71:8, ECF No. 84-2, Ex. 87 at 71-72), despite Ms. Ferguson's practice

of doing so. (Freiberger Dep. Tr. 87:13-88:3, ECF No. 84-5, Ex. 90 at 87-88). By comparison, Ms.

Ferguson did address on the record the conversation that took place subsequently regarding the

additional information Doe sought to introduce in his statement (Hearing Tr. 36:17-37:6, ECF No.

80-1, Ex. 2035 at 36-37); (Ferguson Dep. Tr. 65:13-66:3, ECF No. 84-2, Ex. 87 at 66-67). Her failure

to note for the record that any "agreement" was reached concerning the questions posed by Doe

therefore raises substantial doubt as to the existence of any such "agreement" having been reached.

Subsequent to the hearing, Ms. Freiberger was responsible for shredding all documents utilized

by the Hearing Panel during the hearing.[2] (Yost Dep. Tr. 10:17-22; ECF No. 84-4, Ex. 89 at 10);

(Freiberger Dep. Tr. 97:2-4; 107:22-108:18, ECF No. 84-5, Ex. 90 at 97, 107-108). According to Ms.

Freiberger, when she searched for a copy of Doe's questions in connection with this litigation, which

IU's training manuals require them to keep with the file, she testified that she must have "shredded"

the list with other materials. (Freiberger Dep. Tr. 96:10-97:9, 106:6-23, ECF No. 84-5, Ex. 90 at 96-

97, 106). The lack of any contemporaneous notes, coupled with the spoliation of evidence invites

further skepticism as to the veracity of Ms. Ferguson's testimony concerning the alleged agreement.

### 2.  *Title IX – Erroneous Outcome*

Plaintiff is also likely to succeed on his Title IX – Erroneous Outcome claim. Title IX provides,

in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any educational

---

[2] Indiana courts define spoliation as "[t]he intentional destruction, mutilation, alteration, or concealment of evidence, usually a document." *J.S. Sweet Co. v. Sika Chem. Corp.,* 400 F.3d 1028, 1032 (7th Cir. 2005)

program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault, *Davis v. Monroe Bd. Of Education* (526 U.S. 629 (1999)), or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994). In either case, the statute is enforceable through an implied private right of action. *Yusuf,* 35 F.3d at 714.

To establish a Title IX "erroneous outcome" claim, it has been generally accepted that the plaintiff must demonstrate (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) "particular circumstances suggesting gender bias was a motivating factor behind the erroneous findings," such as (but not only) statements by disciplinary tribunal members and university officials and patterns of decision-making. *Yusuf,* 35 F.3d at 715; *see also Doe v. Indiana Univ. - Bloomington,* No. 1:18-CV-03713(TWP)(MJD), 2019 WL 341760, at *8 (S.D. Ind. Jan. 28, 2019). The Seventh Circuit in *Doe v. Purdue* (928 F.3d 652 (7th Cir. 2019)), recently refined this standard, recognizing there is "no need to superimpose doctrinal tests on the statute." *Doe v. Purdue Univ.,* 928 F.3d at 667. Instead, the question to be asked is as follows: "do the alleged facts, if true, raise a plausible inference that the university discriminated against [Plaintiff] 'on the basis of sex'?" For the reasons detailed below, the answer in this matter is the affirmative.

Throughout the investigation and hearing process, Plaintiff maintained his innocence and denied any wrongdoing. (ECF No. 88-1, Ex. 1000, Doe Aff. at 6, ¶ 14). Despite this, the Title IX hearing panel approached the hearing with a predisposition against Doe, and ultimately found him responsible for dating violence. This decision failed to account for Doe's lie detector results that indicated no deception, health assessments of Doe, text messages, evidence that directly placed Roe's credibility in question, and inconsistent and inaccurate statements from witnesses. (ECF No. 73-20, Ex. 1048, May 18, 2019 Letter); (Hearing Tr. ECF No. 80-1, Ex. 2035 at 69); (ECF No. 88-16, Ex.

2024, Appendix to Report at 27-31, 32-38, 95-97, 98-100, 103, 106, 108, 125, and 133). Thus, the erroneous decision was reached as a result of bias against Doe.

The Hearing Panel's inherent bias against Doe can be directly traced back to the Title IX training materials utilized by IU during the relevant timeframe. Ms. Dickey and Ms. Freiberger were responsible for coordinating the trainings for sexual misconduct panel members and preparing the materials to be presented. (Dickey Dep. Tr. 12:10-13:5, ECF No. 72-1, Ex. 85 at 13-14). All panel members were required to attend annual training, (Ferguson Dep. Tr. 24:9-13, ECF No. 84-2, Ex. 87 at 25), which included the following programs during the 2018-2019 academic year: (i) "Complainant Trauma and Respondent Stress" (ECF No. 73-2, Ex. 1002); (ii) "Sanctioning Activity" (ECF No. 73-3, Ex. 1007); (iii) "Hearing Commission Sexual Misconduct Panel Training" (ECF No. 77-7, Ex. 2004); (iv) "Chairperson Skills Training" (ECF No. 77-8, Ex. 2005); (v) "Hearing Commission Training" (ECF No. 77-9, Ex. 2006); (vi) "Hearing Commission General Training, August 23, 2018" (ECF No. 77-10, Ex. 2007); and (vii) "Hearing Commission Sexual Misconduct Training, October 1, 2018" (ECF No. 77-11, Ex. 2008). The three panel members who heard Doe's case each attended all of these sessions. (Ferguson Dep. Tr. 27:11-29:8, ECF No. 84-2, Ex. 87 at 28-30); (Yost Dep. Tr. 59:11-61:3, ECF No. 84-4, Ex. 89 at 59-61); (ECF No. 71-08, Ex. 81, Magallon Aff. at 2, ¶ 5-7).

The material presented in the above referenced training programs reflected the University's perspective that males accused of misconduct are "perpetrators" who must be held responsible for their alleged conduct, while female complainants are "victims" who must be believed. The mandated training sessions attended by those involved in Doe's case included the following information:

(i)     "Sexual assault is an act of dominance. It is the use of a sex act to fulfill the perpetrator's desire for power/control, revenge, recreation, proof of masculinity, and/or sexual gratification." (ECF No. 73-2, Ex. 1002, Complainant Trauma and Respondent Stress at 6).

(ii)    "99% of sexual violence perpetrators are male." (ECF No. 73-2, Ex. 1002, Complainant Trauma and Respondent Stress at 8).

(iii)   "Supporting the Victim…Believe them → don't question the story." (ECF No. 73-2, Ex. 1002, Complainant Trauma and Respondent Stress at 60).

(iv)   "Indiana University is committed to…supporting victims with full information about available resources, assisting victims in accessing resources, and at all times exhibiting personal care and concern to victims." (ECF No. 77-7, Ex. 2004, Hearing Commission Sexual Misconduct Panel Training at 4).

(v)   The "Sanctioning Activity" training, given by Ms. Freiberger, provided five sample scenarios for discussion of appropriate sanctions; in all five scenarios the respondent was a male. (ECF No. 73-3, Ex. 1007, Sanctioning Activity at 3-8); (Freiberger Dep. Tr. 33:3-35:24, ECF No. 84-5, Ex. 90 at 33-35).

Furthermore, several of these required training sessions advocated for the use of the trauma-informed method, an investigative technique putatively intended to prevent inflicting additional trauma on the complainant. (ECF No. 73-2, Ex. 1002, Complainant Trauma and Respondent Stress); (ECF No. 77-11, Ex. 2008, Hearing Commission Sexual Misconduct Training, October 1, 2018). This investigative method results in the avoidance of certain questions, including those that may go towards credibility out of concern for "re-traumatization," (ECF No. 73-2, Ex. 1002, Complainant Trauma and Respondent Stress at 64, 68, 70), even in a "he said/she said" case where credibility is a central issue. Ms. Ferguson acknowledged that she applied information learned in the trainings to hearings she participated in (Ferguson Dep. Tr. 35:4-9, ECF No. 84-2, Ex. 87 at 35), and Mr. Yost testified that he was trained on trauma-informed investigations and implemented the method when serving as a hearing panel member on Doe's case, through the types of questions he asked. (Yost Dep. Tr. 63:9-25, ECF No. 84-4, Ex. 89 at 63). The University's use of these female/victim-oriented training materials, the content of which IU undoubtedly expected its panel members to implement, raises a plausible inference that the Title IX hearing panel discriminated against Doe on the basis of his sex.

### 3.   *Title IX – Selective Enforcement*

Finally, Plaintiff is likely to succeed on the merits of his Title IX-Selective Enforcement claim. Under this theory, a plaintiff must establish that "regardless of [his] guilt or innocence, the severity of

the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Doe v. Purdue Univ.,* 928 F.3d at 667. Defendants selectively enforced their policies when they failed to take any action on Doe's complaint against Roe, despite their knowledge of his claims as early as January 2019, while proceeding to investigate Roe's claims against Doe.

Ms. Dickey first learned of Roe's allegations against Doe on October 24, 2018. (ECF No. 74-14, Ex. 1072, Timeline at 1). Ms. Dickey met with Roe on November 5, 2018, (Dickey Dep. Tr. 17:25-18:8, ECF No. 72-1, Ex. 85 at 18-19), and appointed Mr. Kuester to investigate the matter on or about November 15, 2018. (Kuester Dep. Tr. 47:3-6, ECF No. 84-1, Ex. 86 at 48) (Dickey Dep. Tr. 17:6-9, ECF No. 72-1, Ex. 85 at 17). Mr. Kuester met with Roe on January 16, 2019 and immediately initiated the investigation against Doe. (ECF No. 88-11, Ex. 2017, Investigation Report at 6). During this meeting, Roe told Mr. Kuester that she had instigated an argument with Doe that became physical and that she pushed him during the argument. (Kuester Dep. Tr. 88:23-89:23, ECF No. 84-1, Ex. 86 at 89-90). During Mr. Kuester's meeting with Doe on January 29, 2019, Doe told him that Roe had struck him and threw a flower vase in his direction while they were in Italy in the summer of 2018. (ECF No. 71-7, Ex. 80, Kuester Aff. at ¶ 56); (ECF No. 71-3, Ex. 76, Dickey Aff. at ¶ 28). Ms. Kuester informed Ms. Dickey of Doe's allegations against Roe in late January or early February 2019. (Dickey Dep. Tr. 59:9-15, ECF No. 72-1, Ex. 85 at 60); (ECF No. 71-3, Ex. 76, Dickey Aff. at ¶ 28). Yet, Ms. Dickey failed to take any action on Doe's complaint against Roe.

IU's Policy establishes that "When an individual tells a responsible employee about an incident of sexual misconduct, that individual has the right to expect the University to take immediate and appropriate steps to investigate what happened and to resolve the matter promptly and equitably." (ECF No. 69-1, Ex. 1, Policy at 6). Here, Ms. Dickey did not attempt to meet or speak with Doe about his allegations, (Dickey Dep. Tr. 59:23-25, ECF No. 72-1, Ex. 85 at 60), and did not advise him of his right to pursue a complaint against Roe, (Doe Dep. Tr. 51:3-5, ECF No. 71-10, Ex. 84 at 51), until

four months after learning of his allegations, on the day of Doe's Title IX hearing. (Doe Dep. Tr. 70:4-16, ECF No. 71-10, Ex. 84 at 70). Defendants' aggressive pursuit of Roe's complaint, while failing to initiate similar action on Doe's complaint, demonstrates a selective enforcement of its policies, sufficient to establish Doe's likelihood of success on this claim.

### D.  The Balance of Hardships Tips Decidedly in Plaintiff Doe's Favor

Plaintiff is further entitled to injunctive relief as the harm that he will suffer if unable to return to his medical studies greatly outweighs any potential harm to the University. In fact, it can be argued and established that the Defendants would not incur any harm at all. *See, e.g., Ritter v. Oklahoma*, 2016 WL 2659602, at *5 (W.D. Okla. May 6, 2016) (noting balance favors granting injunction because any harm to college is "inconsiderable" compared to harm to student if he was wrongfully expelled); *Doe v. Middlebury Coll.,* 2015 WL 5488109, at *4 (finding balance weighs in favor of student because "[t]he harm Middlebury will suffer if Plaintiff is allowed to remain a student for the fall semester is not as great as the harm Plaintiff will suffer if he is not permitted to return to campus but ultimately prevails in the case"); *King*, 2014 WL 4197507, at *14 (finding balance of equities "firmly" in student's favor: "the real, unavoidable consequences" he would suffer absent an injunction, even if he ultimately won the case, outweighed any harm to university). Any claim now by the Defendants that the student body would be distracted by Doe's return is without merit. Defendants were ready and willing to have Doe back on campus prior to his unlawful expulsion. Additionally, Doe's classmates will be two full years ahead of him and would have no interactions with him.

If Plaintiff is unable to immediately resume his medical school education, it is likely he will never be able to pursue a career in medicine. (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 26-28). His only reasonable chance of ever becoming a practicing physician in the United States is to begin clinical rotations with IUSM's class of 2023, in the spring of 2021. (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 28). Indisputably, Plaintiff faces severe hardships if injunctive relief is not granted. Thus, "in the

absence of a preliminary injunction [Plaintiff] will continue to suffer real, unavoidable consequences even if he wins this suit." *King*, 2014 WL 4197507, at *14.

It is respectfully submitted that the Plaintiff has amply demonstrated that Defendants committed grave and serious violations of Plaintiff's due process rights. Plaintiff's injuries are concrete, while Defendants' are speculative at best. Staying the expulsion from IUSM will mitigate the concrete injury that Plaintiff has already suffered.

### E.  The Public Interest Weighs in Favor of Granting the Injunction

Granting a preliminary injunction and allowing Plaintiff to continue his education will also serve the public interest. The regime of the April 4, 2011 Dear Colleague Letter led to campus sexual misconduct tribunals where there is use of prosecutorial "investigation," lack of reasoned decision-making, presumption of male guilt, a failure to apply the burden of proof in fact, denial of meaningful appeal, manifest bias against males and unfair hearings. That the public is not served by such proceedings was recognized by Department of Education Secretary Betsy DeVos, who in vacating the April 4, 2011 Dear Colleague Letter rightly denounced these proceedings as involving denials of due process that are wholly un-American. Elizabeth DeVos, *Secretary DeVos Prepared Remarks on Title IX Enforcement*, U.S. DEPT. OF EDUC. (Sept. 7, 2017), www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement. In the instant matter, there are serious doubts surrounding the legitimacy of Defendants' actions in expelling Plaintiff. This fact strongly suggests that the public interest would best be served by allowing Plaintiff to continue with his education while the flawed process that produced his expulsion is exposed. Granting the requested preliminary injunction in this case thus serves the public interest.

### F.  Bond Should Be Waived Because Defendants Will Not Be Harmed

Finally, Plaintiff moves the Court to waive security for any injunction it issues. The strict adherence to Federal Rule 65(c) can be waived by the Courts. "Under appropriate

circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)." *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r, Indiana State Dep't of Health,* 2018 WL 10580407, at *8 (S.D. Ind. June 28, 2018). Specifically, if "there's no danger that the opposing party will incur any damages from the injunction," a court may choose not to require a bond." *Indiana Civil Liberties Union Found., Inc. v. Superintendent, Indiana State Police,* 2020 WL 3546018, at *14 (S.D. Ind. June 30, 2020). In this matter, Defendants are at no risk of any monetary loss with the granting of Plaintiff's application.

## <u>CONCLUSION</u>

For the reasons stated above, this Court should grant a preliminary injunction enjoining Defendants from enforcing the dismissal of Plaintiff John Doe from Indiana University School of Medicine, and permitting him to return to Indiana University School of Medicine immediately such that he may select his rotation preferences in December 2020 and begin clinical rotations in the spring of 2021.

Dated:   New York, New York
         November 12, 2020

Respectfully submitted,

*Attorneys for Plaintiff John Doe*

**NESENOFF & MILTENBERG, LLP**

By: *<u>/s/ Andrew T. Miltenberg</u>*
Andrew T. Miltenberg, Esq. (*pro hac vice*)
Stuart Bernstein, Esq. (*pro hac vice*)
Philip A. Byler, Esq. (*pro hac vice*)
Tara J. Davis, Esq. (*pro hac vice*)
Regina M. Federico, Esq. (*pro hac vice*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
pbyler@nmllplaw.com
tdavis@nmllplaw.com
rfederico@nmllplaw.com

**DELK MCNALLY, LLP**

By: *<u>/s/ Michael McNally</u>*
Michael McNally, Esq.
IN No. 23676-49
211 South Walnut Street
Muncie, Indiana 47305
(317) 442-4444
mcnally@delkmcnally.com