# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |
|---|---|
| **JOHN DOE,** | |
| **Plaintiff,** | |
| | |
| **v.** | **Civ. No. 1:20-CV-02006-JRS-MJD** |
| | |
| **THE TRUSTEES OF INDIANA UNIVERSITY, INDIANA UNIVERSITY SCHOOL OF MEDICINE, INDIANA UNIVERSITY PURDUE UNIVERSITY – INDIANAPOLIS, INDIANA UNIVERSITY KELLEY SCHOOL OF BUSINESS, GREGORY KUESTER, in his official and individual capacity, BRADLEY ALLEN, in his official and individual capacity, and JAY HESS, in his official and individual capacity,** | |
| | |
| **Defendants.** | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

Plaintiff John Doe ("Plaintiff" or "Doe") submits this brief in opposition to Defendants' partial motion to dismiss (ECF No. 29), which seeks dismissal of his Fourteenth Amendment Procedural Due Process claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants' motion should be denied in its entirety. At the outset, Plaintiff notes the unusual procedural posture of this matter, in which Defendants' pending motion to dismiss was filed prior to the filing of Plaintiff's Motion for Preliminary Injunction. Since that time, the parties have engaged in extensive briefing and factual discovery related to the motion for preliminary injunction, which included nine depositions and the exchange of nearly three thousand documents. While Plaintiff's Amended Complaint, on its face, sufficiently alleges a due process claim, it would be remiss to not acknowledge

1

the factual record which has already been developed in this matter, and which further demonstrates Plaintiff's entitlement to relief.[1] Consequently, Plaintiff herein points to additional support in the evidentiary record which further establishes the plausibility of his claims.

At the motion to dismiss stage, the Court's task is to examine whether plaintiff's claim demonstrates facial plausibility; that is, "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). In assessing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts, and drawing reasonable inferences in the plaintiffs' favor." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 879 (7th Cir. 2012). Plaintiff is not, at this stage, required to establish a triable issue of fact.[2]

As demonstrated through the evidentiary record, and as described in further detail below, there is no dispute that Plaintiff Doe was expelled from Indiana University School of Medicine ("IUSM") on June 16, 2020 without any notice regarding the alleged conduct leading to such expulsion, and without any opportunity to defend himself. In addition, Doe was deprived of the requisite level of process during the Title IX investigation and disciplinary hearing. Accepting all of Plaintiff's well-pleaded allegations as true, and drawing all reasonable inferences in his favor, as the Court is required

---

[1] Generally, findings of fact and conclusions of law made at the preliminary injunction stage do not have preclusive effect. *See, e.g., Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 291–92 (7th Cir. 1998) (noting that findings made in a preliminary injunction order are not binding on the court at the summary judgment stage, as they are often based on "incomplete evidence and a hurried consideration of the issues" and "different standards apply in the two contexts.") This reasoning should similarly apply in the context of a motion to dismiss.

[2] The Court is required to examine Defendants' motion under the motion to dismiss plausibility standard. Should the Court decide to convert Defendants' motion to dismiss into a Rule 56 motion for summary judgment, Plaintiff respectfully requests an opportunity to determine if additional discovery is required, and to submit supplementary materials and evidence. *Eglen v. Am. Oneline, Inc.,* No. TH-00-0135-C-M/H, 2001 WL 1028851, at *3 (S.D. Ind. June 19, 2001).

to do on a motion to dismiss, Plaintiff adequately states a Fourteenth Amendment procedural due process claim requiring denial of Defendants' motion.

## FACTUAL BACKGROUND

Plaintiff John Doe was expelled from Indiana University School of Medicine on June 16, 2020 without any notice regarding the conduct leading to such expulsion, and without any opportunity to defend himself, contrary to university policy and in violation of Doe's fundamental rights. (ECF No. 69-20, Ex. 21, IUSM Dismissal); (Hess Dep. Tr. 87:3-9, 103:3-7, ECF No. 84-7, Ex. 92 at 88, 104); (Reeser Dep. Tr. 76:23-77:3, ECF No. 84-6, Ex. 91 at 76-77). Plaintiff matriculated at Indiana University School of Medicine in the fall of 2017, with an expected graduation in the spring of 2021. (ECF No. 8 at ¶ 50); (ECF No. 88-10, Ex. 1082, Student Promotions Report at 3). During the fall 2017 semester, Plaintiff began dating fellow IUSM student Jane Roe. (ECF No. 8 at ¶ 118-119); (ECF No. 69-13, Ex. 14, SPC Appeal Request at 5-6). After a year-long relationship that included several break-ups and reconciliations, John Doe ended the relationship with Jane Roe in October, 2018. (ECF No. 8 at ¶ 149-150); (ECF No. 69-13, Ex. 14, SPC Appeal Request at 5-6). Mere days later, Roe filed a complaint with the University[3] alleging Doe had assaulted her on several occasions. (ECF No. 8 at ¶ 54); (Dickey Dep. Tr. 68:5-8, ECF No 72-1, Ex. 85 at 69); (ECF No. 88-2, Ex. 1030, Incident Report at 3-4).

On January 18, 2019, Doe was notified by Investigator Gregory Kuester ("Mr. Kuester") that a formal investigation regarding Roe's allegations against him was being initiated. (ECF No. 8 at ¶ 162-163); (ECF No. 77-13, Ex. 2011, Notice Letter at 1-2). Mr. Kuester, an interim investigator who was never trained in the University's policies, proceeded to conduct a faulty investigation in which he failed to obtain critical evidence such as Roe's medical records, arbitrarily declined to interview

---

[3] Doe refers to Defendants Trustees of Indiana University, Indiana University School of Medicine, and Indiana University Purdue University – Indianapolis collectively, as the "University."

witnesses identified by Doe, included in the final investigative report highly inflammatory and prejudicial information regarding Doe that was not relevant to the charges at issue, made unwarranted relevancy determinations regarding the evidence, and failed to seek the testimony of Roe's father who likely had material information concerning Roe's claims. (ECF No. 8 at ¶ 176, 187-188, 203); (Kuester Dep. Tr. 48:18-49:9, 99:8-18, 104:5-25, 107:21-108:6, 108:13-109:4, 110:3-24, ECF No. 84-1, Ex. 86 at 49-50, 100, 105, 108-111); (Doe Dep. Tr. 16:4-6, 10-13; ECF No. 71-10, Ex. 84 at 16). Mr. Kuester's deficient investigation culminated in the issuance of a report to which Doe was permitted to respond, but of which he was not provided a hard copy. (ECF No. 8 at ¶ 201-203); (Dickey Dep. Tr. 52:10-53:2, ECF No. 72-1, Ex. 85 at 53-54).

On May 20, 2019, Doe appeared before a hearing panel comprised of Chairperson Wende' Ferguson ("Ms. Ferguson"), faculty member Robert Yost, and staff member Jose Magallon Maciel (the "Hearing Panel"). (ECF No. 8 at ¶ 212); (Hearing Tr. 2:12-14, 3:6-9, ECF No. 80-1, Ex. 2035 at 2-3). Prior to the start of the hearing, Director of Student Conduct and Deputy Title IX Coordinator Sara Dickey ("Ms. Dickey") notified Ms. Ferguson, Chairperson and a voting member of the Hearing Panel, that Roe had previously alleged Doe brought a firearm to campus, notwithstanding that this information had been redacted from the report due its prejudicial and highly inflammatory nature. (ECF No. 8 at ¶ 212-236); (ECF No. 71-4, Ex. 77(B), Ferguson Aff. at 6, ¶ 33); (ECF No. 71-3, Ex. 76, Dickey Aff. at 4, ¶ 17).

Doe participated in the hearing which deprived him of a meaningful opportunity to be heard when he was precluded from making an uninterrupted statement regarding his defense to the charges, and Ms. Ferguson declined to ask Roe all questions that Doe submitted, without any explanation for such refusal. (ECF No. 8 at ¶ 217-218); (Ferguson Dep. Tr. 71:17-73:1, ECF No. 84-2, Ex. 87 at 72-74); (Hearing Tr. 17:5-18:16, 33:10-37:6, ECF No. 80-1, Ex. 2035 at 17-18, 33-37) (ECF No. 69-5, Ex. 5, Question List). Ultimately, the Hearing Panel concluded that Doe was responsible for dating

violence in relation to an encounter that occurred on July 12, 2018[4] and issued a decision letter dated May 23, 2019, imposing a one-year suspension. (ECF No. 8 at ¶ 237-239); (ECF No. 69-6, Ex. 6, Decision Letter, at 1-3). Doe appealed the finding and sanction. (ECF No. 8 at ¶ 240-250); (ECF No. 69-9, Appeal Denial). His appeal was denied by Dean of Students Jason Spratt on June 7, 2019. (ECF No. 8 at ¶ 251-252); (ECF No. 69-8, Ex. 8, Appeal); (ECF No. 69-9, Ex. 9, Appeal Denial).

Subsequent to the Title IX hearing and appeal process, on May 24, 2019, Doe was notified that he would be subjected to a second disciplinary process, which required him to appear before IUSM's Student Promotions Committee ("SPC"). (ECF No. 8 at ¶ 253); (ECF No. 69-7, Ex. 7, SPC Notice). After an unexplained delay in the proceeding, Doe appeared before the SPC on October 28, 2019. (ECF No. 8 at ¶ 258, 268-275); (ECF No. 71-1, Ex. 68, SPC Agenda at 2). The purpose of the SPC was to accept the findings reached by the Title IX Hearing Panel and merely assign appropriate sanctions, rather than to "re-investigate" the matter. (ECF No. 8 at ¶ 265); (ECF No. 74-2, Ex. 1056, Email re SPC, at 2). After a brief meeting during which Doe was unable to present any witnesses, question his accuser, or be accompanied by counsel, the SPC recommended that Doe be dismissed from the medical school. (ECF No. 8 at ¶ 262, 268-277); (ECF No. 74-2, Ex. 1056, Email re SPC, at 2-3, 5); (ECF No. 69-11, Ex. 11, SPC Decision, at 1).

Doe sought reconsideration of the SPC's decision, which was denied, and subsequently appealed the SPC finding, which was also denied, before a final review of the matter was sent to Dean of Indiana University School of Medicine Jay Hess ("Dean Hess"), for final approval. (ECF No. 8 at ¶ 278-290); (ECF No. 88-5, Ex. 12, SPC Reconsideration, at 3-18); (ECF No. 69-12, Ex. 13, Denial of Reconsideration, at 1-14); (ECF No. 69-14, Ex. 15, SPC Appeal, at 1-3); (ECF No. 69-15, Ex. 16,

---

[4] For purposes of this memorandum, Plaintiff provides a brief overview of the factual background. For a more detailed recitation of the underlying events, Plaintiff respectfully refers the Court to his Amended Complaint, (ECF No. 8) and his Amended Memorandum of Law in Support of Motion for Preliminary Injunction (ECF No. 94).

Appeal Denial, at 1-2). Doe met with Dean Hess on March 4, 2020. (ECF No. 71-6, Ex. 79, Hess Aff. at 6, ¶ 21). At the meeting, Dean Hess vacated the SPC's recommendation of expulsion. (ECF No. 8 at ¶ 291, 295-300); (ECF No. 88-9, Ex. 1059, Hess Recording at 24:59-24:11). Dean Hess notified Doe that he would be permitted to complete an additional one-year leave of absence from IUSM, during which time Doe could pursue his MBA from Indiana University's Kelley School of Business ("IUKSB"), and continue his counseling before returning to IUSM in the spring of 2021 to complete his medical education. (ECF No. 8 at ¶ 301-304); (ECF No. 69-16, Ex. 17, March 27 Letter); (Hess Dep. Tr. 41:5-12, ECF No. 84-7, Ex. 92 at 42).

In reliance on Dean Hess's assurances, Doe applied to IUKSB but was ultimately denied admission on May 29, 2020 for the stated reason that Doe withheld information and gave false or incomplete information in his application. (ECF No. 8 at ¶ 309, 313-314, 330-334); (ECF No. 69-19, Ex. 20, IUKSB Denial). Thereafter, on June 16, 2020, Dean Hess, via letter, notified Doe that he was immediately expelled from IUSM due to perceived misrepresentations made in his application to IUKSB. (ECF No. 8 at ¶ 345-348); (ECF No. 69-20, Ex. 21, IUSM Dismissal). Dean Hess did not reference any other conduct that contributed to this decision in the June 16 letter. *Id.* The expulsion was imposed without any prior notice from IUSM that there was a concern regarding statements made by Doe in his application, and without any opportunity for Doe to appear for a meeting or hearing, or to respond to the charges. (Hess Dep. Tr. 87:3-9, 103:3-7, ECF No. 84-7, Ex. 92 at 88, 104); (Reeser Dep. Tr. 76:23-77:3, ECF No. 84-6, Ex. 91 at 76-77). The expulsion effectively ended Doe's medical career before it even began. (ECF No. 8 at ¶ 16-25); (ECF No. 88-1, Ex. 1000, Doe Aff. at 8, ¶ 23); (ECF No. 73-1, Ex. 1001, Miller Aff. at ¶ 16-25).

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on

its face." *Ashcroft v. Iqbal,* 556 U.S. at 678. A claim demonstrates facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678. In assessing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts, and drawing reasonable inferences in the plaintiffs' favor." *McReynolds v. Merrill Lynch & Co.,* 694 F.3d 873, 879 (7th Cir. 2012). Thus, the Court's "task is not to determine what allegations are supported by the evidence but to determine whether [Plaintiff] is entitled to relief if everything that he says is true." *Doe v. Purdue Univ.,* 928 F.3d 652, 656 (7th Cir. 2019). Accepting Plaintiff John Doe's well-pleaded allegations as true, Doe satisfies the standard to overcome Defendants' motion to dismiss his procedural due process claim.

## ARGUMENT

### I.    Plaintiff has Sufficiently Alleged That Defendants Deprived Him of His Protected Liberty and Property Interests.

Plaintiff John Doe has plausibly alleged a violation of Fourteenth Amendment Procedural Due Process. Count II of Plaintiff's Amended Complaint alleges a claim under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution for a denial of Plaintiff's protected liberty interest in "his good name, reputation, honor, and integrity" (ECF No. 8 at ¶ 397-99), and in his protected property interest in pursuing his education and in "future educational and employment opportunities and occupational liberty," without due process. (ECF No. 8 at ¶ 409-414).

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." When a right is protected by the Due Process Clause, a state "may not withdraw [it] on grounds of misconduct absent[ ] fundamentally fair procedures to determine whether the misconduct has occurred." *Doe v. Purdue Univ.,* 928 F.3d at 663 (internal citations and alterations omitted). It is well established that the requirements of the Fourteenth Amendment Due Process clause apply to student disciplinary proceedings at public

institutions. A public educational institution may not expel a student for misconduct (or even suspend him for as few as ten days) "without adherence to the minimum procedures required by [the Due Process] Clause." *Goss v. Lopez*, 419 U.S. 565, 573-74 (1975); *see also Gagne v. Trustees of Indiana Univ.*, 692 N.E.2d 489, 493 (Ind. Ct. App. 1998) ("a student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property, and a student facing expulsion from a public educational institution is entitled to the protections of due process.") Here, Dean Hess expelled Plaintiff from Indiana University School of Medicine without any process whatsoever, let alone the minimum process required by the Due Process Clause.

a) **Plaintiff has a protected property interest within the meaning of the 14ᵗʰ amendment.**

In the higher education context, "any property interest is a matter of contract between the student and the university." *Doe v. Purdue Univ.*, 928 F.3d at 660. Indiana state law recognizes that an implied contract exists between a student and a school, affording graduate school students a property interest in their continued education. *See e.g. Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013) ("the legal relationship between a student and a university is one of implied contract…"); *Neel v. Indiana University Board of Trustees,* 435 N.E.2d 607, 610 (Ind. Ct. App. 1982) ("[t]he most pervasive and enduring theory is that the relationship between a student and an educational institution is contractual in nature.""); *Gordon v. Purdue Univ.*, 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007) ("'[T]he relationship between a student and an educational institution is contractual in nature. . . ."") To establish the requisite property interest, "a university student must do more than show that he has a contract with the university; he must establish that the contract entitled him to the specific right that the university allegedly took, such as the right to a continuing education or the right not to be suspended without good cause." *Doe v. Purdue Univ.*, 928 F.3d at 660 (internal citations omitted).

As a relationship between a student and a university is contractual in nature, Doe thus entered into a contract with the University, entitling him to due process protections. *See Doe v. Purdue*, 928 F.3d

at 661. In exchange for Plaintiff's enrollment and payment of tuition and fees, the University agreed to adhere to the applicable policies and procedures in effect at the time of Doe's enrollment, including the 2018-2019 Student Sexual Misconduct Policy (the "Policy") (ECF No. 69-1, Ex. 1), the Code of Student Rights, Responsibilities & Conduct (the "Code") (ECF No. 69-3, Ex. 3), and the Guidelines for Promotion, Suspension, Dismissal and Withdrawal (the "Guidelines") (ECF No. 69-2, Ex. 2). *See Amaya v. Brater,* 981 N.E.2d at 1240 ("It is generally well accepted that the catalogues, bulletins, circulars, and regulations of a university made available to the matriculant become of part of the contract.")

The Guidelines expressly provide that "[s]tudents in good standing who have passing grades and evaluation reports automatically advance to the next unit of instruction." (ECF No. 69-2, Guidelines, Ex. 2 at 2). The foregoing establishes that Plaintiff has demonstrated a "legitimate entitlement [to his continued education] by pleading the existence of an express or implied contract…" *Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago,* 741 F.3d 769, 773 (7th Cir. 2013). Specifically, Plaintiff was guaranteed that if he remained in good standing and maintained passing grades and evaluation reports, he would *automatically* move forward to the next phase of the medical school curriculum. Doe did indeed achieve passing grades in his courses. (ECF No. 88-10, Ex. 1082, SPC Report, at 3). This policy statement sufficiently establishes Doe's contractual right to continue his education at IUSM, a promise that Defendants failed to honor. *See Bissessur v. Indiana Univ. Bd. of Trustees,* 581 F.3d 599, 602 (7th Cir. 2009) ("A right established by an implied contract between a student and a university can be a property interest subject to constitutional protection…but to receive such protection, the student must first show that the implied contract establishes an entitlement to a tangible continuing benefit…")

The Guidelines further state that any student cited "for lack of acceptable academic standards, ethics, or professional behavior" (ECF No. 69-2, Guidelines, Ex. 2 at 4, ¶ 11(F)) "will be ***required*** to

appear before the SPC to discuss why he/she should not be dismissed from school." (ECF No. 69-2, Guidelines, Ex. 2 at 4, ¶ 11). Plaintiff was assured that he would not be dismissed from IUSM, and deprived of his right to continue his medical education, without an opportunity to appear before the SPC and discuss why he should not be dismissed. For the reasons discussed below, Defendants deprived Doe of these contractually guaranteed property rights, and imposed a dismissal on June 16, 2020 without the requisite process.

**b) Plaintiff has a protected liberty interest within the meaning of the 14th amendment.**

To plead a liberty interest due process claim under § 1983, a plaintiff must sufficiently allege "(1) that [he] had a cognizable liberty interest under the Fourteenth Amendment; (2) that [he] was deprived of that liberty interest; (3) and that the deprivation was without due process." *Mann v. Vogel,* 707 F.3d 872, 877 (7th Cir. 2013). The Seventh Circuit utilizes the "stigma-plus" test to determine whether a deprivation of a protected liberty interest has occurred. The stigma-plus test requires a plaintiff to demonstrate that (1) the state inflicted reputational damage, (2) which was accompanied by an alteration in legal status. *See Doe v. Purdue Univ.,* 928 F.3d at 661. This test is met, for instance, "when a state actor casts doubt on an individual's 'good name, reputation, honor or integrity' in such a manner that it becomes 'virtually impossible for the [individual] to find new employment in his chosen field.'" *Mann v. Vogel,* 707 F.3d at 878 (internal citations omitted); *see also Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001); *Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984) ("The concept of liberty in Fourteenth Amendment jurisprudence has long included the liberty to follow a trade, profession, or other calling.") In other words, "[t]he level of stigma must cause a 'tangible loss of other employment opportunities' or 'have the effect of blacklisting' the plaintiff from comparable jobs." *Doe v. Trustees of Indiana Univ.,* No. 1:20-CV-00123 (JRS/DML), 2020 WL 6274816, at *4 (S.D. Ind. Oct. 26, 2020). Doe satisfies the stigma-plus test because he has been stigmatized by the disciplinary dismissal and has an altered legal status, having been expelled from medical school.

i)  **State-inflicted reputational damage.**

There is no question that Defendants' action in expelling Doe from medical school inflicted reputational damage as he will be unable to continue his medical education or pursue a career in medicine. (ECF No. 8 at ¶ 436).[5] With a permanent erroneous notation of expulsion on his record, he will be prevented from gaining admission to another medical school, obtaining a residency position, and ultimately, becoming a practicing physician. (ECF No. 8 at ¶ 353).

In addition, Doe will unquestionably be obligated to disclose to any future employer or medical school the disciplinary findings on his record. Whether the disclosure is made by the University directly, or by Doe himself, such disclosure is consequently "compelled and certain," rather than speculative, thus satisfying the "state-inflicted" publication component of the stigma-plus test. *See Doe v. Purdue Univ.,* 928 F.3d at 662; *Doe v. Purdue Univ.,* 464 F. Supp. 3d 989, 1002 (N.D. Ind. 2020) ("stigma-plus" test met where plaintiff's chosen occupation was to be an attorney or a financial professional, and such professions would trigger a legal obligation to disclose the disciplinary proceedings to graduate schools and licensing boards, making it "virtually impossible" for him to obtain the necessary licensing credentials due to his obligation to disclose); *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 632 (2d Cir.1996) (stigma-plus test satisfied where "[p]otential future employers undoubtedly will consult plaintiff's prior employer" and learn of stigmatizing statements); *Doe v. Rector & Visitors of George Mason Univ.,* 132 F. Supp. 3d 712, 724 (E.D. Va. 2015) (expulsion from a public university on charges of misconduct implicated a protected liberty interest under the Fourteenth Amendment. Plaintiff alleged he was wrongly held responsible for sexual

---

[5] In *Doe v. Trustees of Indiana University*, (No. 1:20-CV-00123 (JRS/DML), 2020 WL 6274816), this Court recognized that "[a]fter *Purdue*, it is at least clearly established that a student can state a claim based on a state university's deprivation of his liberty interest." *Doe v. Trustees of Indiana Univ.,* No. 1:20-CV-00123 (JRS/DML), 2020 WL 6274816, at *9 (S.D. Ind. Oct. 26, 2020).

misconduct and that this stigmatizing label would impair his ability to seek further education or employment elsewhere.)

Here, Indiana University-Purdue University Indianapolis ("IUPUI") and IUSM had already disclosed Doe's entire disciplinary record to IUKSB. As part of the application process to IUKSB, Doe was not only obligated but required to sign an authorization permitting IUKSB to obtain his disciplinary records (ECF No. 8 at ¶ 315, 332, 341), the disclosure of which was "compelled and certain." (ECF No. 69-18, Ex. 19, Henry Email to Doe at 1); (ECF No. 82-11, Ex. 2049, Henry Email to Hess at 1); (ECF No. 82-10, Ex. 2048, IUKSB Application at 8). IUKSB had no prior knowledge of Doe's disciplinary records, as he was not a student there. (ECF No. 88-10, Ex. No. 1082, SPC Report); (ECF No. 82-10, Ex. No. 2048, IUKSB Application). Similar to *Doe v. Purdue Univ.,* where the Court found that the university's disclosure of the plaintiff's disciplinary finding amounted to state inflicted harm that stigmatized the plaintiff, in the instant matter, the disclosure of Doe's disciplinary record to IUKSB constituted state inflicted harm sufficient to meet that element of the stigma-plus test. *See Doe v. Purdue Univ.* 928 F.3d at 662 (highlighting that publication is satisfied when a plaintiff is "obligated authorize a state agency to disclose its finding.") As a result, IUPUI and IUSM's disclosure of Doe's records and the disciplinary findings to IUKSB constitute publication for purposes of a stigma-plus analysis.[6]

### ii) Alteration in Doe's legal status.

Further, Defendants' actions in suspending and then expelling Doe constituted clear alterations in his legal status as he went from being a full-time medical school student in good standing to a student suspended from medical school, and now a student who has been dismissed from medical school. Prior to the initiation of the Title IX investigation, Doe was a second-year medical student

---

[6] Although IUKSB, IUSM, and IUPUI are all part of Indiana University, upon information and belief, each entity operates as its own entity, with its own independent admissions process.

pursuing his lifelong dream of obtaining a medical degree and becoming a doctor. (ECF No. 8 at ¶ 49). He was an active member of the IUSM community, engaged in a class committee and student interest group, and had an unblemished student record. (ECF No. 8 at ¶ 51-52). The June 16, 2020 decision has permanently stigmatized Doe as an individual who has been expelled from medical school, thus preventing him from pursuing his career of choice, as he will likely be unable to transfer institutions, gain a residency position, or obtain employment in the future. (ECF No. 8 at ¶ 349-353).

Doe's legal status has therefore been significantly altered, from that of a medical student with a promising career, to an individual unlikely to ever become a practicing physician in the United States. (ECF No. 8 at ¶ 353). *See e.g. Doe v. Purdue Univ.*, 464 F. Supp. 3d 989, 1002 (N.D. Ind. 2020) (Plaintiff's legal status altered when expelled from Purdue University); *Doe v. Purdue Univ.*, 928 F.3d 652, 662 (7th Cir. 2019) (legal status altered when plaintiff went from a full-time student in good standing to one suspended for an academic year); *Doe v. Univ. of Connecticut*, No. 3:20-CV-92 (MPS), 2020 WL 406356, at *3 (D. Conn. Jan. 23, 2020) ("Here, the two-year suspension for sexual assault changed the Plaintiff's legal status since he could no longer be a student, put his reputation at stake, and seriously damaged his career prospects; he is thus entitled to procedural protections under the Due Process Clause"); *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d at 722-724 (highlighting that a student's expulsion from a public university constitutes an alteration in legal status, which will hinder additional education or employment elsewhere); *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 614 (E.D. Va. 2016) (recognizing that "the possibility that a disciplinary violation will "interfere with later opportunities for higher education and employment" is so clear as to almost be a truism.") Consequently, Doe satisfies the stigma-plus test, implicating the procedural protections of the due process clause.

## II.    Defendants Deprived Plaintiff of his Protected Interests Without the Requisite Level of Due Process.

Due process requires notice, an impartial decision maker, an opportunity to be heard, and where important decisions turn on questions of fact, an opportunity to confront and question adverse witnesses. *Mathews v. Eldridge,* 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S. Ct. 1011, 1022, 25 L. Ed. 2d 287 (1970). Additional procedures may be warranted as "[d]ue process is a flexible concept that 'calls for such procedural protections as the particular situation demands.'" *Pugel*, 378 F.3d at 662 (quoting *Gilbert v. Homar*, 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997)). In a university disciplinary proceeding, the process due depends on a number of factors including the severity of the offense. *Doe*, 928 F.3d at 663. "The severity of the deprivation suggests the appropriateness of more formal procedures." *Pugel v. Bd. of Trustees of Univ. of Illinois*, 378 F.3d 659, 664 (7th Cir. 2004) (internal citations and quotations omitted). As set forth below, Defendants deprived Doe of the minimal level of process required, both during the Title IX investigation and hearing, as well as prior to dismissing him from IUSM on June 16, 2020.

### a)    The June 16, 2020 expulsion was a disciplinary dismissal, requiring notice and an opportunity to be heard.

The level of due process required in the context of a university dismissal turns on the nature of the dismissal, as either disciplinary or academic. Defendants incorrectly classify the June 16, 2020 expulsion of Doe as an "academic" dismissal, with the intent of securing greater deference toward Dean Hess's conduct, and fewer procedural protections for Doe than he would be entitled to in the case of a dismissal for disciplinary reasons. Yet, the Seventh Circuit has explicitly recognized that "more extensive procedures in the context of a university dismissal comport with the Supreme Court's own admonition in *Goss* that due process requirements depend upon context. Accordingly, those cases considering the adequacy of notice and hearing procedures in the context of graduate student

14

deprivations have dealt with procedural requirements significantly more extensive than those described in *Goss.*" *Pugel v. Bd. of Trustees of Univ. of Illinois,* 378 F.3d 659, 664 (7th Cir. 2004).

Citing to the Supreme Court's decision in *Board of Curators of the University of Missouri v. Horowitz,* (435 U.S. 78 (1978)), the Court in *Fenje v. Feld* explained the distinction between an "academic" and "disciplinary" dismissal as follows:

> The Court held that the dismissal of the medical student in *Horowitz* was "academic" rather than "disciplinary" because it "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor[.]" *Id.* at 89–90, 98 S.Ct. 948. The Court further noted that an academic dismissal is one that involves "a school's determination of whether a student will make a good doctor," and the school's consideration of a student's personal attributes—in *Horowitz* they were hygiene and the ability to keep to a clinical schedule—may permissibly factor into this "academic" decision. *Id.* at 91 n. 6, 98 S.Ct. 948. More broadly, the Court characterized an academic dismissal as one being "more subjective and evaluative" than the "typical factual questions presented in the average disciplinary decision." *Id.* at 90, 98 S.Ct. 948. Academic dismissals, requiring as they do the "expert evaluation ... [and] historic judgment of educators," bear "little resemblance to ... judicial and administrative fact-finding proceedings." *Id.* at 89–90, 98 S.Ct. 948.
>
> Disciplinary dismissals, by contrast, are those involving "the violation by a student of valid rules of conduct" or "disruptive and insubordinate behavior." *Id.* at 86, 90, 98 S.Ct. 948. Disciplinary dismissals, being more objective in nature and not dependent upon the analytical expertise of professional academicians, will bear a "resemblance to traditional judicial and administrative factfinding[.]" *Id.* at 88–89, 98 S.Ct. 948. *Fenje v. Feld,* 398 F.3d 620, 624–25 (7th Cir. 2005).

*See also Keefe v. Adams,* 840 F.3d 523, 537 (8th Cir. 2016) ("If… the reason for the dismissal was the violation by a student of valid rules of conduct—here, the College's Code of Conduct—the Supreme Court has said the dismissal is properly characterized as disciplinary, not academic.") (internal citations omitted*); J. Endres v. Ne. Ohio Med. Univ.,* 938 F.3d 281, 299 (6th Cir. 2019) ("it cannot be the case that because the alleged misconduct somehow relates to a professional trait, the medical school need only treat the matter as academic and provide the student with minimal process. If that were so, the medical school could reasonably construe all types of misconduct as a sign of the student's lack-of-professionalism and thus avoid providing the student with the heighted procedures that the Due

Process Clause may demand… Such a broad conception of academic conduct would swallow all forms of conduct, sweeping *Goss* into oblivion and obviating the need to ever hold a disciplinary hearing.")

Other courts have concluded that dismissals effectuated in similar circumstances fall within the realm of "disciplinary" dismissals. For instance, in *Roach v. University of Utah,* 968 F. Supp. 1446 (D. Utah 1997), the court found a graduate student's dismissal from a master's degree program to be disciplinary where the dismissal was based upon the university's conclusion that the student had provided misleading information on his admission forms. *Id.* at 1453. Similar to the present matter, in *Roach*, there was no academic justification given for the dismissal. Instead, the student received a letter from the school informing him that his admission to the graduate program had been rescinded, effective immediately, on the sole basis that he had provided inaccurate information on his admission form. *Id.* The school did not provide any further explanation or justification for the student's dismissal. The Court consequently concluded that the dismissal was "disciplinary" on the grounds that there was "no evidence that ... inability to perform the work required by [the graduate program] ... or any failings whatsoever of an academic nature influenced [the school's] decision to suspend Roach." *Id. See also Keefe v. Adams,* 840 F.3d 523, 537 (8th Cir. 2016) (concluding dismissal of student from nursing program for offensive comments made on social media was a disciplinary dismissal, distinguishing from academic dismissals which are related to school's curriculum, such as failing to complete coursework, failing exams, lack of preparation, absenteeism, or cheating on an exam).

Dean Hess's dismissal letter of June 16, 2020 informed Doe that he was being dismissed from IUSM as a result of alleged misrepresentations made in his application to IUKSB. (ECF No. 69-20, Ex. 21, Dismissal Letter). There was no indication that the dismissal resulted from Dean Hess's conclusion that Doe "did not possess the attributes necessary to adequately perform his clinical duties," (*Fenje v. Feld*, 398 F.3d at 625), nor did the letter disclose that Dean Hess "made the careful and deliberate decision to dismiss Plaintiff" as alleged in Defendants' brief. (ECF No. 29 at 16). The

plain language of the letter indicated that the perceived misrepresentations made by Doe in his application to IUKSB were the sole basis for Doe's dismissal. (ECF No. 69-20, Ex. 21, Dismissal Letter); (Hess Dep. Tr. 78:1-80:7; 86:19-22, ECF No. 84-7 at 79-81, 87). Indisputably, the stated reason for the dismissal was Doe's alleged violation of IUSM's Guidelines, rather than an academic failure. The dismissal therefore falls squarely within the category of a disciplinary dismissal, requiring more robust procedural protections than those afforded here. *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. at 86. At minimum, there is a question of fact as to the basis for Doe's dismissal and whether it constituted an academic or disciplinary dismissal. Consequently, this matter cannot be appropriately decided at the pleading stage.

Defendants' reliance on *Fenje v. Feld* is misplaced, as that matter is plainly distinguishable from the present case. *Fenje v. Feld,* 398 F.3d 620 (7th Cir. 2005). Though the plaintiff in *Fenje* was dismissed from a residency program due to an alleged lack of candor in the application process, any similarities to the present matter end there. The plaintiff in *Fenje* received far more process than Doe received in this case. Specifically, Fenje was: (i) "fully informed of Dr. Feld's concerns and provided an opportunity to give his side of the story in an effort to dissuade Dr. Feld from dismissing him from the program;" (ii) Fenje took advantage of this opportunity both orally and in writing; and (iii) Fenje received a full post-termination hearing before an academic committee and was permitted a subsequent administrative appeal. *Fenje v. Feld, 3*98 F.3d at 627. Here, Doe did not receive any of the foregoing process afforded the plaintiff in *Fenje*. Neither Dean Hess himself, nor anyone else at the University, ever informed Doe about Dean Hess' concerns related to Doe's application to IUKSB. Doe also did not have an opportunity to respond, either verbally or in writing, to any of the concerns in an attempt to dissuade Dean Hess from dismissing him from IUSM, he never received any type of hearing, or even a single administrative meeting concerning the alleged discrepancies in his application, before the expulsion was imposed, and he did not have an opportunity to appeal. Moreover, as noted

in the Court's Decision dated November 30, 2020, Doe's alleged misrepresentation on his IUKSB application was "a separate offense distinct from his [alleged] violation of the Sexual Misconduct Policy." (ECF No. 102 at 11). As such, this separate and distinct alleged violation mandated its own level of due process, which was conspicuously absent. Contrary to Defendants' contention that Doe was "provided more process than he was due," he was in fact provided no process whatsoever.

   b) **Defendants violated university procedures during the May 20, 2019 Title IX hearing, which further deprived Doe of a fair process.**

   In addition to the current factual record which unquestionably demonstrates a violation of Doe's right to notice and an opportunity to be heard prior to his dismissal from IUSM, Defendants further deprived Doe of his fundamental procedural rights during the Title IX disciplinary hearing concerning the allegations made by Jane Roe.

   1. *Doe was deprived of a meaningful opportunity to be heard.*

   "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.E.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), *Marshall v. Lauriault*, 372 F. 3rd 175 (3rd Cir. 2004)). The "opportunity to be heard" is the "constitutional minimum." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018). At the same time, the decision makers must also be willing to listen. *See, e.g., Carter v. Harris*, 64 F. Supp. 2d 1182, 1189 (M.D. Ala. 1999). It is well settled that "a body that has prejudged the outcome cannot render a decision that comports with due process." *Bakalis v. Golembeski*, 3 F.3d 318, 326 (7th Cir. 1994); *see also Pavel v. Univ. of Oregon*, 2017 WL 1827706 (D. Oregon May 3, 2017); *Playfair v. South Lemhi School Dist.* 2009 WL 2474205 (D. Idaho 2009) ("A hearing does not comport with due process if it 'is totally devoid of a meaningful opportunity to be heard' because the decision-makers have predetermined the outcome of the hearing") (quoting *Matthews v. Harney County Or., School Dist. No. 4*, 819 F.2d. 889 (9th Cir 1987)); *Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir.1987) ("Due process of law does not allow the state

to deprive an individual of property where the state has gone through the mechanics of providing a hearing, but the hearing is totally devoid of a meaningful opportunity to be heard.")

Defendants deprived Doe of a meaningful opportunity to be heard when he appeared before a panel that lacked the necessary impartiality and approached the proceeding with a predetermined conclusion of guilt against Doe. The Policy guarantees at Section e(ii), that "[b]oth the complainant and respondent will have equal opportunity to provide a statement to the hearing panel." (ECF No. 69-1, Ex. 1, Policy at 12). Accordingly, Doe prepared a statement in which he highlighted discrepancies in Roe's account, pointed to evidence disputing her allegations, and addressed evidence that challenged Roe's credibility. (ECF No. 69-4, Ex. 4, Opening Statement).

However, during the hearing of May 20, 2019, Doe was prevented from delivering his full opening statement to the Hearing Panel members, when he was stopped midway through the delivery of his statement. (Hearing Tr. 17:5-18:16, 33:10-37:6, ECF No. 80-1 at 17-18, 33-37). At Ms. Ferguson's direction, a break was taken and a meeting held between Ms. Ferguson, Ms. Dickey, and Ms. Freiberger, to discuss the information Doe sought to discuss in his statement, which they considered to be "new evidence." (Dickey Dep. Tr. 43:23-45:7, ECF No. 72-1 at 44-46). Ultimately, Ms. Dickey, Ms. Ferguson, and Ms. Freiberger decided that Doe would not be permitted to discuss various factors that impacted Roe's honesty and credibility. *Id.* (ECF No. 8 at ¶ 221-224). Despite the fact that the determination in a he said/she said matter such as this one comes down to the credibility of the parties, Doe was arbitrarily precluded from presenting information that directly impugned Roe's credibility. Doe's inability to present a full statement impacted his opportunity to present a meaningful defense, directly violating his due process rights. *See Doe v. Pennsylvania State Univ.,* 276 F. Supp. 3d 300, 311 (M.D. Pa. 2017) ("to be fair, the accused must therefore be afforded the opportunity to respond, explain, and defend") (internal citations omitted).

19

The Hearing Panel also demonstrated a clear presumption of guilt against Doe, further depriving him of his fundamental right to be heard. It was evident that the Hearing Panel had prejudged the matter and had no intent to actually hear what he had to say. In comparison to its questioning of Roe, the Hearing Panel asked Doe accusatory and leading questions, and made such inappropriate conclusory statements such as, it seemed as though Doe loved his dog more than his (then) girlfriend Roe. (ECF No. 8 at ¶ 228-229); (ECF No. 37-1 at ¶ 112). Further, while the Hearing Panel called Roe's witness to appear for the hearing -- the sole witness -- they failed to request the presence of any of Doe's witnesses. (ECF No. 8 at ¶ 230); (ECF No. 37-1 at ¶ 114). The conduct of the Hearing Panel resulted in a hearing that fell far short of a sufficiently meaningful opportunity to be heard, as required by the Fourteenth Amendment.

### 2. _Doe was deprived of a meaningful opportunity to cross-examine his accuser._

Defendants' decision ostensibly turned on a finding that Jane Roe's version of events was more credible than Doe's. Yet, the Hearing Panel deprived Plaintiff of any meaningful way to confront his accuser. The Supreme Court has held that "in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." _Goldberg v. Kelly_, 397 U.S. 254, 269 (1970). This is so because "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." _Davis v. Alaska_, 415 U.S. 308, 316 (1974).

Where a school disciplinary hearing turns almost entirely on the complainant's credibility, the accused student needs to be provided the right to challenge adverse testimony during the disciplinary proceedings. _Furey v. Temple Univ._, 884 F. Supp.2d 223 (E.D. Pa 2012); _Winnick v. Manning_, 460 F.2d 545, 550 (2d Cir. 1972). As the _Winnick_ court explained, in cases in which the question of student discipline turns on a question of credibility, and the decision maker has to choose between either the accused or his accuser, "cross-examination might … [be] essential to a fair hearing." _Id._ at 550. _See also_

*Donohue v. Baker*, 976 F. Supp. 136, 146-47 (N.D.N.Y. 1997); *Doe v. Baum*, 903 F.3d at 581 ("Due process requires cross-examination in circumstances like these because it is 'the greatest legal engine ever invented' for uncovering the truth…Not only does cross-examination allow the accused to identify inconsistencies in the other side's story, but it also gives the fact-finder an opportunity to assess a witness's demeanor and determine who can be trusted. *Id.* So if a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process.") (internal citations omitted); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 403 (6th Cir. 2017) ("Cross-examination, 'the principal means by which the believability of a witness and the truth of his testimony are tested,' can reduce the likelihood of a mistaken exclusion and help defendants better identify those who pose a risk of harm to their fellow students.") In fact, on May 6, 2020, the Department of Education released its final regulations on Title IX, which took effect on August 14, 2020.[7] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. pt. 106). The regulations make clear, *inter alia*, that schools are now required to afford parties a live hearing with cross-examination, to ensure compliance with the statute.

Doe was denied his right of cross-examination as he was not afforded the opportunity to directly challenge his accuser's allegations and testimony. Instead, Doe's ability to question Roe consisted of him submitting proposed written questions to the Chairwoman of the Hearing, Ms. Ferguson, who would then unilaterally decide whether to pose such questions to Roe. (ECF No. 8 at ¶ 219-220); (ECF No. 37-1 at ¶ 104). The University's Policy provides that "The complainant and respondent may not directly question each other, but may submit questions to the Chair, to be asked of the other party." (ECF No. 69-1, Ex. 1, Policy at 12). The Policy does not restrict the types of

---

[7] The Department of Education published the final regulations in the *Federal Register* on May 19, 2020.

questions that may be posed, other than to say "[t]he Chair or other panel members will review questions prior to posing to the other party to prevent questioning that is not permitted under these proceedings." (ECF No. 69-1, Ex. 1, Policy at 12). The types of questioning "not permitted under these proceedings," however, is not defined. (*Id.*) In accordance with the Policy, Doe presented a list of questions to be posed to Roe through the Chair. (Hearing Tr. 17:5-21, ECF No. 80-1, Ex. 2035 at 17); (ECF No. 69-5, Ex. 5, Question List). Doe's written list of thirteen questions for Roe concerned their relationship and the alleged conduct at issue. (ECF No. 69-5, Ex. 5, Question List).

Upon receipt of Doe's written questions, Ms. Ferguson initiated a break in the proceedings to allow Doe to neatly write out the questions. (Hearing Tr. 17:5-18:7, ECF No. 80-1, Ex. 2035 at 17-18). When the hearing resumed, Ms. Ferguson did not state on the record that any conversation between her, Doe, and his advisor ever took place, let alone that Doe agreed to limit his drafted questions of Roe. (Hearing Tr. 17:5-18:16, ECF No. 80-1, Ex. 2035 at 17-18). Ms. Ferguson testified that she reached an agreement with Doe and his advisor regarding which of his thirteen questions the panel would ask Roe. (Ferguson Dep. Tr. 62:20-22, ECF No. 84-2, Ex. 87 at 63). Doe disputes that such an agreement took place, (Doe Dep. Tr. 57:1-15, ECF No. 71-10, Ex. 84 at 57), and no reference to this agreement was made on the record, (Hearing Tr. 17:5-18:16, ECF No. 80-1, Ex. 2035 at 17-18) (Ferguson Dep. Tr. 70:24-71:8, ECF No. 84-2, Ex. 87 at 71-72), despite Ms. Ferguson's practice of doing so. (Freiberger Dep. Tr. 87:13-88:3, ECF No. 84-5, Ex. 90 at 87-88). Ultimately, Ms. Ferguson arbitrarily refused to ask Roe a number of questions submitted by Doe, instead asking only select portions of certain questions to Roe. (ECF No. 8 at ¶ 219-220). Doe was therefore unable to meaningfully question his accuser, in violation of his procedural rights.

### III. Plaintiff is Entitled to Proceed Against the Individual Defendants, in their Official Capacities, for Prospective Injunctive Relief Pursuant to *Ex Parte Young.*

This matter is properly brought against defendants Dean Hess and Dean Allen in their official capacities, under the *Ex Parte Young* doctrine, as Plaintiff seeks prospective injunctive relief for an

ongoing constitutional violation. This Court in *Sonnleitner v. York*, 304 F.3d 704, 717 (7th Cir. 2002), recognized that Eleventh Amendment immunity may be abrogated by: (i) congressional abrogation; (ii) waiver; and (iii) prospective injunctive relief against state officials in their official capacities per *Ex Parte Young*, 209 U.S. 123 (1908). Here, the congressional abrogation with respect to 42 U.S.C. § 1983 does not extend to the state and its officials in their official capacities, *Will v. Mich. Dep't of State*, 491 U.S. 58 (1989), and no waiver is involved. That leaves *Ex Parte Young* prospective injunctive relief against the individual Defendants in their official capacities and monetary damages against the individual Defendants in their private capacities.

As stated by this Court, "official-capacity suits against state officers for injunctive relief are permitted under § 1983 and are not barred by the Eleventh Amendment." *Doe v. Trustees of Indiana Univ.,* No. 1:20-CV-00123 (JRS/DML), 2020 WL 6274816, at *8 (S.D. Ind. Oct. 26, 2020). This narrow exception to Eleventh Amendment immunity permits prospective injunctive relief claims against individual officials in their official capacities for ongoing constitutional violations. *Doe v. Purdue Univ.*, No. 2:17-CV-33-JPK, 2020 WL 2542674, at *13 (N.D. Ind. May 19, 2020). There is no question that "[w]hen a state official violates the Constitution or federal law, he acts outside the scope of his authority and is no longer entitled to the State's immunity from suit. *Young* thus creates a legal fiction— the state official who acts in violation of the federal Constitution is stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Ameritech Corp. v. McCann,* 297 F.3d 582, 586 (7th Cir. 2002) (internal citations and quotations omitted).

Plaintiff's Amended Complaint names individual defendants for the effectuation of prospective injunctive relief under *Ex Parte Young*. This is the case because "[c]laims against persons in their official capacities for prospective relief are not treated as actions of the State, and thus may proceed separately as actions against these defendants in their official capacities." *Grant v. Trustees of Indiana Univ.,* No. 1:13-CV-00826-TWP, 2015 WL 4077255, at *2 (S.D. Ind. July 6, 2015). In fact,

Defendants do not challenge that Dean Hess is a properly named defendant for purposes of the specific relief sought, acknowledging that he is: "the only potential official-capacity defendant for prospective relief…" (ECF No. 29 at 21). As alleged in his Amended Complaint, Bradley Allen, Senior Associate Dean for Medical Student Education ("Dean Allen"), imposed an administrative suspension in the spring of 2019, arranged for Doe to move to a different campus, and prevented him from utilizing campus resources. (ECF No. 8 at ¶ 170, 181, 182, 194, 195). Subsequent to Dean Hess's reversal of the SPC decision, the March 27, 2020 letter from Dean Hess expressly stated that Doe would be required to meet with Dean Allen to apply for reinstatement to IUSM, prior to September 1, 2020. (ECF No. 8 at ¶ 302, 303). The complaint, fairly read in Plaintiff's favor, alleges that Dean Allen would be involved in the decision to readmit Doe to IUSM. A deposition of Dean Allen is therefore appropriate, to determine his precise role and responsibilities, and whether he is a necessary defendant for purposes of effectuating the requested relief. Thus, Doe may proceed against Defendants Hess and Allen in their official capacities, as necessary parties to implement the relief he seeks.

In addition, the harm Doe seeks to rectify unquestionably includes prospective injunctive relief. Here, Doe seeks expungement of all disciplinary records and sanctions. (ECF No. 8 at p. 83). As affirmed by the Seventh Circuit in *Doe v. Purdue*, "John's marred record is a continuing harm for which he can seek redress." *Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019). *See, e.g.*, *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (pursuing expungement of university records "serve[s] the purpose of preventing present and future harm"); *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (seeking to "remove the negative notation from appellants' disciplinary records" is "nothing more than prospective remedial action"); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (an "F" grade and a plagiarism conviction "constitute[d] a continuing injury to the plaintiff" and an action to remove them was "prospective in nature"); *Johnson v. W. State Colorado Univ.*, 71 F. Supp. 3d 1217, 1230

(D. Colo. 2014) ("Plaintiff's request for injunctive relief in the form of expungement of his record falls within the *Ex parte Young* exception.")

### IV.     The Individual Defendants Are Not Entitled to Qualified Immunity.

Plaintiff is also entitled to proceed against Defendants Hess and Kuester in their individual capacities, as they engaged in violations of Plaintiff's clearly established rights, and their actions deprive them of a qualified immunity defense. An analysis of qualified immunity utilizes a two-part inquiry: (1) whether the facts, as read in favor of moving party, amount to a constitutional violation; and (2) whether the constitutional right was clearly established at the time of the alleged violation. *See Figgs v. Dawson,* 829 F.3d 895, 905 (7th Cir. 2016). The law is considered "clearly established" when "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Id.* (internal citations omitted). Contrary to Defendants' submission, Plaintiff specifically alleges that he was not afforded notice and an opportunity to be heard. (ECF No. 8 at ¶ 396-399, 414, 424(vi)). Defendants Hess and Kuester engaged in conduct constituting clear violations of Doe's constitutional rights, which divest them of a qualified immunity defense. Doe is therefore entitled to proceed against Defendants Hess and Kuester in their individual capacities, for monetary damages.

In addition, Defendants' defense of qualified immunity is premature, at the motion to dismiss stage. The defense of qualified immunity is "generally addressed at summary judgment rather than on the pleadings." *Doe v. Purdue Univ.,* 928 F.3d 652, 665 (7th Cir. 2019). *See Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir. 2001) ("[A] complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds."); *see also Jacobs v. City of Chicago,* 215 F.3d 758, 765 n.3 (7th Cir. 2000) ("[T]he dismissal of a § 1983 suit under Rule 12(b)(6) is a delicate matter.") "The reason for deferring it to summary judgment is that an officer's entitlement to qualified immunity often "depend[s] on the particular facts of a given case," *Jacobs,* 215 F.3d at 765 n.3, and the Federal Rules of Civil Procedure

25

do not require a plaintiff to include much factual detail in a complaint, *see* Fed. R. Civ. P. 8 (providing that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief")." *Doe v. Purdue Univ.,* 928 F.3d 652, 665 (7th Cir. 2019). As recently explained by this Court, "[a]lthough there is "no hard-and-fast rule" against it, *Purdue,* 928 F.3d at 665, "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds," *Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir. 2001). That is because qualified immunity often "depend[s] on the particular facts of a given case," *Jacobs v. City of Chicago,* 215 F.3d 758, 765 n.3 (7th Cir. 2000), which are often not sufficiently developed at the pleading stage." *Doe v. Trustees of Indiana Univ.,* No. 1:20-CV-00123 (JRS/DML), 2020 WL 6274816, at *8 (S.D. Ind. Oct. 26, 2020). For the reasons set forth below, the individual defendants are not entitled to dismissal on grounds of qualified immunity at this stage of the proceedings.

### a)  Dean Hess

The Supreme Court has plainly articulated the hallmarks of procedural due process as notice and a meaningful opportunity to be heard. *Mathews v. Eldridge, 424* U.S. 319. Dean Hess single-handedly deprived Doe of any process whatsoever, let alone the minimal level of process required to satisfy the constitutional standard, when he expelled Doe from IUSM without any notice, and without any meeting or hearing, in violation of the Guidelines as well as Doe's fundamental rights.

The most egregious alteration in Doe's status was an independent expulsion that occurred on June 16, 2020, when Dean Hess summarily expelled Doe from IUSM without any prior notice and without any opportunity to be heard. (ECF No. 8 at ¶ 345, 399). Doe was informed by letter from Dean Hess that he was dismissed from IUSM for the stated reason that information Doe provided in his application to IUKSB was inconsistent with what Dean Hess had represented during their meeting on March 4, 2020 and in his subsequent letter of March 27, 2020 concerning Doe's return to the medical school. (ECF No. 69-20, Ex. 21, Dismissal Letter). The perceived misrepresentations made

by Doe in his application to the business school were the sole basis for Doe's dismissal. (ECF No. 69-20, Ex. 21, Dismissal Letter) (Hess Dep. Tr. 78:1-80:7; 86:19-22, ECF No. 84-7, Ex. 92 at 79-81, 87). The June 16, 2020 dismissal letter made no reference to Doe's prior appearance before the SPC (Hess Dep. Tr. 86:25-87:2, ECF No. 84-7, Ex. 92 at 87-88), nor did it reference any other conduct that influenced the decision to expel Doe. (ECF No. 69-20, Ex. 21, Dismissal Letter).

IUSM's Guidelines for Promotion, Suspension, Dismissal, and Withdrawal (ECF No. 69-2, Guidelines, Ex. 2) make clear that a student may be recommended for dismissal on several grounds, such as "[b]eing cited for lack of acceptable academic standards, ethics, or professional behavior," which certainly includes lying. The Guidelines explicitly state that "[a]ny student who meets any of the below criteria will be *required* to appear before the SPC to discuss why he/she should not be dismissed from school." (emphasis added). Despite the clear requirement that a student appear before the SPC prior to being dismissed from IUSM, Doe was never provided any type of meeting or hearing with IUSM related to the statements made in his IUKSB application.

Doe was consequently deprived of the opportunity to share his perspective, answer any questions concerning the statements made in his application, or argue why he should not be dismissed from medical school. Furthermore, at no time was Doe even contacted prior to receipt of the June 16, 2020 dismissal letter, by Dean Hess or anyone else at IUSM, to put him on notice that statements made in his application were potentially misrepresentative and thus under review. (Hess Dep. Tr. 103:3-7, ECF No. 84-7, Ex. 92 at 104). Instead, Dean Hess unilaterally issued the Draconian measure of Doe's immediate expulsion from the medical school, without any semblance of process, in deprivation of Doe's fundamental rights and in clear violation of the Guidelines. Based on the foregoing, there is no question that Dean Hess engaged in conduct amounting to a constitutional violation, and that such right was clearly established at the time of Doe's expulsion.

### b)  Gregory Kuester

Plaintiff is also entitled to proceed against Mr. Kuester on the grounds that he violated Doe's due process rights, as well as the University's policies, when he failed to conduct the "adequate, reliable, and impartial investigation" to which Doe was entitled. First, Mr. Kuester overlooked evidence that supported Doe's account of the events, including photographs, text messages, emails, videos, a substance abuse evaluation, a letter from Doe's therapist, and a lie detector test Doe voluntarily submitted to in order to establish his innocence. (ECF No. 8 at ¶ 368). Second, Mr. Kuester failed to interview five of the witnesses identified by Doe in relation to the investigation. (ECF No. 8 at ¶ 368). Third, Mr. Kuester omitted evidence presented by Doe which called Roe's credibility into question, including a history of complaints of a similar nature. *Id.* Each of the foregoing contributed to the deprivation of Doe's constitutional right to a meaningful opportunity to be heard.

Mr. Kuester further violated Doe's right to an "adequate, reliable, and impartial investigation" when he failed to obtain Roe's medical records. Roe claimed as part of her allegations that she suffered injuries which required her to seek medical attention. (ECF No. 88-2, Ex. 1030, Incident Report at 4). Though she provided Mr. Kuester with receipts for her medical bills, she did not provide him with copies of the actual medical records for inclusion in the investigation report. Mr. Kuester made repeated requests to Roe to provide him with a copy of the records, understanding that such records could be "helpful." (ECF No. 74-18, Ex. 1076, Email January 16-17, 2019). Yet, Roe never produced the medical records from her visit to the hospital the day after one of the alleged instances of assault. (Kuester Dep. Tr. 102:17-20, ECF No. 84-1, Ex. 86 at 103). Mr. Kuester not only failed to request Roe provide an authorization to obtain these records but incredibly, never even thought to ask her for one. (Kuester Dep. Tr. 104:9-25, ECF No. 84-1, Ex. 86 at 105); (ECF No. 88-15, Ex. 2023, Final Report at 3).

As discussed above, the opportunity to be heard is one of the central tenets of procedural due process. Mr. Kuester, as an individual retained for purposes of conducting an "adequate, reliable, and impartial investigation" was arguably well aware of one's right to be heard, in a meaningful manner, when being investigated for misconduct. Based on the foregoing, Mr. Kuester knowingly violated Doe's rights as articulated by the Policy, and further deprived Doe of the fair proceeding to which he was entitled, thus eliminating a qualified immunity defense.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss Plaintiff's procedural due process claim should be denied in its entirety, and the Court should order such other relief as deemed just and proper. In the event Defendants' motion is granted in whole or in part, Plaintiff alternatively requests leave to amend his Amended Complaint, pursuant to Federal Rule of Civil Procedure 15(a)(2).


Dated:   New York, New York
         December 4, 2020



                              Respectfully submitted,

                              *Attorneys for Plaintiff John Doe*

                              **NESENOFF & MILTENBERG, LLP**
                              **By: */s/ Andrew T. Miltenberg***
                              **Andrew T. Miltenberg, Esq. (*pro hac vice*)**
                              **Stuart Bernstein, Esq. (*pro hac vice*)**
                              **Philip A. Byler, Esq. (*pro hac vice*)**
                              **363 Seventh Avenue, Fifth Floor**
                              **New York, New York 10001**
                              **(212) 736-4500**
                              **amiltenberg@nmllplaw.com**
                              **sbernstein@nmllplaw.com**
                              **pbyler@nmllplaw.com**

Tara J. Davis, Esq. (*pro hac vice*)
Regina M. Federico, Esq. (*pro hac vice*)
101 Federal Street, Nineteenth Floor
Boston, Massachusetts 02110
(617) 209-2188
tdavis@nmllplaw.com
rfederico@nmllplaw.com

DELK MCNALLY, LLP
By: */s/ Michael T. McNally*
Michael McNally, Esq.
IN No. 23676-49
211 South Walnut Street
Muncie, Indiana 47305
(317) 442-4444
mcnally@delkmcnally.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of record via the Court's Electronic Notification System, this 4th day of December, 2020.

*/s/ Tara J. Davis*
Tara J. Davis