UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02006-JRS-MJD |
| | ) | |
| THE TRUSTEES OF INDIANA | ) | |
| UNIVERSITY, | ) | |
| INDIANA UNIVERSITY SCHOOL OF | ) | |
| MEDICINE, | ) | |
| INDIANA UNIVERSITY KELLEY | ) | |
| SCHOOL OF BUSINESS, | ) | |
| GREGORY KUESTER in his official and | ) | |
| individual capacity, | ) | |
| BRADLEY ALLEN in his official and | ) | |
| individual capacity, | ) | |
| JAY HESS in his official and individual | ) | |
| capacity, | ) | |
| INDIANA UNIVERSITY PURDUE | ) | |
| UNIVERSITY INDIANAPOLIS, INDIANA, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On May 20, 2019, Indiana University Purdue University Indianapolis ("IUPUI")

suspended medical student John Doe for dating violence.[1]  Doe then applied for the

MBA program at Indiana University's Kelley School of Business ("IUKSB").  But in

preparing his application, Doe misrepresented his disciplinary status.  IUPUI noticed

_____

[1]Plaintiff has been permitted to proceed under a pseudonym to protect his identity.  Likewise,
the student who accused him of dating violence is referred to by the pseudonym Jane Roe.

the misrepresentation, notified Doe's medical school—Indiana University School of Medicine ("IUSM")—of it, and on June 16, 2020, IUSM expelled Doe.

Doe brought this action against IUSM, Indiana University ("IU"), the Trustees of IU, IUKSB, IUPUI, IUSM Dean Jay Hess, IUSM Senior Associate Dean Bradley Allen, and former Title IX investigator Gregory Kuester, in their individual and official capacities (collectively "Defendants").  Doe alleges a violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq*., and a deprivation of procedural due process, cognizable under 42 U.S.C. § 1983.  Doe seeks damages and injunctive relief.[2]  Defendants moved for summary judgment.  (Defs.' Mot. Summ. J., ECF No. 122.)  The parties have fully briefed the issue.  (Defs.' Br. Supp. Summ. J., ECF No. 124; Pl.'s Resp. Opp'n, ECF No. 128; Defs.' Reply, ECF No. 135.)  Doe also moved for an oral argument on Defendants' motion.  (Pl.'s Mot. Oral Arg., ECF No. 129.)

Regarding the due process claim, asserted in Count II of the Amended Complaint, the Court previously granted in part and denied in part Defendants' Partial Motion to Dismiss, (Order Mot. Dismiss, ECF No. 140), dismissing with prejudice Doe's due process claims as against the Trustees, IU, IUPUI, and IUSM; the due process claims for damages against Dean Hess, Associate Dean Allen, and Kuester in their official capacities; and the due process claim for prospective injunctive relief against Kuester in his official capacity.  Doe did not assert a due process claim against IUKSB.  Thus, the only due process claims remaining for consideration in this summary judgment

---

[2] On October 29, 2021, Doe withdrew his claim for damages related to psychological and emotional distress.  (Notice Pl.'s Withdrawal Claim, ECF No. 145.)

ruling are (1) the due process claims for prospective injunctive relief against Dean Hess and Associate Dean Allen in their official capacities, and (2) the due process claims for damages against Dean Hess, Associate Dean Allen, and Kuester in their individual capacities. (Order Mot. Dismiss 9, ECF No. 140.) For the following reasons, Defendants' Motion for Summary Judgment, (Defs.' Mot. Summ. J., ECF No. 122), is **granted**. Doe's Motion for Oral Argument on Summary Judgment, (Pl.'s Mot. Oral Arg., ECF No. 129), and Defendants' Motion to Exclude Plaintiff's Damages Experts or Limit Certain Opinions, (Defs.' Mot. Exclude, ECF No. 147), are each **denied as moot**.

## I. Background

Given the summary judgment standard, the Court takes the facts in the light most favorable to Doe. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). As the Court has previously detailed, (Order Mot. Dismiss, ECF No. 140), Doe entered IUSM and began dating Jane Roe, another student at IUSM, in October of 2017. (Doe Decl. ¶ 2, ECF No. 70-1; Final Inv. Report 3, ECF No. 87-13.) Their on-and-off relationship was "at times tempestuous," (Am. Compl. ¶ 119, ECF No. 8), as evidenced by some relevant examples. In June 2018, Roe struck Doe several times and threw a flower vase at Doe's head. (Final Inv. Report App. 178–79, ECF No. 88-16; Final Inv. Report 4, 9, ECF No. 87-13.) Then, in July 2018, Doe and Roe got into an argument at Roe's father's house. (Doe Decl. ¶ 25, ECF No. 70-1.) As Doe was leaving the house, he collided with Roe. (*Id.*) But Roe detailed that Doe then pushed her through a closed door onto the laundry room floor and that he had

been verbally and physically abusive on other occasions.  (Final Inv. Report 3, 5, ECF No. 87-13; Letter from Gregory Kuester, Title IX Investigator, OSC, to John Doe 1 (Jan. 18, 2019), ECF No. 77-13.)  On January 18, 2019, Gregory Kuester, a Title IX Investigator with IUPUI's Office of Student Conduct ("OSC"), notified Doe that the OSC was investigating Roe's allegations.  (Letter from Gregory Kuester, Title IX Investigator, OSC, to John Doe 1 (Jan. 18, 2019), ECF No. 77-13.)

After an investigation by Kuester, an OSC hearing panel found Doe, who appeared before the panel with his counsel, responsible for dating violence in violation of the Student Sexual Misconduct Policy.  (OSC Hr'g Tr. 2–4, ECF No. 81-15; Ferguson Aff. ¶¶ 47–48, ECF No. 70-3.)  The panel suspended Doe for one year and imposed conditions on any potential return to IU.  (Letter from Kelly Freiberger, Student Conduct Coordinator, IUPUI, to John Doe (May 23, 2019), ECF No. 69-6.)  Because the panel found that Doe violated the Student Sexual Misconduct Policy, IUSM's Student Promotions Committee ("SPC") met with Doe and considered imposing additional, IUSM-specific sanctions.  (Reeser Aff. ¶¶ 6–7, ECF No. 70-8; Letter from Emily Walvoord, Assoc. Dean for Student Affairs, IUSM, to John Doe (May 24, 2019), ECF No. 76-7.)  After speaking with Doe, the SPC recommended that Doe be dismissed from IUSM.  (Comm. Meeting Mins. 2, ECF No. 78-1.)

Doe appealed the SPC's recommendation to the Dean of IUSM, Jay Hess.  (Doe Dep. 92–100, ECF No. 75-1.)  Following a meeting with Doe, Dean Hess decided not to dismiss Doe.  (*Id.*; Hess. Aff. ¶¶ 29–34, ECF No. 70-5.)  Dean Hess's decision letter to Doe said that Dean Hess was granting Doe's appeal of the dismissal

recommendation, but it added that "[t]o be eligible to return to [IUSM], [Doe] must complete all the sanctions" outlined by the OSC, as well as the additional conditions listed in Dean Hess's letter, and noted that "any subsequent violation of academic or personal codes of conduct" would potentially impact or jeopardize Doe's return in spring 2021. (Letter from Jay Hess, Dean, IUSM, to John Doe 1 (Mar. 27, 2020), ECF No. 76-16; Hess Aff. ¶ 34, ECF No. 70-5.) If Doe satisfied those conditions, he could "apply for reinstatement" to IUSM. (Letter from Jay Hess, Dean, IUSM, to John Doe 1 (Mar. 27, 2020), ECF No. 76-16.)

Two months later, Doe applied to IUKSB's MBA program. (IUKSB Appl., ECF No. 83-5.) As part of his application, Doe disclosed his disciplinary history, stating that Dean Hess "overturned the erroneous findings" of the Title IX panel and "fully authorize[d]" his reinstatement "without limitation or restriction." (*Id.* at 5–7.) Doe's disclosure triggered a review by the IUPUI Prior Misconduct Review Committee ("PMRC"). (Email from John Doe to Monica Henry, Assoc. Dir., IUPUI Graduate Off. (May 21, 2020), ECF No. 69-18.) The PMRC reviewed Doe's application, and wrote to Doe that "[t]here appear to be inconsistencies between your statement and Dean Hess's [March 27, 2020 decision] letter." (Email from Monica Henry, Assoc. Dir., IUPUI Graduate Off., to John Doe 1 (May 19, 2020), ECF No. 76-18.) Because of this inconsistency, the PMRC asked Doe for clarification. (*Id.*)

Doe defended his application in writing. (*Id.* at 3–4.) After reviewing Doe's argument, the PMRC concluded that Doe "withheld pertinent information and gave false or incomplete information." (Email from Monica Henry, Assoc. Dir., IUPUI

Graduate Off., to John Doe (May 29, 2020), ECF No. 76-19.)  Thus, the PMRC denied Doe's IUKSB application and notified Dean Hess of Doe's actions.  (*Id.*; Email from Monica Henry, Assoc. Dir., IUPUI Graduate Off., to Jay Hess, Dean, IUSM 1 (June 1, 2020), ECF No. 82-11.)

Dean Hess reviewed Doe's application and Doe's explanation of the inconsistency between it and Dean Hess's actual disposition of Doe's appeal.  (Hess Aff. ¶ 39, ECF No. 70-5; Email from Jay Hess, Dean, IUSM, to Eric Weldy, Vice Chancellor for Student Affairs, IUPUI (June 10, 2020), ECF No. 83-8.)  Dean Hess agreed that Doe had misrepresented Dean Hess's decision and concluded from the incident that Doe was unfit to practice medicine.  (*See* Hess Aff. ¶¶ 39, 44–45, ECF No. 70-5; Email from Jay Hess, Dean, IUSM, to Eric Weldy, Vice Chancellor for Student Affairs, IUPUI (June 10, 2020), ECF No. 83-8.)  Thus, IUSM dismissed Doe effective immediately.  (Letter from Jay Hess, Dean, IUSM, to John Doe 1 (June 16, 2020), ECF No. 37-21.)

## II. Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of production.  *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  That initial burden consists of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim."

*Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Modrowski*, 712 F.3d at 1169). If the moving party discharges its initial burden, the burden shifts to the non-moving party, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of the case. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (quotations omitted).

The Court must construe the facts and reasonable inferences arising from those facts in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. Doe's brief does not specifically controvert many of Defendants' facts. (Pl.'s Resp. Opp'n 12–28, ECF No. 128.) Thus, as to Defendants' facts that are asserted, supported, and not specifically controverted, the Court takes those facts as true. S.D. Ind. L.R. 56-1(f).

## III. Discussion

Doe brings two counts against Defendants. First, he says that Defendants discriminated against him on the basis of sex, in violation of Title IX, during their Title IX investigation into him. (Am. Compl. 59, ECF No. 8.) Second, he says that Defendants deprived him of due process in dismissing him from IUSM over his IUKSB application. (*Id.* at 72.) The Court begins with the Title IX allegations.

A. *Count I: Title IX*

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  The Court must determine whether a reasonable jury could find that Defendants discriminated against Doe "on the basis of sex" during any part of Doe's Title IX process.[3]  *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019).  The Seventh Circuit has identified three types of circumstantial evidence that will support an inference of intentional discrimination:  "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest . . . justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020) (Title VII case); *see Doe v. Brimfield Grade Sch.*, 552 F. Supp. 2d 816, 822–23 (C.D. Ill. 2008) (listing cases and showing that Title VII precedent can generally aid in assessing Title IX claims).

At the outset, the Court notes that Doe has not raised any Title IX arguments against IUKSB.  Doe's Title IX allegations only concern the Title IX process.  None of the decisions made in that process were made by IUKSB.  Since Doe has not shown

---

[3] The Parties tend to use "sex" and "gender" interchangeably, (*see, e.g.*, Defs.' Br. Supp. Mot. Summ. J. 2, ECF No. 124; Pl.'s Resp. Opp'n 8, ECF No. 128), but sex and gender are not the same, *see Gender*, Am. Psych. Ass'n Dictionary of Psych., https://dictionary.apa.org/gender (last visited Jan. 8, 2022) ("Sex usually refers to the biological aspects of maleness or femaleness, whereas gender implies the psychological, behavioral, social, and cultural aspects of being male or female (i.e., masculinity or femininity).").  Since nothing in this case suggests that Doe was discriminated against because of his gender, the Court uses the term "sex."

a genuine dispute regarding whether IUKSB violated Title IX, the Court summarily **grants** summary judgment on Count I for IUKSB.

In an attempt to show discrimination on the basis of sex, Doe points to four instances of alleged anti-male animus. (Pl.'s Resp. Opp'n 35–40, ECF No. 128.) The Court addresses each in turn below.

### 1. Relocation to West Lafayette Campus

First, Doe argues that during the Title IX investigation, IUSM imposed additional, more stringent restrictions on him, a male, but not on Roe, a female. (Pl.'s Resp. Opp'n 8, 36, ECF No. 128.) Doe says that both he and Roe had university-sponsored no contact orders ("NCOs") placed on one another, but despite this similarity, IUSM relocated him to IUSM's West Lafayette campus for two weeks. (*Id.*; Email from Bradley Allen, Senior Assoc. Dean for Med. Sch. Educ., IUSM, to John Doe 2–3 (Apr. 5, 2019), ECF No. 77-17.) Doe argues that the relocation was sex discrimination because IUSM did not make Roe relocate. (Pl.'s Resp. Opp'n 36, ECF No. 128.) The Court assumes that the relocation was adverse—since Defendants have not argued otherwise, although they do note the relocation was not a punitive action—thus, the Court proceeds to whether the relocation decision was based on sex.

Comparator evidence can raise an inference of discrimination, but the inference is only reasonable when the comparators are similarly situated. *See Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (citing *Humphries v. CBOCS W. Inc.,* 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)) ("In other words, the proposed comparator must be similar enough to permit a reasonable juror to infer, in

light of all the circumstances, that an impermissible animus motivated the employer's decision."). Here, Doe has not shown that he and Roe were similarly situated at the time the relocation decision was made. Doe claims that he and Roe had "identical" NCOs imposed on one another when the decision was made, (Pl.'s Resp. Opp'n 36, ECF No. 128), but that assertion is incomplete if not speculative. While Doe and Roe both had NCOs imposed on one another after February 20, 2019, before that date, only Roe had an NCO on Doe. (Allen Dep. 108–09, ECF No. 134-1; Kuester Aff. ¶¶ 13–14, ECF No. 70-6.) Based on the NCO issued in January 2019 in place only against Doe and based on Roe's complaint, the planning process to move Doe so he could complete his training despite the NCO began at that time. (Allen Dep. 109–11, ECF No. 134-1.) Again, putting aside whether this was a non-punitive accommodation in his favor rather than a harm to him, and acknowledging that moving both of them would frustrate any NCO, there is no evidence showing that the plan to move him was based on his sex or was not made before February 20, 2019. Doe has no evidence definitively showing that the relocation decision was made after February 20, 2019. Rather, although communicated in April 2019, Doe has only produced evidence that the relocation *decision* was made sometime prior to April 2019, (Allen Dep. 109–10, ECF No. 134-1), but that only makes it *possible* that the decision was made while both Doe and Roe had NCOs. Speculative assertions are not sufficient on summary judgment. *Hamer v. Neighborhood Hous. Servs. of Chi.*, 897 F.3d 835, 841 (7th Cir. 2018). Since Doe has not provided evidence to reasonably suggest that the relocation

decision was made while he and Roe were allegedly similarly situated, no reasonable jury could infer that the decision was made on the basis of sex.

Even if Doe and Roe did have dueling NCOs at the time of the relocation decision, there is a distinguishing characteristic between them: Roe is a complainant in a Title IX case, while Doe is a respondent. (Defs.' Reply 14, ECF No. 135.) *See Doe v. Trustees of Ind. Univ.*, No. 1:21-cv-00973-JRS-MPB, 2021 WL 2982186, at *6 (S.D. Ind. July 15, 2021) ("Doe and Roe are not similarly situated but for their sex. Doe was accused of sexual misconduct [while] Roe was the accuser."). Thus, they are not similarly situated, but rather are distinguished as complainant and respondent. Since Doe and Roe were not similarly situated but for sex, their different treatment does not give rise to a reasonable inference of sex discrimination.

### 2. Doe's Allegations against Roe

Second, Doe says that Defendants ignored his allegation against Roe, but pursued Roe's allegations against him. (Pl.'s Resp. Opp'n 36–37, ECF No. 128.) Specifically, Doe argues that the OSC knew of Roe's alleged dating violence (stemming from the June 2018 vase-throwing incident), but did not pursue those allegations. (*Id.*) Doe further complains that the Director of the OSC, Sara Dickey, met with Roe and gave her information on the Title IX process, but did not meet with him or advise him. (*Id.*)

As to the disparate investigation argument, Defendants agree that no investigation was launched against Roe, but they say that was because of their sex-neutral standard for deciding when to pursue an investigation. (Defs.' Reply 14–15,

ECF No. 128.)  Under that standard, if a complainant wants to proceed with a claim, then an investigation will almost always go forward.  (Dickey Dep. 70, ECF No. 72-1.)  But if a complainant does not want to proceed, then the university will weigh various factors in determining whether to investigate without the complainant's involvement.  (*Id.*)  Defendants say that they applied this standard to both Doe and Roe, and their different treatment resulted from Roe ultimately wanting to proceed with an investigation, while Doe did not.  (Defs.' Reply 14–15, ECF No. 128.)

When a Title IX defendant provides a legitimate, nondiscriminatory reason for differential treatment, it becomes the plaintiff's burden to show that the defendant's reason is pretextual.  *See Andriakos v. University of S. Ind.*, 867 F. Supp. 804, 810 (S.D. Ind. 1992), *aff'd*, 19 F.3d 21 (7th Cir. 1994) (unpublished) (under *McDonnell-Douglas*, if a Title IX defendant produces a legitimate nondiscriminatory reason, the presumption of illegal discrimination dissolves).  Here, Defendants have provided a legitimate nondiscriminatory reason—the OSC's investigation standard.

That standard explains the OSC's investigation decisions here.  When the OSC first learned of the respective allegations, Roe expressed interest in an investigation, (*see* Final Inv. Report 2, ECF No. 87-13), while Doe did not, (Kuester Aff. ¶ 57, ECF No. 70-6; Dickey Aff. ¶¶ 29–30, ECF No. 70-2).  Director Dickey testified that the OSC applied its investigation standard to Doe and concluded that the factors weighed against opening an investigation.  (Dickey Aff. ¶¶ 29–30, ECF No. 70-2; Dickey Dep. 61, ECF No. 75-2.)  While both Doe and Roe wavered on their respective decisions at one point, (Final Inv. Report 2–3, ECF No. 87-13; Email from Sara Dickey, Dir., OSC,

to John Doe 2 (June 26, 2019), ECF No. 83-4), in the end, Roe wanted to proceed and Doe did not, (Final Inv. Report 2–3, ECF No. 87-13; Email from Sara Dickey, Dir., OSC, to John Doe 2 (June 26, 2019), ECF No. 83-4; Doe Dep. 50, ECF No. 75-1). Since Defendants have offered a legitimate nondiscriminatory reason for their actions, and since Doe has not presented any evidence to suggest that the stated reason is pretextual, no reasonable jury could find that the OSC ignored his allegations against Roe on the basis of sex. Moreover, these facts show that Doe and Roe were not similarly situated: Roe was interested in a Title IX investigation and Doe was not. Therefore, no reasonable jury could conclude that Director Dickey discriminated on the basis of sex.

Doe also argues that Defendants "aggressively pursued" Roe when she was uncertain about her complaint, but did not give him the same treatment. (Pl.'s Resp. Opp'n 36–37, ECF No. 128.) Doe's characterization is unsupported. Doe is referring to the fact that after Roe reported her allegations, Director Dickey had a meeting with Roe, and Kuester then emailed Roe to set up a follow-up meeting. (Final Inv. Report 2, ECF No. 87-13; Email from Jane Roe to Gregory Kuester, Title IX Investigator, OSC 1–2 (Nov. 26, 2018), ECF No. 127-22.) When Roe did not respond to the first email, Kuester sent a short follow-up email, writing, "I am just reaching out to verify you received my November 19th email (below). Please let me know when you are available to meet and if you have any questions." (Email from Jane Roe to Gregory Kuester, Title IX Investigator, OSC 1 (Nov. 26, 2018), ECF No. 127-22.) At that point, Roe responded and said she did not want to continue with the investigation. (*Id.*)

There were no further emails from Kuester until Roe later changed her mind two months later and wanted to open an investigation.  Nothing in these emails suggests that Defendants "aggressively" pursued Roe's allegations.

### 3. The Title IX Investigation and Hearing

Third, Doe says that during the Title IX investigation, Kuester did not thoroughly consider Doe's evidence, did not interview five of the eight witnesses Doe identified, and did not seek the documents Doe requested.  (Pl.'s Resp. Opp'n 37–38, ECF No. 128.)  But Doe does not tie these alleged omissions to sex.  Even if Kuester failed to consider Doe's evidence, which was included in the Appendix to Kuester's Final Investigation Report, (ECF No. 88-16 at 1), or did not seek out the people or documents Doe requested, Doe has not pointed to a similarly situated female respondent who received better treatment, any biased statements, or any shifting justifications.  *See Doe v. Marian Univ.*, No. 19-CV-388-JPS, 2019 WL 7370404, at *11 (E.D. Wis. Dec. 31, 2019) (granting summary judgment for a university in a Title IX case where the plaintiff "did not offer any evidence to connect the way he was treated with the fact of his [sex]"), *aff'd sub nom. Johnson v. Marian Univ.*, 829 F. App'x 731 (7th Cir. 2020).

Doe says that Kuester should have interviewed five of the witnesses he identified—known as Friend E, F, G, H, and I—but Kuester stated that these individuals could not assist him in assessing the charge against Doe.  (ECF No. 70-6 at ¶ 24; ECF No. 81-20 at 9.)  Kuester said that these witnesses were duplicative and would only provide minimal probative value.  (ECF No. 81-20 at 9.)  Universities and

their investigators are allowed to make relevance determinations in viewing and collecting evidence, and such determinations can be a legitimate nondiscriminatory reason. *See Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 955 (N.D. Ill. 2017) (allegations that an investigation excluded evidence did not show sex bias when there were legitimate truth-seeking reasons for the decisions), *aff'd* 933 F.3d 849 (7th Cir. 2019). At bottom, this does not show evidence of sex bias.

Doe also takes aim at his Title IX hearing panel. First, he says that the Title IX panel discriminated on the basis of sex by excluding evidence questioning Roe's credibility and limiting his questions on cross-examination. (Pl.'s Resp. Opp'n 39–40, ECF No. 128.) But once again, he identifies no comparator evidence of a female respondent receiving better treatment. (*Id.*) Doe only protests that he was not able to present some facts that would attack Roe's credibility—namely, (1) a false allegation by Roe that Doe had brought a firearm to campus, which in fact the panel did allow Doe to address, (ECF No. 80-1 at 36–38), (2) an audio recording of Roe making inflammatory comments, and (3) an allegation that Roe engaged in university grant fraud. (ECF No. 128 at 40.) Yet, even if some of the aforementioned evidence was relevant, its exclusion is still not connected to sex. Without comparator evidence, biased statements, or dishonest justifications, there is no reasonable inference that the panel's decision to exclude evidence or limit questions was influenced by anti-male bias.

But Doe adds that the chair of the panel interrupted Doe's opening statement and prevented him from continuing. (OSC Hr'g Tr. 33–37, ECF No. 80-1.) But the

transcript he cites belies this assertion.  (*Id.*)  During his opening statement, Doe began to speak about the unsupported firearm allegation Roe made against him, (*id.* at 33), but, the panel's chair stopped Doe to ask about the allegation's relevance, (*id.*). The panel took a break, and when it resumed, the chair said that Doe could continue his opening and discuss the firearm allegation.  (*Id.* at 36–37.)  Any harm from this interruption was *de minimis*, and even if there was prejudice, no reasonable jury could find the interruption, followed by a resumption, to be discrimination on the basis of sex.

### 4. Title IX Trainings

Lastly, Doe argues that his hearing panel was trained to discriminate.  (Pl.'s Resp. Opp'n 38–39, ECF No. 128.)  First, Doe says that the panel was instructed to use "the trauma-informed method," an investigative and adjudicative technique designed to "prevent inflicting additional trauma on the complainant."  (*Id.* at 38.)  Doe claims that this is synonymous with a pro-female viewpoint.  (*Id.* at 39.)  But this method has no connection to sex, despite Doe's claim to the contrary.  Both men and women can be complainants.

Second, Doe complains that  IUPUI's Title IX trainings demonstrate an anti-male bias.  (*Id.* at 39, 47-48.)  But none of the quotes he produces creates a reasonable inference of bias.  Doe first cites the quote; "Supporting the Victim . . . Believe them—don't question the story." (Complainant Trauma Presentation 60, ECF No. 73-2.)  The word "victim," however, does not indicate anti-male bias because it does not denote any sex—both men and women can be victims. *See Doe v. Marian Univ.*, No. 19-CV-

388-JPS, 2019 WL 7370404, at *11 (E.D. Wis. Dec. 31, 2019) ("While their comments are pro-victim, this does not compel the conclusion that they are also pro-woman, or anti-man."), *aff'd sub nom. Johnson v. Marian Univ.*, 829 F. App'x 731 (7th Cir. 2020). Doe's second cited quote, which refers to Indiana University's support for victims, (Univ. Hr'g Comm'n Sexual Misconduct Training 4, ECF No. 77-7), fails for the same reason—being pro-victim is not the same as being anti-male.

Doe also quotes from a ninety-one-slide presentation titled "Complainant Trauma and Respondent Stress." (Complainant Trauma Presentation 1, ECF No. 73-2.)  One slide in that presentation says that "[s]exual assault is an act of dominance . . . [i]t is the use of a sex act to fulfill the perpetrator's desire for power/control, revenge, recreation, proof of masculinity, and/or sexual gratification." (*Id.* at 6.)  Another slide says that "99% of sexual violence perpetrators are male." (*Id.* at 8.)

But no reasonable jury could find that this presentation taught bias.  For one, the presentation included only two questionable slides out of ninety-one, the remaining of which Doe does not challenge as having an anti-male viewpoint.  *See Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 116 (D. Mass. 2021) (the phrase "hostile masculinity" on two slides out of ninety was insufficient to show anti-male bias).  Moreover, the other slides in this presentation undercut any anti-male sentiment.  *See Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909, 925 (S.D. Iowa 2019) (using male pronouns to describe perpetrators and listing hypotheticals involving male perpetrators did not create a genuine issue of material fact regarding sex discrimination where the trainings also undermined such bias).  Doe's highlighted

quotes appear next to statements like "most men are NOT perpetrators" and "~7% of men are responsible for >90% of sexual assaults." (Complainant Trauma Presentation 8, ECF No. 73-2.) Other slides describe how men can be victims of sexual misconduct, and the presentation warns that men are sometimes viewed as perpetrators even when they are victims. (*Id.* at 49.) Because of the context around Doe's cited quotes, no reasonable jury could find that this presentation is evidence of anti-male bias.

Doe lastly points to an eight-slide presentation titled "Sanctioning Activity." (Sanctioning Activity 1, ECF No. 73-3.) This presentation walks the audience through five hypothetical Title IX cases and asks the audience to discuss how they would sanction the students in the hypotheticals. (*Id.* at 2.) The hypotheticals make up a majority of the slideshow and appear to be the main purpose of the slideshow. (*See id.* at 2–8.) Doe claims that this presentation indicates bias because every hypothetical features a male respondent found responsible of sexual misconduct. *(Id.* at 3–8.)

Giving a presentation in which every hypothetical involves a male perpetrator may imply to the listeners that males are more likely to commit sexual misconduct. It may create an inference of bias on behalf of *the speaker*. But Doe must produce evidence that the Title IX panelists who heard this training "acted at least partly on the basis of sex *in his particular case.*" *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (citing *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018)) (emphasis added). Here, the nexus is missing. This training occurred at some point in 2018. (*See* Yost

18

Dep. 62, ECF No. 84-4.)  On May 20, 2019, the panelists presided over Doe's hearing and made the decisions of which Doe complains above.  (OSC Hr'g Tr. 1–3, 18–21, ECF No. 81-15.)  But it is not reasonable to infer that the panel's decisions were based on sex just because the panelists heard a potentially suggestive presentation in the past.  Since no reasonable jury could find that the panel's decisions were based on sex, Doe cannot prevail on his Title IX claims.  Thus, the Court **grants** Defendants' Motion for Summary Judgment as to the Title IX claims.

### B. Count II: Procedural Due Process

Doe originally raised a procedural due process claim against all Defendants except IUKSB.  (Am. Compl. 72, ECF No. 8.)  In ruling on Defendants' motion to dismiss, the Court dismissed all due process claims against IUPUI, IU, the Trustees of IU, and IUSM.  (Order Mot. Dismiss 9, ECF No. 140.)  Furthermore, in opposing this summary judgment motion, Doe did not respond to Defendants' arguments that Associate Dean Allen and Kuester are improper parties for injunctive relief and are protected by qualified immunity.  (Defs.' Br. Supp. Mot. Summ. J. 27–30, ECF No. 124.)  Thus, the Court treats those issues as conceded, *see, e.g.*, *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (forfeiture occurs when a "litigant effectively abandons [a claim or claims] by not responding to alleged deficiencies" raised in a motion to dismiss), and **grants** summary judgment in favor of Associate Dean Allen and Kuester on the procedural due process claims.  Thus, the only remaining due process claim involves Dean Hess in his individual capacity for damages and in his

official capacity for injunctive relief as relates only to his decision to expel Doe from IUSM.

The Due Process Clause guarantees certain procedures when a state actor deprives someone of "life, liberty, or property." U.S. Const. amend. XIV, § 1. When assessing a procedural due process claim, the Court must (1) identify the protected property or liberty interest at stake, and (2) determine what process is due under the circumstances. *Charleston v. Board of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 772 (7th Cir. 2013) (citing *Omosegbon v. Wells*, 335 F.3d 668, 674 (7th Cir. 2003)). Doe bears the burden of showing that he had a cognizable property or liberty interest. *See Petru v. City of Berwyn*, 872 F.2d 1359, 1362 (7th Cir. 1989).

Here, Doe alleges both a property interest and a liberty interest, and argues that Dean Hess deprived him of such without due process in expelling him from IUSM. He says that he has a property interest in "pursuing his education and in future educational and employment opportunities and occupational liberty." (Pl.'s Resp. Opp'n 20, ECF No. 128.) He also says that he has a liberty interest in "his good name, reputation, honor, and integrity." (*Id.*) The Court assumes that Doe has a cognizable property interest here because Dean Hess has not fully responded to Doe's argument.[4] *See Bonte v. U.S. Bank, N. Am.*, 624 F.3d 461, 466 (7th Cir. 2010) (failing

---

[4] Specifically, Dean Hess did not respond to one of Doe's asserted grounds for a property interest. Doe says that he has a property interest arising from an implied contract with IU. (Pl.'s Resp. Opp'n 20–22, ECF No. 128.) In order to have a property interest in an implied contract, however, "[a] student must first show that the implied contract establishes an entitlement to a tangible continuing benefit." *Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009). Doe cites two provisions of an IUSM policy for support, (Pl.'s Resp. Opp'n 21–22, ECF No. 128), but Dean Hess has only argued against one of them, (Defs.' Reply 2–3, ECF No. 135). The unaddressed provision states that "[s]tudents in good standing who

20

to respond results in waiver). Given that assumption, the Court does not reach Doe's purported liberty interest and instead proceeds to assessing whether Doe received due process.

How much process is due depends on whether Doe's dismissal was academic or disciplinary. *See Fenje v. Feld*, 398 F.3d 620, 624–25 (7th Cir. 2005). An academic dismissal occurs when a school dismisses a student based on an "academic" rationale. *See id.* at 624 (citing *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 89–90 (1978)). In the medical school context, if a dismissal is based on "whether a student will make a good doctor" or whether a student has the personal attributes to be a good doctor, then the dismissal is academic. *See id.* (citing *Horowitz*, 435 U.S. at 89–90). Disciplinary dismissals, on the other hand, are those involving "the violation by a student of valid rules of conduct or disruptive and insubordinate behavior." *Id.* (internal quotations omitted). Disciplinary dismissals are "more objective in nature and not dependent upon the analytical expertise of professional academicians," and thus "will bear a resemblance to traditional judicial and administrative factfinding." *Id.* at 625 (citing *Horowitz*, 435 U.S. at 89–90).

---

have passing grades and evaluation reports automatically advance to the next unit of instruction." (IUSM Guidelines 3, ECF No. 69-2.) Doe says that this provision gives him an entitlement to advance to the next semester, since he was in good standing. (Pl.'s Resp. Opp'n 21–22, ECF No. 128.) It is not clear that Doe was in good standing. Various IU committees had found that Doe violated IUSM and IU policies, (Comm. Meeting Mins. 2, ECF No. 78-1; Letter from Kelly Freiberger, Student Conduct Coordinator, IUPUI, to John Doe (May 23, 2019), ECF No. 37-7), and Doe had just started his one-year leave of absence from IUSM and could only return to IUSM upon fulfilling various conditions, (Letter from Jay Hess, Dean, IUSM, to John Doe 1 (Mar. 27, 2020), ECF No. 76-16). Still, since Dean Hess has not contested Doe's argument, it is conceded.

If a dismissal is academic, less process is due.  Academic dismissals only require that the student be informed of the nature of the faculty's dissatisfaction and that the decision be "careful and deliberate."  *Id.* at 626.  In disciplinary dismissals, however, more is required.  *See Pugel v. Board of Trs. of Univ. of Ill.*, 378 F.3d 659, 664 (7th Cir. 2004) (citing *Goss v. Lopez*, 419 U.S. 565, 578 (1975)).  The Seventh Circuit has not set out what process is due in graduate school disciplinary dismissals, but it has suggested that due process requires something "more extensive" than "oral or written notice of the charges," "an explanation of the evidence the authorities have[,]" and an opportunity to respond to the charges.  *See id.* (citing *Goss*, 419 U.S. at 578) (commenting on graduate school dismissals).

The Parties dispute whether Doe's dismissal was an academic or disciplinary decision.  Dean Hess argues that it was academic because Doe's misrepresentations directly impacted his honesty, a trait that is—in Dean Hess's view—essential to the practice of medicine.  (Defs.' Br. Supp. Mot. Summ. J. 22, ECF No. 124; Hess Aff. ¶¶ 37–46, ECF No. 70-5.)  Doe argues that the dismissal was disciplinary because Dean Hess's dismissal letter did not indicate that Doe lacked "the attributes necessary" to be a doctor, and because it allegedly mentioned that Doe was being dismissed for violating IUSM guidelines.  (Pl.'s Resp. Opp'n 29, ECF No. 128.)

The Court concludes that Dean Hess's expulsion decision—premised on the misrepresentations in Doe's IUKSB application and not on the violation of any IUSM guidelines—was an academic dismissal, and therefore, less process was due.  *Fenje* is on point.  In that case, a doctor applied to be a resident at the University of Illinois

at Chicago, but did not disclose his prior dismissal from a hospital.  *Fenje*, 398 F.3d at 622–23.  When the school's program director learned of the doctor's omission, the director dismissed the doctor for his dishonesty.  *Id.* at 623, 625.  The Seventh Circuit said that this was an academic dismissal because the director determined that the doctor's lack of candor undermined "his future credibility as a source of information concerning the care of seriously ill patients."  *Id.*  That connection "between [the doctor's] lack of candor in the application process and his capacity to be trusted with patient care clearly pushe[d] [the] decision into the realm of an academic dismissal." *Id.*

Here, in applying to IUKSB, Doe described his prior disciplinary record in a way that Dean Hess, correctly, believed was inaccurate.  Like the program director in *Fenje*, Dean Hess saw Doe's retelling as an indication that Doe was unfit to be a doctor.  As Dean Hess wrote in his affidavit:

> Honesty and integrity are essential attributes for any student at IUSM and for any person to become a doctor.  Careful attention to detail and accuracy in documentation created by a physician is a core manifestation of these essential attributes . . . [w]e cannot admit to our profession individuals who do not communicate honestly on academic matters.  Such a person cannot be trusted with the lives of patients.

(Hess Aff. ¶¶ 41–42, ECF No. 70-5.)  This rationale shows that Dean Hess's decision was "an academic judgment by [a] school official[], expert in the subjective evaluation of medical doctors," that Doe did not demonstrate the personal attributes necessary to be a physician.  *Fenje*, 398 F.3d at 624 (citation omitted).

Doe complains that Dean Hess's decision letter did not explain that Doe lacked the personal attributes necessary to be a doctor, or that such an opinion motivated

the dismissal.  (Pl.'s Resp. Opp'n 29, ECF No. 128.)  The letter explains only that Doe was being dismissed for the misrepresentations in the IUKSB application.  (Letter from Jay Hess, Dean, IUSM, to John Doe 1 (June 16, 2020), ECF No. 37-21.)

While an expulsion letter's language can be probative on whether a decision is academic or disciplinary, there is no requirement for Dean Hess to state any magic words in his letter.  The Court looks to see if *the decision* was academic or disciplinary, and here, Dean Hess has produced evidence showing that the decision was based on Doe's lack of honesty, (Hess Aff. ¶¶ 41–42, ECF No. 70-5), a trait that Dean Hess said was essential to the practice of medicine, (*id.* at ¶ 45).  Doe has no evidence to the contrary.  Doe tries to argue that his dismissal was based on an alleged violation of IUSM rules.  (Pl.'s Resp. Opp'n 29, ECF No. 128.)  But he does not provide any support for this, and despite Doe's assertion otherwise, the letter from Dean Hess does not mention any disciplinary guidelines or rules.  (Letter from Jay Hess, Dean, IUSM, to John Doe 1 (June 16, 2020), ECF No. 37-21.)

Having concluded that Doe's expulsion was an academic decision, the Court now assesses whether Doe was afforded due process.  In an academic dismissal, due process only requires that the student be informed of the nature of the faculty's dissatisfaction, *i.e.,* Hess's dissatisfaction, and that the ultimate decision to dismiss be "careful and deliberate." *Fenje*, 398 F.3d at 626 (citing *Horowitz*, 435 U.S. at 85).

Doe argues that he had no notice of Dean Hess's dissatisfaction with the IUKSB application.  (Pl.'s Resp. Opp'n 29, ECF No. 128.)  Indeed, Doe first learned of Dean Hess's opinion on the matter in the dismissal letter.  (Letter from Jay Hess, Dean,

IUSM, to John Doe 1 (June 16, 2020), ECF No. 37-21.) Doe says that since he was not given notice of Dean Hess's dissatisfaction ahead of his dismissal, Doe was deprived of due process. (Pl.'s Resp. Opp'n 29, ECF No. 128.) But—putting aside the fact that the PMRC afforded him the opportunity to explain away the discrepancy in his application, which he failed to do—Doe has provided no authority that he should have been afforded additional notice beyond that contained in the dismissal itself that it was based on the "conclusion that statements in support of your KSB application do not accurately represent the discussion I had with you nor my letter to you dated March 27, 2020." (Letter from Jay Hess, Dean, IUSM, to John Doe 1 (June 16, 2020), ECF No. 37-21.) This is enough notice to satisfy the due process requirements for an academic dismissal.

But Doe received more process than what was due. Dean Hess wrote to Doe and explained to him that he was being dismissed for his misrepresentations in the IUKSB application. (*Id.*) As noted, this dismissal letter gave Doe notice of Hess's dissatisfaction and that Doe was being dismissed. Doe has cited no requirement that the notice be prior to or separate from the dismissal itself. Yet, Dean Hess did tell Doe that he needed to be an "exemplary citizen" in order to return to IUSM. (Doe Dep. 107, ECF No. 71-10.) Being dishonest on his application was neither exemplary, nor, in Dean Hess's mind, in keeping with the candor required of a doctor. Still, despite having been forewarned, Doe wrote his application in a way that mischaracterized his disciplinary status. In sum, Doe received more than sufficient notice for an academic dismissal.

There is no genuine dispute that Dean Hess's decision was "careful and deliberate." Dean Hess reviewed Doe's application, Dean Hess's March 27 letter, Doe's response letter to the PMRC, and a letter sent by Doe's attorneys. (Email from Jay Hess, Dean, IUSM, to Eric Weldy, Vice Chancellor for Student Affairs, IUPUI (June 10, 2020), ECF No. 83-8.) Only after considering these documents, did Dean Hess make his decision.

Although there is no evidence that Dean Hess consulted with other faculty members like the decisionmaker in *Fenje* did, 398 F.3d at 623, Dean Hess had all of the evidence in documentary form right in front of him and he was able to see the inconsistency for himself. Dean Hess had the March 27 decision letter, which outlined the conditions on Doe's eligibility to return to IUSM, and Dean Hess had Doe's application, in which Doe claimed that Dean Hess had "fully authorize[d]" Doe's return to IUSM "without limits or restrictions." (IUKSB Appl. 5, ECF No. 83-5.) Further, Dean Hess had first-hand knowledge of his own discussions and communications with Doe. Not only is there no requirement that the decisionmaker consult others to meet the careful deliberation requirement, here any such deliberations would not have provided Dean Hess with any relevant information not already known to him through his unique personal knowledge. To Dean Hess, Doe's misrepresentations were glaring and irrefutable.

Doe suggests, without authority, that the decision was not "careful and deliberate" because Dean Hess's letter did not state that the decision was "careful and

deliberate." (Pl.'s Resp. Opp'n 29, ECF No. 128.)  But no magic words are required; the Court looks to the decision, not just the letter announcing it.

In sum, Doe has not shown that a reasonable jury could find a deprivation of due process.  Thus, the Court **grants** Defendants' Motion for Summary Judgment regarding the § 1983 claims.

### IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment, (Defs.' Mot. Summ. J., ECF No. 122), is **granted.**  Doe's Motion for Oral Argument, (Pl.'s Mot. Oral Arg., ECF No. 129), and Defendants' Motion to Exclude Plaintiff's Damages Experts or Limit Certain Opinions, (Defs.' Mot. Exclude, ECF No. 147), are **denied as moot**.  The Clerk is directed to enter final judgment.

**SO ORDERED.**

Date: ___3/31/2022___

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution via CM/ECF to all registered parties